## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHABAD LUBAVITCH OF | : | CIVIL ACTION NO. |
| LITCHFIELD COUNTY, INC. | : | 3:09-CV-1419 (JCH) |
|     Plaintiff, | : | |
| | : | |
|        v. | : | |
| | : | |
| BOROUGH OF LITCHFIELD, | : | FEBRUARY 17, 2012 |
| CONNECTICUT, ET AL. | : | |
|     Defendants. | : | |

## RULING RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 138, 140) AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 137)

### I.    INTRODUCTION

Plaintiff, Chabad Lubavitch of Litchfield County, Inc. ("Chabad"), brings this action against defendants, the Borough of Litchfield, Connecticut ("the Borough") and the Historic District Commission of the Borough ("the HDC") (collectively, "Borough defendants"); and Wendy Kuhne, Glenn Hillman, and Kathleen Crawford, members of the HDC (collectively, "individual defendants"), for declaratory relief and damages for injuries plaintiff allegedly sustained as a result of the discriminatory activity of defendants.

Defendants have filed two separate motions for summary judgment.  The Borough defendants seek summary judgment as to all counts against them, Counts One through Eight, Eleven, and Twelve (Doc. No. 140).  The individual defendants filed a separate Motion for Summary Judgment (Doc. No. 138) on all counts against them.[1]

---

[1] The individual defendants are named in all twelve counts.  At oral argument, plaintiff's counsel acknowledged that Wendy Kuhne, who recused herself from the HDC proceeding, was only sued for the conspiracy, Counts Nine and Ten.  Tr. at 13–14.

In addition, Chabad filed a Motion for Partial Summary Judgment as to Count Eight (Doc. No. 137).

## II.   STATEMENT OF FACTS[2]

The Borough of Litchfield is an independent municipal corporation, whose boundaries are wholly within the Town of Litchfield.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 10; Pl.'s L.R. 56(a)(2) Stmt. Supporting Pl.'s Opp. to Borough of Litchfield and Historic District Commission of the Borough of Litchfield ¶ 10 (hereafter "Pl.'s Borough L.R. 56(a)(2) Stmt.").  The Borough is governed by a municipal charter adopted in 1989, pursuant to the Connecticut General Statutes.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 10; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 10.  Since 1978, the Borough of Litchfield has been enrolled in the National Register of Historic Places.  See Borough Defs.' Mem., Ex. D, Attachment 5.  In addition, the National Park Service has described Litchfield as "[p]robably the finest surviving example of a typical late 18th century New England town."  See id., Ex. D, Attachment 6.

In 1989, pursuant to the provisions of Chapter 97a of the Connecticut General Statutes §§ 7-147a et seq, the Borough established the Historic District Commission (hereafter "HDC") to govern aspects of the construction and modification of buildings within the Litchfield Historic District.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 11; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 11.  Pursuant to the authority granted in section 7-147c(e) of the Connecticut General Statues, the HDC adopted regulations which set

---

[2] In connection with a motion for summary judgment, the court relies on the undisputed facts or, if a fact is disputed, the court views the evidence in the light most favorable to the party opposing summary judgment.

forth the criteria by which it would judge applications.  See Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 12; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 12.  In addition, the HDC also adopted the criteria set forth in the Secretary of the Interior's Standards for Rehabilitating Historic Buildings.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 14; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 14.

Rabbi Joseph Eisenbach is an ordained Hasidic Rabbi and is the President of the plaintiff, Chabad Lubavitch of Litchfield County, Inc.[3]  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 1; Pl.'s Borough L.R. 56(a)(2) Stmt. at ¶ 1.  Rabbi Eisenbach is a member of the Chabad.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 2; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 2.  Currently, Chabad holds weekly religious services at a rented location in a Litchfield shopping center; however, Chabad alleges that its current space is inadequate to carry out its religious practices.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶¶ 4–6; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶¶ 4–6.

Chabad purchased property at 85 West Street, Litchfield, Connecticut.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 8; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 8.  The property was constructed in the late 1870s, as a two story, stick-style Victorian residential house, consisting of approximately 2600 square feet, plus a basement.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 24; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 24.  The house is commonly known as the "Deming House."  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 25; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 25.  The property was originally residential; however, it was

---

[3] Rabbi Eisenbach was originally a plaintiff in this case; however, the court terminated him as a party after finding that he did not have individual standing to bring these claims.  See Doc. No. 151.

rezoned to commercial property in 1971.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 38; Defs.' L.R. 56(a)(2) Stmt. ¶ 38.

After it purchased the property, Chabad filed an application for a certificate of appropriateness with the HDC.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶¶ 9, 11; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶¶ 9, 11.  Through its proposed facility, Chabad seeks to serve the needs of the community; host prayer, religious ceremonies, religious education; and provide living quarters for Rabbi Eisenbach and his family, and a guest apartment.  See Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 6–8; Defs.' L.R. 56(a)(2) Stmt. ¶¶ 6–8.  Chabad's proposal would add a three story, 17,000 square foot addition to the Deming House.  See Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 26; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 26.[4]  A fourth floor is a sub-basement level set completely below ground.  The guest apartment is in part of the third,[5] attic floor.

The parties contest much of what occurred during the hearing process after Chabad submitted its application, including which commissioners actually voted on the application.[6]  See Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 37; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 37.  It is clear, however, that the HDC voted unanimously to deny the motion without prejudice, and it invited Chabad to resubmit its application with a proposal that

[4] Chabad denies this paragraph as a whole; however, the evidence it cites in support of its denial does not contest the square footage of the proposal.  Consequently, the court deems this portion of the asserted fact to be admitted.  See L.R. 56(a)(3).

[5] The attic is a partial floor located above the Rabbi's apartment (second floor), the sanctuary (first floor at ground level at front), the classrooms (basement), and pool (sub-basement).

[6] In their arguments, counsel noted that the HDC has a system where not all members vote on each application.  The HDC's Chair, Wendy Kuhne, recused herself from voting, at Chabad's request.  Individual Defs.' L.R. 56(a)(1) Stmt. ¶ 14; Pls.' 56(a)(2) Stmt. ¶ 14.

provided for an addition no larger than the original house on the property.  See Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 36; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 36.  Chabad did not resubmit its application.  See Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 49; Pl.'s Borough L.R. 56(a)(2) Stmt. ¶ 49.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  In determining whether a triable issue of fact exists, the court may only rely on admissible evidence.  See ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 357 (2d Cir. 1997).  Where the opposing

party relies on affidavits or declarations, the affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated."  Fed. R. Civ. Pro. 56(c)(4).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV.   DISCUSSION

### A.   Substantial Burden (Counts One, Six, and Twelve)

#### 1.   Constitutional and Statutory Principles

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. Amdt. 1.  Religious exercise not only includes the exercise of religious beliefs, but "the performance of (or abstention from) physical acts" pertaining to religion as well.  See Emp't Div. Dep't of Human Res. v. Smith, 494 U.S. 872, 877 (1990).  Where the object of a law is to restrict particular practices because of their religious motivation, the law is subject to strict scrutiny and, therefore, must be justified by a compelling government interest and narrowly tailored to advance that interest.  See

6

Church of the Lukumi Babalu Aye v. Hialeah, 508 U.S. 520, 533, 546 (1993).  Where

the law is neutral and of general applicability, however, the law does not need to be

justified by a compelling government interest, even if the effect of the law is to

incidentally burden a particular religion or religious practice.  See id. at 531;

Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 350 (2d Cir. 2007) ("This

reasoning helps to explain why courts confronting free exercise challenges to zoning

restrictions rarely find the substantial burden test satisfied even when the resulting

effect is to completely prohibit a religious congregation from building a church on its own

land.").

      Pursuant to the Religious Land Use and Institutionalized Persons Act (hereafter

"RLUIPA"), "[n]o government shall impose or implement a land use regulation in a

manner that imposes a substantial burden on the religious exercise of a person,

including a religious assembly or institution," unless the government demonstrates that

the regulation furthers a compelling interest and is the least restrictive means of

furthering that interest.  See 42 U.S.C. § 2000cc(a)(1).  Religious exercise is defined

broadly to include "any exercise of religion, whether or not compelled by, or central to, a

system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).[7]  It is clear, however, that not

every project undertaken by a religious group constitutes religious exercise.  See, e.g.,

Westchester Day Sch., 504 F.3d at 347 ("For example, if a religious school wishes to

---

[7] Here, most if not all of the activities planned for the building are "religious exercise," inter alia,
the sanctuary, kosher kitchens, and seven religious education classrooms.

build a gymnasium to be used exclusively for sporting activities, that kind of expansion would not constitute religious exercise.  Or, had the ZBA denied the Westchester Religious Institute's 1986 request for a special permit to construct a headmaster's residence on a portion of the property, such a denial would not have implicated religious exercise."); Living Water Church of God v. Charter Twp. Of Meridian, 258 Fed. Appx. 729, 741 (6th Cir. 2007) ("We find no substantial burden because Living Water has failed to demonstrate that, without the [permit] that the Township has refused to approve, it cannot carry out its church missions and ministries.  Instead, Living Water has demonstrated only that it cannot operate its church on the scale it desires.") (emphasis in original).  Furthermore, generally applicable burdens--imposed neutrally-- are not "substantial."   See Westchester Day Sch. at 350 (quoting Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 389–91 (1990)).  Finally, where the denial of a religious organization's application to build is not absolute and, instead, invites an amended application, it is less likely to constitute a substantial burden.  See id. at 349.

Courts look to the Supreme Court's free exercise jurisprudence in analyzing whether a substantial burden exists.  See id. at 348.  Consequently, the substantial burden analysis under RLUIPA tracks the analysis under the Free Exercise Clause. See id.; Living Water Church of God, 258 Fed. Appx. at 733 (noting that RLUIPA's legislative history indicates that the "term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of

8

the concept of substantial burden or religious exercise.") (internal quotations and citations omitted).  As such, the court will consider these claims together.

In considering whether a statute is neutral and generally applicable, a court first looks to the language of the statute, to determine whether the statute is facially neutral as to religion.  See Ungar v. New York City Hous. Auth., 363 Fed. Appx. 53, 56 (2d Cir. 2010).  Where the statute contains particular exceptions, the court considers whether the exceptions apply to specific categories, or whether they are made on an ad hoc basis.  See id.  The fact that a law contains particular exceptions does not cause the law not to be generally applicable, so long as the exceptions are broad, objective categories, and not based on religious animus.  See id.; Grace United Methodist v. City of Cheyenne, 451 F.3d 643, 651 (10th Cir. 2006) (noting that "although zoning laws may permit some individualized assessment for variances, they are generally applicable if they are motivated by secular purposes and impact equally all land owners in the city seeking variances.").

2.    Parties' Positions

Borough defendants argue that Chabad cannot demonstrate that the HDC's decision imposes a substantial burden on the practice of their religion.  See Defs' Mem. in Support at 22 (hereafter "Borough Defs.' Mem.").  In support of this position, Borough defendants first argue that the laws and regulations applied by the HDC are neutral, and consequently, cannot constitute a substantial burden on Chabad's religious exercise as a matter of law.  See id. at 20.  Next, the Borough defendants argue that the size of

9

Chabad's proposed renovation is unnecessary given the size of Chabad's congregation.
See id. at 24.  In addition, Borough defendants argue that large portions of the proposed
renovation "would be devoted to secular purposes," including the Rabbi's residential
quarters and a swimming pool in the basement.  See id. at 27.

    In response, Chabad asserts that the HDC's decision was arbitrary and illegal
because the HDC improperly considered the proposed square footage of Chabad's
proposed renovation.  See Pl.'s Mem. Resp. Borough Defs. at 35.  Further, Chabad
contends that the current needs of its congregation are not being met, and that every
aspect of the renovation "reflects the spiritual and physical needs to further Plaintiff's
mission."  See id. at 41–43.  Chabad states that even the residential areas of the
proposed renovation will be dedicated "to serve the religious needs of Plaintiff's
participants and the Rabbi's family."  Id. at 14–15.  Chabad finally argues that the
statutory scheme requiring a certificate of appropriateness is an individualized
assessment because it "involves the application of discretionary standards" and,
consequently, the court must apply strict scrutiny to the scheme.  See Pl.'s Mot. Partial
Summ. J. at 9–11.  Chabad relies on Sherbert v. Verner, 374 U.S. 398 (1963), and its
progeny for the proposition that "laws burdening religious exercise that have 'eligibility
criteria [that] invite consideration of the particular circumstances' and lend themselves

'to individualized governmental assessment of the reasons for the relevant conduct,' are subject to heightened scrutiny."[8] Id. at 11.

3.    Connecticut Statutory Scheme: Historic District Commission

Where a town, such as the Borough of Litchfield, has established a historic district, section 7-147d(a) of the Connecticut General Statutes specifies that "[n]o building or structure shall be erected or altered within an historic district until after an application for a certificate of appropriateness as to exterior architectural features has been submitted to the historic district commission and approved by said commission." Section 7-147k(b), however, provides an exception to this general rule, in that the "provisions of this part shall not apply to any property owned by a nonprofit institution of higher education, for as long as a nonprofit institution of higher education owns such a property."  Plaintiff contends that this exception facially differentiates between religious and nonreligious assemblies or institutions.  See Pl.'s Mem. Supp. Mot. Partial Summ. J. at 21.  Defendants respond that the exception applies equally to religious, non-profit institutions of higher education and to secular non-profit institutions of higher learning. See Defs.' Opp. Pl.'s Mot. Summ. J. at 13.

---

[8] With regard to Sherbert, the Supreme Court has clarified that, "[e]ven if we were inclined to breathe into Sherbert some life beyond the unemployment compensation field, we would not apply it to require exemptions from a generally applicable . . . law."  See Empl. Div. Dep't of Human Res. v. Smith, 494 U.S. 872, 884 (1990).  Further, most courts that have considered this issue have found that the mere existence of discretionary standards or categorical exemptions does not "amount to a system of individualized exemptions triggering strict scrutiny."  See Grace United Methodist v. City of Cheyenne, 451 F.3d 643, 653 (10th Cir. 2006); Lighthouse Inst. for Evangelism v. Long Branch, 510 F.3d 253, 276 (3rd Cir. 2007); but see Fortress Bible Church v. Feiner, 734 F. Supp. 2d 409, 498–99 (S.D.N.Y. 2010) (finding a zoning application process to be an individual assessment where the Town had no "mechanistic assessments in place for evaluating the Church's application," relied on subjective opinions of the Town Board's members, and treated the Church differently than other applicants).

The language of section 7-147d clearly makes no reference to any religious practice or particular religion.  As a result, section 7-147d is facially neutral.  See Ungar, 363 Fed. Appx. at 56.  Though section 7-147k(b) excepts non-profit institutions of higher education from the requirement of obtaining a certificate of appropriateness, the statutory language does not indicate that the exception would benefit a secular non-profit institution of higher education, but not a religious non-profit institution.  That is, nothing in the statute indicates that a religious, non-profit institution of higher education could not take advantage of the exception in the same way a secular institution could.

At oral argument, Chabad argued that the statutory scheme is facially discriminatory because a religious group, such as Chabad, is required to obtain a certificate of appropriateness, but a secular, non-profit institution of higher education would not have to comply with the same requirement.  As a result, Chabad argues, Chabad's use of the property may be prohibited if they are unable to obtain a certificate of appropriateness, but if the University of Connecticut were to buy the same land and propose to build a law school exactly like Chabad's proposed structure, it would be exempt from the requirement of obtaining a certificate of appropriateness.

This comparison, however, misses the fact that a secular, non-educational organization that bought the same land would likewise be required to obtain a certificate of appropriateness, while a religious, non-profit institution of higher learning would also be exempt from that same requirement.  Put another way, as a non-profit institution, if Chabad had proposed to place a higher education yeshiva in the proposed facility,

instead of a synagogue, it would have been exempt from section 7-147d.  That is, both the general scheme and the exemption apply equally to religious and secular groups alike.  As a result, the statutory exception is neutral and generally applicable because the exception is granted to any organization, religious or secular, that meets the defined category.  See Ungar, 363 Fed. Appx. at 56 ("In the present case, [the scheme] is facially neutral, making no reference to religious practice."); see also Konikov v. Orange Cnty., 410 F.3d 1317, 1326 (11th Cir. 2005) (holding that a law that "treats religious and nonreligious organizations differently offends the principles of the Free Exercise Clause because it is not neutral or generally applicable.").  As a result, the statutory scheme is neutral and generally applicable.

Consequently, as a matter of law, Chabad cannot establish a substantial burden on the free exercise of its religion, because the statutory scheme Chabad challenges is neutral and of general applicability, and not imposed arbitrarily, capriciously, or unlawfully.[9]  See Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 392 (1990) ("[T]he collection and payment of the generally applicable tax . . . imposes no

---

[9] Chabad's argument that the HDC acted arbitrarily and capriciously in considering the square footage of Chabad's proposal does not warrant a different conclusion.  Section 7-147f clearly states that the HDC may consider "scale [of the proposal] . . . and the relationship thereof to the exterior architectural style and pertinent features of other buildings and structures in the immediate neighborhood."  Consequently, the HDC's consideration of the proposal's square footage, as part of its consideration of the scale of the proposal, did not render its decision arbitrary, capricious, or unlawful.  Further, there is nothing in the record to indicate that it is not the HDC's normal procedure to consider the square footage—as a measure of "scale"—of a proposed project.  However, it is not clear from the record that Chabad's proposed addition must necessarily be less than or equal to the square footage of the current property in order to be an appropriate "scale", especially given the downward slope of the property and Chabad's proposed underground level.  As that issue is not before the court, however, the court will not address it here.

constitutionally significant burden on appellant's religious practices or beliefs.");
Westchester Day School v. Vill. of Mamaroneck, 504 F.3d 338, 350 (2d Cir. 2007)
(collecting cases).  As a result, defendants are entitled to summary judgment with
regard to their substantial burden claim in Count Six.[10]

      With regard to Count Twelve, the Connecticut Supreme Court has determined
that, "as applied in the land use context, § 52-571b is no broader than RLUIPA."  See
Cambodian Buddhist Soc. of Connecticut v. Planning and Zoning Comm'n of the Town
of Newtown, 285 Conn. 381, 422 (2008).  Therefore, defendants are entitled to
summary judgment with regard to Count Twelve as well.

      As Chabad cannot prove a substantial burden, even if the statute has the effect
of incidentally burdening Chabad's religious exercise, the statute is constitutional so
long as it satisfies rational basis review.  See Church of the Lukumi Babalu Aye v.
Hialeah, 508 U.S. 520, 531 (1993); Ungar v. New York City Hous. Auth., 363 Fed. Appx.
53, 56 (2d Cir. 2010).  Under rational basis review, the statute "must be reasonable and
not arbitrary, and it must bear 'a rational relationship to a [permissible] state objective.'"
See Lighthouse Inst. for Evangelism, 510 F.3d at 277 (quoting Belle Terre v. Boraas,
416 U.S. 1, 8 (1974)).

      The preservation of aesthetic values is recognized as a legitimate government
interest.  See Lusk v. Vill. of  Cold Spring, 475 F.3d 480, 491 (2d Cir. 2007).  The

---

[10] In addition, the court notes that the HDC's decision was not final, but instead invited Chabad to
resubmit its application.  See Westchester Day School, 504 F.3d at 349.  See also Borough Defs.' Mem.,
Ex. K at 8–9.

14

statute's requirement that anyone proposing to build in a historic district obtain a certificate of appropriateness is rationally related to this interest.  Consequently, the statute survives rational basis review, and defendants are entitled to summary judgment as to the Free Exercise claim (Count One).

      B.    <u>Valid Comparators (Counts Four, Seven, and Eight)</u>

          1.    Equal Terms (Count Eight)

RLUIPA further prohibits a government from treating a religious institution on "less than equal terms with a nonreligious assembly or institution."  <u>See</u> 42 U.S.C. § 2000cc(b)(1).  To determine "whether a municipality has treated a religious entity on 'less than equal terms'," courts look to "a comparison between that religious entity and a secular one."  <u>Third Church of Christ v. City of New York</u>, 626 F.3d 667, 669 (2d Cir. 2010).  Although other Courts of Appeal have considered what constitutes a valid comparator under RLUIPA's Equal Terms provision, the Second Circuit has not specifically addressed the issue of how to select an appropriate secular comparator.  <u>See</u> <u>id.</u> at 669–70 ("The differences in the mechanism for selecting an appropriate secular comparator . . . need not concern us today. . . . [I]t suffices for our present purposes that the district court concluded the Church's and the hotels' catering activities were similarly situated with regard to their legality under New York City law.  And so they are.").  It is clear that the main inquiry under this section, however, is "whether, in practical terms, secular and religious institutions are treated equally."  <u>See</u> <u>id.</u> at 671.

Under RLUIPA, the plaintiff bears the initial burden of coming forward with prima facie evidence of a violation.  See 42 U.S.C. § 2000cc-2(b); Primera Iglesia Bautista Hispana v. Broward Cnty., 450 F.3d 1295, 1308 (11th Cir. 2006).  If the plaintiff fails to offer prima facie evidence of a similarly situated comparator, "then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof."  See Primer Iglesia Bautista Hispana, 450 F.3d at 1311.

Borough defendants argue that Chabad cannot point to a valid comparator within the historic district that was treated differently than Chabad.  See Borough Defs.' Mem. at 29.  Chabad points to three secular entities, which it argues are similarly situated to Chabad and were treated differently than Chabad: the Wolcott Library, the Rose Haven Home, and the Cramer and Anderson law firm building.  See Pl.'s Mem. Resp. Borough Defs. at 24–26, 46–47.  Chabad contends that each of these entities was permitted to build additions that "changed the appearance from a residence to an institutional property" and were "very large in comparison to the original structure."  See id. 25–26.  Chabad contends that, because the HDC's decision focused on the "residential character" of the Deming House and specified that it would only approve an addition that was no larger than the original structure, Chabad was treated on less than equal terms with these secular entities.  See id. at 23–24, 33.

First, Chabad points to the Wolcott Library as an example of a secular entity that "was allowed to make modifications that caused it to lose its 'residential' character."  See Pl.'s Mem. Resp. Borough Defs. at 24.  Chabad notes that, in 1965, "a substantial

16

addition to the residence changed the appearance from a residence to an institutional property," and that the "addition was substantially larger than the original structure." Id. at 25.   In addition, Chabad asserts that the library addition includes industrial features that contribute to an "overall modern appearance." See id.  While the parties contest various attributes of the library's addition, it is uncontested that the original building was built as a residence and that the addition is larger than the original structure.  See Nelson Aff., Exs. 1, 11.

Borough defendants respond that the library is not an appropriate comparator because the 1965 addition Chabad references was not approved by the HDC, as the HDC was not established until 1989.  See Borough Defs.' Mem. at 30.  Instead, the addition was approved by the Board of Warden and Burgesses, pursuant to "An Act Establishing the Old and Historic Litchfield District," in which the Board was specifically prohibited from considering the size and scale of buildings.  See id.; Ex. D, Attachment 2, Section 7.

The Second Circuit has asserted that "organizations subject to different land-use regimes may well not be sufficiently similar to support a discriminatory-enforcement challenge."  See Third Church of Christ, 626 F.3d at 671 (emphasis in original).  Here, the Wolcott Library is not a valid comparator because the library's addition was approved under a significantly different regime.  The regime under which the library addition was approved specifically prohibited the Board of Warden and Burgesses from considering relative size.  See Borough Defs.' Mem., Ex. D, Attachment 2, Section 7

("[T]he warden and burgesses shall not consider . . . relative size of buildings . . . ."). In contrast, section 7-147f specifically directs the HDC to consider, inter alia, relative scale. Consequently, the Wolcott Library is not sufficiently similar to act as a valid comparator for Chabad's Equal Terms claim.

Next, Chabad argues that the Rose Haven Home is a valid comparator. Chabad asserts that, similar to Chabad's property, the Rose Haven Home was once a residence, but that "[a] substantial addition . . . changed the appearance from a residence to an institutional property," and that "[t]he addition was substantially larger than the original structure." In support of these assertions, Chabad cites to an affidavit from one of Chabad's attorneys. See Pl.'s Mem. Resp. Borough Defs. at 25; Ex. C (hereafter "Bearns Aff."). In response, Borough defendants assert that there is no public record of the HDC permitting an addition onto the Rose Haven Home, although it concedes that it appears from the assessor's card that "at some point there was a small addition added to the main house." See Borough Defs.' Mem. at 30; Ex. L at 6–9.

In opposing a motion for summary judgment, a party must produce evidence sufficient to raise a material issue of fact. See Clayborne v. OCE Bus. Servs., 381 Fed. Appx. 32, 34 (2d Cir. 2010). It is well established that "[m]ere conclusory allegations or denials . . . are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." See id. (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Chabad's assertions regarding the Rose Haven Home rest entirely on the Bearns affidavit. See Pl.'s Mem. Resp. Borough Defs. at 25,

47.  The Bearns affidavit, however, merely makes conclusory assertions "based upon [her] research and review of the official records," without providing the court with any of this research or the official records.  See Bearns Aff. at ¶ 3.  For instance, Bearns baldly asserts that "[a] substantial addition to [the Rose Haven Home] changed the appearance from a residence to an institutional property, [t]he addition was very large in comparison to the original structure, [and the] addition was substantially larger than the original structure."  See id. at ¶ 5.  Neither Bearns, nor Chabad, however, provides the court with any admissible evidence or documentation to substantiate these assertions. The affidavit is hearsay, and without the records, there is no basis for these statements. See Fed. R. Civ. Pro. 56(c)(4).

In reviewing the entire record, the court found two pictures of the Rose Haven Home, in the property assessor's cards provided by the Borough Defendants.  See Borough Defs.' Mem., Ex. L at 7, 9.  These pictures, and the assessor's cards, however, are insufficient for the court to determine that Chabad has come forward with sufficient evidence to create a material issue of fact as to whether it can meet its prima facie burden of demonstrating that the Rose Haven Home is a valid comparator for Chabad. First, Chabad has failed to explain why there appear to be two assessor's cards for the Rose Haven Home.  See id.  If the court were to speculate, it appears that two free-standing structures exist; however, if this speculation is wrong, Chabad has not offered any explanation as to how to interpret the relationship between the two cards or structures.  As such, on the basis of this evidence, a jury would also be left to speculate

19

as to the relationship between these two pictures.  In addition, the cards appear to indicate that the "effective date" is 1985, which would presumably mean that any renovation to the Rose Haven Home occurred under a different land use regime than that which is in currently in place.  See id.  In sum, Chabad has failed to come forward with any admissible evidence which would allow the court to determine that Chabad can meet its prima facie burden of demonstrating to the jury that the Rose Haven Home is a valid comparator.  Without any competent evidence to support Bearns's assertions that "the addition was substantially larger than the original structure"-- and without any evidence as to when any changes to Rose Haven occurred, or that they occurred under the current land use regime and with the HDC's approval -- these assertions alone are insufficient to raise a material issue of fact with regard to the Rose Haven Home as a valid comparator.

Finally, Chabad points to the Cramer and Anderson building as a valid comparator, asserting that this building was also previously used as a residence.  See Pl.'s Mem. Resp. Borough Defs. at 25–26.  Once again, Chabad baldly asserts that, "[a] substantial addition to the residence changed the appearance from a residence to an institutional property, [t]he addition was very large in comparison to the original structure, [and the] addition was substantially larger than the original structure."  See id. at 25–26, 47.  Again, Chabad solely relies on the Bearns affidavit in support of these assertions.  See id.  And again, the Bearns affidavit merely states conclusory assertions, without any supporting evidence.  See Bearns Aff. at ¶ 6.  For the same

reasons as stated above, these conclusory statements are insufficient to raise a
material issue of fact on the record before the court with regard to whether the Cramer
and Anderson building is similarly situated to Chabad.

   In addition, even if Chabad had met its burden of demonstrating that Cramer and
Anderson was a valid comparator,[11] it does not appear that the HDC treated Chabad
differently than Cramer and Anderson.  In fact, the HDC specifically used the Cramer
and Anderson building as a comparator property in its decision,[12] and stated that it
"agreed with [Chabad] that the addition to the Cramer and Anderson building is
appropriate in terms of size and scale."  See Borough Defs.' Mem., Ex. K at 8.  As a
result, the HDC stated that it "would approve an addition equal in square footage to the
Deming house," in recognition that the addition to the Cramer and Anderson building
was approximately the size of the original structure.  See id.  While Chabad appears to
contest the assertion that the Cramer and Anderson addition was approximately the
size of the original structure, it has failed to raise a material issue of fact in support of
that assertion, by relying on the Bearns affidavit only.

   As Chabad fails to point to a secular property in the historic district that was
treated more favorably than Chabad, it has failed to come forward with evidence upon
which a jury could find it met its burden of producing prima facie evidence of a valid

----

[11] At oral argument, the parties appeared to agree that the Cramer and Anderson building was an
appropriate comparator property.  See Tr. at 38–39,63.

[12] The HDC decision notes that Chabad's attorney "requested that the Commission consider that
[the Cramer and Anderson] addition to the house was equal in size to the original structure and was
permitted by an earlier Commission in 1985."  Borough Defs.' Mem., Ex. K at 8.

comparator property.  Consequently, summary judgment in favor of the defendants is granted with regard to the equal terms claim in Count Eight.  See Primera Igleisa Bautista Hispana, 450 F.3d at 1313–14.

        2.      Nondiscrimination (Count Seven)

RLUIPA further prohibits a government from imposing or implementing "a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  See 42 U.S.C. § 2000cc(b)(2)  To determine whether a government has discriminated against a religious institution on the basis of religion, courts look to whether the government has applied a land use provision to one religion differently than it has applied the provision to another.  See, e.g., Church of Scientology of Georgia, Inc. v. City of Sandy Springs, Georgia, 2011 WL 4793144, at *23 (N.D.Ga Sept. 30, 2011); Adhi Parasakthi Charitable v. Twp. of W. Pikeland, 721 F.Supp.2d 361, 385 (E.D.Pa. 2010).  Again, plaintiff bears the initial burden of coming forward with prima facie evidence to support its claim under the nondiscrimination portion of RLUIPA.  See 42 U.S.C. § 2000cc-2(b); Church of Scientology of Georgia, 2011 WL 4793144, at *23.

Defendants argue that Chabad cannot point to a religious entity within the historic district that the HDC treated more favorably than Chabad because none of the churches within the historic district, nor any other entity, has ever been permitted "to place an addition on a historic residential structure larger than the original structure."  See Borough Defs.' Mem. at 31–32.  In response, Chabad points to four Christian churches

located within the historic district.  See Pl.'s Mem. Resp. Borough Defs. at 26–32.

Chabad contends that three of these churches "are substantially larger in visual mass"

than Chabad's proposed building, and that the fourth church is "almost identical in visual

mass as that called for in [Chabad's] Application."  Id. at 26.

Chabad first points to the Congregational Church and asserts that, in 1966,[13] the

HDC permitted the Congregational Church "to expand to a size larger than the square

footage requested in [Chabad's] Application," and that, currently, the church has a "total

comparative scale of 41,354 square feet."[14]  See Pl.'s Mem. Resp. Borough Defs. at 27;

Nelson Aff., Ex. 16.  In addition, the Congregational Church has capacity to hold four

hundred people, though its average weekly attendance is one hundred seventy-five

people.  See Pl.'s Mem. Resp. Borough Defs. at 28 (citing Nelson Aff., Ex. 17, Hauer

depo.).

Next, Chabad asserts that the United Methodist Church is "almost identical in

mass (visual size) than [sic] that called for in [Chabad's] Application."  See id. at 28.

Further, Chabad states that the United Methodist Church has seating capacity for three

---

[13] As already discussed, the current HDC regime was established in 1989.  See Borough Defs.' Mem., Ex. D.

[14] Again, Chabad relies on the Bearns affidavit for many assertions regarding the various churches.  See Pl.'s Mem. Resp. Borough Defs. at 26–32.  However, Chabad also produced assessor's cards for the churches.  On the basis of the assessor's card, however, it does not appear that the Congregational Church is actually 41,354 square feet, but that the actual size of the Church building is 14,370 square feet, and Chabad has calculated its "comparative scale" assertion by adding the square footages of the main church building, meeting house, parsonage, plus two additional floors within the church building (in the vaulted space) that do not actually exist, but would exist if the Congregational Church had built two extra floors, using Chabad's "stacking" method.  See Pl.'s Mem. Resp. Borough Defs. at 27; Nelson Aff., Exs. 15–16.

hundred people, though its weekly attendance is only twenty-eight to thirty people.  Id.
at 29.  Finally, Chabad contends that the HDC allowed the Methodist Church to apply
vinyl siding to three sides of its building "to help the United Methodist Church save
money" in the mid-1980s, even though no other buildings in the historic district have
vinyl siding.  See id. at 39–30.

Next, Chabad points to St. Michael's Parish, an Episcopal parish, which Chabad
contends is substantially larger in visual size than Chabad's proposed addition, with a
total square footage of 16,330.[15]  See id. at 30.  In addition, Chabad asserts that the
Parish has seating capacity for four hundred people and is usually at capacity on
Saturday and Sunday services, though only at half capacity for services that fall during
the week.  See id. at 31.

Finally, Chabad points to St. Anthony of Padua, a Roman Catholic Church in the
historic district, which Chabad asserts is substantially larger in visual size than
Chabad's proposal.  See id. at 31.  Chabad states that the square footage of the main
building is similar to the design in Chabad's application.  See id. at 31–32.

Demonstrating that two entities are similarly situated generally requires some
specificity.  See Racine Charter One v. Racine Unified Sch. Dist., 424 F.3d 677, 680
(7th Cir. 2005) (holding that "comparators must be prima facie identical in all relevant
respects"); Church of Scientology of Georgia, Inc. v. City of Sandy Springs, 2011 WL

---

[15] Chabad's proposed addition totals approximately 18,000 square feet, for a total proposed area
of 21,011 square feet.  See Nelson Aff., Ex. 15.

4793144, at *25 (N.D.Ga. Sept. 30, 2011) ("In the zoning context, a showing that two projects were similarly situated requires some specificity.").  While it is clear that each of the churches within the historic district is larger than the Deming House, and that several of the churches may be larger than the Deming House even with Chabad's proposed addition, the churches differ from Chabad in significant aspects.  Each of the churches in the historic district was initially built as a church (notably before 1989) and was not remodeled into a church from an existing residential home.  Further, the churches were originally built to sizes essentially the same as their current sizes.  The HDC did not authorize their construction or scale.  Had Chabad purchased a building within the historic district of the size of the churches (or even half) and sought to build an addition, Chabad might be closer to supporting its argument that one or more of these churches is a valid comparator.  Instead, however, Chabad purchased a relatively small building that was historically residential.  These differences are significant, because the two types of buildings are inherently dissimilar.  It cannot be said that the church buildings, which were originally erected specifically as places of worship and designed accordingly, are "identical in all relevant respects" to a two story, stick-style Victorian residential home, even if it has lost many of its original features in conversion to commercial use.  See Racine Charter One, 424 F.3d at 680.  In addition, it does not appear that any of the houses of worship to which Chabad points have made any

additions since the current HDC regime was implemented.[16]  For each of these reasons, the churches are not similarly situated entities.  As a result, Chabad fails to raise a material issue of fact to support its claim that other religious entities were treated more favorably, and summary judgment is appropriate with regard to the claim of nondiscrimination in Count Seven.

### 3.    Equal Protection (Count Four)

In order to prevail on its equal protection claim, Chabad must show (1) that it was treated differently from other similarly situated entities and (2) that this differential treatment was "based on impermissible considerations, such as . . . religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  See Cine Sk8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007).

As discussed above with regard to Chabad's Equal Terms and Nondiscrimination claims, Chabad has failed to come forward with evidence to support its prima facie burden to point to any entities, secular or religious, that were similarly situated but treated differently.  Consequently, Chabad fails to raise a material issue of fact with

---

[16] Chabad asserts that the HDC granted a Certificate of Appropriateness to the United Methodist Church to apply vinyl siding "[i]n the mid-eighties."  See Pl.'s Mem. Resp. Borough Defs. at 29.  As discussed above, the current HDC regime was implemented in 1989.

Though Chabad does not raise this argument, the court notes that some of the houses of worship have undertaken construction in recent history, though on the record before the court, none since 1989. Such additions have included structures such as garages, or single story structures, and each addition was substantially smaller than both Chabad's proposed addition, and the size of the house of worship. See Borough Defs.' Mem., Ex. L.  Consequently, none of these additions are prima facie identical in all relevant respects, see Racine One, 424 F.3d at 680, and none raise a material issue of fact to support Chabad's claim.

regard to its equal protection claim, and summary judgment is appropriate as a matter of law with regard to Count Four.

C.    Claims Pursuant to 42 U.S.C. § 1983 (Counts Two, Three, and Five)

Borough defendants assert that they are not liable under section 1983 because Chabad does not point to any policy or custom that led to the violation of Chabad's constitutional rights. See Borough Defs.' Mem. at 33–34. The law is clear, however, that a plaintiff may hold a municipality liable for a single decision by a municipal policymaker so long as the plaintiff demonstrates that the defendant had final policymaking power. See Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008). An official has final authority if the official's decisions constitute the municipality's final decision. See id. at 38. Courts look to state law to determine, as a matter of law, whether an official, or group of officials, has final policymaking authority with respect to the challenged conduct. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).

Pursuant to Conn. Gen. Stat. §§ 7-147b and 7-147c, the legislative body of a municipality may take steps to establish a historic district commission and, once established, the historic district commission may adopt regulations with regard to the historic district in order to provide guidance to property owners seeking a certificate of appropriateness. Further, no building may be erected or altered within the historic district "until after an application for a certificate of appropriateness as to exterior architectural features has been submitted to the historic district commission and approved by said commission." Conn. Gen. Stat. § 7-147d.

27

The Litchfield HDC clearly had final policymaking authority with regard to the decision of whether or not to approve Chabad's certificate of appropriateness.  Notably, the Borough defendants fail to address this aspect of Chabad's argument.  Accordingly, Chabad may assert its section 1983 claims against the HDC and the Borough of Litchfield.

Borough defendants also argue that Chabad lacks standing to assert a First Amendment claim.[17]  See Borough Defs.' Mem. at 37–38.  It is well-established that standing under Article III requires the plaintiff to show that "(i) [the plaintiff] personally has suffered some actual or threatened injury as a result of defendants' putatively illegal conduct; (ii) the injury is fairly traceable to the challenged action; and (iii) the injury is likely to be redressed by a favorable decision."  See Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1095 (2d Cir. 1997).  Chabad asserts that its members' ability to fully practice their religion has been injured by the HDC's denial of its application.  See Pl.'s Mem Resp. Borough Defs at 13–16.  A decision in Chabad's favor--that the HDC violated its rights in denying its application--would redress this injury, in that Chabad would be free to build the structure it claims is necessary for its religious exercise.  Therefore, Chabad has standing to assert its First Amendment claim.

---

[17] It is unclear from the Borough defendants' brief whether they challenge Chabad's standing for all of its First Amendment claims, or just for its Free Speech claim.  However, for the purposes of the court's analysis, this lack of clarity is irrelevant.

1.      Freedom of Speech (Count Two)

First Amendment jurisprudence draws a distinction between laws and regulations that are content based and those that are content neutral.  See Turner Broad. Sys., Inc. v. Fed. Commc'n Comm'n, 512 U.S. 622, 642–43 (1994).  Generally, laws that, "by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed[,] are content based."  See id. at 643.  Such content based laws require "the most exacting scrutiny."  See id. at 642.  In contrast, laws that "confer benefits or impose burdens on speech without reference to the ideas or views expressed" are generally content neutral.  See id. at 643.

A content neutral law or regulation will be sustained if it meets intermediate scrutiny, in that it "furthers an important or substantial governmental interest," and "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  See id. at 662 (quoting United States v. O'Brien, 391 U.S. 367, 377 (1968)).  The narrow tailoring requirement is met if the law or regulation does not "burden substantially more speech than is necessary to further the government's legitimate interests."  Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)).

The statutory scheme requiring Chabad to obtain a certificate of appropriateness prior to building within the historic district does not, by its terms, distinguish favored speech from disfavored speech.  As discussed above, section 7-147d of the Connecticut General Statutes requires any person, or entity, building or altering a

29

structure in the historic district to obtain a certificate of appropriateness, subject only to one limited, generally applicable exception for non-profit institutions of higher learning. In addition, section 7-147f(b) specifically provides that the HDC "shall not consider interior arrangement or use" when determining whether to approve a certificate of appropriateness.  Consequently, the statutory scheme at issue here is content neutral, and subject to intermediate scrutiny.  See Turner Broad. Sys., Inc., 512 U.S. at 662.

As discussed above, see supra Section IV.A.3, it is well established that the preservation of aesthetic values is a legitimate government interest.  See Lusk v. Vill. of Cold Spring, 475 F.3d 480, 491 (2d Cir. 2007).  The parties agree that the appropriate analysis for Chabad's free speech claim mirrors the substantial burden analysis previously undertaken with regard to Chabad's RLUIPA claim and claim pursuant to the Free Exercise Clause.[18]  See Borough Defs.' Mem. at 20, 39; Pl.'s Mem Resp. Borough Defs at 54.  For the same reasons as stated above, see supra Section IV.A.3, Chabad does not raise a material issue of fact in support of its position, and the court finds as a matter of law that Chabad does not demonstrate a substantial burden.  Consequently, defendants are entitled to summary judgment as to Count Two.

> 2.    Freedom of Association

Defendants assert that they are entitled to summary judgment as to Chabad's Freedom of Association claim because the laws and regulations enforced by the HDC

---

[18] Other courts that have addressed free speech rights in the context of zoning laws have applied a "time, place, and manner" analysis.  See San Jose Christian Coll. V. City of Morgan Hill, 360 F.3d 1024, 1032 (9th Cir. 2004); Easlick v. City of Lansing, 875 F.2d 863 (6th Cir. 1989).  As neither party raised this argument, the court will not address it.

are content neutral and survive intermediate scrutiny.  See Borough Defs.' Mem. at 42–

44.  Chabad does not appear to contest that the laws are in fact facially neutral, yet

contends that, as applied, the laws and regulations allow the HDC "excessive

discretion" and, as a result, the HDC's denial of Chabad's application was arbitrary and

capricious.  See Pl.'s Mem. Resp. Borough Defs. at 54–56.

        A law or regulation that vests excessive discretion in a decision maker--such that

the law is applied arbitrarily--may violate the First Amendment.  See Lusk v. Vill. of Cold

Spring, 475 F.3d 480, 494 (2d Cir. 2007).  Courts must ask whether the provision in

question vests "unbridled discretion in a government official over whether to permit or

deny expressive activity."  See id.  Although regulations regarding aesthetic standards

may apply subjective criteria, where such subjective criteria are sufficiently tied to

objective aesthetic standards, the law will not violate the First Amendment.  See id. at

495.

        Section 7-147f of the Connecticut General Statues instructs that the HDC "shall

consider, in addition to other pertinent factors, the type and style of exterior windows,

doors, light fixtures, signs, above-ground utility structures, mechanical appurtenances

and the type and texture of building materials," as well as "the historical and

architectural value and significance, architectural style, scale, general design,

arrangement, texture and material of the architectural features involved and the

relationship thereof to the exterior architectural style and pertinent features of other

buildings and structures in the immediate neighborhood."  Though some of these criteria

are subjective, they are sufficiently tied to objective aesthetic standards to provide

necessary guidance to the HDC such that the Commission is not vested with unbridled

discretion.[19]  See Lusk, 475 F.3d at 494–95 (upholding a law as constitutional where it

instructed the Review Board to consider general design, character, scale, texture and

materials, and visual compatibility); Mayes v. City of Dallas, 747 F.2d 323, 325 (5th Cir.

1984) (upholding a law that called for building details to "harmonize," be "architecturally

and historically appropriate," and "be compatible with . . . surrounding structures").

As previously discussed, see supra Section IV.C.1, regulations that are content-

neutral, and only incidentally burden speech, are subject to intermediate scrutiny.  See

Vincenty v. Bloomberg, 476 F.3d 74, 84 (2d Cir. 2007).  When considering whether

government activity has impermissibly infringed an individual's right of expressive

association, a court must first consider "whether and to what extent defendants' actions

burdened that right."  See Tabbaa v. Chertoff, 509 F.3d 89, 101 (2d Cir. 2007).  To be

cognizable, the interference with plaintiff's associational rights must be more than

merely incidental.  See id. at 101.  Rather, the plaintiff must demonstrate that the

interference with its associational rights is "direct and substantial, or significant."  See id.

(internal quotations omitted).

As discussed above, see supra Section IV.A.3, Chabad cannot demonstrate a

substantial burden on its associational rights, because any burden imposed is merely

---

[19] Further, the court notes that the HDC's regulations specifically adopted the Department of Interior's Standards for Rehabilitating Historic Buildings, see Borough Defs.' Mem., Ex. G at 3, which provide additional objective standards.  See Borough Defs.' Mem., Ex. H.

incidental to a neutral, generally applicable law, and there is no basis in the record upon which a reasonable jury could rest a finding that the HDC's decision was improperly based on Chabad's religion.  Consequently, defendants are entitled to summary judgment as to Count Three.

        3.     Due Process

Chabad argues that HDC's "regulatory activities" are void for vagueness pursuant to due process jurisprudence.  See Pl.'s Resp. to Borough Defs. at 63. Chabad does not specify which statute or regulation it challenges.[20]  In response, Borough defendants assert that C.G.S. § 7-147f sets forth specific factors the HDC must consider in enforcing the statute and, consequently, the statute is not unconstitutionally vague.  See Borough Defs.' Reply at 10–11.

A statute may be void for vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement."  See VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 186 (2d Cir. 2010).  In determining whether a statute is impermissibly vague, the court must look to the words of the statute and, to some degree, the interpretation of the statute given by those charged with enforcing it. See id.  A law that is capable of infringing First Amendment rights demands "a greater degree of specificity."  Id.

---

[20]  Chabad asserts that its claim is based "on the fact that the unfettered discretion afforded by the vague and ambiguous standards to deny a religious land use is unconstitutional."  See Pl.'s Mem. Resp. Borough Defs. at 63.

As discussed above, section 7-147f of the Connecticut General Statutes specifies factors the HDC "shall consider" in determining whether to issue a certificate of appropriateness.  Though these factors are somewhat subjective, they are not so subjective that a reasonable person could not ascertain what factors the HDC will consider in deciding whether to grant an application for a certificate of appropriateness. See Lusk, 475 F.3d at 494–95; see also Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").

Similarly, section 7-147f is not void for vagueness due to arbitrary enforcement. A statute may be found unconstitutionally vague if that statute "does not 'provide explicit standards for those who apply [it].'"  See VIP of Berlin, LLC at 191 (quoting Thibodeau v. Portuondo, 486 F.3d 61, 65 (2d Cir. 2007)).  Nonetheless, a statute is not void for vagueness simply because its enforcement requires some exercise of discretion.  See Grayned, 408 U.S. at 114; VIP of Berlin, LLC, 593 F.3d at 192.  As discussed above, though section 7-147f instructs the HDC to consider factors that are subjective in nature, those factors are sufficiently tied to objective aesthetic standards, such as scale, texture, and material of the architectural features involved, to provide the required guidance to the HDC in enforcing the law.  See Lusk, 475 F.3d at 495.  Consequently, Chabad's claim that section 7-147f is unconstitutionally vague fails as a matter of law, and summary judgment is granted as to Count Five.

34

D.     Individual Defendants[21]

The individual defendants seek summary judgment on Counts Nine and Ten, which assert that the individual defendants conspired to violate the plaintiff's rights to equal protection of the law, or of equal privileges and immunities.  To state a claim for conspiracy under 42 U.S.C. § 1985(3), a plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of privilege of a citizen of the United States." Cine Sk8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007).  Although a plaintiff is not required to show a conspiracy by demonstrating proof of an explicit agreement, "a plaintiff must demonstrate at least that 'parties have a tacit understanding to carry out the prohibited conduct.'"  See id. at 792 (internal citations omitted). Evidence that may be sufficient to demonstrate animus on the part of an individual is not necessarily sufficient to demonstrate a tacit agreement between individuals.  See id. ("Nor does this evidence suffice to support a fact-finder's conclusion that three members of the Board (whose comments would permit a jury to find that they individually acted with racial animus) had an understanding among themselves to do so.") (emphasis in original).

---

[21] In their brief, the individual defendants begin by arguing that RLUIPA does not provide a cause of action against individuals.  As this argument was subsequently withdrawn at oral argument, the court will not address it.  See Tr. at 4.

The individual defendants contend that there is no evidence to indicate an agreement of any kind between Kuhne, Hillman, and Crawford.  See Individual Defs' Mem. in Support at 29.  In response, Chabad points to two alleged instances where one or more of the individual defendants discussed Chabad's planned renovations outside the context of a formal hearing.  See Pl.'s Mem. in Response to Individual Defs' Mot. at 45–46.  First, Chabad notes that, after the first HDC (pre-application) meeting where the renovation was discussed, Hillman, Crawford, and Kuhne spoke outside after the meeting about the size of Chabad's proposed building.[22]  Chabad does not present any additional evidence regarding the matters discussed during this conversation, other than to assert that the conversation took place "outside the public hearings to discuss Plaintiff's planned renovations to the Property."  Id. at 46.  Second, Chabad points to a phone call between Hillman and Camila Crist, another HDC member who is not named as a defendant.  As to this second conversation, the record is uncontested that the telephone call concerned questions Ms. Crist had about the scale on the architect's drawings (as distinguished from the scale of the project).  Borough Defs.' Mem., Ex. C at ¶ 4 ("To the best of my recollection her question concerned the scales on the plans.  I think there was an inconsistency between the plans, perhaps the scales were different on different sheets.  I'm not sure.  In any case, I explained some technical aspect of the

---

[22] Hillman and Kuhne both submitted affidavits stating that this conversation never occurred.  See Borough Defs' Mot. for Summ. J., Ex C at ¶ 5; Borough Defs' Mot. for Summ. J., Ex. F at ¶ 5.  Crawford, however, testified at her deposition that she spoke with Hillman and Kuhne after the first meeting where Chabad presented their plans.  See Nelson Aff. Ex. 4 at 69–70.

plans to her.").[23]  In further support, Chabad states that both Hillman and Crist voted to deny Chabad's application.  See Pl.'s Mem. in Response to Individual Defs' Mot. at 45–46.  Finally, Chabad contends there is evidence of animus on the part of the individual defendants, as a result of Kuhne's comment during the September 6, 2007 pre-hearing meeting that the Star of David is not "historically compatible with the District," which Chabad contends is an anti-Semitic statement.  See id. at 20, 47.

Even taking the evidence in the light most favorable to Chabad, it fails to raise a material issue of fact to support the existence of even a tacit understanding between the defendants to deny Chabad equal protection under the law or equal privileges and immunities.  As to the first conversation, Crawford's testimony specifies that the conversation with Hillman and Kuhne related "to the size of the building."  See Nelson Aff. Ex. 4 at 69–70.  With regard to the phone call between Crist and Hillman, the only evidence as to the topic of the phone call comes from Hillman's affidavit, where he asserts that he "explained some technical aspect of the plans to [Crist]" regarding the scales of the drawings.  See Borough Defs.' Mem., Ex. C ¶ 4.

Finally, with regard to Kuhne's comment regarding the Star of David during the pre-application meeting, the court agrees with Chabad that, had Kuhne voted on Chabad's application, Kuhne's comment could raise a material issue of fact as to whether Kuhne's decision was motivated by religious animus.  However, at the request

---

[23] The issue of mis-scaling the plans, or using different scales on different drawings, arose at the hearing as well.  See HDC Ex. 67, Disc 2.

of Chabad's counsel, Kuhne recused herself from voting on Chabad's application, and it

is undisputed that she did not vote on Chabad's application.  See Indiv. Defs.' L.R.

56(a)(1) Stmt.  ¶ 14; Pls.' L.R. 56(a)(2) Stmt. ¶ 14.  Further, Chabad's counsel

confirmed at oral argument that, because Kuhne recused herself, the only counts

pressed against her are those regarding conspiracy.  See supra n. 1.  While Kuhne's

comment may be sufficient to raise an inference of animus on her part, had she voted

on the application, it is insufficient to raise a reasonable inference of a tacit agreement

between Kuhne, Hillman, and Crawford.  See Cine Sk8, 507 F.3d at 792.  In addition,

nothing in the record suggests that religious animus was a significant influence on those

HDC members who did vote on Chabad's application.  See id. at 786.  Consequently,

Chabad failed to come forward with evidence that raises a material issue of fact to

support its claim of a conspiracy among the individual defendants to violate Chabad's

constitutional rights.  See Scotto v. Almenas, 143 F.3d 105, 115 (2d Cir. 1998).

Summary judgment is therefore appropriate with regard to Count Nine.[24]

---

[24] Chabad also asserts that the Freedom of Information Act prohibits any discussion between the defendants of an application outside the public hearings.  Given the apparent nature of these communications, however, there is no evidence to support a finding by a jury that they rose to the level of a "meeting" as defined by the Freedom of Information Act, and consequently, would not be prohibited by the statute.  See Conn. Gen. Stat. § 1-200(2) ("'Meeting' means any hearing or other proceeding of a public agency, any convening or assembly of a quorum of a multimember public agency, any any communication by or to a quorum of a multimember public agency . . . to discuss or act upon a matter of which the public agency has supervision, control, jurisdiction or advisory power.  'Meeting' does not include . . . any chance meeting, or a social meeting neither planned nor intended for the purpose of discussing matters relating to official business"); Lawson v. East Hampton Planning and Zoning Comm'n, 2005 WL 3662907 at *1–3 (Conn. Super. Ct. Dec. 13, 2005) (holding that procedural irregularities do not amount to a denial of fundamental fairness, even where there was "a recess, [during] which there were unrecorded conversations between commission members")).

Chabad also asserts that the individual defendants failed to prevent the violation of plaintiff's rights, in violation of section 1986.  A claim under section 1986 "must be predicated upon a valid § 1985 claim."  See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993).  Consequently, Chabad fails to raise a material issue of fact to support its claim under section 1986 as well.  As a result, the individual defendants are entitled to summary judgment as to Count Ten.

As the court grants summary judgment on the merits of the plaintiff's claims, it is unnecessary for the court to address the various immunity issues raised by the individual defendants.  See Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) ("[W]here there is no viable . . . claim, defendants have no need of an immunity shield.") (citing, inter alia, Farrell v. Burke, 449 F.3d 470, 499 n.14 (2d Cir. 2006) ("Because we have found no cognizable violation of [p]laintiff's rights in this case, we need not reach the question of qualified immunity.")).

Neither party asserts any argument that Chabad's claim in Count Eleven as to a conspiracy by the individual defendants to violate Chabad's constitutional rights under the Connecticut Constitution is governed by any different law.  Accordingly, for the same reasons stated with regard to Count Nine, Chabad fails to raise a material issue of fact with regard to its conspiracy claim in Count Eleven, and summary judgment is granted.

## III.   CONCLUSION

For the reasons stated above, the Borough defendants' Motion for Summary Judgment (Doc. No. 140) is **GRANTED**.  The individual defendants' Motion for

Summary Judgment (Doc. No. 138) is **GRANTED**.  Chabad's Motion for Partial

Summary Judgment (Doc. No. 137) is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 17th day of February, 2012.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

40