UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHABAD LUBAVITCH OF | : | CIVIL ACTION NO. |
| LITCHFIELD COUNTY, INC., et al., | : | 3:09-CV-1419 (JCH) |
|    Plaintiffs, | : | |
| | : | |
|      v. | : | |
| | : | |
| BOROUGH OF LITCHFIELD, | : | JANUARY 27, 2016 |
| CONNECTICUT, et al., | : | |
|    Defendants. | : | |

**RULING RE: MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 185 & 187) &
MOTIONS TO DISMISS RABBI EISENBACH AS PLAINTIFF (DOC. NOS. 88 & 141)**

**I.  INTRODUCTION**

Plaintiffs the Chabad Lubavitch of Litchfield County, Inc. ("the Chabad") and

Rabbi Joseph Eisenbach ("Rabbi Eisenbach") filed a Third Amended Complaint (Doc.

No. 54) ("Third Am. Compl.") against the Borough of Litchfield, Connecticut ("the

Borough") and the Historic District Commission of the Borough ("the HDC") (collectively,

"Borough defendants"), and Wendy Kuhne, Glenn Hillman, and Kathleen Crawford,

members of the HDC (collectively, "individual defendants").[1]  The Third Amended

Complaint alleged twelve causes of action, each of which named the Borough

defendants and the individual defendants.

The Borough defendants filed a Motion for Summary Judgment (Doc. No. 140)

on all counts.  The individual defendants also filed a separate Motion for Summary

Judgment (Doc. No. 138) on all counts.  The plaintiffs, meanwhile, filed a Motion for

---

[1] All claims against Wendy Kuhne have been dismissed; she is no longer a party to this case. See Chabad Lubavitch of Litchfield Cty. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 187 n. 1 (2d Cir. 2014) ("Chabad").

Partial Summary Judgment (Doc. No. 137) as to Count Eight.  The individual defendants had previously filed a Motion to Dismiss (Doc. No. 88) seeking to remove Rabbi Eisenbach as a plaintiff for lack of standing.  The Borough defendants later filed their own Motion to Dismiss (Doc. No. 141), in which they joined the individual defendants' Motion.

The court granted the Motions to Dismiss Rabbi Eisenbach.  See Ruling (Doc. No. 151).  The court denied the plaintiffs' Motion for Partial Summary Judgment and granted both the Borough defendants' and the individual defendants' Motions for Summary Judgment.  See Ruling (Doc. No. 169).

On appeal, the United States Court of Appeals for the Second Circuit vacated this court's grant of summary judgment for the defendants on Counts Six and Seven, and remanded these claims for further proceedings in accordance with the Court of Appeals' decision.  Order at 2 (Doc. No. 179).  The Court of Appeals also vacated the court's dismissal of Rabbi Eisenbach as a plaintiff for lack of standing and remanded for determination of whether Rabbi Eisenbach has stated a claim upon which relief can be granted.  Id.  The Court of Appeals affirmed the court's grant of summary judgment for the defendants on all the other counts.  Id.  Lastly, the Court of Appeals directed the court to address, in the first instance, the individual defendants' arguments that they are entitled either to absolute immunity or qualified immunity, and to consider whether Crawford "is properly subject to this suit in the absence of evidence that she voted on the application." Id. at 40.

Both the remaining individual defendants and the Borough defendants have filed Second Motions for Summary Judgment (Doc. Nos. 185 and 187, respectively).  Neither

set of defendants has filed a second Motion to Dismiss as to Rabbi Eisenbach, instead opting to rest on their original Motions.

## II.    FACTUAL BACKGROUND[2]

The Borough of Litchfield is an independent municipal corporation, whose boundaries are wholly within the Town of Litchfield.  See Borough Defendants' Local Rule 56(a)(1) Statement ¶ 15 (Doc. No. 187-1) ("Borough Defs.' L.R. 56(a)(1) Stmt.").  The Borough is governed by a municipal charter adopted in 1989, pursuant to the Connecticut General Statutes.  Id.  In 1989, pursuant to the provisions of Chapter 97a of title 7 of the Connecticut General Statutes, C.G.S.A. §§ 7-147a et seq., the Borough established the HDC to govern aspects of the construction and modification of buildings within the Litchfield Historic District.  Id. ¶ 16; see also C.G.S.A. § 7-147a.  Section 7-147c(e) of title 7 of the Connecticut General Statutes permits the HDC to adopt regulations which set forth the criteria by which it would judge applications.  Id. ¶ 17; see also C.G.S.A. § 7-147c(e).  However, in deciding whether to grant a certificate of appropriateness, the HDC is barred from considering a building's "interior arrangement or use."  C.G.S.A. § 7-147f(b).

Rabbi Eisenbach is an ordained Hasidic Rabbi and is the President of the plaintiff, the Chabad Lubavitch of Litchfield County, Inc.  Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 1.  Currently, the Chabad leases a space where it holds its regular services and various meetings.  Id. ¶ 3; see also Third Am. Compl. ¶¶ 24-25.  The Chabad alleges

---

[2] In connection with a motion for summary judgment, the court relies on the undisputed facts or, if a fact is disputed, the court views the evidence in the light most favorable to the party opposing summary judgment.  Except where noted, the facts are not in dispute.

that its current space is inadequate to carry out its religious practices.  Borough Defs.'
L.R. 56(a)(1) Stmt. ¶ 4.

The Chabad purchased property at 85 West Street, Litchfield, Connecticut.  Id. ¶
7.  The structure located on the property was built in the late 1870s, as a two story,
stick-style Victorian residential house, consisting of approximately 2,656 square feet,
plus a basement.  Id. ¶ 30.[3]  The parties clarified at the most recent oral argument that
the 2,656 square feet is the total square footage of the house, exclusive of the
basement and attic – which means that each of the two floors is roughly 1,328 square
feet large.  The house is commonly known as the "Deming House."  Id. ¶ 32.  Although
originally residential, the Deming House has since been used for commercial purposes,
most recently housing a retail store.  Id. ¶ 31.

After it purchased the property, the Chabad applied for a Certificate of
Appropriateness in order to gain permission to modify the property to accommodate its
religious needs.  Plaintiffs' Local Rule 56(a)(2) Statement ¶ 8 (Doc. No. 205-1) ("Pls.'
L.R. 56(a)(2) Stmt. (Disp.)");[4] see Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 34.  The Chabad
submitted plans to add a three-story, 17,000 square foot addition, which would include a
sanctuary, two kosher kitchens, a ritual bath, a residence for Rabbi Eisenbach and his

---

[3] The exact square footage of the Deming House is unclear.  At one point in the HDC Decision,
the Deming House is described as 2,656 square feet large.  Borough Defendants' Memorandum in
Support of Second Motion for Summary Judgment Ex. K at 10 (Doc. No. 187-16) ("HDC Decision").  Later
in the HDC Decision, it is described as 2,679 square feet large.  Id. at 14.  Ultimately, this difference
between 2,656 and 2,679 is immaterial.  The court will use the lower figure for purposes of this Ruling.

[4] In response to each defendant's Local Rule 56(a)(1) Statement, the Chabad filed a Local Rule
56(a)(2) Statement.  The Local Rule 56(a)(2) Statement is comprised of two sections.  The first section
mirrors the defendant's Local Rule 56(a)(1) Statement and either admits or denies the statements made
by the defendant.  The second section contains the Chabad's list of disputed facts.  Because the Chabad
uses the same numbers in each section, the court will refer to the first section of the Chabad's Local Rule
56(a)(2) Statement as "Pls.' L.R. 56(a)(2) Stmt."  The court will refer to the second section of the
Chabad's Local Rule 56(a)(2) Statement as "Pls.' L.R. 56(a)(2) Stmt. (Disp.)".

family, staff / visitor housing, a coffee bar, and an indoor swimming pool.  Borough

Defs.' L.R. 56(a)(1) Stmt. ¶ 33.[5]  The addition would also include classrooms, see

Declaration of Rabbi Eisenbach ¶ 9 (Doc. No. 205 Ex. B) ("Rabbi Eisenbach Decl."),

and a rabbi's study adjacent to the sanctuary, see Second Motion for Summary

Judgment by Borough of Litchfield, Connecticut and Historic District Commission of the

Borough of Litchfield, App. U at 4 (Doc. No. 187-26) ("Architectural Renderings").  Aside

from the addition, the Chabad applied to add a clock tower with a Star of David finial to

the roof, see Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 33,[6] and to replace the single door at

the front of the house with a double door, see id. ¶ 52.  The Chabad also sought

permission to make a number of other stylistic modifications.  Id. ¶ 53.

The plot of land on which the Deming House is located slopes downward, as one

moves from the street front side of the plot to the back.  See Architectural Renderings at

9.  The various uses in the proposed addition would be located on five different levels,

as follows: the pool and the ritual bath would be situated together on the "basement

level"; the classrooms and library would be situated on the "classroom level"; the

sanctuary, coffee bar, rabbi's study, and one of the kosher kitchens would be situated

together on the "sanctuary level";[7] the rabbi's residence, including the second kosher

---

[5] The Chabad denies this paragraph as a whole; however, the evidence it cites in support of its denial does not contest the square footage of the proposal or the various uses of the proposed structure. Consequently, the court deems this portion of the asserted fact to be admitted.  See D. Conn. L. Civ. R. 56(a)(3).

[6] Again, the Chabad denies this paragraph as a whole, but the evidence it cites in support of its denial does not contest that the Chabad sought to add a clock tower with a Star of David finial.

[7] The "sanctuary level" is at level with the first floor of the original Deming House.

kitchen, would be situated together on the "residential level";[8] and, the staff / visitor housing would be situated on the "staff residential level."[9]  See id. at 2-6.  As the parties clarified at the most recent oral argument, the sanctuary, residential, and staff residential levels would all be fully above-ground.  The parties also clarified that the basement level would be entirely underground and not visible from the outside.  Lastly, the parties clarified that, due to the fact that the plot slopes downward, part of the classroom level would be above-ground and part underground.  Accordingly, part of the exterior wall for the classroom level would be visible from the outside.  See id.

The HDC denied the Chabad's application without prejudice, and it invited the Chabad to resubmit its application with a proposal that provided for an above-ground addition that doubled the square footage of the original property, and which addition would be narrower than the original building and have a lower roofline.  See Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 48; HDC Decision at 14.  At oral argument, the defendants clarified that the HDC Decision stated it would allow the Chabad to build an addition whose above-ground square footage was equal to the above-ground square footage of the current Deming House.  The defendants also clarified that the Chabad would be free to build as much underground as it desired.  The HDC also approved of all of the Chabad's stylistic modifications except for the addition of the clock tower and the substitution of the double door for the single door.[10]  Id. ¶ 53.  Hillman voted on the

---

[8] The "residential level" is at level with the second floor of the original Deming House.

[9] The "staff residential level" is at level with the attic of the original Deming House.

[10] Neither party addressed in its briefing whether the HDC's denial of the Chabad's proposal to add the clock tower and to replace the single door with a double door substantially burdened the Chabad's religious exercise.  At the most recent oral argument, the Chabad conceded that it does not

Chabad's application.[11]  Id. ¶ 49.  There is disagreement as to whether Crawford voted

on the application.  See id. ¶ 12; Pls.' L.R. 56(a)(2) Stmt. (Disp.) ¶ 16 (citing Plaintiffs'

Memorandum of Law in Response to Defendants' Borough of Litchfield, Connecticut,

and the HDC Motion for Summary Judgment ("Pls.' Mem. in Supp.") (Doc. No. 205) Ex.

A-4 (Doc. No. 205-6) ("Crawford Dep.").

## III.  LEGAL STANDARD

### A. Motion for Summary Judgment

On a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once

the moving party has met its burden, in order to defeat the motion, the nonmoving party

must "set forth specific facts showing that there is a genuine issue for trial," Anderson,

477 U.S. at 256, and present such evidence as would allow a jury to find in his favor,

see Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve

all ambiguities and draw all inferences in favor of the party against whom summary

judgment is sought.  Graham, 230 F.3d at 38.  Summary judgment "is properly granted

only when no rational finder of fact could find in favor of the non-moving party." Carlton

v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons,

---

believe that the construction of the clock tower and double door constitutes religious exercise, and it is not challenging the HDC's denial of these portions of its application.

[11] The Chabad denies the portion of this paragraph that asserts that Commissioner Montebello voted.  See Pls.' L.R. 56(a)(2) Stmt. ¶ 49.  It does not deny that Hillman voted.  See Pls.' L.R. 56(a)(2) Stmt. (Disp.) ¶ 9.

applying the proper legal standards, could differ in their responses to the question"

raised, on the basis of the evidence presented, the question must be left to the finder of

fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

      B.  Motion to Dismiss

On a motion to dismiss, all factual allegations in the complaint must be accepted

as true, and the court must draw all reasonable inferences in the plaintiff's favor.  Harris

v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009).  "[A] motion to dismiss does not involve

consideration of whether a plaintiff will ultimately prevail on the merits, but instead solely

whether the claimant is entitled to offer evidence in support of his claims."  Peter F.

Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 65 (2d Cir. 2010) (citation

and quotation marks omitted).

Pursuant to the Federal Rules, a defendant may move to dismiss a complaint if it

"fails to state a claim upon which relief may be granted."  Fed. R. Civ. P. 12(b)(6).  In its

review of a motion to dismiss, the court may consider "only the facts alleged in the

pleadings, documents attached as exhibits or incorporated by reference in the pleadings

and matters of which judicial notice may be taken."  Samuels v. Air Trans. Local 504,

992 F.2d 12, 15 (2d Cir. 1993).  To survive a motion to dismiss pursuant to Rule

12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.  The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

## IV.   DISCUSSION

### A.   Motion for Summary Judgment

The Borough defendants and the individual defendants seek summary judgment on the only two remaining claims against them, brought under the Religious Land Use and Institutionalized Persons Act's ("RLUIPA") substantial burden and nondiscrimination provisions.  Crawford also argues that she is entitled to summary judgment on the ground that, because she never voted on the Chabad's application, she never acted as a government official and, accordingly, is not subject to RLUIPA.  In addition to arguing that summary judgment on these claims is warranted on the merits, the individual defendants also argue that they are entitled to summary judgment based on either absolute or qualified immunity.

#### 1.   Substantial Burden Claim

RLUIPA's substantial burden provision applies in three situations, where,

> (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

> (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or,

> (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2).  The Court of Appeals concluded that, "the HDC's denial of the Chabad's application resulted from an 'individual assessment,' triggering RLUIPA's substantial burden provision," under section 2000cc(a)(2)(c).  Chabad, 768 F.3d at 194. Accordingly, the inquiry presently before the court is whether the HDC's denial violated the substantial burden provision, which states that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

Notably, the substantial burden provision only bars the government from substantially burdening "religious exercise."  Accordingly, before the court can determine whether the HDC's actions substantially burdened the Chabad's religious exercise, the court must determine whether or not the curtailed behavior constitutes "religious exercise."  See, e.g., Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338 (2d Cir. 2007) ("Westchester Day III") (bifurcating "religious exercise" and "substantial burden" analyses).  As already mentioned, see supra, at 6 n. 10, the Chabad is only challenging the HDC's denial of its application to build the proposed addition.  Accordingly, the court must first analyze whether construction of the proposed addition constitutes religious exercise and then, whether the HDC's denial substantially burdened that exercise.

i. <u>Religious Exercise</u>

RLUIPA defines "religious exercise" as covering "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Further, the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  42 U.S.C. § 2000cc-5(7)(B).  The Court of Appeals for the Second Circuit has also stated that, in determining whether a use constitutes "religious exercise," district courts should ask "whether the proposed facilities were for a religious purpose rather than simply whether the [facilities] w[ere] religiously-affiliated."  <u>Westchester Day III</u>, 504 F.3d at 348.

While genuine issues of material fact may exist as to how a certain facility will be used, the ultimate determination as to whether a facility – assuming how it will be used is agreed upon or is first determined by a factfinder – constitutes "religious exercise" is a question of law for the court to decide.  See, e.g., <u>Bikur Cholim, Inc. v. Vill. of Suffern</u>, 664 F.Supp.2d 267, 289 (S.D.N.Y. 2009) (at summary judgment stage, court made ultimate determination as to whether rabbi's operation of a "Shabbos House" constituted "religious exercise"); <u>California-Nevada Annual Conference of the Methodist Church v. City and Cty. of San Francisco</u>, 74 F.Supp.3d 1144, 1154 (N.D.Ca. 2014) (at motion to dismiss stage, court made ultimate determination as to whether Conference's "ability to sell the property for use on the commercial rental market" constituted "religious exercise").

a. <u>The Addition</u>

The Chabad proposed to build a multi-use addition to the Deming House.  The various uses contemplated by the addition included, <u>inter</u> <u>alia</u>: a sanctuary; a rabbi's study, a ritual bath; two kosher kitchens; a religious school; a residence for Rabbi Eisenbach and his family; staff / visitor housing; a library; a coffee bar; and, a pool.  <u>See</u> Architectural Renderings at 2-6; Borough Defs.' L.R. 56(a)(1) Stmt. ¶ 33.[12]  When a religious entity seeks to construct a single building with multiple uses, the inquiry as to whether the construction of the building constitutes religious exercise becomes complicated.  This is especially so when some of the uses are arguably secular.  On the one hand, "as the Second Circuit noted, the construction of rooms used exclusively for secular purposes cannot constitute religious exercise." <u>Westchester Day Sch. v. Vill. of Mamaroneck</u>, 417 F.Supp.2d 477, 544 (S.D.N.Y. 2006) ("<u>Westchester Day II</u>") (referring to <u>Westchester Day Sch. v. Vill. of Mamaroneck</u>, 386 F.3d 183 (2d. Cir. 2004) ("<u>Westchester Day I</u>")).  On the other hand, "[w]here a building is to be used for the purpose of 'religious exercise,' the building is not denied protection under RLUIPA merely because it includes certain facilities that are not at all times themselves devoted to, but are inextricably integrated with and reasonably necessary to facilitate, such 'religious exercise.' " <u>Westchester Day II</u>, 417 F.Supp.2d at 544.  This framework can be applied neatly when one of two circumstances exist: (1) a single-use structure or room is to be used exclusively for either religious or secular purposes, or (2) every room / facility in a multi-use building will be used, at least in part, for religious purposes, or is

---

[12] The Chabad denies that the proposed addition includes a coffee bar, instead calling it "an area for self-service coffee for those visiting the Library."  Rabbi Eisenbach Decl. ¶ 9.  However, the plans drawn up by the Chabad's own architect, Michael Boe, identify this area as a "coffee bar."  <u>See</u> Architectural Renderings at 4.

inextricably integrated with and reasonably necessary to facilitate religious exercise, even if a given room / facility inherently has more of a secular, than religious, nature. For example, in <u>Westchester Day III</u>, which represents the final word in this line of cases, the Court of Appeals addressed both scenarios.  Addressing the former situation, the Court stated: "if a religious school wishes to build a gymnasium to be used exclusively for sporting activities that kind of expansion would not constitute religious exercise."  <u>Westchester Day III</u>, 504 F.3d at 347.  And, addressing the latter situation, the court approved of the district court's conclusion that construction of the building in question constituted religious exercise because the court "made careful factual findings that each room the school planned to build would be used at least in part for religious education and practice."  <u>Id.</u> at 348.

However, the <u>Westchester Day</u> cases do not instruct a court how to proceed when a multi-use building that includes some rooms that will be used for religious purposes also includes some rooms / facilities that are used exclusively for secular purposes.  The court can conceive of two possible approaches.  A "segmented" approach would look at each distinct room / facility within the multi-use building and determine if it is used exclusively for secular purposes, or if it is used either exclusively for religious purposes or for both religious and secular purposes.  The construction of rooms / facilities that fall into the first grouping would not be considered religious exercise, and the effect of the government's action on the ability to build those rooms / facilities would not be analyzed under the substantial burden framework.  The construction of those rooms / facilities that fall into the second grouping would still be analyzed under the substantial burden framework.

Alternatively, a "balancing" approach would look at each room / facility and determine how it is used – exclusively secular, exclusively religious, or a hybrid use – and then, weighing all of the rooms / facilities, make a final determination as to whether construction of the entire building is, on balance, a form of religious exercise or not.  In Fortress Bible Church v. Feiner, 734 F.Supp.2d 409 (S.D.N.Y. 2010) ("Fortress Bible Church I"), the court seemed to adopt the latter approach, stating, "[e]ven if certain of the school's activities are considered to be secular, as Defendants argue they are, given the substantial evidence regarding the intended religious uses for the facility, this Court does not believe that such limited secular activities would be sufficient to bar a finding of religious exercise." Id. at 501.  However, the Fortress Bible Church I court had earlier determined that even the secular school rooms / facilities, such as the gymnasium, would be used at times for religious purposes, see id. at 500, thereby placing in doubt whether Fortress Bible Church I dealt with the hypothetical situation described above – where a multi-use building contains some uses that are purely secular.

The "segmented" approach appears sounder to the court, most compellingly because it best allows the court to effectuate legislative intent.  "As a legislative accommodation of religion, RLUIPA occupies a treacherous narrow zone between the Free Exercise Clause, which seeks to assure that government does not interfere with the exercise of religion, and the Establishment Clause, which prohibits the government from becoming entwined with religion in a manner that would express preference for one religion over another, or religion over irreligion."  Westchester Day I, 386 F.3d at 189.  In light of the "treacherous narrow zone" that RLUIPA occupies, the "segmented" approach allows the court to afford religious organizations all the benefits conferred

upon them by RLUIPA, but no more, lest the court incidentally "preference . . . religion over irreligion."  Id.  The "balancing" approach, on the other hand, risks affording religious organizations special accommodations for secular activities that would not be afforded to secular organizations – which could occur if a structure were used predominantly for religious purposes but also included some rooms / facilities that were exclusively for secular use.

The "segmented" approach is sounder also because it allows the court to comport more closely with the instructions given to it by Court of Appeals on remand. Among the numerous factors the Court of Appeals instructed the court to consider when determining whether the HDC's denial substantially burdened the Chabad's religious exercise was whether the denial was conditional and, if so, whether the conditions themselves substantially burdened the Chabad's religious exercise.  See infra, §§ IV.A.1.ii.b, IV.A.1.ii.c.  The facts of this case illustrate why the "segmented" approach is preferable in terms of following this directive.  The HDC's denial was conditional: it said it would allow the Chabad to build an addition that would double the square footage of the Deming House.  To determine whether this condition itself substantially burdens the Chabad's religious exercise, a factfinder needs to know whether an addition of that size, along with the original Deming House, would be sufficiently large to accommodate all of the Chabad's religious exercise.  The amount of space the Chabad needs for religious exercise may differ substantially if the court views the entire addition as religious exercise on the basis that the predominant uses for the building overall constitute religious exercise (this would be an application of the "balancing" approach), than if the court views each use in isolation and asks only whether those facilities used for

15

religious purposes could be fit into the addition that the HDC says it will allow (this would be an application of the "segmented" approach). Accordingly, the court can better assess whether the HDC's condition itself substantially burdened the Chabad's religious exercise by applying the "segmented" approach.

The court will now turn to the various uses in the Chabad's proposed addition and analyze whether there exists a genuine issue of material fact with regard to whether each use constitutes religious exercise, and, to the degree that no genuine issue of material fact exists for a given use, whether such use constitutes religious exercise as a matter of law.

At the most recent oral argument, the defendants conceded that construction of the sanctuary, rabbi's study, classrooms, ritual bath, library, and coffee bar constitutes religious exercise.[13] The defendants also conceded that construction of the kosher kitchens constitutes religious exercise, although in their briefing they argue that the second kosher kitchen is likely only necessitated by the inclusion of Rabbi Eisenbach's residence, the construction of which the defendants claim is not religious exercise.

---

[13] Other courts have held that some of these uses constitute religious exercise. For example, in Fortress Bible Church v. Feiner, 694 F.3d 208 (2d. Cir. 2012) ("Fortress Bible Church II"), the court applied the substantial burden analysis to the plaintiff's proposal to build a church, thereby implying that construction of the church constitutes religious exercise. With regard to classrooms, the Westchester Day III court noted that construction of classrooms that "would be used at least in part for religious education and practice" also constitutes "religious exercise." Id. at 348. To that end, the Chabad claims, and the defendants do not contest, that the classrooms would be part of a Jewish preschool. See Rabbi Eisenbach Decl. ¶ 9. Some of the other uses, such as the library, rabbi's study, and ritual bath, clearly constitute religious exercise, insofar as they serve a "religious purpose," and the defendants do not appear to argue to the contrary. For example, the library, and presumably also the rabbi's study, would serve the "religious purpose" of allowing the Chabad to satisfy its "religious mandates for the inclusion of at least the minimal religious texts which would serve to educate and instruct our participants and family." Id. Likewise, the ritual bath allows the Chabad "to perform the purification ritual required by our religion." Id. ¶ 11. With regard to the coffee bar, although it is less clear based on the record how construction or use of this space constitutes religious exercise, the defendants' concession that its construction constitutes religious exercise renders further analysis by the court on this point unnecessary.

On the other hand, the defendants argue that the pool, staff / visitor housing, and residence for Rabbi Eisenbach are all "secular uses."  Borough Defendants' Memorandum in Support of Second Motion for Summary Judgment at 34 (Doc. No. 187-2) ("Borough Defs.' Mem. in Supp.").  Construction of an intuitively secular facility – such as a pool, staff / visitor housing, and a residence – can constitute religious exercise if the facility will be used, at least in part, for religious exercise.  See Fortress Bible Church I, 734 F.Supp.2d at 500 (concluding that construction of certain secular facilities such as a gymnasium and mathematics, history, science, and art classrooms constitute religious exercise because "the Bible is integrated into all secular subjects taught at the school" and because "the proposed gymnasium will be used, in addition to teaching physical education, among other purposes, to host youth meetings and fellowships"); see also Westchester Day II, 417 F.Supp.2d at 494-498 (finding that construction project which included classrooms for intuitively secular subjects constituted religious exercise because the school's "existing facilities, in whole and in all of their constituent parts, are used for religious education and practice—i.e., devoted to religious purposes. While it is possible that a classroom may be used for a general studies course not infused with religion at a particular time, the uses to which a particular classroom are put will change over time and at some point will be devoted to religious purposes"); see also Westchester Day III, 504 F.3d at 348 ("On remand, the district court . . . made careful factual findings that each room the school planned to build would be used at least in part for religious education and practice . . .").[14]

---

[14] It bears noting that the district court, in Westchester Day II, was the finder of fact at a bench trial.

With regard to the pool, the Chabad offers evidence that, the "pool area and lower educational areas are dedicated to various religious uses for [the Chabad's] participants including [the Chabad's] Gan Israel program for children."  Rabbi Eisenbach Decl. ¶ 9.  Although the Chabad has not explicitly stated how the pool will be used for religious exercise, there is evidence in Rabbi Eisenbach's sworn declaration that the pool will be used for religious purposes.  Thus, based on the <u>Fortress Bible Church</u> and <u>Westchester Day</u> cases, there is, at the very least, a genuine issue of material fact with regard to whether the pool will be used for religious purposes and, thus, whether its construction constitutes religious exercise.

With regard to Rabbi Eisenbach's residence, the Chabad has offered evidence that "[i]t is the custom and practice of [the Chabad's] faith to dedicate the living areas of the Rectory/Parsonage/Residence to serve the religious needs of [the Chabad's] participants and the Rabbi's family."  Pls.' Mem. in Supp. at 10; <u>see also</u> Rabbi Eisenbach Decl. ¶ 3 ("every aspect of our lives – including our Rectory/Parsonage/Residence – is dedicated to serve a religious purpose").  Specifically, "even the non-consecrated activities such as eating, sleeping, playing, <u>etc.</u> must also be infused with holiness, even beyond the normative religious rituals that are mandated."  Rabbi Eisenbach Decl. ¶ 7.

This argument is undercut somewhat by the fact that the Chabad further argued that the spiritual leader of the Chabad "instructed all his followers to designate their private dwellings as Chabad Houses in the symbolic sense of: (i) identifying with values and goals of the Chabad Movement in terms of personal religious lifestyle alongside devotion to other people (inspiring all who dwell or visit there) and (ii) as an educational

tool for the resident children to realize their responsibilities toward everyone else."  Id. ¶ 5.  Reflecting that attitude, "there is a popular Lubavitch school song which says . . . 'Every home should be a Chabad House.' "  The court struggled with the concept that any adherent of the Chabad could transform his home into a place of "religious exercise," and in so doing envelop himself within RLUIPA's protective umbrella, simply by asserting that the Chabad's leader instructed all his followers to make their homes religious places.

At oral argument, however, the Chabad clarified that there exists a difference between a "Chabad House" and a Chabad member's home.  A "Chabad House," as referred to in the portion of the Chabad's Memorandum quoted above, is a term of art referring to the structure that a Chabad rabbi establishes for his community.  Further, the Chabad argued that the "Chabad House" occupies a special place in the religion, and that how a Chabad rabbi raises his children within the residential portion of the Chabad House serves as instructive to the entire community.  There is at least a genuine issue of material fact that Rabbi Eisenbach's residence, because it is the residence of the community's leader, serves the religious purpose of providing the community with an exemplar of how to raise a family in a household that incorporates the Chabad's tenets, and of how "every home" can become a "Chabad House."

The defendants, meanwhile, do not provide any support for their assertion that the rabbi's residence is secular, nor do they dispute Rabbi Eisenbach's assertion that all aspects of his domestic life are infused with religious exercise or that his home serves as a religiously-mandated exemplar to the community.  See Borough Defs.' Mem. in

Supp. at 34.[15]  Instead, they argue that Rabbi Eisenbach's Declaration is "replete with vague and conclusory statements."  Defendants Borough of Litchfield, Connecticut and HDC's Reply Brief in Support of Motion for Summary Judgment at 2 (Doc. No. 210). Although Rabbi Eisenbach's Declaration does not provide voluminous evidence demonstrating how his residence will be used for religious exercise, neither is it wholly conclusory.  At the very least, there exists a genuine issue of material fact with regard to whether the residence will be used for religious exercise.

Turning, lastly, to the staff / visitor housing, there is little evidence in the record to suggest how it will be used.  In his deposition, the Chabad's architect stated that he was under the impression that it would be used to house "visiting rabbis and counselors."  Id. Ex A-12 (Doc. No. 205-12) ("Boe Dep.").  The defendants, on the other hand, have not offered any evidence that supports the conclusion that the staff / visitor housing will not be used for religious exercise.  Accordingly, at the very least, there exists a genuine issue of material fact as to whether the staff / visitor housing will be used for religious exercise.

Construction of the proposed facilities is in large measure religious exercise and, as to the remaining use / facilities, there exist genuine issues of material fact regarding their status as places of religious exercise.

---

[15] While it is true that not every Chabad House includes a residence for the rabbi, that fact does not require the conclusion that a rabbi's residence will not serve a religious purpose.  For example, while surely not every house of worship in the country contains classrooms for a religious school, it is indisputable that the construction, in a house of worship, of classrooms that are used for a religious school constitutes religious exercise.

ii. Substantial Burden

Turning to the second inquiry under the substantial burden claim, RLUIPA does not define "substantial burden."  In the past, the Second Circuit has stated that, in the context of the government's denial of a religious institution's building application, "[a] substantial burden is one that 'directly coerces the religious institution to change its behavior.' "  Fortress Bible Church II, 694 F.3d at 218-19 (quoting Westchester Day III, 504 F.3d at 349).  To assist the court in determining whether the HDC's denial of the Chabad's Certificate of Appropriateness application imposed a substantial burden on the Chabad's religious exercise, the Court of Appeals directed the court to consider a number of factors.  These factors include:

(1) "the arbitrariness of the denial";
(2) "whether the denial was conditional";
(3) whether, if the denial was conditional, "the conditions attendant to the HDC's denial of the Chabad's application themselves imposed a substantial burden on the Chabad's religious exercise";
(4) "whether feasible alternatives existed for the Chabad to exercise its faith";
(5) "whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street"; and,
(6) "whether the proposed modifications shared a close nexus with and would be consistent with accommodating the Chabad's religious exercise."

Chabad, 768 F.3d at 195-96.  The Court of Appeals did not suggest the relative importance of these factors.  Accordingly, the court's approach will be to examine each factor as it pertains to the HDC's denial of the addition.

a. Arbitrariness of the denial

The Court of Appeals cited to Westchester Day III and Fortress Bible Church II in connection to the "arbitrariness of the denial" factor.  See id. at 195.  In its own discussion of this factor, the Westchester Day III court looked for guidance to Saints

Constantine and Helen Greek Orthodox Church v. City of New Berlin, 396 F.3d 895 (7th Cir. 2005) and Guru Nanak Sikh Soc'y v. Cty. of Sutter, 456 F.3d 978 (9th Cir. 2006), both of which decisions the Court of Appeals cited approvingly in other portions of its Chabad decision.  Accordingly, all of these cases will provide guidance to this court in its application of the arbitrariness factor.

In Westchester Day III, the Court of Appeals concluded that the district court's finding in Westchester Day II – that the zoning board's denial was arbitrary and capricious – was supported by the record.  Westchester Day III, 504 F.3d at 351.  The district court's conclusion was based on the fact that the zoning board's findings were not supported by substantial evidence and because the purported justifications for denial, upon which the zoning board relied, were not sufficiently related to public health, safety, or welfare.  See id.

In Fortress Bible Church II, the Court of Appeals concluded that the town that denied the church's building application had acted in an "arbitrary, capricious, and discriminatory" manner, and that its actions were "taken in bad faith."  Fortress Bible Church II, 694 F.3d at 219.  In support of this finding, the Court of Appeals found that, "[t]he Town attempted to extort from the Church a payment in lieu of taxes, it ignored and then replaced its Planning Commissioner when he advocated on the Church's behalf, and Town staff intentionally destroyed relevant evidence."  Id.

In Saints Constantine and Helen, the Seventh Circuit stated that, "[i]f a land-use decision . . . imposes a substantial burden on religious exercise . . . and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision."  Saints Constantine and Helen, 396 F.3d at

22

900.  Earlier in the decision, the court also noted that the "repeated legal errors by the City's officials casts doubt on their good faith."  Id. at 899.  The Second Circuit couched these types of acts within the larger framework of "arbitrary application of laws to religious organizations."  Westchester Day III, 504 F.3d at 350.

In Guru Nanak Sikh, the Ninth Circuit held that the county had both "inconsistently applied" certain land-use concerns to the religious organization's detriment and disregarded, "without explanation," relevant findings that favored the organization.  Guru Nanak Sikh, 456 F.3d at 990, 991.  The Second Circuit regarded this type of behavior as an example of "arbitrary, capricious, or unlawful" government action.  Westchester Day III, 504 F.3d at 351.

The defendants assert that the Chabad has not alleged any "specific arbitrary, capricious or illegal application of the laws and regulations applied by the Commission in rendering its decision."  Borough Defs.' Mem. in Supp. at 23.  Rather, they argue that, "the HDC extensively explained the basis and rationale for its decision, as related to the Secretary [of Interior's] Standards [for Rehabilitating Historic Buildings] and C.G.S. § 147f . . . "  Id. at 24.  The Chabad, on the other hand, claims that the HDC's decision was based on illegal considerations such as "interior use or square footage" and "below grade or other unseen areas."  Pls.' Mem. in Supp. at 38, 39.  Further, the Chabad argues that the HDC Decision arbitrarily attempts to sustain the residential character of the Deming House, despite the fact that "the historic residential character of the property was already eviscerated when the HDC approved the conversion of the Property from a residential to a commercial building."  Id. at 40.  The court will address these arguments in turn.

The Chabad argues that the HDC's decision was based on an illegal consideration of "interior use or square footage."  Section 7-147f of the Connecticut General Statutes, which articulates the factors the HDC may consider in deciding on a certificate of appropriateness, bars the HDC from considering "interior arrangement or use."  C.G.S.A. § 7-147f(b).[16]  How many square feet are in a structure is a function of the interior arrangement of that structure.  This is because square footage is calculated only by multiplying the length of a room by its width, without taking into account height. For example, if a structure has one floor, and that floor is 20 feet long and 20 feet wide, the square footage of the structure is 400 square feet.  This would be the square footage, regardless of whether the ceiling of the building was 10 feet or 50 feet high. However, assume that same building was sufficiently tall that a second floor could be added, without changing the roofline.  If a second floor were added, and that second floor was also 20 feet long and 20 feet wide, then the square footage of the building would become 800 square feet, even though the exterior size of the building, i.e. its volume, had not changed.  Thus, how many square feet a building has is determined by how the interior of the building is arranged.

At one point in the HDC's written decision denying the Chabad's application, the HDC stated that it "would approve an addition equal in square footage to the Deming House."  Borough Defs.' Mem. in Supp. App. K at 14 (Doc. No. 187-16) ("HDC

---

[16] It strikes the court that such a proscription places bodies like the HDC in a difficult position in situations in which an applicant claims that the proposed building will be used for religious exercise.  If the governmental body blinds itself to the interior use of the facility and focuses solely on the exterior, then the government may inadvertently render a decision that violates the applicant's RLUIPA rights.  On the other hand, if the governmental body considers how the building will be used so as to avoid violating RLUIPA, the governmental body may end up violating the state law that prohibits the governmental body from looking at interior use.

Decision").  Later in that paragraph, the decision states that, "[d]epending on the foot print of the addition and the design of the below grade spaces, the applicant should be able to design an addition that renders a completed building with over 6,000 square feet of usable space."  Id.  Additionally, Robert D'Andrea, an HDC member who did not vote on the Chabad's application, testified at his deposition that the HDC "considered the square footage that was explained to us by the applicant and the applicant's architect." Pls.' Mem. in Supp. Ex. 8 at 3 (Doc. No. 205-8) ("D'Andrea Dep.").[17]

To be sure, the HDC Decision also includes other bases for denying the Chabad's application, such as the HDC's determination that the exterior scale of the addition was incongruous with the originally residential character of the Deming House. See HDC Decision at 14.  The above-ground portions of the proposed addition are, indeed, approximately three times the mass of the original Deming House.   It is also possible that the HDC's reference to square footage was simply a result of sloppy draftsmanship, and that the HDC was using the phrase "square footage" as a proxy for external size, which the HDC is permitted to consider.  However, whether the HDC's explanations or the Chabad's interpretations are more believable is a question for a factfinder to decide.  The Chabad has proffered evidence that creates an issue of fact as to whether the HDC based its decision on the interior arrangement of the proposed addition.  And, because a decision based on illegal considerations such as interior

---

[17] At oral argument, counsel for the Borough defendants repeatedly argued that the Chabad could fit all of its facilities that constitute religious exercise in a building the size of which the HDC indicated it would approve if the Chabad were to rearrange the interior of its proposed building.  Although the HDC did not make such a point in its Decision, its counsel's recommendation represents the exact type of consideration of "interior arrangement or use" that the HDC appears to be prohibited from engaging in under C.G.S.A. § 7-147f(b).

arrangement would, as described above, necessarily be arbitrary, there exists a genuine issue of material fact as to whether the HDC Decision was arbitrary.

Given this determination, the court need only quickly discuss the Chabad's other two arguments that the HDC's decision was arbitrary.  One of these arguments it that the HDC Decision was arbitrary because it took into consideration "below grade or other unseen areas."  See Pls.' Mem. in Supp. at 39.  The HDC admits that "it has no jurisdiction over sub-surface space."  Borough Defs.' Mem. in Supp. at 18.[18]  That said, the only reference in the HDC's decision to the underground portions of the proposed addition is the HDC's statement that, "[d]epending on the foot print of the addition and the design of the below grade spaces, the applicant should be able to design an addition that renders a completed building with over 6,000 square feet of usable space."  It unclear whether, based only on that statement, a reasonable factfinder could conclude that the HDC's decision was based on the underground portions of the proposed addition.  Another plausible interpretation is that the HDC, in that sentence, was merely referring to what the Chabad could do in the future, rather than commenting on underground portions of the plans the Chabad had submitted.  Nevertheless, this reference to "below grade" spaces creates a genuine issue of material fact as to whether the HDC's decision was arbitrary.

Lastly, the Chabad argues that the HDC Decision arbitrarily focused on preserving the residential character of the Deming House and the neighborhood in general.  See Pls.' Mem. in Supp. at 40-41.  Such a focus was arbitrary, the Chabad

---

[18] At oral argument, the defendants clarified that this means the HDC only has jurisdiction over the exterior structures that are above ground.  So long as an exterior is above ground, the HDC maintains jurisdiction, regardless of whether a certain part of the structure is on a downward-sloping portion of the property.

claims, because the residential nature of the Deming House, as well as that of the neighborhood at large, had already been lost through various prior renovations.  See id. While preserving the residential character of originally residential buildings is a goal the HDC is certainly entitled to pursue, inconsistent pursuit of that goal constitutes arbitrary behavior.  See Guru Nanak Sikh, 456 F.3d at 990 (inconsistently applied concern with leapfrog development).  There is evidence in the record that many of the original exterior features of the Deming House had been lost over time.  See HDC Decision at 10.  There is also evidence in the record that additions had been made to other originally residential structures and that, at least on one occasion (the Oliver Wolcott Library), the size of the addition was "substantial."  Id. at 14-15.  However, there is also evidence that the overall size of the Deming House had not changed since it was built, see id. at 10, and that the Wolcott Library addition "was built before the creation of the Historic District and was probably one of the reasons that prompted its formation,"  id. at 15.  Thus, there exists a genuine issue of material fact as to whether the HDC's reliance on the residential nature of the Deming House as a justification for its denial of the proposed addition was pretextual.  And, because a pretextual decision is akin to the type of arbitrary behavior described in the case law cited above, there exists another genuine issue of material fact as to whether the HDC Decision was arbitrary.

b. Whether the denial was conditional

There can be no doubt that the HDC's denial was, on its face, conditional.  The HDC Decision stated that, "the Commission would approve an addition equal in square footage to the Deming House."  HDC Decision at 14.  A further condition to approval

27

was that the "addition's roof and width should also be subordinate to the roof and width of the Deming House."  Id.

An ostensibly conditional denial is properly reclassified as an absolute denial if the government's "stated willingness to consider a modified proposal was disingenuous."  Westchester Day III, 504 F.3d at 352; see also Fortress Bible Church II, 694 F.3d at 219 ("if the town's stated willingness to consider another proposal is disingenuous, a conditional denial may rise to the level of a substantial burden").  The Chabad asserts that reapplication would be futile because it has already made repeated changes to its plan based on the HDC's requests, and yet the proposal was still denied.  See Pls.' Mem. in Supp. at 41-42; Pls.' L.R. 56(a)(2) Stmt. (Disp.) ¶ 112.  Further, the Chabad argues that "[a]t the fourth and final [HDC] meeting, the HDC refused to identify any additional concerns when asked."  Pls.' Mem. in Supp. at 42.

That said, there is no evidence in the record that the HDC would not approve a modified proposal that complied with the two conditions stated in the HDC Decision.  Not only does the HDC Decision state, unambiguously, that the HDC would approve an addition that complied with its requested changes, but the defendants also repeatedly affirmed this position at the most recent oral argument.  Further, the record reveals that the HDC was willing to reach compromises with the Chabad with regard to other alterations that the Chabad wanted to make.  For example, the HDC approved the Star of David finial, despite concluding that "such a finial and emblem is not historical in style," HDC Decision at 13, and also accommodated the Chabad's desire to construct the addition using Jerusalem stone, rather than brick, Pls.' L.R. 56(a)(2) Stmt. (Disp.) ¶ 54.

While it is true that the HDC did not approve of all of the proposed changes that the Chabad sought to make, it cannot be the case that a conditional denial is automatically treated as a final one in any situation where the government does not approve all of the applicant's requested changes. There must be more evidence of actually disingenuous behavior to convince a reasonable factfinder that a government body's ostensibly conditional denial was, in reality, a final denial. See, e.g., Fortress Bible Church I, 734 F.Supp.2d at 502 (conditional denial deemed final where: (1) defendants stated that no mitigating measures were available despite feedback from their own consultants stating that mitigation of environmental impact was possible; (2) Town Board members testified that they had specifically looked for reasons to "kill" the plaintiff's application). Such evidence is lacking here and, based on the record, there is neither a genuine issue of material fact as to whether the HDC's denial was conditional, nor as to whether the HDC would honor its conditions.

### c. Whether the conditions create a substantial burden

Even if the HDC is not being disingenuous when it says it will approve of an addition that lowers the roofline, narrows the footprint, and whose above-ground portions are double the square footage of the Deming House, the court must still consider whether a genuine issue of material fact exists as to whether those conditions themselves substantially burden the Chabad's religious exercise. The question squarely before the court then is whether a genuine issue of material fact exists as to whether the Chabad's religious exercise would be substantially burdened if the Chabad were limited to an addition of 2,656 square feet of above-ground space, which addition would also be narrower than the original building, and have a lower roofline. See

29

<u>Westchester Day III</u>, 504 F.3d at 352 (noting that while a religious organization's "religious exercise has not been substantially burdened" if the organization "has a ready alternative" such as "an entirely different plan to meet the same needs," the school in that case "could not have met its needs simply by reallocating space within its existing building").

While RLUIPA does not afford religious organizations blanket approval to build however large a facility it desires, it does afford such organizations the right to build a facility that will allow it to engage in its religious exercise without being substantially burdened.[19]  For example, in <u>Living Water Church of God v. Charter Twp. of Meridian</u>, 258 Fed.Appx. 729 (6th Cir. 2007), which the defendants cite for support, the Sixth Circuit stated that, "[t]he fact that Living Water's current facility is too small does not give the church free reign to construct on its lot a building of whatever size it chooses, regardless of limitations imposed by the zoning ordinances."  <u>Living Water</u>, 258 Fed.Appx. at 739.  However, the court also noted that, "[w]hile Living Water has outgrown its current facility, the record does not contain the kind of facts that would permit a finding that the building which the church can construct without an additional [Special Use Permit] would be so inadequate as to substantially burden Living Water's religious exercise in the future."  <u>Id.</u>  The clear implication is that, if the building that

---

[19] Of course, even this right is not absolute.  RLUIPA does allow a government to "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise" of a person or organization if the "imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc(a)(1)(A)-(B).  In this case, the defendants argue only that the denial of the Chabad's application does not substantially burden its exercise of religion.  The defendants do not argue that, in the event that the HDC's denial did substantially burden the Chabad's religious exercise, it would still not constitute a violation of RLUIPA because the HDC was furthering a compelling governmental interest through the least restrictive means available.  Because the defendants do not raise this argument at this time, the court does not address it.

Living Water was allowed to build would substantially burden its ability to engage in its religious exercise, the denial would violate RLUIPA.[20]  Applied to the facts of this case, Living Water suggests that, while the Chabad is not necessarily entitled to build however large an above-ground addition it would like, it must still be able to engage adequately in its religious exercise in a building the size of which the HDC would allow – specifically, a building with 5,312 above-ground square feet (2,656 square feet in the original Deming House times two).  If the Chabad were not able to adequately engage in its religious exercise in an addition that size, then the condition upon which the HDC would approve the Chabad's application would itself substantially burden the Chabad's religious exercise.

It is at this point where it is once again important to parse which of the Chabad's intended uses constitute religious exercise.  As discussed earlier, see supra, § IV.A.1.i.a, on the record before the court there is no genuine issue of material fact that construction of the sanctuary, rabbi's study, ritual bath, kosher kitchens, library, and classrooms constitutes religious exercise, and there remains a genuine issue of material fact regarding construction of the rabbi's residence, the pool, and the staff / visitor housing.  As also discussed earlier, see supra, § II, the ritual bath and pool are located completely underground, the classrooms and library are located on a floor that is partially underground and partially above-ground, and the sanctuary, rabbi's study, both kosher kitchens, and Rabbi Eisenbach's residence are all located entirely above-ground.  The "classroom level," which contains the classrooms and the library, is 4,941 square feet.  See Architectural Renderings at 3.  The "sanctuary level," which contains

---

[20] This assumes there was no compelling governmental interest behind the imposition of the regulation, as discussed in the preceding footnote.  See supra, n. 19.

one kitchen, the sanctuary, the rabbi's study, the coffee bar, and other rooms such as bathrooms and a coatroom, is also 4,941 square feet.  Id. at 4.  The "residential level" is 4,766 square feet.  Id. at 5.  The "staff residential level" is 532 square feet.  Id. at 6.

Obviously, a building with 5,312 above-ground square feet cannot accommodate all of these rooms, at least not at their currently conceived size.  However, that begs the question of whether the Chabad can modify its plans such that it can fit all of these uses into a smaller building.  Although doing so would clearly burden the Chabad, and while "a burden need not be found insuperable to be held substantial," Westchester Day III, 504 F.3d at 349, "the burden must have more than a minimal impact on religious exercise," Fortress Bible Church II, 694 F.3d at 219, to qualify as a substantial burden.

At oral argument, the defendants argued that the Chabad could rearrange its plans so as to fit the facilities that constitute religious exercise in an addition whose above-ground square footage is double that of the Deming House.  Specifically, the defendants argued that the kitchen on the "sanctuary level" could be moved elsewhere and the sanctuary itself could be made smaller by not fanning the seats.  The Chabad, on the other hand, asserts that it cannot possibly reduce the size of its plans, even an inch.  See Pls.' Mem. in Supp. at 10 ("Plaintiff's advisory committee met numerous times, and the size of the renovation was determined to be the minimum required for Plaintiff's mission and purpose to serve the area").  In support of the Chabad's assertion, Rabbi Eisenbach declared, under oath, that "[t]he length of the building is determined by the sanctuary and the need for the kosher kitchen to be located on the same floor," and the "length and width of the building are also influenced by the orientation of the seating arrangement to face Jerusalem."  Rabbi Eisenbach Decl. ¶ 27.

32

Further, the Chabad notes that, "[t]he State Building Code, State Fire Code and the Americans with Disabilities Act also affect the length and the width as there must be adequate space for internal circulation and multiple exits." Id. As for Rabbi Eisenbach's residence, the Chabad indicates that it first determined how large it needed the sanctuary floor to be and then determined how large Rabbi Eisenbach's residence would be by simply "stacking" the residence on top of the first floor. Pls.' Mem. in Supp. at 36.

Whether or not the Chabad could rearrange its facilities so as to fit all the ones that will be used for religious exercise within a structure the size of which the HDC would approve is a question of fact. The defendants argue that the Chabad can do so, although they have not introduced any evidence showing that the Chabad could fit a 104-person sanctuary[21] that must face Jerusalem into a building whose above ground square footage is double that of the Deming House. See id. at 10; Rabbi Eisenbach Decl. ¶ 27. The Chabad, meanwhile, argues it cannot so rearrange its sanctuary, and it has introduced sworn testimony in support of that stance. See Rabbi Eisenbach Decl. ¶¶ 11, 27. There exists a genuine issue of material fact as to whether the conditions attached to the HDC's denial – which allowed the Chabad to build an addition equal in above-ground square footage to that of the Deming House, with a narrower footprint and a lower roofline – themselves substantially burden the Chabad's religious exercise.

---

[21] At oral argument, the defendants conceded that they do not dispute that the Chabad needs a sanctuary that can accommodate 104 people. Rather, they argued that the sanctuary as designed in the Chabad's plans was unnecessarily large to accommodate that many people.

d. Existence of feasible alternatives

The Court of Appeals directed the court to consider "whether feasible alternatives existed for the Chabad to exercise its faith."  Chabad, 768 F.3d at 196.  It is not immediately clear whether "feasible alternatives" refers to a different piece of property altogether or to alterations in a proposal that can be easily accomplished.  However, the cases that the Second Circuit cited in connection with this factor, and the fact that the latter scenario is already contemplated and discussed in connection with the factor that asks whether the conditions of denial themselves impose a substantial burden, see supra, § IV.A.1.ii.c, suggest that this factor asks whether alternative properties that could accommodate the Chabad's religious exercise were available.

"When there is plenty of land on which religious organizations can build churches (or, as is common nowadays, convert to churches buildings previously intended for some other use) in a community, the fact that they are not permitted to build everywhere does not create a substantial burden."  Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846, 851 (7th Cir. 2007).  For example, in Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir. 2004), which the Court of Appeals cited in connection with this factor, two religious congregations were denied a permit to operate their synagogues in the town's business district.  Id. at 1228.  However, the court noted that, "the congregations have the alternative of applying for a permit to operate only a few blocks from their current location."  Id.  The court concluded that, "[w]hile walking may be burdensome and 'walking farther' may be even more so, we cannot say that walking a few extra blocks is 'substantial,' as the term is used in RLUIPA."  Id.

In cases where courts have found that no feasible alternative existed, these findings have been supported by factual evidence.  For example, in Westchester Day III, the plaintiff's architectural firm determined that, in order to accommodate the plaintiff's needs, a new building would need to be built, and experts hired by the plaintiff determined that the proposed site was the only one that could accommodate a new building.  See Westchester Day III, 504 F.3d at 352.  In Int'l Church of the Foursquare Gospel v. City of San Leandro, 673 F.3d 1059 (9th Cir. 2011), the Ninth Circuit determined that a genuine issue of material fact existed as to whether a feasible alternative existed based on the fact that the plaintiff's realtor "examined each of the 196 parcels rezoned for assembly use, and found them unsuitable for the needs of a large religious congregation."  Id. at 1068.

The defendants argue that, "there is no evidence that the Plaintiffs reasonably looked for alternative space and that it was unavailable."  However, there is evidence in the record that Rabbi Eisenbach, with the aid of a real estate agent, visited three other properties before purchasing the 85 West Street property: (1) 367 Bantam Road, which the Chabad had previously occupied as a tenant for a period of time; (2) the Gill property on South Street; and, (3) a property that housed a restaurant called the West Street Grill.  See Borough Defs.' Mem. in Supp. App. A at 65-67 ("Rabbi Eisenbach Dep."); Rabbi Eisenbach Decl. ¶ 12.  Although Rabbi Eisenbach apparently felt that the West Street Grill property was sufficient for the Chabad's needs, as evidenced by the fact that he instructed his agent to make an offer on the property after viewing it, see Rabbi Eisenbach Decl. ¶ 12, Rabbi Eisenbach was told that, by the time he made the

offer, the property was no longer available.[22]  Id.  While the Chabad has certainly not provided evidence that it engaged in as exhaustive a search as did the plaintiffs in International Church of the Foursquare Gospel, it has introduced evidence that it searched for other properties sufficient to raise a genuine issue of material fact as to whether a feasible alternative property existed.[23]

### e. Reasonable belief

The Court of Appeals directed the court to consider "whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street."  Chabad, 768 F.3d at 196.  In connection with this factor, the Court of Appeals cited to Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548 (4th Cir. 2013) and Petra Presbyterian Church,

---

[22] Rabbi Eisenbach did later come to learn that the property was still available.  See Rabbi Eisenbach Decl. ¶ 12.

[23] The court notes, however, that the Chabad's assertion that the other properties were insufficient because they were not located on "church row," amidst the Borough of Litchfield's other houses of worship, see Pls.' Mem. in Supp. Ex. 33 at 3 (Doc. No. 205-33) ("Merriam Letter"), is, without more, insufficient to create a genuine issue of material fact as to whether alternatives existed.  For example, in Midrash Sephardi the court, before concluding that feasible alternatives did exist, noted that the congregations "do not claim that their current location [which they were being forced to vacate] has some religious significance such that their faith requires a synagogue at this particular site."  Midrash Sephardi, 366 F.3d at 1228.  Here, the Chabad does argue that 85 West Street has "religious significance."  However, the Chabad does not argue that its faith "requires" that its synagogue be placed either among other houses of worship or in the center of town.  Rather, situating its synagogue near the other churches and in the center of town is a preference.  See Pls.' Mem. in Supp. at 15 ("Historically, houses of worship have been located in or near the center of the village or town in close proximity to houses, shops, and local government buildings such as the town hall and the court house.  Plaintiff seeks to build a synagogue alongside other religious institutions near the center of the Borough of Litchfield consistent with this tradition") (internal citations omitted).  However, as Midrash Sephardi suggests, there is a difference between a preference and a religiously-mandated requirement.  To that end, even a case cited by the Chabad's attorney in his presentation to the HDC cuts against the Chabad's argument.  In Congregation Kol Ami v. Abington Twp., No. Civ.A. 01-1919, 2004 WL 1837037 (E.D. Pa. Aug. 17, 2004), the court distinguished between a preference and a religiously-mandated requirement, stating that, "The Plaintiffs, however, do not claim that locating their house of worship in a residential area is a basic tenet of their faith. While Rabbi Holin states that his synagogue teaches its members 'the importance of involvement and service to the community,' he does not aver that it mandates that worship services take place next to houses."  Id. at *6.

489 F.3d 846, 851 (7th Cir. 2007).  As a general proposition, "[w]hen a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden."  Bethel, 706 F.3d at 557; see also Petra Presbyterian Church, 489 F.3d at 851 ("once the [religious] organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship on it").  Further, if the religious organization did, in fact, operate under this reasonable expectation, it may be substantially burdened "even though other suitable properties might be available, because the 'delay, uncertainty, and expense' of selling the current property and finding a new one are themselves burdensome."  Bethel, 706 F.3d at 557 (quoting Saints Constantine & Helen, 396 F.3d at 901).

In Bethel, the county argued that the religious organization could not have reasonably expected that it would be permitted to build a church on the purchased property for two reasons: (1) "because at that time the County had long been considering changes to its private institutional facilities policy to limit such institutional uses," and, (2) because "there were no guarantees that Bethel would get all the necessary approvals to build what it wanted."  Id. at 558 (internal quotation marks omitted).  The court rejected both arguments because the county "permitted churches in the rural density transfer zone at the time Bethel bought the property, and [because] modern zoning practices are such that landowners are rarely guaranteed approvals." Id. (emphasis in the original).

On the other hand, in Petra Presbyterian Church, the court concluded that the religious group did not have a reasonable expectation that it would be permitted to build

a church on the purchased property because it had "decided to go ahead and purchase the property outright <u>after</u> it knew that the permit would be denied."  <u>Petra Presbyterian Church</u>, 489 F.3d at 851 (emphasis added).

The defendants note that the "laws and regulations applied by the Commission existed when the Litchfield Chabad purchased the property."  Borough Defs.' Mem. in Supp. at 32.  They also argue that, "[c]onsidering that the Historic District Commission had never allowed an addition greater than the original building, the Plaintiffs were or should have been aware that it was extremely unlikely that they would be permitted to destroy the historical character of a house by adding an addition four times as large." <u>Id.</u>  At oral argument, the defendants argued that the only way for the Chabad to have formulated a reasonable belief as to what the HDC would approve would have been for the Chabad to actively investigate what the HDC had approved in the past.

For its part, the Chabad argues that its belief that its proposal would be approved is evidenced by the fact that at the first pre-hearing only the Chabad's architect and Rabbi Eisenbach appeared "because [the Chabad] did not expect the need for lawyers or a legal challenge."  Pls.' Mem. in Supp. at 33.  Whether that belief was reasonable, however, is another question.  To that end, the Chabad attempts to undercut the defendants' assertion that the HDC's denial was predictable because it was applying impliedly objective "laws and regulations" that had long been on the books.  The Chabad argues that the HDC guidelines are unlike the objective zoning regulations at play in <u>Petra Presbyterian Church</u>, and that, consequently, the HDC's decisions are impossible to predict because they essentially boil down to questions of aesthetics, which are inherently idiosyncratic.  Pls.' Mem. in Supp. at 34.  As a result, the Chabad

argues that it "had no way to know whether or not the application would be approved or denied, but expected a prompt approval." Id. However, such an assertion still begs the question of whether the Chabad's expectation was reasonable.

The record does contain evidence showing that the Episcopal and Catholic churches are both within the historic district and are essentially equally as massive as the Chabad's proposed structure. See id. Ex. A-22 (Episcopal church), Ex. A-26 (Catholic church). Although it is true that those structures were built originally as churches and not as residential structures, unlike the Deming House, case law suggests that it would not have been unreasonable for the Chabad to have looked around the historic district, seen numerous churches which were quite large, and formulated a belief that it too could build a synagogue / religious structure as large.[24]

Further, the reasonableness of the Chabad's belief is buttressed by the fact that there exists another originally residential house which includes an addition that was quite large, relative to the size of the original house. As the HDC admits in its decision, "the Oliver Wolcott Library . . . consists of a historically significant home, to which is attached a substantial library addition." HDC Decision at 14. The HDC attempts to argue that the large addition to that house is inapposite here because the addition, which "made fortunate use of a sloping rear yard," is "hidden below and behind the colonial house," is narrower and lower than the original house, and is only visible from one public street. Id. at 15. However, the Deming House lot also slopes downward in

---

[24] For example, in Bethel the court noted that the county allowed churches to be built in the area where the plaintiffs bought their property, which supported a finding that the plaintiff's belief that they would be able to build a church there was arguably reasonable. See Bethel, 706 F.3d at 558. This is analogous to the Chabad concluding, based on the existence of other large houses of worship, that its large house of worship would be allowed.

the rear.  See Architectural Renderings at 9.  Although clearly the HDC did not think the Deming House property was sufficiently similar to the Wolcott Library property to approve the Chabad's addition – despite the downward sloping plot – there exists a genuine issue of material fact as to whether Chabad could have known, before it bought the property, that the HDC would deny its addition because its property and addition did not sufficiently share these traits.

Lastly, there is evidence in the record that indicates that the size of the Chabad's addition would have been allowable under the zoning regulations.[25]  Borough Defs.' Mem. in Supp. App. O at 9-10.

The existence of other houses or worship that are equally as massive as the Chabad's proposed addition, the existence of another originally residential property that is currently commercial use and had a very large addition made to it, and the evidence that the Chabad's proposal would have complied with the zoning regulations, all raise genuine issues of material fact as to whether the Chabad's belief that the HDC would approve its application was a reasonable one.

### f. Close nexus

Lastly, the Court of Appeals instructed the court to consider "whether the proposed modifications shared a 'close nexus' with and would be consistent with accommodating the Chabad's religious exercise."  Chabad, 768 F.3d at 196.  Both Fortress Bible Church II and Westchester Day III discuss the idea of a "close nexus."

---

[25] Although the defendants argue that the Chabad's proposal would have faced other zoning challenges, see Borough Defs.' Mem. in Supp. at 43-45, the defendants concede that the size of the proposed structure was within the zoning laws' allowances, see id. at 12 ("The size of the structure was, for practical purposes, the maximum structure that was allowable under the Town's zoning coverage restrictions").

In <u>Westchester Day III</u> the Court of Appeals stated:

> We recognize further that where the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive. There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise. Imagine, for example, a situation where a school could easily rearrange existing classrooms to meet its religious needs in the face of a rejected application to renovate. In such case, the denial would not substantially threaten the institution's religious exercise, and there would be no substantial burden, even though the school was refused the opportunity to expand its facilities.

<u>Westchester Day III</u>, 504 F.3d at 349.  In <u>Fortress Bible Church II</u>, the Court of Appeals concluded that, "the burden on the Church was more than minimal and that there was a close nexus between the Town's denial of the project and the Church's inability to construct an adequate facility."  <u>Fortress Bible Church II</u>, 694 F.3d at 219.  As <u>Westchester Day III</u> and <u>Fortress Bible Church II</u> indicate, the question asked by the "close nexus" factor is whether the religious organization is still capable of engaging in its religious exercise despite the government's denial of its proposal.

The most instructive discussion of the "close nexus" factor is found in <u>Fortress Bible Church I</u>.  In that case, the court concluded that:

> A close nexus exists between the Town denying the Church's application to construct its new facility and the Church's religious exercise. This Court credits Reverend Karaman's testimony regarding the ways in which the limitations of the Church's current facility have impeded his and his congregants' religious practice. Reverend Karaman testified that the inadequacies of the current facility have prevented the Church from performing tasks that it believes are mandated by God, including expanding the Church's membership and discipling [sic] to more members. Reverend Karaman also testified that the size limitations of the current facility have impeded the Church's ability to perform certain religious practices, to host visiting missionaries, and to teach certain

> subjects and accommodate handicapped students in its school.
> Thus, the Church's lack of adequate space is significantly curtailing
> its religious activities and preventing Plaintiffs from fulfilling their
> religious mandate. By precluding the construction of a much
> needed facility, Defendants significantly interfered with the Church's
> ability to exercise its religion.

Fortress Bible Church I, 734 F.Supp.2d at 503.  The evidence in the case at bar mirrors

that in Fortress Bible Church I.  Here, Rabbi Eisenbach has testified that he has "lost

parishioners because of the space limitations of the current facility."  Rabbi Eisenbach

Decl. ¶ 11.  He also testified that the Chabad has frequently had to rent space at other

locations in order to create enough room for it to engage in various religious events,

such as Passover Seders, holiday services, and the dedication of a new Torah.  See id.

Unlike in the hypothetical scenario discussed in Westchester Day III – where the plaintiff

could simply rearrange the classrooms in its current facility – in this case, Rabbi

Eisenbach has averred that the Chabad cannot engage fully in its religious exercise in

its current facility.  In short, on the record before this court, without approval for the

proposed addition, a reasonable jury could find that Rabbi Eisenbach cannot fulfill the

"religious and spiritual mission" that he has been "called to fulfill."  Id.

Just as Reverand Karaman's testimony in Fortress Bible Church I was sufficient

to convince the court that a close nexus existed between the government's denial of the

plaintiff's proposal and the plaintiff's religious exercise, Rabbi Eisenbach's testimony in

this case creates a genuine issue of material fact as to whether there exists a close

nexus between the HDC's denial and the Chabad's religious exercise.

### iii. Conclusion

Genuine issues of material fact exist regarding a number of the factors the Court

of Appeals instructed the court to consider.  Specifically, genuine issues of material fact

exist as to: the arbitrariness of the denial; whether the conditions of denial create a substantial burden; the existence of feasible alternatives; the Chabad's reasonable belief that the HDC would approve its proposal; and, whether there exists a close nexus between the denial and the Chabad's religious exercise.  Accordingly, there are genuine issues of material fact as to whether the HDC's denial substantially burdened the Chabad's exercise of religion.  Thus, the Borough defendants' Motion for Summary Judgment on the substantial burden claim is denied.[26]

### 2.  Nondiscrimination Claim

RLUIPA's nondiscrimination provision states that, "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc(b)(2).  The defendants have also moved for summary judgment on this claim.  The court is tasked with determining whether the Chabad has presented sufficient evidence upon which a reasonable jury could find a nondiscrimination claim.  Chabad, 768 F.3d at 200.

To establish a prima facie nondiscrimination claim under RLUIPA, the Chabad must come forward with facts sufficient to allow a reasonable jury to conclude that the defendants, in denying the Chabad's application, acted with an intent to discriminate against the Chabad on the basis of religion.  See id. at 198-200.  Evidence of discriminatory intent may be direct or circumstantial.  Id. at 199.  "Recognizing in the land use context that legislative and administrative actions are rarely motivated by one purpose only, the Supreme Court in Arlington Heights held that a plaintiff must establish

---

[26] Because the individual defendants raise additional arguments in favor of summary judgment, which arguments the court has yet to address, it would be premature to deny the individual defendants' Motion for Summary on the substantial burden claim at this time.

that the challenged decision was at least motivated in part by a discriminatory purpose but not that it was the primary, or dominant purpose." Church of Scientology of Georgia, Inc. v. City of Sandy Springs, Ga., 843 F.Supp.2d 1328, 1371 (N.D. Ga. 2012) (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977)).

Although the Chabad court noted that the Second Circuit has yet to interpret RLUIPA's nondiscrimination provision, the Court of Appeals identified a number of factors germane to the inquiry. Id. at 198-99. These factors include: (1) "the series of events leading up to a land use decision"; (2) "the context in which the decision was made"; (3) "whether the decision or decisionmaking process departed from established norms"; (4) "statements made by the decisionmaking body and community members"; (5) "reports issued by the decisionmaking body"; (6) "whether a discriminatory impact was foreseeable"; and, (7) "whether less discriminatory avenues were available." Id. at 199. The Court of Appeals culled these factors from two other cases: Bethel, which the court has already discussed in connection with the substantial burden analysis, and Church of Scientology.

>    i. Series of events leading up to decision / context in which decision
>       made

The Chabad's most compelling argument with regard to the "series of events / context" factor is that the HDC allowed other applicants to alter their buildings in ways that were not historically accurate, thereby raising an inference that the HDC's denial of the Chabad's attempts to do so was religiously motivated. Specifically, the Chabad notes that the HDC allowed the Methodist Church to apply vinyl siding as a cost-saving measure, despite the fact that vinyl siding was not historically accurate. See Pls.' Mem. in Supp. at 44-45. The defendants, on the other hand, argue that the HDC made similar

accommodations for the Chabad by allowing the Chabad to: (1) use stained glass rather than plain glass on the door; (2) add the Star of David finial to the roof; and, (3) use Jerusalem Stone on the addition.  Borough Defs.' Mem. in Supp. at 35.  That said, the HDC did not accommodate the largest component of the Chabad's proposal – the addition.  A reasonable jury could conclude that the HDC's approval of the three more minor modifications that the Chabad sought was comparable to the HDC's approval of the Methodist Church's request to use vinyl siding.  However, a reasonable jury could also conclude that the allowance granted to the Methodist Church was a more significant accommodation than that which the HDC afforded the Chabad.  Thus, there exists evidence in the record relating to this factor that is potentially supportive of the Chabad's nondiscrimination claim.

### ii. Whether the decision / decisionmaking process deviated from established norms

As already discussed, see supra, § IV.A.1.ii.a, there is a genuine issue of material fact as to whether or not the HDC's decision deviated from established norms by considering the interior square footage of the addition.

The Chabad also argues that the decisionmaking process deviated from established norms.  Gillian Bearns, who served as the Chabad's counsel during the HDC hearings, declared under oath that, "[a]t various points during the administrative hearing process, the HDC, through its attorney, James Stedronsky, attempted to prevent Plaintiffs from submitting relevant documents and to delete or remove documents already submitted and marked as exhibits from the administrative record." See Pls.' Mem. in Supp. Ex. C ¶ 20 (Doc. No. 205-35) ("Bearns Decl.").  The defendants do not address this argument in their Reply memoranda.

Lastly, the Chabad argues that the decisionmaking process deviated from established norms insofar as HDC members met and spoke about the Chabad's application outside of the public hearings. Pls.' Mem. in Supp. at 46. The record supports the Chabad's assertion that certain HDC members did discuss the Chabad's application outside of official proceedings. For example, Hillman admitted that, after the first pre-hearing, he spoke to Crist outside of a public hearing. See Borough Defs.' Mem. in Supp. App. C at 2 (Doc. No. 187-6) ("Hillman Aff."). However, Hillman claims that that conversation was limited to a discussion of a technical aspect of the Chabad's application having to do with inconsistencies in the plans submitted by the Chabad. See id. Similarly, although Crawford admitted that she spoke to Hillman and Kuhne outside a public hearing, she states that she only spoke to them about the size of the Chabad's proposed addition. See Crawford Dep. at 4.

Hillman testified that the HDC members were instructed not to discuss the Chabad's case outside of the public hearings. See Hillman Aff. ¶ 5. Thus, although the individual HDC members have proffered explanations that purport to prove that their ex-parte conversations were facially nondiscriminatory, there is evidence in the record that a number of HDC members discussed the Chabad's application outside of the public hearing, despite being instructed not to, and that the HDC attempted to prevent the Chabad from submitting and removing documents from the administrative record. Thus, there exists evidence in the record relating to this factor that is supportive of the Chabad's nondiscrimination claim.

iii. <u>Statements made by the HDC or the public</u>

The Chabad's most persuasive argument related to "statements made by the HDC / public" factor focuses on comments made by HDC member Acerbi at the first pre-hearing, and the presumptive effect of those comments.  At the pre-hearing, Acerbi said, "[w]e have to get the public out on this project for the public hearing."  Pls.' Mem. in Supp. at 46.  Following the pre-hearing, the public did, in fact, attend the various public hearings in great numbers.  <u>See id.</u>; <u>see also</u> D'Andrea Dep. at 6 (noting that in the three years he had been a member of the HDC, the only times the location for the public hearings had to be moved to accommodate the public were for the three hearings on the Chabad's application).  Although the Chabad does not argue that Acerbi's comments were directly anti-Semitic, it argues that they were said "with a tone of urgency seaming [sic] dismissive of the proposal."  Pls.' Mem. in Supp. at 46.

With regard to the content of Acerbi's comments, even if they were not obviously anti-Semitic, it is possible for a reasonable factfinder to infer that, when an HDC member urges the public to turn out en masse for a public hearing on a religious organization's application, the HDC member is acting with religious animus.[27]  And, with regard to the tone with which Acerbi made her comments, it is also possible for a reasonable factfinder to infer religious animus from a hostile tone.  <u>See</u> <u>Church of Scientology</u>, 843 F.Supp.2d at 1372 (plaintiffs asserted, and the court agreed, that one piece of circumstantial evidence supporting a potential inference of religious discrimination was "the negative tenor of the questions and statements made by two

_____

[27] Although "[a]n unconstitutional motive on the part of one member of the City Council is insufficient to impute an unconstitutional motive to the entire City Council as a whole," <u>Church of Scientology</u>, 843 F.Supp.2d at 1375, it can still serve as one piece of circumstantial evidence, <u>see id.</u> at 1375-76.

Council members" at a public hearing") (internal quotation marks omitted).  Thus, the record contains evidence related to this factor that is supportive of the Chabad's nondiscrimination claim.

### iv. Report issued by the decisionmaking body

The Chabad does not offer any new arguments as to the "report issued by the decisionmaking body" factor, instead simply repeating its allegation that the HDC "applied arbitrary, capricious and illegal considerations to issue the decision."  Pls.' Mem. in Supp. at 47.  The court has already addressed the alleged irregularities in the decision / decisionmaking process, see supra, § IV.A.2.ii.  The evidence in the record related to this factor is supportive of the Chabad's nondiscrimination claim.

### v. Whether a discriminatory impact was foreseeable

The record shows that one of the Chabad's attorneys, Peter Herbst, informed the HDC that denying the Chabad's application would substantially burden its exercise of religion.  Specifically, Herbst told the HDC:

> If you were to deny this addition to the property because of its size or because of its massing, you would be imposing a substantial burden on the Chabad's religious exercise.  Rabbi Eisenbach has made it unequivocally clear that the size and the mass of this building is based on what is absolutely essential for the Chabad to be able to fulfill its religious mission.  Denying this application, because the mass or the size of the addition is in your opinion too large, substitutes your opinion, for that of Rabbi Eisenbach as to what is necessary to fulfill the Chabad's religious mission.  The Federal and State Constitutions prohibit you, the government, from imposing that secular judgment upon a place of worship

Pls.' Mem. in Supp. Ex. D Ex. 2 at 5 (Doc. No. 205-36) ("Herbst Stmt. to HDC").  In Church of Scientology, the plaintiff's attorney provided the town with a functionally identical warning.  See Church of Scientology, 843 F.Supp.2d at 1373-74.

Nevertheless, the town offered the Scientology plaintiffs a conditional approval for a building smaller than the plaintiffs desired.  See id.  As a result, the court noted that, "[a] reasonable factfinder could find that the City's conditional approval limiting the size of the Church to 32,000 square feet despite its knowledge, or at least the foreseeability, of the predictable effect on Plaintiff's effort to create and practice as the Ideal Organization, could support an inference of discriminatory intent."  Id. at 1374.  Although "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation," "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose."  Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464 (1979); see also Soberal-Perez v. Heckler, 717 F.2d 36, 42 (2d Cir. 1983) ("While it is true, as plaintiffs argue, that the fact that a particular action has a foreseeable adverse impact may be relevant evidence in proving an equal protection claim, standing alone that fact is insufficient to establish discriminatory intent") (internal citations omitted).  In the case at bar, the foreseeable impact of the HDC's denial serves as evidence that the HDC acted with a religiously discriminatory intent.  Thus, there is evidence in the record related to this factor that is supportive of the Chabad's nondiscrimination claim.

vi. <u>Whether less discriminatory avenues were available</u>

The "less discriminatory avenue" factor generally asks whether the government "ignored less [discriminatory] options which would have furthered its policies as effectively as the more [discriminatory] option it chose."  United States v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind., 573 F.2d 400, 413 (7th Cir. 1978); see also Church of Scientology, 843 F.Supp.2d at 1375 (citing this operative language from City

49

of Indianapolis).  With regard to this factor, the Chabad argues only that, "[t]he Defendants should allow Plaintiff to have a facility at least the same in height and scale as the Christian Churches.  Anything less would be discriminatory."  Pls.' Mem. in Supp. at 48.  As already discussed, see supra, § IV.A.1.ii.e, the Catholic and Episcopal churches are essentially as massive as the Chabad's proposed addition.  The Chabad has also asserted that it could not have reduced the size of the addition at all.  See Pls.' Mem. in Supp. at 10.  Thus, there is no evidence in the record that an alternative, less discriminatory option was presented to the HDC and that the HDC ignored this option.  Accordingly, this factor is neutral.

### vii. Conclusion

Upon review of the various factors discussed in Chabad, there is sufficient evidence in the record to allow a reasonable factfinder to conclude that the HDC acted with an intent to discriminate against the Chabad on the basis of religion.  See Church of Scientology, 843 F.Supp.2d at 1376 ("In light of the totality of the circumstances, there is sufficient evidence in the record to create a triable issue of fact on whether the City acted with a discriminatory purpose in its conditional approval of Plaintiff's Application by limiting the square footage of the Church based on an inadequate parking allocation and thereby allegedly rendering the building unfit for the practice of Scientology").  Therefore, the defendants' Motion for Summary Judgment on the Chabad's nondiscrimination claim is denied.

### 3. Individual Defendants' Defenses

In addition to arguing that the HDC Decision did not substantially burden the Chabad's religious exercise or discriminate against the Chabad on the basis of religion,

Hillman and Crawford argue that they are entitled to summary judgment on certain grounds that pertain only to them, as individual defendants, and not to the Borough defendants. Specifically, Crawford argues that she is entitled to summary judgment because she did not vote on the Chabad's application. Hillman and Crawford (to the degree that the court holds that Crawford is not entitled to summary judgment based on her first argument) also argue they are entitled to summary judgment on both claims because they are protected by quasi-judicial absolute immunity or, in the alternative, qualified immunity.

### i. Whether Crawford Voted on the Chabad's Application

Crawford argues that, because RLUIPA only applies to government bodies and government officials acting under color of state law, Crawford could not possibly have violated RLUIPA because she never voted on the Chabad's application and, as such, never acted in an official governmental capacity. See Indiv. Defs.' Mem. in Supp. at 20-21. The Chabad argues that there is a genuine issue of material fact as to whether or not Crawford voted. See Plaintiffs' Memorandum of Law in Response to Defendants' Glenn Hillman and Kathleen Crawford's Motion for Summary Judgment at 35-36 (Doc. No. 206) ("Pls.' Mem. in Supp. Re: Indiv. Defs.").

The court concludes that a genuine issue of material fact as to whether Crawford voted on the Chabad's application exists. On the one hand, the minutes of the HDC meeting in which the HDC voted on the Chabad's application contain both a "Recording of Attendance" and a "roll call vote." See HDC Decision at 2. Based on the minutes, Crawford was present at the meeting and served as an Alternate Commissioner. See id. According to the "roll call vote," only HDC members Montebello, Acerbi, Hillman,

Sansing, and Crist voted on the Chabad's application.  Id.  The "roll call vote" does not contain any record of Crawford voting.  Thus, it would appear she did not vote.

However, at her deposition, Crawford testified, unequivocally, that she voted on the Chabad's application.

> Q: Okay. What was your vote on the Chabad's application?
>
> A: It was a two-part vote.  One was on the cupola.  And the other was on the size of the building, the building itself.  I voted against the building.

Crawford Dep. 81:24-82:3.  Thus, because a genuine issue of material fact exists as to whether Crawford voted on the Chabad's application, her Motion for Summary Judgment on the basis that she never acted in an official capacity is denied.

### ii. Immunity Defenses

### a. Qualified Immunity

"When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.' "  Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 223-24 (2009)).  It is within the court's discretion to decide which part of the two-part inquiry to address first.  Pearson, 555 U.S. at 236.  That being said, the first part of the inquiry functions as a threshold inquiry: if, on the facts presented, the plaintiff cannot establish that it suffered a statutory or constitutional violation, there is no need to proceed to the second part of the inquiry.  See Southerland v. City of New York, 681 F.3d 122, 125 (2d. Cir. 2012).  As already discussed, genuine issues of material fact exist with regard both to

whether the defendants violated RLUIPA's substantial burden and nondiscrimination provisions.  However, because it is still possible that the individual defendants are protected by qualified immunity – even in the event that a jury determines that the Chabad's rights under RLUIPA were violated – the court will proceed to discuss the second prong of the qualified immunity inquiry.[28]

"To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Taravella, 599 F.3d at 133 (internal quotation marks and alterations omitted).  "For a right to be clearly established for purposes of qualified immunity, it is sufficient if decisions of the Supreme Court or of the appropriate circuit have defined the contours of the right with reasonable specificity."  Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000). Still, whether a right is "clearly established" "is not answered by reference to how courts or lawyers might have understood the state of the law.  Rather, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Southerland, 681 F.3d at 125.  "Qualified immunity thus shields government officials from liability when they make reasonable mistakes about the legality of their actions . . ."

---

[28] The court notes that in Zellner v. Summerlin, 494 F.3d 344 (2d Cir. 2007), the Court of Appeals indicated that, if there existed unresolved issues of fact relating to the first prong of the qualified immunity inquiry, then the court should wait until the jury determined the historical facts before turning to the second prong of the inquiry.  See id. at 368 ("If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court.  If there is such a dispute, however, the factual questions must be resolved by the factfinder. Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court) (internal quotation marks, alterations, and citations omitted).  However, Zellner was decided before the Supreme Court, in Pearson, expressly granted district courts permission to consider the second prong before the first.

Sudler v. City of New York, 689 F.3d 159, 174 (2d. Cir. 2012) (internal quotation marks omitted).

The thrust of the individual defendants' argument is that the individual HDC members "attempt[ed] to follow the difficult constitutional and statutory standards applicable to the application as discussed by the Second Circuit in Westchester Day [III]."  Indiv. Defs.' Mem. in Supp. at 21.  The court sympathizes with the difficult task presented to the HDC members, and it agrees that many aspects of RLUIPA jurisprudence were unclear at the time that the HDC was deciding on the Chabad's application.  Further, the record does contain evidence indicating that the HDC members attempted to adhere to the recent RLUIPA jurisprudence when making its decision on the Chabad's application.  See, e.g., HDC Decision at 12.  That said, one thing that was absolutely clear under RLUIPA at the time the HDC was deliberating over the Chabad's application was that the HDC's decision could not permissibly be based on arbitrary, capricious, or illegal grounds.  See Westchester Day III, 504 F.3d at 350-53.

And, as already discussed, see supra, § IV.A.1.ii.a, there exists a genuine issue of material fact as to whether the HDC's decision was based on illegal considerations such as interior arrangement or square footage.  Because it would have been clear to the HDC that its decision could not rest on illegal considerations, if the jury were to determine that the HDC's decision was, in fact, predicated on illegal considerations, then the court, as a matter of law, would have to conclude that the individual defendants are not entitled to qualified immunity.  However, if the jury were to determine that the HDC's decision violated RLUIPA – but not because it was based on illegal

considerations – then the court would return to the question of whether the HDC's decision, though violative of the Chabad's rights, was nevertheless the product of the type of reasonable mistake that qualified immunity immunizes.  Thus, at this juncture, the individual defendants' Motion for Summary Judgment based on qualified immunity is denied. [29]

### ii. Quasi-Judicial Absolute Immunity

The individual defendants also argue that they are entitled to quasi-judicial absolute immunity as to both the Chabad's substantial burden and nondiscrimination claims.  See Indiv. Defs.' Mem. in Supp. at 18.  The defendants do not present separate arguments for each of the Chabad's claims, likely because the legal analysis would not differ.  Accordingly, the court will discuss whether the individual defendants are entitled to absolute immunity as to both of the Chabad's claims simultaneously.

The party seeking quasi-judicial absolute immunity bears the burden of proving that he is entitled to such immunity.  See Gross v. Rell, 585 F.3d 72, 81 (2d Cir. 2009).

---

[29] In their brief, the individual defendants argue that they are entitled to qualified immunity "from this suit."  Individual Defendants' Memorandum in Support of Their Motion for Summary Judgment at 21 (Doc. No. 185-2) ("Indiv. Defs.' Mem. in Supp.").  The natural reading on this assertion is that the individual defendants are arguing they are entitled to summary judgment as to both the substantial burden and nondiscrimination claims based on qualified immunity.

However, the substance of the individual defendants' brief on this point only seems to address qualified immunity as it pertains to the substantial burden claim.  See id. at 21-22.  Further, even if the court were to construe the individual defendants' memorandum in support as arguing that they are entitled to summary judgment on the nondiscrimination claim based on qualified immunity, this argument would fail.  As the discussion of the Chabad's nondiscrimination claim illustrates, a reasonable factfinder could conclude, based on the evidence in the record, that the HDC discriminated against the Chabad on the basis of religion.  See supra, § IV.A.2.  An entity's right not to be discriminated against on the basis of religion is articulated by the plain text of RLUIPA.  See 42 U.S.C. 2000cc(b)(2) ("No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination") (emphasis added).  Further, because a plaintiff needs to prove that the defendant intended to discriminate in order for the plaintiff to prevail on a nondiscrimination claim, if the factfinder determines that the defendants did discriminate against the Chabad on the basis of religion, it would seem hard for the defendants to argue that their discriminatory actions were the types of "reasonable mistakes" that qualified immunity exists to protect.  Thus, at the very least, there is a genuine issue of material fact as to whether the individual defendants would be entitled to qualified immunity on the Chabad's nondiscrimination claim.

"[F]ederal law on quasi-judicial immunity applies to state officials sued in federal court on federal claims," as is the case here.  Id.  However, neither the defendants, nor the plaintiffs argue federal law on this issue, but instead rely on Connecticut state law. Although there is some significant overlap between the factors federal and Connecticut courts look to when deciding whether an official is entitled to quasi-judicial immunity, the considerations are not co-extensive.  Specifically, the defendants, having cited to a Connecticut Supreme Court case that articulates three factors, only discuss these three factors.  See Indiv. Defs.' Mem. in Supp. at 19-20 (relying on Carruba v. Moskowitz, 274 Conn. 533 (2005).  The Court of Appeals for the Second Circuit, however, has articulated six factors to consider.  See Gross, 585 F.3d at 88 (citing Cleavinger v. Saxner, 474 U.S. 193, 202 (1985)).

Although the defendants appear to make a compelling case that they are entitled to quasi-judicial immunity, in light of the parties' incomplete briefing, and in light of the fact that no court within the Second Circuit has yet to address whether members of a historic district commission are entitled to quasi-judicial immunity, the court declines to decide the question as an issue of first impression at this time.  See, e.g., Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F.Supp.2d 357, 366-67 (S.D.N.Y. 2011) ("While it is true that an analysis concerning the applicability of quasi-judicial immunity under state versus federal law may overlap in significant ways, Defendants, who bear the burden, have not addressed the [federal] factors and have proffered neither facts nor arguments sufficient for this Court to determine that quasi-judicial immunity should apply to Defendants under that federal standard. The Court is unable to locate any Second Circuit authority applying such immunity under federal law in these

56

circumstances and therefore declines to decide the question as an issue of first impression").  Accordingly, the individual defendants' Motion for Summary Judgment on the basis of quasi-judicial immunity is denied.  However, the individual defendants may move for summary judgment on the basis of quasi-judicial immunity with briefing that discusses federal law.

B. Motions to Dismiss Rabbi Eisenbach as a Plaintiff

When the defendants filed their original Motion to Dismiss Eisenbach as a Plaintiff, they claimed that, because Eisenbach did not possess a property interest in the 85 West Street property, he lacked standing to bring a RLUIPA claim.  See Memorandum in Support of Motion to Dismiss Against Rabbi Joseph Eisenbach 8-10 (Doc. No. 88-1) ("Mem. in Supp. of Defs.' Mot. to Dismiss").  Accordingly, the defendants' Motion was styled as a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Id. at 1.  When Rabbi Eisenbach responded to the motion, he also treated the motion as one brought under Rule 12(b)(1).  See Plaintiffs' Opposition to Individual Defendants' Motion to Dismiss Rabbi Eisenbach 2 (Doc. No. 117) (Pls.' Opp. to Mot. to Dismiss).  After the court granted the Motion to Dismiss, the Court of Appeals vacated that decision on the ground that the court incorrectly analyzed the Motion as a motion to dismiss for lack of standing, rather than as a motion to dismiss for failure to state a claim.  See Chabad, 768 F.3d at 201-02.

The question squarely before the court is whether Rabbi Eisenbach has stated a claim upon which relief can be granted.  Because neither party has re-briefed this issue, the court will address the arguments the parties presented in their original briefing on the Motion to Dismiss Rabbi Eisenbach as a Plaintiff.

Both RLUIPA's substantial burden and nondiscrimination provisions apply only to "land use regulations[s]."  42 U.S.C. §§ 2000cc(a)(1); 2000cc(b)(2).  "Land use regulation" is defined as, "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest."  42 U.S.C. § 2000cc-5(5).  Accordingly, to state a claim under RLUIPA's substantial burden or nondiscrimination provision, the plaintiff must have "an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest."

The defendants argue that, because only the Chabad purchased the 85 West Street property, Rabbi Eisenbach possesses no property interest in the property.  See Mem. in Supp. of Defs.' Mot. to Dismiss at 8.  Rabbi Eisenbach argues that he has a property interest stemming either from his anticipated exclusive use of the parsonage portion of the proposed addition or from his right, granted to him by the Chabad, to place a mortgage lien on the 85 West Street property.  See Pls.' Opp. to Mot. to Dismiss at 4-5.

Before discussing whether Rabbi Eisenbach's claimed property interests actually constitute property interests, the court notes that there is no mention of Rabbi Eisenbach's mortgage lien in the Complaint (Doc. No. 1), the Amended Complaint (Doc. No. 6), the Second Amended Complaint (Doc. No. 25), or the Third Amended Complaint (Doc. No. 54).  Rather, the first mention of it comes in Rabbi Eisenbach's sworn declaration, dated February 18, 2011, and submitted as an exhibit to Rabbi Eisenbach's

opposition to the Motion to Dismiss.  See Pls.' Opp. to Mot. to Dismiss Ex. A ¶ 15 (Doc. No. 117-1) ("2011 Rabbi Eisenbach Decl.").  When the Motion to Dismiss was styled as a Rule 12(b)(1) motion, the court appropriately considered Rabbi Eisenbach's Declaration, even though it was not part of the Complaint, because courts "may refer to evidence outside the pleadings" when deciding a Rule 12(b)(1) motion.  Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000).  However, now that the Motion to Dismiss is styled as a Rule 12(b)(6) motion, the court will not consider Rabbi Eisenbach's Declaration.  See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006) ("the district court committed reversible error when, in ruling that the complaint failed to state a claim for which relief could be granted, it considered matters outside plaintiff's complaint").  Accordingly, in connection with the Motion to Dismiss for failure to state a claim, the court will not consider Rabbi Eisenbach's argument that he has a property interest based on his mortgage lien.

With regard to Rabbi Eisenbach's claim that he has a property interest because he plans to live in the proposed building, the court first notes that, in Connecticut, a non-owner can acquire a property interest by entering into an oral agreement with the owner to lease the property.  See Moutinho v. Planning and Zoning Comm'n of City of Bridgeport, 899 A.2d 26, 29, 33 (Conn. 2006).  Further, because RLUIPA specifically applies to anyone with a contract to acquire a property interest, an oral agreement to lease, purchase, or occupy property would clearly situate the would-be lessee within RLUIPA's umbrella.  The Third Amended Complaint, which was filed on behalf of both the Chabad and Rabbi Eisenbach, states that the addition will include "accessory rabbinical housing dedicated solely to its full-time rabbi's use."  Third Am. Compl. ¶ 1.

This assertion is sufficient to permit the reasonable inference that the Chabad and Rabbi Eisenbach entered into an oral agreement that allows Rabbi Eisenbach exclusive use of the rabbinical housing.  Accordingly, the Third Amended Complaint contains factual matter sufficient to support the conclusion that Rabbi Eisenbach had a contract to acquire a property interest in 85 West Street

However, an alternative ground exists for dismissing Rabbi Eisenbach as a plaintiff with regard to the nondiscrimination claim.  The nondiscrimination provision bars the government from discriminating against "any assembly or institution" on the basis of religion.  42 U.S.C. § 2000cc(b)(2).  It does not bar the government from discriminating against an individual.  On the other hand, the substantial burden provision bars the governments from substantially burdening the religious exercise "of a person, including a religious assembly or institution . . . "  42 U.S.C. § 2000cc(a)(1).  This distinction makes it clear to the court that the nondiscrimination provision does not provide a cause of action for individuals such as Rabbi Eisenbach.[30]

The Motions to Dismiss Rabbi Eisenbach as a Plaintiff are granted in part and denied in part.  The Motions to Dismiss Rabbi Eisenbach are granted with regard to the nondiscrimination claim, and denied with regard to the substantial burden claim.

## V.    CONCLUSION

For the above-stated reasons, the Individual Defendants' Motion for Summary Judgment (Doc. No. 185) is **DENIED**.  The individual defendants will be granted 21

---

[30] Aside from the fact that the statutory language is clear, Rabbi Eisenbach's failure to address this argument, which the individual defendants raised in their brief, see Indiv. Defs.' Mem. in Supp. at 23, renders Rabbi Eisenbach's nondiscrimination claim abandoned, see Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014) ("in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned").

days, until February 17, to submit an additional motion and briefing with regard to the quasi-judicial immunity claim, which briefing discusses federal law.  If the individual defendants submit additional briefing, the plaintiffs will have fourteen days, until March 2, to file a brief in opposition.  The individual defendants will then have seven days, until March 9, to file a reply.

The Borough Defendants' Motion for Summary Judgment (Doc. No. 187) is **DENIED**.  The Individual Defendants' Motion to Dismiss Rabbi Eisenbach as Plaintiff (Doc. No. 88) is **GRANTED IN PART AND DENIED IN PART.**  The Motion is granted with regard to the nondiscrimination claim, and denied with regard to the substantial burden claim.  The Borough Defendants' Motion to Dismiss Rabbi Eisenbach as Plaintiff (Doc. No. 141) is **GRANTED IN PART AND DENIED IN PART.**  The Motion is granted with regard to the nondiscrimination claim, and denied with regard to the substantial burden claim.

**SO ORDERED**.

Dated at New Haven, Connecticut this 27th day of January 2016.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge