**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHABAD LUBAVITCH OF | : | CIVIL ACTION NO. |
| LITCHFIELD COUNTY, INC., et al., | : | 3:09-CV-1419 (JCH) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BOROUGH OF LITCHFIELD, | : | SEPTEMBER 29, 2016 |
| CONNECTICUT, et al., | : | |
| Defendants. | : | |


**RULING RE: DEFENDANTS GLENN HILLMAN AND KATHLEEN CRAWFORD'S
MOTION FOR SUMMARY JUDGMENT (DOC. NO. 229)**

**I.    INTRODUCTION**

Plaintiffs, the Chabad Lubavitch of Litchfield County, Inc. ("the Chabad") and

Rabbi Joseph Eisenbach, filed a Third Amended Complaint against the Borough of

Litchfield, Connecticut, the Historic District Commission of the Borough ("the HDC"), and

HDC members Wendy Kuhne ("Kuhne")[1], Glenn Hillman ("Hillman"), and Kathleen

Crawford ("Crawford").  Only Counts Six and Seven of the Third Amended Complaint

remain.  Both remaining counts allege violations of the Religious Land Use and

Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc et seq.

Hillman and Crawford have moved for summary judgment on both counts on the

ground that they are entitled to quasi-judicial absolute immunity.  See Defendants Glenn

Hillman and Kathleen Crawford's Motion for Summary Judgment at 1-2 (Doc. No. 229).

---

[1] All claims against Wendy Kuhne have been dismissed; she is no longer a party to this case.
See Chabad Lubavitch of Litchfield Cty. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 187 n. 1 (2d
Cir. 2014).

## II.     FACTUAL BACKGROUND

The Borough of Litchfield is an independent municipal corporation, whose

boundaries are wholly within the Town of Litchfield.  See Rule 56(a)(1) Statement of

Facts in Support of the Individual Defendants' Motion for Summary Judgment re:

Absolute Immunity ¶ 7 (Doc. No. 229-2) ("L.R. 56(a)(1) Stmt.").  The Borough is

governed by a municipal charter adopted in 1989, pursuant to the Connecticut General

Statutes.  Id.  Pursuant to the provisions of Chapter 97a of title 7 of the Connecticut

General Statutes, C.G.S.A. §§ 7-147a et seq., the HDC governs aspects of the

construction and modification of buildings within the Litchfield Historic District.  Id. ¶ 8;

see also C.G.S.A. § 7-147a.  Anyone seeking to erect or alter a structure within the

Litchfield Historic District must receive a certificate of appropriateness from the HDC

before commencing construction.  See C.G.S.A. § 7-147d(a).  Section 7-147c(e) of title

7 of the Connecticut General Statutes permits the HDC to adopt regulations which set

forth the criteria by which it would judge applications.  See L.R. 56(a)(1) Stmt. ¶ 9; see

also C.G.S.A. § 7-147c(e).

Seeking to alter and add to a building it purchased within the Litchfield Historic

District, the Chabad applied for a certificate of appropriateness in 2007.  See generally

L.R. 56(a)(1) Stmt. ¶¶ 14 – 27.  The HDC held a series of public hearings in connection

with the Chabad's application; it ultimately denied the Chabad's application without

prejudice.  See id.

## III.     LEGAL STANDARD

As the parties seeking quasi-judicial absolute immunity, Hillman and Crawford

bear the burden of demonstrating that they are entitled to such immunity.  See Gross v.

Rell, 585 F.3d 72, 88 (2d Cir. 2009).  "[F]ederal law on quasi-judicial immunity applies to

state officials sued in federal court on federal claims," as is the case here.  Id. at 81.

The Supreme Court has articulated six factors that courts must consider in determining

whether a governmental official is entitled to absolute immunity.  The factors are:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation;

> (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;

> (c) insulation from political influence;

> (d) the importance of precedent;

> (e) the adversary nature of the process; and

> (f) the correctability of error on appeal.

Cleavinger v. Saxner, 474 U.S. 193, 202 (1985) (citing Butz v. Economou, 438 U.S. 478

(1978)).  This "[i]mmunity analysis is 'functional' and scrutinizes the actual

responsibilities of the government official in question in light of six factors."  Tulloch v.

Coughlin, 50 F.3d 114, 116 (2d Cir. 1995).  Quasi-judicial absolute immunity is "rare and

exceptional."  Cleavinger, 474 U.S. at 202.  "[Q]ualified immunity represents the norm"

for executive officials.  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).

In this Circuit, the question of whether local board or commission members may

receive federal quasi-judicial immunity for land use decisions appears to have only been

addressed a few times and only at the district court level.[2]  The Western District of New

York refused to grant quasi-judicial immunity to members of a village board of trustees

in deciding a zoning dispute.  See Altaire Builders, Inc. v. Vill. of Horseheads, 551 F.

---

[2] The Second Circuit has held that town board members had absolute legislative immunity for their adoption of a zoning master plan and amendment of zoning ordinances.  See Orange Lake Associates, Inc. v. Kirkpatrick, 21 F.3d 1214, 1224 (2d Cir. 1994).

3

Supp. 1066, 1073 (W.D.N.Y. 1982).  The court in Altaire noted that zoning has not

traditionally been characterized as a judicial function.  Id. at 1073.  The court refused to

grant immunity despite the fact that the village board provided notice, held a hearing

which was required by law, considered evidence offered by both sides, and made

findings of fact and conclusions.  See id. at 1071.  The Altaire court stated:

> The nature of the hearing required by the zoning ordinance is
> not the adjudicative hearing conducted in a judicial or quasi-
> judicial forum.   It is a public hearing, and its function
> encompasses a variety of objectives.  It is designed to inform
> the Trustees of the merits of the proposal.  It is also intended
> to inform the public and to allow the Trustees to determine the
> public's response to the proposal and, in particular, the
> response of landowners as to the effect of the proposal on
> their interests.   While evidence is received, it is clearly not
> subject to the rules of evidence, and may in fact be rife with
> hearsay, conjecture and speculation, but is nonetheless
> acceptable for the purpose of gauging public opinion.

Id. at 1072.  The Southern District of New York expressly adopted Altaire's reasoning,

and held that members of a Village Board of Zoning Appeals lacked judicial immunity.

See Rodrigues v. Vill. of Larchmont, N.Y., 608 F. Supp. 467, 475–76 (S.D.N.Y. 1985).[3]

The Third Circuit, on the other hand, has granted quasi-judicial immunity to

members of a board of supervisors, in connection with a zoning decision.  See Dotzel v.

Ashbridge, 438 F.3d 320, 327 (3d Cir. 2006).  The Third Circuit granted immunity in part

because, "zoning disputes can be among the most fractious issues faced by

---

[3] The Southern District of New York has also refused to grant quasi-judicial immunity to a village building inspector and the village's mayor in one zoning dispute, see Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead, 98 F. Supp. 2d 347, 357 (S.D.N.Y. 2000), and to a village building inspector in another zoning dispute, see Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 336 (S.D.N.Y. 2011).

The scarcity of Second Circuit cases on federal quasi-judicial immunity for members of local boards and commissions for land use decisions may suggest that defendants rarely seek to claim such immunity.

municipalities, and the risk of threats and harassment is great." Id. at 325.  The Ninth Circuit has similarly granted quasi-judicial immunity to members of a state (rather than local) growth management hearing board for its rulings on zoning appeals.  See Buckles v. King Cty., 191 F.3d 1127, 1136 (9th Cir. 1999).[4]

On the other hand, the Ninth Circuit has held that state land conservation and development commissioners did not act in a judicial capacity under Butz when they issued an order that resulted in property being rezoned.  See Zamsky v. Hansell, 933 F.2d 677, 679 (9th Cir. 1991).  Additionally, the First Circuit refused to recognize judicial immunity for town planning board members for their imposition of conditions on the development of a proposed subdivision.  See Cutting v. Muzzey, 724 F.2d 259, 262 (1st Cir. 1984).  The Fifth Circuit has also refused to recognize quasi-judicial immunity for city council members for their denial of a land development plan application.  See Da Vinci Inv., Ltd. P'ship v. Parker, 622 F. App'x 367, 374 (5th Cir. 2015).

## IV.   DISCUSSION

The court will first address the Cleavinger factors individually.  In reaching a decision, however, this court will consider the relative importance of each factor in the context of the case.

### A.   Need to assure that the individual can perform his functions without harassment or intimidation

While it is axiomatic that no one relishes the prospect of being sued, this factor focuses on whether absolute immunity is required to assure HDC members that they can perform their duties without fear of harassment or intimidation.  Both Hillman and

---

[4] It bears noting that the Buckles decision involved a board explicitly referred to in a state statute as "quasi-judicial."  See id. at 1133.

Crawford have stated, under oath, that being sued by the Chabad has impacted their performance on the HDC.  <u>See</u> Affidavit of Glenn Hillman ¶¶ 15-17 (Doc. No. 229 App. GG) ("Hillman Aff."); Affidavit of Kathleen Crawford ¶¶ 8, 10 (Doc. No. 229 App. HH) ("Crawford Aff.").  Additionally, Leon Losee, the Warden of the Borough of Litchfield, attests that, since the commencement of this lawsuit, the Board of Warden and Burgesses, which is the body responsible for appointing HDC members, has had a significantly more difficult time filling vacancies on the HDC.  <u>See</u> Affidavit of Leone Losee ¶¶ 6-8, 10 (Doc. No. 229 App. FF) ("Losee Aff.").  Although the Chabad does not dispute these assertions, the fact remains that these statements are somewhat conclusory.  For example, Warden Losee does not provide the rate of declination or absolute number of declinations, before and after the commencement of this lawsuit. <u>See</u> <u>id.</u>  Furthermore, the record reflects that Hillman and Crawford did not resign after the commencement of this lawsuit but rather, continued to serve.  <u>See</u> Hillman Aff. ¶ 1; Crawford Aff. ¶ 1.

The record also contains other uncontested facts that evidence that HDC members will be able to serve without fear of harassment or intimidation, even without the benefit of absolute immunity.  It is undisputed that, "[a]fter hundreds of applications, this case is the only [one] identified in which any members of the [HDC] have been sued."  Memorandum in Opposition to Individuals' Motion for Summary Judgment Dated February 24, 2016 at 8 (Doc. No. 230) ("Pls.' Mem. in Opp'n").  The fact that, historically speaking, applicants before the HDC do not resort to suing individual HDC members as a result of an adverse decision by the HDC militates against the conclusion that absolute immunity is required to shield HDC members from harassment and

intimidation.  For example, in Cleavinger, the Supreme Court denied members of a federal prison's Institution Discipline Committee quasi-judicial absolute immunity despite acknowledging "that many inmates do not refrain from harassment and intimidation," as evidenced by "[t]he number of nonmeritorious prisoners' cases that come to this Court's notice." Cleavinger, 474 U.S. at 502.  However, in Tulloch, the court concluded that this factor weighed in favor of granting a state prison disciplinary officer quasi-judicial absolute immunity because "[p]rison disciplinary hearings are often fraught with emotion and ill-will, and prisoners are a group prone to litigation." Tulloch, 50 F.3d at 116. Similarly, in Young v. Selsky, the court noted, in connection with this factor, that, "the plaintiff in this case has abused the district court's resources in the past by engaging in a pattern of vexatious litigation.  Such inmates, if unchecked, could seriously undermine defendant's ability to function as an independent reviewer." Young v. Selsky, 41 F.3d 47, 53 (2d Cir. 1994).  As already noted, these cases are easily distinguishable from the case at bar because there is nothing to suggest that HDC applicants are a "group prone to litigation," see Tulloch, 50 F.3d at 116, or a group that tends to engage in "a pattern of vexatious litigation," see Young, 41 F.3d at 53.  Indeed, the fact that the Chabad's case has survived an appeal to the Second Circuit and a motion for summary judgment in this court after the case was remanded indicates that, while the Chabad may not ultimately prevail, its claims are not unmeritorious and this litigation is certainly not vexatious.[5]

---

[5] It bears noting that in Cleavinger, Tulloch, and Young, the defendants' claims for quasi-judicial absolute immunity were denied.  Thus, while a high volume of unmeritorious cases does not guarantee that a defendant will be granted quasi-judicial absolute immunity, a small number of suits would certainly militate against granting a defendant such immunity.  This court is aware of only one other reported case in which members of a local land use board or commission in Connecticut were sued under RLUIPA in their individual capacities.  See Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 344–45 (2d Cir.

Even without absolute immunity, HDC members will still benefit from the qualified immunity generally afforded to administrative officials.  See Harlow, 457 U.S. at 807. For example, this court has previously granted qualified immunity to members of a zoning board of appeals in connection with its authority to grant certain variances.  See Wiltzius v. Town of New Milford, 453 F. Supp. 2d 421, 432 (D. Conn. 2006).

Additionally, certain protections afforded to HDC members undermine the defendants' claim that, absent absolute immunity, they cannot perform their functions on the HDC without being harassed or intimidated.  As the defendants alluded to in their briefing and clarified at oral argument, if both the municipal defendants and the individual defendants are found liable on either the Chabad's substantial burden or nondiscrimination claim, the municipal defendants will pay the joint-and-several judgment.  See Individual Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 2 (Doc. No. 229-1) ("Defs.' Mem. in Supp.") ("payment of any judgment [against an individual HDC member] is backed by the full faith and credit of the Borough").  Thus, the individual defendants will only be responsible for paying a judgment against them if both (1) that judgment is entered only against them and not also against the municipal defendants and (2) as discussed below, the Borough does not fully indemnify them.

Under Second Circuit law, an indemnification arrangement weighs against finding absolute immunity to be necessary as a means to avoid harassment and intimidation. See Young, 41 F.3d at 52 (in discussing factor of need to avoid harassment and intimidation, explaining that lawsuits do not drain the defendant's financial resources

_____

2005).

because of indemnification).[6]  Here, pursuant to Connecticut state statute, the individual

defendants have not so far had to pay for any of their legal costs.  See C.G.S.A. § 7-

101a(a) ("Each municipality shall protect and save harmless any municipal officer,

whether elected or appointed, of any board, committee, council, agency or commission

. . . from financial loss and expense, including legal fees and costs, if any, arising out of

any claim, demand, suit or judgment . . . for alleged infringement of any person's civil

rights, on the part of such officer or such employee while acting in the discharge of his

duties").  Additionally, even if the individual defendants are found liable on the Chabad's

substantial burden claim, they will not be required to pay the judgment against them, nor

will they be required to reimburse the Borough of Litchfield for their legal expenses.

Only if the individual defendants are found liable on the Chabad's nondiscrimination

claim will they have to pay the judgment against them and reimburse the Borough for

the cost of their legal fees, see C.G.S.A. § 7-101a(b),[7] because such an outcome would

mean that the individual defendants had intended to discriminate, see Chabad

Lubavitch of Litchfield Cty. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 198 (2d

Cir. 2014).  Section 7-101a(b) does not indemnify for intentional wrongs.  See Wilson v.

City of Norwich, 507 F. Supp. 2d 199, 212–13 (D. Conn. 2007); Charron v. Town of

Griswold, No. 5000849, 2006 WL 3833843, at *6 (Conn. Super. Ct. Dec. 12, 2006).

The fact that HDC members do not need to fund their own defenses, and will not

need to pay any judgment against them if either that judgment is joint-and-several with

---

[6] Second Circuit law differs in this respect from the law applied in Buckles, where the Ninth Circuit treated an indemnification arrangement as irrelevant.  See Buckles, 191 F.3d at 1136.

[7] "In the event such officer or employee has a judgment entered against him for a malicious, wanton or wilful act in a court of law, such municipality shall be reimbursed by such officer or employee for expenses it incurred in providing such defense and shall not be held liable to such officer and employee for any financial loss or expense resulting from such act."  C.G.S.A. § 7-101a(b).

the Borough or they are indemnified, undercuts the defendants' argument that, absent absolute immunity, they will be incapable of performing their functions without harassment and intimidation.  See Cleavinger, 474 U.S. at 208 (noting, in connection with this factor, that, "any expense of litigation largely is alleviated by the fact that a Government official who finds himself as a defendant in litigation of this kind is often represented, as in this case, by Government counsel.  If the problem becomes acute, the Government has alternatives available to it: it might decide to indemnify the defendant official"); Tulloch, 50 F.3d at 117 (quoting the above-quoted passage from Cleavinger).

The court does not doubt that Hillman and Crawford have been inconvenienced by this lawsuit, which is now nearly seven years old.  Further, the court is cognizant of the fact that HDC members might suffer reputational harm as a result of being sued, regardless of whether they are ultimately vindicated.  However, the cases discussing this factor do not focus on the inconvenience or reputational effect of being sued. Rather, they speak about whether the number of suits is so high as to be harassing, whether the suits tend to be unmeritorious or vexatious, and whether the costs of being sued – both the cost of funding a defense and the potential cost of satisfying a judgment – is so great as to be intimidating.  Because this is the first time that individual HDC members have been sued for damages; because this one suit is not unmeritorious or vexatious, and there is no pattern of vexatious litigation generally; and because the individual defendants are not paying for their defense and may not even pay a judgment that is entered against them, the court concludes that this factor strongly militates against granting the defendants absolute immunity.

B.  <u>Presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct</u>

The second factor – discussed for the first time in <u>Butz</u> and codified as a factor in <u>Cleavinger</u> – presents the court with a broad inquiry that, to a certain degree, encompasses the next four factors.  For example, in <u>Butz</u>, the court announced what has become the second factor and then immediately identified the next four factors as examples of procedural safeguards.  <u>See Butz</u>, 438 U.S. at 512 ("At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct.  The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges").

Aside from the availability of appeal,[8] the application process for a certificate of appropriateness is accompanied by other procedural safeguards.  For example, the HDC is legally required to hold a public hearing on all applications for certificates of appropriateness.  <u>See</u> C.G.S.A. § 7-147e(a).  These public hearings must, by law, "be recorded by a sound recording device or other appropriate means."  <u>See</u> Administrative Regulations and Procedures for Borough of Litchfield Historic District Commission at 9 (Doc. No. 187-10) ("Litchfield Admin. Regs.").  Additionally, if the HDC denies an application, it must "place upon its records and in the notice to the applicant the reasons

---

[8] The defendants, in their discussion of this factor, note that all applicants have the right to appeal an HDC decision pursuant to section 7-147i of the Connecticut General Statutes.  <u>See</u> Defs.' Mem. in Supp. at 19.  The Chabad, in its discussion of this factor, argues that the appeal available under section 7-147i is insufficient for a number of reasons.  The court notes that there is a distinct factor that addresses the correctability of error on appeal and, as such, the court will address both parties' arguments regarding the availability and sufficiency of the appeal procedure in section IV.F of this Ruling.

for its determination, which shall include the bases for its conclusion that the proposed activity would not be appropriate."  C.G.S.A. § 7-147e(b).

A public proceeding on a record can serve as a check on malicious or wrongful conduct by commission members, and this militates in favor of granting the defendants absolute immunity.  See Butz, 438 U.S. at 513 (noting, in support of its finding that absolute immunity was warranted, that, "[t]he parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record"); see also Mitchell v. Fishbein, 377 F.3d 157, 173 (2d Cir. 2004) (fact that "[t]here is no requirement for a formal hearing" related to an attorney's application to become certified to represent indigent litigants, no "recordation of statements by witnesses or the applicant," and no "requirement that the Committee reveal the reasons for its decisions" militates against granting absolute immunity); see also Young, 41 F.3d at 53 ("access to a verbatim transcript" constitutes a procedural safeguard under this factor).

As a further procedural safeguard, applicants are permitted to introduce both oral and documentary testimony in support of an application, both of which the Chabad did in support of its application.  At the public hearing, the HDC must afford both proponents and opponents of a proposal equal opportunity to present comments.  See Litchfield Admin. Regs. at 9.  Each side's presentation is made "in succession without allowing an intermixture of comments pro or con."  Id.  After both sides have made their presentation, "[b]rief rebuttals may be allowed at the discretion of the Chairman."  Id. The ability to call witnesses and introduce testimony buttresses the application process with procedural safeguards akin to those that exist in a court proceeding.  See Butz, 438 U.S. at 513 (party's ability "to present his case by oral or documentary evidence"

constitutes a procedural safeguard); <u>Tulloch</u>, 50 F.3d at 117 (right to "present evidence and call witnesses" constitutes a procedural safeguard).

In light of the foregoing, the court concludes that the existence of the aforementioned procedural safeguards in connection with the certificate of appropriateness application process militates in favor of granting the defendants absolute immunity.

C.  <u>Insulation from political influence</u>

Political influence can be exerted by people other than politicians.  HDC commissioners are members of the local community and, as was the case here, other members of the community may have strong opinions about an application.  The Eastern District of New York has suggested that the fact of a decision-maker living in the community about which she or he decides may weigh against finding insulation from political influence.  <u>See</u> <u>Taylor v. Brentwood Union Free Sch. Dist.</u>, 908 F. Supp. 1165, 1174 (E.D.N.Y. 1995) (finding school district disciplinary hearing panel members insulated from political influence in part because "a potential hearing officer is precluded from service if he or she resides in the school district in which the hearing is taking place").  Similarly, the Ninth Circuit has suggested that the fact of all board members living in the same county could weigh against finding insulation.  <u>See</u> <u>Buckles</u>, 191 F.3d at 1134 (finding state board members insulated in part because "no more than two [ ]of the three[ ] members may . . . reside in the same county").

In this case, numerous members of the public attended the public hearings to speak out in opposition to the Chabad's application.  As the Second Circuit noted, one HDC member even urged "that '[w]e have to get the public out on this project for the public hearing.'"  <u>Chabad</u>, 768 at 189.  The court would be blinding itself to the practical

13

realities of local government if it were to ignore the possibility that HDC commissioners could be pressured or unduly influenced by the vociferous opinions of their fellow community members:  As mentioned above, see p. 3–4, supra, a district court in this Circuit has treated the fact that a zoning hearing was intended partially to assess public opinion as a reason not to grant quasi-judicial immunity.  See Altaire, 551 F. Supp. at 1072.  Furthermore, it bears noting that political influence from members of the public may be especially strong in a small community such as the Borough of Litchfield.[9]

HDC commissioners are appointed by the Borough of Litchfield's Board of Warden and Burgesses.  See Litchfield Code § 12-4(E) (Doc. No. 229 App. GG).[10] HDC commissioners do not enjoy the insulation from political influence that comes from lifetime or long-term tenure.  Once appointed, a commissioner is entitled to serve, by law, for a term of either five years (regular members) or three years (alternates).  See id. § 12-4(C).  That said, there is no indication that HDC commissioners can be removed at will by members of the Board of Warden and Burgesses, and the fact that commissioners are entitled to serve at least three or five years is somewhat suggestive of the fact that they are not removable at will.  See DiBlasio v. Novello, 344 F.3d 292, 298 (2d Cir. 2003) (assuming, in part because the health commissioner was entitled to serve a finite term, "that the commissioner is not removable at will [by the governor] and

---

[9] This court takes judicial notice of the fact that the United States Census Bureau's American Community Survey 2014 population estimate for Litchfield Borough is only 1,430 people.

[10] Although appointments to the HDC are, by law, made by the Board of Warden and Burgesses, the Warden of the Borough of Litchfield has stated, under oath, that, "[w]hen there is a vacancy on the HDC, usually the HDC recommends someone to be appointed" and the Board of Warden and Burgesses "give[s] great weight to any person that the HDC does suggest."  Losee Aff. ¶ 4.  The fact that many HDC appointments come at the suggestion of the HDC, and the fact that the Board of Warden and Burgesses gives such weight to the HDC's recommendations, suggests that the Board plays a smaller role in appointing HDC members than the letter of the law might suggest.

that such insulation from political influence weighs in favor of a grant of absolute immunity"); see also Tulloch, 50 F.3d at 117 (Department of Correctional Services' "control over the hearing officers' terms of employment" undermines the officers' insulation from political influence).  The members may, however, be reappointed.  See Litchfield Code § 12-4(C).  The lack of lifetime or long-term appointment combined with the availability of re-appointment suggests that a commissioner may make decisions with an eye to his or her reappointment.[11]

Hillman has stated, under oath, that in his 14-plus years of service on the HDC, he has "never been approached or pressured by any public official on any application," nor is he aware of this having happened to any other HDC member.  Hillman Aff. ¶ 18.  The court accepts that Hillman has been forthright in making this statement, especially in light of the fact that the Chabad has not produced any evidence of a public official pressuring an HDC member.  That said, political pressure could take the form of a commissioner being approached or pressured by community members other than public officials.  The Dotzel and Buckles decisions found insulation in part because ex parte communication with board members was prohibited.  See Dotzel, 438 F.3d at 327; Buckles, 191 F.3d at 1134.  Here, however, "there is evidence in the record that a number of HDC members discussed the Chabad's application outside of the public hearing, despite being instructed not to."  Chabad Lubavitch of Litchfield Cty., Inc. v. Borough of Litchfield, No. 3:09-CV-1419 (JCH), 2016 WL 370696, at *20 (D. Conn. Jan. 27, 2016).  Political pressure could also take the less-overt form of a commissioner

---

[11] This court also notes that the HDC commissioners' three-to-five year tenure is less than the six-year tenure of the board members whom the Ninth Circuit found to be insulated from political influence in Buckles.  See 191 F.3d at 1134.

simply knowing that a certain decision would help the commissioner to garner favor with a public official or with the community.  For example, the Ninth Circuit found insulation in Buckles in part because board members were prohibited from running for or holding any public office.  See 191 F.3d at 1134.  The defendants have not presented evidence of a comparable prohibition here.  Under state law, historic district commissioners are prohibited from holding a "salaried municipal office," see C.G.S.A. § 7-147c(d), but Borough of Litchfield officers generally serve without pay, see Losee Aff. ¶ 2.

Based on the foregoing, the court concludes that this factor militates against a finding of absolute immunity.

D.  Importance of precedent

If a decision-making body uses precedent, and if that precedent is important to the decision-making process and to the validity of a decision, then the precedent factor would tend to support a finding of judicial immunity.  Here, to the extent that the defendants argue that the HDC relies on precedent, the defendants refer not to "precedent" in the sense that a court uses the term to mean public decisions maintained in a system enabling easy future reference, but rather, simply to the limited group of decisions made by the agency.[12]

Furthermore, the Chabad accurately asserts that, "[t]here is no binding precedent that an unsuccessful applicant can apply to challenge a decision of the agency."  Pls.' Mem. in Opp'n at 12.  The defendants conceded at oral argument that there is no

---

[12]  The court's experience is that records of HDC's past decisions do not always seem to be easy to find.  As this court has noted, "Borough defendants assert that there is no public record of the HDC permitting an addition onto the Rose Haven Home, although it concedes that it appears from the assessor's card that 'at some point there was a small addition added to the main house.'"  Chabad Lubavitch of Litchfield Cty., Inc. v. Borough of Litchfield, Conn., 853 F. Supp. 2d 214, 227 (D. Conn. 2012).

statute or Borough regulation that mandates that the HDC follow its own precedent. The defendants argued that if, in denying an application, the HDC were to ignore a prior decision that allowed a different applicant to make a similar modification, the aggrieved applicant would have a strong case on appeal to the Superior Court that the HDC's decision was arbitrary.

However, such an argument ignores the fact that each HDC application is evaluated on a case-by-case basis, and there is almost certainly always a way to distinguish one application from another. See, e.g., Chabad, 768 F.3d at 194 ("Were there any doubt as to the type of assessment at issue, even a cursory review of the HDC's consideration of the Chabad's application confirms that the process was patently individualized."). Indeed, as the Court of Appeals noted, RLUIPA exists precisely to combat the "subtle forms of discrimination" that may result when, as here, local boards are granted "essentially standardless discretion" to conduct "case-by-case evaluation[s]" of land use applications, as such discretion carries "the concomitant risk of idiosyncratic application of land use standards that may permit (and conceal) potentially discriminatory denials." Id. at 193 (internal quotation marks omitted). Here, the statutory scheme requires commissioners only to implement a "general rule by applying loosely defined and subjective standards:" Id. at 194. Commissioners must determine whether a proposal is "'appropriate,'" a term involving "'historical and architectural value and significance,'" "'architectural style, scale, general design, arrangement, texture, and material,'" "'relationship'" to the neighborhood, and "'any other pertinent factors.'" Id. at 194. In the case of the Chabad's application, "the HDC conducted this inquiry without the guidance of laws or regulations that dictated the specific metes and bounds either of

17

its inquiry or of the conditions it imposed." Id. at 194. This lack of concrete rules may set a historic district commission's work in evaluating "appropriateness" apart from typical zoning board work, which would more often involve the application of particularlized rules.

The HDC's written opinion denying the Chabad's application indicates that the HDC, in reaching a decision on the Chabad's application, did attempt to follow precedents established by prior court cases and considered the HDC's prior decisions. In attempting to render a decision that avoided infringing on the Chabad's RLUIPA rights, the HDC noted in its opinion its reliance on McCreary County v. American Civil Liberties Union, 545 U.S. 844 (2005), Cutter v. Wilkinson, 544 U.S. 709 (2005), and Westchester Day School v. Village of Mamaroneck, 504 F.3d 338 (2d Cir. 2007), which was decided shortly before the HDC's decision. See HDC Decision at 12 (Doc. No. 187-16). See also Tulloch, 50 F.3d at 117; Young, 41 F.3d at 53 (both discussing, in connection with this factor, whether the administrative body looked to prior case law and administrative precedent). However, the HDC is not required to be comprised of lawyers or others with expertise in interpreting case law. See Litchfield Code § 12-4(B).

The HDC said it referred to its prior decisions in order to render a decision on the Chabad's application that it viewed was consistent with the HDC's prior decisions. For example, the HDC noted that, because an earlier iteration of the HDC had permitted the Cramer and Anderson law firm to erect an addition to a residential property that was equal in size to the original structure, the HDC would allow the Chabad to erect an addition that was equal in size to the original 85 West Street structure. See HDC Decision at 14. This use of "precedent" failed, however, to take into consideration the

18

differences between these two properties, which differences might suggest allowing the same size addition was not appropriate.  Further, to aid in its efforts to adhere to its own precedent, the HDC maintains "comprehensive files of earlier decisions," as well as "photos and pertinent documents in the files which more accurately depict [the HDC's] decisions than would a copy of the decision alone."  Hillman Aff. ¶ 10.  However, such files do not appear to be fully accurate, or organized for easy research.[13]  See Tulloch, 50 F.3d at 117 (fact that "there appear to be no compendiums of the records of disciplinary hearings and appeals for officers to rely on" militates against granting absolute immunity).

While it may appear that in this case the HDC made an attempt to adhere to its "precedents" in rendering a decision, the lack of any official requirement that this or other historic district commissions adhere to precedent, and the ease with which a historic district commission can distinguish one application from another, or fail to distinguish one application from another, creates a serious risk that granting HDC commissioners absolute immunity will undermine the purpose of RLUIPA and create an environment in which commissioners can perpetuate "subtle forms of discrimination." The Third Circuit has interpreted the Butz precedent factor broadly to ask whether decision-making is "constrained by outside law," including statutory law, rather than "purely discretionary."  See Dotzel, 438 F.3d at 326–27 (noting approvingly that board was "required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance, and to explain its reasoning in written opinions").  Here, the loosely defined and subjective standards that the HDC applies weigh against finding

---

[13] See footnote 12.

sufficient constraint by statutory law so as to satisfy the precedent factor.  Accordingly, the court concludes that this factor militates against granting the defendants absolute immunity.

E.  Adversary nature of the process

In arguing that the hearing process for the Chabad's application was adversarial, the defendants note that numerous "adversarial reports and letters" were submitted and there were "three nights of adversarial testimony at the public hearings."  Defs.' Mem. in Supp. at 21.  Some examples of these "adversarial reports and letters" include: (1) a letter from the HDC's lawyer to the HDC providing guidance on RLUIPA, see Letter from James Stedronsky (Doc. No. 187-6); (2) a letter from one of the Chabad's lawyers to the HDC, see Letter from Dwight Merriam (Doc. No. 205-33); and, (3) a written evaluation of the Chabad's proposed renovations by John Herzan, an architectural historian hired by the HDC's lawyer to author an "independent evaluation of the appropriateness of architectural work" proposed by the Chabad, see Evaluation of Proposed Renovations to 85 West Street (Doc. No. 210-1).  However, when the Second Circuit cases interpreting Butz and Cleavinger discuss whether the proceeding in question was adversarial in nature, they are using the word "adversarial" as a term of art to refer to such protections as, inter alia, the right to counsel, the right to cross-examine witnesses, and the existence of evidentiary rules.  See, e.g., DiBlasio, 344 F.3d at 299; Tulloch, 50 F.3d at 117; Young, 41 F.3d at 53.[14]

Although there is no statutory right to be represented by counsel at HDC

---

[14] This court notes that the Ninth Circuit in Buckles, however, appears to have applied this adversary nature factor in a manner different than that in which the Second Circuit applies this factor. See Buckles, 191 F.3d at 1134 (finding "little doubt that the proceeding was an adversarial one" solely because parties "took dramatically polar positions").

hearings, in this case the Chabad was represented by counsel since the early stages of the hearing process.  An applicant's ability to be represented by counsel adds to the adversarial nature of the certificate of appropriateness application process.  See Tulloch, 50 F.3d at 117 ("absence of counsel to help focus inquiry and present reasoned proofs and arguments precludes the development of a full adversarial process"); Young, 41 F.3d at 54 (proceedings in question not adversarial in part because "[p]risoners have no right to counsel in either proceeding").

On the other hand, the court finds it quite significant that there is no evidence in the record that the Chabad had the right to cross-examine adverse witnesses, and its ability to challenge evidence was limited to rebuttal.  See Young, 41 F.3d at 53 (fact that "rights [of prisoners appearing before disciplinary board] to cross-examine and challenge witnesses and evidence are limited" militates against concluding that such hearings are adversarial); see also Dotzel, 438 F.3d at 327 (finding the process adversarial in part due to the availability of cross-examination).  The ability to cross-examine witnesses is one of the hallmarks of an adversarial proceeding, and the apparent inability for HDC applicants to cross-examine those who speak out in opposition of an application counsels strongly against a grant of absolute immunity.

The record is also devoid of evidence that the HDC's hearings are governed by "evidentiary rules."  At oral argument, the defendants conceded that HDC proceedings are not governed by any set of evidentiary rules.  See DiBlasio, 344 F.3d at 299 ("Even though physicians are permitted to have an attorney present at the [medical license suspension] interview, and are allowed to present countervailing evidence, the interviews lack key elements of an adversarial proceeding, such as a neutral decision

maker and evidentiary rules").  The lack of evidentiary rules distinguishes the situation here from that in <u>Buckles</u>, where the proceedings used "the Washington rules of evidence as a non-binding guide," <u>see</u> <u>Buckles</u>, 191 F.3d at 1135, and from that in <u>Dotzel</u>, where an ordinance allows parties to challenge proffered evidence, <u>see</u> <u>Dotzel</u>, 438 F.3d at 327.

The lack of "evidentiary rules" is evidenced in the lack of procedures available to applicants to challenge the qualifications of experts that the HDC hires to provide guidance on the issue at hand.  At the October 18, 2007 hearing, the HDC decided to hire Mr. Herzan, an architectural historian, to opine on the historical appropriateness of the Chabad's proposed modifications.  <u>See</u> October 18, 2007 Meeting Minutes at 4 (Doc. No. 187-28) ("Oct. 18 Minutes").  At that same meeting, one of the Chabad's attorneys requested that he be able to review any consultant's report prior to that report being discussed at a meeting.  <u>See</u> <u>id.</u> at 3.  The HDC, through its attorney, responded that the HDC "will try to accommodate the request."  <u>Id.</u>[15]  The HDC hearings do not contain any procedures that provide a party the right to challenge the qualifications and the report of a purported expert.  This lack of procedure stands in stark contrast with the procedures that exist in court for ensuring that a proposed expert is, indeed, qualified to testify as an expert, and for ensuring that the opposing party has the opportunity to read and challenge the expert's report prior to the expert testifying.  While such fulsome rules may not be called for at the HDC, some process to permit challenge to the qualification and opinion of an expert would seem part of an "adversarial" process.

---

[15] The record does not reveal whether the Chabad was able to review Mr. Herzan's report prior to when it was presented on December 6, 2007.

The lack of evidentiary rules governing the HDC hearings is particularly problematic given one of the Chabad's attorney's sworn declaration that, "[a]t various points during the administrative hearing process," the HDC, through its attorney, "attempted to prevent Plaintiffs from submitting relevant documents and to delete or remove documents already submitted and marked as exhibits from the administrative record." Declaration of Gillian Bearns ¶ 20 (Doc. No. 205-35).

In consideration of the foregoing, particularly the lack of cross-examination and evidentiary rules, the court concludes that this factor militates strongly against a finding of absolute immunity.

F. Correctability of error on appeal

Pursuant to section 7-147i of the Connecticut General Statutes, HDC decisions are appealable to the Superior Court of Connecticut. See C.G.S.A. § 7-147i. The Chabad argues that the limited nature of such appeals renders them incapable of providing sufficient protection to aggrieved parties, such that permitting an aggrieved party to sue individuals for damages is necessary. The court concludes that it is unclear whether the Chabad would have been able to pursue its RLUIPA claim on appeal from the HDC decision.

Correctability on appeal refers to the plaintiff's "opportunity to challenge the legality of the proceeding," including, for instance, the proceeding's comportment with the Constitution. See Butz, 438 U.S. at 515–16. There appears to be a split of authority as to whether the Superior Court can decide, as a matter of first impression on an appeal from an HDC decision, whether that decision violated the applicant's statutory or constitutional rights.

Courts have sometimes rejected a plaintiff's attempt to append a statutory or

constitutional claim to an administrative appeal.  In <u>Dan Beard, Inc. v. Orange Town Plan and Zoning Com'n</u>, the court stated that, "[i]t is clear that an adjudication of the plaintiff's § 1983 claim and an award of the monetary relief requested pursuant to that claim are outside both the court's scope of review and its authority to grant relief in an appeal from decisions of a planning and zoning commission brought pursuant to General Statutes § 8-8."  <u>Dan Beard, Inc. v. Orange Town Plan and Zoning Com'n</u>, No. CV92038750S, 1992 WL 175075, at *3 (Conn. Super. Ct. July 16, 1992).  In <u>Murphy v. City of Stamford</u>, the court reached the same result.  <u>See</u> <u>Murphy v. City of Stamford</u>, No. FSTCV145014274S, 2015 WL 493518, at *4 (Conn. Super. Ct. Jan. 12, 2015) (collecting cases).  In <u>Murphy</u>, the court's decision was based on the fact that "the differences in the procedure and scope of review" between administrative appeals and civil actions render joinder of two types of actions "improper."  <u>Id.</u> at *4.

However, in the zoning appeal case <u>Cambodian Buddhist Society</u>, the Superior Court engaged in a lengthy analysis of whether the plaintiffs' RLUIPA rights had been violated.  <u>See</u> <u>Cambodian Buddhist Soc'y of CT., Inc. v. Newtown Planning and Zoning Comm'n</u>, No. CV030350572S, 2005 WL 3370834, at *5–15 (Conn. Super. Ct. Nov. 18, 2005).  The court's decision to adjudicate the plaintiff's RLUIPA claim in what was, originally, an administrative appeal, was motivated by its view of judicial economy.  As the court stated at an earlier point in the proceedings: "[i]nstead of forcing the [S]ociety to initiate a separate action to pursue its statutory and constitutional claims, the court, exercising its discretion under the factual circumstances of the appeal before it, finds that it should hear additional evidence during the appeal in order to advance judicial economy and gain further testimony for the equitable disposition of the appeal."

24

<u>Cambodian Buddhist Soc'y of CT., Inc. v. Newtown Planning and Zoning Comm'n</u>, No. CV030348578S, 2005 WL 1433842, at *4 (Conn. Super. Ct. May 25, 2005).[16]

The Chabad also argues that the appeals process is insufficient in part because "[t]he court is limited to the record compiled during the administrative proceeding." Pls.' Mem. in Opp'n. at 10. Generally speaking, this assertion may be correct because "[a]n appeal from an administrative tribunal should ordinarily be determined on the record made before that tribunal." <u>See</u> <u>Gevers v. Planning & Zoning Comm'n of Town of N. Canaan</u>, 94 Conn. App. 478, 489 (2006) (citing <u>Beach v. Planning & Zoning Comm'n of Town of Milford</u>, 141 Conn. 79, 79, 103 A.2d 814, 815 (1954)). However, pursuant to section 8-8(k) of the Connecticut General Statutes, the reviewing court "shall allow any party to introduce evidence in addition to the contents of the [administrative] record if (1) the record does not contain a complete transcript of the entire proceedings before the board . . . or (2) it appears to the court that additional testimony is necessary for the equitable disposition of the appeal." C.G.S.A. § 8-8(k). In <u>Cambodian Buddhist Soc'y</u>, 2005 WL 3370834, at *3, a case in which the plaintiff appealed a zoning board's denial of a special exception and argued, <u>inter alia</u>, that the denial violated RLUIPA, the Superior Court allowed the plaintiff, pursuant to section 8-8(k), to expand the record to present additional evidence relevant to the plaintiff's RLUIPA claim.

The Chabad also argues that the appeals process is insufficient because the Superior Court can only decide whether the administrative agency acted "arbitrarily,

---

[16] Although the Superior Court's ultimate decision that the plaintiff's RLUIPA rights had not been violated was affirmed by the Supreme Court of Connecticut, the Connecticut Supreme Court did not directly address the question of whether it was appropriate for the Superior Court as a matter of first impression, to adjudicate the plaintiff's RLUIPA claim in what was, originally, an administrative appeal. <u>See</u> <u>Cambodian Buddhist Soc. Of Connecticut, Inc. v. Planning and Zoning Com'n of Town of Newton</u>, 285 Conn. 381 (2008).

illegally or unreasonably," which limitation does not "permit the court, by trial de novo, to substitute its findings and conclusions for the decision of the board."  Pls.' Mem. in Opp'n at 9.  While the Chabad is correct that the Superior Court cannot readjudicate, <u>de novo</u>, whether the Chabad should have been granted a certificate of approval, <u>see</u> <u>Wil-Nor Corp. v. Zoning Bd. of Appeals of City of Norwalk</u>, 146 Conn. 27, 30 (1958), the Chabad's argument misses the point.  The Chabad is suing the Borough of Litchfield and the individual defendants not on the basis that they simply reached the wrong conclusion on the question of whether the Chabad's application should have been approved under Connecticut law.  Rather, the Chabad is suing the defendants for violating its RLUIPA rights.  Accordingly, the "error" that the court is concerned with is the defendants' potential violation of the Chabad's RLUIPA rights.  Given that this is the "error" that the court is concerned with, this factor in the absolute immunity test asks whether this "error" – the violation of the Chabad's RLUIPA rights – is correctible on the administrative appeal in state court.  If the trial court in <u>Cambodian Buddhist Society</u> is correct, then it is.  If the <u>Murphy</u> court is correct, it is not.

Given that it is not clear that the Chabad would be able to vindicate its RLUIPA rights in an administrative appeal, the court concludes that the correctability of error on appeal may be limited.  Given the uncertainty, the court finds this factor neutral.

## V.     CONCLUSION

Four of the factors discussed militate against granting the defendants absolute immunity, while one militates in favor, and one is neutral, or unclear.  Further, the fifth factor, in which the court discussed the inability of the Chabad to cross-examine witnesses and the lack of evidentiary standards at the HDC hearings, militates strongly against granting the defendants absolute immunity.  Similarly, the fourth factor, which

discussed the importance of precedent and which seems particularly relevant in RLUIPA cases, militates against granting absolute immunity.

Scrutinizing the responsibilities of the HDC members, and analyzing and weighing the Cleavinger/Butz factors, the court concludes that this case does not present the "rare and exceptional" circumstance anticipated by Cleavinger, and members of the Borough of Litchfield HDC are not entitled to absolute judicial immunity. Accordingly, for the above-stated reasons, the Individual Defendants' Motion for Summary Judgment (Doc. No. 229) is **DENIED**.

**SO ORDERED**.

Dated at New Haven, Connecticut this 29th day of September 2016.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge