# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHABAD LUBAVITCH OF            CIVIL ACTION NO.:
LITCHFIELD COUNTY, INC., et al.,      3:09 CV 1419 (JCH)

      *Plaintiffs,*

vs.

BOROUGH OF LITCHFIELD et al;

      *Defendants.*                    JUNE 23, 2017

## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE TESTIMONY REGARDING PLAINTIFF'S ACTUAL MONETARY LOSSES AND PROJECTED LOSS OF REVENUE

The defendants, Borough of Litchfield and the Historic District Commission of the Borough of Litchfield, respectfully move to preclude plaintiffs' testimony regarding actual monetary losses and projected loss of revenue. As grounds, plaintiff state as follows:

I.      Projected Loss of Revenue

Plaintiffs, in their damages analysis dated February 26, 2017 (attached as Exhibit A), identify "Minimum Projected Loss of Revenue" as a category of damages. In this category, at section number three of the analysis, they list "**Chabad Membership – 1 families @ 770.00 per family over 2 years = $154,000.00**"; thereafter, at section number 4, plaintiffs list "**Diminished scope of the Chabad operation – Prospective Preschool @ $9,000.00 per child of 2 years = $360,000.00; Prospective Hebrew School @ $475.00 per child over 2 years = $19,000.00.**"

While this portion of the analysis provides an optimistic view of future profits, Plaintiff Rabbi Eisenbach's discovery responses failed to support any such projections. At his deposition,

Rabbi Eisenbach was only able to identify five individuals from Litchfield who "regularly" attend services.

0052

10    Q.    Saturday morning.  Okay.  Now, how many
11  people in Litchfield, I'm going to -- I've been trying
12  to find out approximately how many regular attendees you
13  have from Litchfield, so I'm going to ask some questions
14  about that.  When I say "regular attendee," I'm going
15  to, first of all, talk about people that, let's say,
16  attend at the least one service a month.  Okay?  How
17  many residents of the town of Litchfield, not the
18  borough, but the town of Litchfield, attend your
19  services at least once a month?
20    A.    Maybe a half a dozen couples.
21    Q.    Can you give me their names, please?
22    A.    Nathan Zimmerman, Russell Herman Shapiro.
23    Q.    Okay.
24    A.    I'm giving males; they're couples.  Peter
25  Bogen.

0053

1    Q.    Okay.
2    A.    Julian Goldsmith, Bruce Sofferman.
3    Q.    How do you spell that last name?
4    A.    S-o-f-f-e-r-m-a-n.  That's Dr. Bruce
5  Sofferman.  I don't recall the rest at this time.
6    Q.    Okay.  Now, I don't believe -- Peter Bogen's
7  not married, is he?
8    A.    He is not at this time.
9    Q.    Okay.  Are the others all married?
10    A.    Yes.
11    Q.    You've given me five names - Zimmerman
12  Shapiro, Bogen, Goldsmith and Sofferman - attend at
13  least once a month.  Out of those five, how many attend
14  regularly, two or more times a month?
15    A.    Sometimes they attend four weeks out of the
16  month, sometimes they attend once a month; it all
17  depends on the need.
18    Q.    Over the course of a year, that would be 24
19  or more times for your regular services.  How many of
20  those five would attend 24 or more?
21    A.    I don't recall.

With regard to individuals from the Litchfield County, Rabbi Eisenbach was only capable

of recalling fifteen individuals who attend the Chabad's services at its, then current facility:

0055

```
 1      A.    Correct.
 2      Q.    Okay.  And, again, I'm going to ask the ones
 3   that attend regularly, attend at least once a month.
 4   Okay?
 5             MR. NELSON:  Jim, just so we're clear,
 6         I'm letting you use the word "regularly"
 7         loosely.
 8             MR. STEDRONSKY:  I'm defining it as
 9         once a month.
10   BY MR. STEDRONSKY:
11      Q.    When I use the term "regularly," I'm saying
12   at least once a month.  Why don't we name those?
13      A.    Name?
14      Q.    Name the regular attendees, outside of the
15   town of Litchfield.
16      A.    David Moche - M-o-c-h-e, Osher (phonetic)
17   Pavel - P-a-v-e-l, Allen Sossin (phonetic), Harold
18   Brandell, Marvin Peiser (phonetic), Joe Ginsberg, Eric
19   Gordon, Alain Levy, Adam Silverman.
20      Q.    "Silberman"?
21      A.    Silverman.  Blaze Kelly, Max Kelly, Ethan
22   Janow, Lawrence Hutsler (phonetic), Herb Fisher, Allen
23   Carabis (phonetic).  Many more, I just don't recall at
24   this time.
25      Q.    I'm just asking the names that you recall.
```

0056

```
 1   So right now you've listed --
 2      A.    Oh, David Gordon.
 3      Q.    Okay.  And if any other ones come to mind,
 4   you certainly --
 5      A.    Many, many, many more, but I don't recall at
 6   this time.
 7      Q.    Now, in raising money for the Chabad, I know
 8   you do various types of fundraisers, do you have an
 9   annual pledge drive just for people to give to the
10   annual operating expenses of the Chabad?
```

11          MR. NELSON:  Object to the form.
12     A.   I don't understand your question.
13  BY MR. STEDRONSKY:
14     Q.   Do you know what an annual pledge drive is?
15     A.   We call it an annual campaign.
16     Q.   Do you have an annual campaign to raise
17  money for the regular operating expenses of the Chabad?
18          MR. NELSON:  Object to the form.
19     A.   Yes.
20  BY MR. STEDRONSKY:
21     Q.   And do you keep records of who gives to that
22  campaign and how much they give?
23     A.   Yes.
24     Q.   Okay.  And do you keep these from year to
25  year?  Do you have the list from 2005 who gave to the

Rabbi Eisenbach is able to identify twenty individuals, or families, that were congregants regularly attending his services, yet his damages analysis lists an amount ($154,000.00) which reflects a membership count of two hundred families, thus, apparently, speculating the number of congregants would grow .  Eisenbach, however, never provides any support for this proposition. Further, plaintiffs have not disclosed any expert witnesses who will testify as to damages.

Prospective profits are allowable as an element of damage "unless they are too speculative and remote…"  (Internal quotation marks omitted.) West Haven Sound Development Corp. v. West Haven, 201 Conn. 305, 320, 514 A.2d 734 (1986)

"Although we recognize that damages for lost profits may be difficult to prove with exactitude ... such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty." (Citations omitted; internal quotation marks omitted.) Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,[1] 247 Conn. 48, 69, 717 A.2d 724.  The trial court "has the discretion to exclude

---

[1] In Beverly Hills Concepts, Inc., the plaintiff claimed lost profits due to the legal malpractice of its attorneys. Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, supra, 247 Conn. at 63, 717 A.2d 724. The

speculative evidence, expert or otherwise." <u>Message Center Management, Inc. v. Shell Oil</u>

<u>Products Co.</u>, 85 Conn.App. 401, 421, 857 A.2d 936 (2004).

Without providing any support for alleged lost future profits, expert or otherwise, the

plaintiffs should be precluded from presenting any testimony or evidence regarding same as such

would mislead the jury and would result in unfair prejudice to the defendants.  F.R.E. 403.

II.     <u>Actual Monetary Losses</u>

Plaintiffs, in their damages analysis at section 2, identify "Actual Monetary Loss" as

"Building Pledges withdrawn for intended new construction - $2,500,000.00."     However, at his

deposition, Rabbi Eisenbach failed to provide any concrete information regarding building

pledges:

0096

```
 1   "schmoozing" is just informal chitchat, kind of informal
 2   friendly talking.  Am I understanding that word
 3   correctly?
 4      A.   No.
 5      Q.   Okay.  Can you please explain to me what
 6   "schmoozing" is?
 7      A.   For instance, getting people knowledgeable
 8   that this is going to be an X, Y, Z building, and we
 9   expect -- and just feeling them out on what they're
10   going to be a part of it.
11      Q.   All right.  So that's what you were doing
12   prior to the denial?
13      A.   Getting committee-wise and personal people
14   who had said, you know, We pledge to do a nice part of
15   this building, we pledge X, Y, Z to do part of the
16   building.
17      Q.   Did you ask anybody for pledges prior to the
```

---

Connecticut Supreme Court was required to determine, in part, "whether lost profits are an appropriate measure of
damages for the destruction of a nascent enterprise." Id. Although the court determined that "lost profits may
provide an appropriate measure of damages for the destruction of an unestablished enterprise"; id., at 67, 717 A.2d
724; it concluded that the assumptions on which the plaintiff's expert based his profit projections were too
speculative. Id., at 70–71, 717 A.2d 724 (sales of toning tables could not be extrapolated to predict future success in
selling franchises; no reasonable basis to compare the two products).

18  building, the construction of the building?
19      A.    Certainly.
20      Q.    Okay.  Did anybody give you any written
21  pledges as to how much they would contribute to the
22  construction of the addition prior to the denial of your
23  application for a Certificate of Appropriateness?
24      A.    I don't think there's a Chabad in the world
25  that built, if it was a $30 million building or a

0097

 1  $100,000 building, that ever got a pledge in writing.
 2  It's a shake of the hand, a look in the eye, a word.
 3      Q.    Okay.  Can you give me names of any people
 4  that gave you their word that they would pledge a sum
 5  certain for the construction of the Chabad prior to the
 6  denial of the certificate of application?
 7      A.    Many; I just don't recall at this time.
 8      Q.    Can you give me the name of one?
 9      A.    Goodman, that's really one that comes to
10  mind; a guy who was one of Madoff's top investors, who
11  has since moved out of the area.
12      Q.    Okay.  So one of Mr. Madoff's top investors.
13  Who was he and how much did he pledge?
14      A.    His name was Len Mayor.
15      Q.    Oh.
16          MR. NELSON:  We have gave you this
17              information.
18  BY MR. STEDRONSKY:
19      Q.    You gave me the name.  How much did pledge?
20      A.    I forget the dollar amount, but it was
21  supposed to be substantial.
22      Q.    Where did he live before he left the area?
23      A.    He lived in Woodridge, Connecticut.
24      Q.    Prior to his pledge, did he ever make any
25  donations to you?

0098
 1      A.    Small annual contributions.
 2      Q.    Did he ever make a pledge, say, in excess of
 3  $5,000, 5,000 or greater?
 4      A.    For our building campaign?
 5      Q.    For any reason, did Len Mayor ever give you
 6  $5,000 or more donation?
 7      A.    I don't recall at this time.
 8      Q.    Let me ask you a question.  We were talking

```
 9   about reputations of a rabbi, okay, and also about
10   anti-Semitism.  If a Jewish resident said that a rabbi
11   was a schnorrer, a rabbi's a schnorrer, would you take
12   that person to be anti-Semitic?
13            MR. NELSON:  Object to the form.
14       A.   Repeat your question.
15   BY MR. STEDRONSKY:
16       Q.   Yeah.  If a Jewish resident said, That
17   rabbi's a schnorrer," based upon that sentence alone,
18   would you take that person to be anti-Semitic?
19            MR. NELSON:  Object to the form.
20       A.   God forbid.
21   BY MR. STEDRONSKY:
22       Q.   Pardon?
23       A.   God forbid.
24       Q.   I don't know if that's a yes or no.
25       A.   If someone said the rabbi was a schnorrer,
```

Rabbi Eisenbach fails to identify any significant pledges yet, as with his lost future profits, makes an inferential leap that the denial of the certificate of appropriateness proximately caused a loss of $2.5 Million in withdrawn pledges.  Again, without providing any support for for these losses, expert or otherwise, the plaintiffs should be precluded from presenting any such testimony or evidence as it would mislead the jury and would result in unfair prejudice to the defendants.  F.R.E. 403.

For the foregoing reasons, the defendants respectfully request that plaintiffs be precluded offering any testimony regarding actual monetary losses and projected loss of revenue at the trial of this matter.

DEFENDANTS,
HISTORIC DISTRICT COMMISSION OF
THE BOROUGH OF LITCHFIELD
ANDBOROUGH OF LITCHFIELD


By _____/s/_____
        Mark S. Shipman, Esq.
        Federal Bar No.04323
        C. Scott Schwefel, Esq.
        Federal Bar No.19324
        Shipman, Shaiken & Schwefel, LLC
        433 South Main Street, Suite 319
        West Hartford, CT 06110
        Telephone No. (860) 606-1712
        Facsimile No. (866) 431-3248
        Email: mark@shipmanlawct.com
        Email: scott@shipmanlawct.com




**<u>CERTIFICATION</u>**


 The undersigned hereby certifies that on June 23, 2017, a copy of the foregoing *Motion* was filed electronically and served by electronic service to those receiving notices through the Court's CM/ECF system.




        _____/s/_____
        C. Scott Schwefel

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHABAD LUBAVITCH OF                           CIVIL ACTION NO.:
LITCHFIELD COUNTY, INC. AND                   3:09 CV 1419 (JCH)
RABBI JOSEPH EISENBACH,

      Plaintiffs,

VS.

BOROUGH OF LITCHFIELD, CONNECTICUT;
HISTORIC DISTRICT COMMISSION OF
THE BOROUGH OF LITCHFIELD; AND
DEFENDANTS DOE ONE THROUGH TEN,

      Defendants.                              FEBRUARY 26, 2010

## PLAINTIFFS' DAMAGES ANALYSIS

COME NOW the Plaintiffs, CHABAD LUBAVITCH OF LITCHFIELD COUNTY, INC.,

and RABBI JOSEPH EISENBACH (hereinafter "Plaintiffs"), and provide the following in

compliance with this Court's Scheduling Order (Doc. # 26).

### Minimum Actual and Projected Loss Revenue

Components of Preliminary List of Damages
    (1) Actual Fees Expended
    (2) Actual Monetary Loss
    (3) Minimum Projected Loss of Revenue
    (4) Diminished Scope of Operation

    1. Actual Fees Expended

        Lease at 7 Village Green Dr, Litchfield CT 06759 from 12/2007 to 3/2010
                    $40,500.00

        Rectory Mortgage @ 52 Litchfield Ponds Dr from 12/2007 to 3/2010
                    $18,900.00
           & Condo fees    $11,286.00

# EXHIBIT A

Lease facility from public schools for summer program-
$9,500.00

Transportation for summer program's activities-
$9,000.00

Legal Fees Herbst & Herbst as of 12/26/2007-
$12,991.50

Legal Fees Robinson & Cole as of January 8, 2008-
$109,035.66

Videography services Hamilton Communications-
$3,120.50

Architectural Consulting Services Smith Edwards Architects-
$6,375.00

Architectural Services Boe Studio Architects (public attendance fees)-
$1,540.00


**2.** <u>Actual Monetary Loss</u>

Building Pledges withdrawn for the intended new construction-
$2,500,000.00


<u>3.   Minimum Projected Loss of Revenue:   Damage Model= Comparables To The Minimal Income from the Immediate Neighborhood</u>

<u>Chabad Membership</u>
1 families @ $770.00 per family over 2 years =
$154,000.00

| <u>Name of Synagogue</u> | <u>Congregation Size</u> | <u>Annual Membership</u> | <u>Total</u> |
| --- | --- | --- | --- |
| Chabad of Greenwich Purchase & Renovation- | 250 Families 5,000 Square Feet cost $3,000.000.00 | | |
| Chabad Farmington Valley Recent Purchase | 270 Families 5,600 Square Feet cost $1,000,000.00 | | |

4. <u>Diminished scope of Chabad operation.</u>

Prospective Preschool @ $9,000.00 per child over 2 years =
$360,000.00

Prospective Hebrew School @ $475.00 per child over 2 years =
$19,000.00

DATE: February 26, 2010

Respectfully submitted,

PLAINTIFFS,                          PLAINTIFFS,
CHABAD LUBAVITCH OF                  CHABAD LUBAVITCH OF
 LITCHFIELD COUNTY, INC.              LITCHFIELD COUNTY, INC.
AND RABBI JOSEPH EISENBACH            AND RABBI JOSEPH EISENBACH

By <u>Kenneth R. Slater, Jr.</u>        By <u>Frederick H. Nelson</u>
    Kenneth R. Slater, Jr., Esq.          Frederick H. Nelson, Esq.
    Connecticut Bar No. 09451             Connecticut Bar No. PHV03633
    (Local Counsel)                       (Lead Trial Counsel)
    **Halloran & Sage LLP**               **American Liberties Institute**
    One Goodwin Square                    P.O. Box 547503
    Hartford, CT 06103-4303               Orlando, FL  32854-7503
    Telephone: (860) 297-4662             Telephone: (407) 786-7007
    Facsimile: (860) 548-0006             Facsimile: (877) 786-3573
    Email: slater@halloran-sage.com       Email: Rick@ali-usa.org
    (Admitted to District of Connecticut)  (Admitted *pro hac vice*)

## <u>CERTIFICATION</u>

I hereby certify that on February 26, 2010 a copy of foregoing was electronically served to all Counsel of Record.

s/ Frederick H. Nelson
Frederick H. Nelson



### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

CHABAD LUBAVITCH OF
LITCHFIELD COUNTY, INC. AND          CIVIL ACTION NO.
RABBI JOSEPH EISENBACH,              3:09 CV 1419 (JCH)

      PLAINTIFFS,

VS.

BOROUGH OF LITCHFIELD, CONNECTICUT;
HISTORIC DISTRICT COMMISSION OF
THE BOROUGH OF LITCHFIELD; WENDY
KUHNE, GLENN HILLMAN, AND
KATHLEEN CRAWFORD,

      DEFENDANTS.


DEPOSITION OF:   RABBI JOSEPH EISENBACH
DATE TAKEN:      August 11, 2010
LOCATION:        Law Offices of James Stedronsky, LLC
                 82 Meadow Street
                 Litchfield, Connecticut 06759


Reporter:  Ann W. Friedman, LSR #91

BRANDON SMITH REPORTING & VIDEO, LLC
249 Pearl Street            Six Landmark Square

Hartford, CT  06103         Stamford, CT  06901

Tel:  (860) 549-1850        (203) 316-8591

Fax:  (860) 549-1537        (860) 549-1537

## EXHIBIT B

1       Q.      It depends on the week.  Sometimes one,

2   sometimes the other, sometimes both?

3       A.      Always Saturday.

4       Q.      Always?  Okay.  Is it during the evening,

5   the Sabbath evening, or is it during the day?  Friday

6   night or Saturday during the day?

7       A.      You're saying the Sabbath service?

8       Q.      Yeah.

9       A.      Saturday morning.

10      Q.      Saturday morning.  Okay.  Now, how many

11  people in Litchfield, I'm going to -- I've been trying

12  to find out approximately how many regular attendees you

13  have from Litchfield, so I'm going to ask some questions

14  about that.  When I say "regular attendee," I'm going

15  to, first of all, talk about people that, let's say,

16  attend at the least one service a month.  Okay?  How

17  many residents of the town of Litchfield, not the

18  borough, but the town of Litchfield, attend your

19  services at least once a month?

20      A.      Maybe a half a dozen couples.

21      Q.      Can you give me their names, please?

22      A.      Nathan Zimmerman, Russell Herman Shapiro.

23      Q.      Okay.

24      A.      I'm giving males; they're couples.  Peter

25  Bogen.

1    Q.    Okay.

2    A.    Julian Goldsmith, Bruce Sofferman.

3    Q.    How do you spell that last name?

4    A.    S-o-f-f-e-r-m-a-n.    That's Dr. Bruce

5    Sofferman.  I don't recall the rest at this time.

6    Q.    Okay.  Now, I don't believe -- Peter Bogen's

7    not married, is he?

8    A.    He is not at this time.

9    Q.    Okay.  Are the others all married?

10   A.    Yes.

11   Q.    You've given me five names - Zimmerman

12   Shapiro, Bogen, Goldsmith and Sofferman - attend at

13   least once a month.  Out of those five, how many attend

14   regularly, two or more times a month?

15   A.    Sometimes they attend four weeks out of the

16   month, sometimes they attend once a month; it all

17   depends on the need.

18   Q.    Over the course of a year, that would be 24

19   or more times for your regular services.  How many of

20   those five would attend 24 or more?

21   A.    I don't recall.

22   Q.    All right.  Now, in the fundraising for the

23   Chabad --

24   A.    Let me interrupt a moment.  You say

25   Litchfield; we're Chabad.  Our Litchfield is northwest

1    A.    Correct.

2    Q.    Okay. And, again, I'm going to ask the ones

3    that attend regularly, attend at least once a month.

4    Okay?

5            MR. NELSON: Jim, just so we're clear,

6            I'm letting you use the word "regularly"

7            loosely.

8            MR. STEDRONSKY: I'm defining it as

9            once a month.

10   BY MR. STEDRONSKY:

11   Q.    When I use the term "regularly," I'm saying

12   at least once a month. Why don't we name those?

13   A.    Name?

14   Q.    Name the regular attendees, outside of the

15   town of Litchfield.

16   A.    David Moche - M-o-c-h-e, Osher (phonetic)

17   Pavel - P-a-v-e-l, Allen Sossin (phonetic), Harold

18   Brandell, Marvin Peiser (phonetic), Joe Ginsberg, Eric

19   Gordon, Alain Levy, Adam Silverman.

20   Q.    "Silberman"?

21   A.    Silverman. Blaze Kelly, Max Kelly, Ethan

22   Janow, Lawrence Hutsler (phonetic), Herb Fisher, Allen

23   Carabis (phonetic). Many more, I just don't recall at

24   this time.

25   Q.    I'm just asking the names that you recall.

1    So right now you've listed --

2        A.    Oh, David Gordon.

3        Q.    Okay.  And if any other ones come to mind,

4    you certainly --

5        A.    Many, many, many more, but I don't recall at

6    this time.

7        Q.    Now, in raising money for the Chabad, I know

8    you do various types of fundraisers, do you have an

9    annual pledge drive just for people to give to the

10   annual operating expenses of the Chabad?

11                   MR. NELSON:  Object to the form.

12       A.    I don't understand your question.

13   BY MR. STEDRONSKY:

14       Q.    Do you know what an annual pledge drive is?

15       A.    We call it an annual campaign.

16       Q.    Do you have an annual campaign to raise

17   money for the regular operating expenses of the Chabad?

18                   MR. NELSON:  Object to the form.

19       A.    Yes.

20   BY MR. STEDRONSKY:

21       Q.    And do you keep records of who gives to that

22   campaign and how much they give?

23       A.    Yes.

24       Q.    Okay.  And do you keep these from year to

25   year?  Do you have the list from 2005 who gave to the

1    "schmoozing" is just informal chitchat, kind of informal

2    friendly talking.  Am I understanding that word

3    correctly?

4          A.      No.

5          Q.      Okay.  Can you please explain to me what

6    "schmoozing" is?

7          A.      For instance, getting people knowledgeable

8    that this is going to be an X, Y, Z building, and we

9    expect -- and just feeling them out on what they're

10   going to be a part of it.

11         Q.      All right.  So that's what you were doing

12   prior to the denial?

13         A.      Getting committee-wise and personal people

14   who had said, you know, We pledge to do a nice part of

15   this building, we pledge X, Y, Z to do part of the

16   building.

17         Q.      Did you ask anybody for pledges prior to the

18   building, the construction of the building?

19         A.      Certainly.

20         Q.      Okay.  Did anybody give you any written

21   pledges as to how much they would contribute to the

22   construction of the addition prior to the denial of your

23   application for a Certificate of Appropriateness?

24         A.      I don't think there's a Chabad in the world

25   that built, if it was a $30 million building or a

1   $100,000 building, that ever got a pledge in writing.

2   It's a shake of the hand, a look in the eye, a word.

3       Q.      Okay.  Can you give me names of any people

4   that gave you their word that they would pledge a sum

5   certain for the construction of the Chabad prior to the

6   denial of the certificate of application?

7       A.      Many; I just don't recall at this time.

8       Q.      Can you give me the name of one?

9       A.      Goodman, that's really one that comes to

10  mind; a guy who was one of Madoff's top investors, who

11  has since moved out of the area.

12      Q.      Okay.  So one of Mr. Madoff's top investors.

13  Who was he and how much did he pledge?

14      A.      His name was Len Mayor.

15      Q.      Oh.

16              MR. NELSON:  We have gave you this

17              information.

18  BY MR. STEDRONSKY:

19      Q.      You gave me the name.  How much did pledge?

20      A.      I forget the dollar amount, but it was

21  supposed to be substantial.

22      Q.      Where did he live before he left the area?

23      A.      He lived in Woodridge, Connecticut.

24      Q.      Prior to his pledge, did he ever make any

25  donations to you?

1      A.      Small annual contributions.

2      Q.      Did he ever make a pledge, say, in excess of

3    $5,000, 5,000 or greater?

4      A.      For our building campaign?

5      Q.      For any reason, did Len Mayor ever give you

6    $5,000 or more donation?

7      A.      I don't recall at this time.

8      Q.      Let me ask you a question.  We were talking

9    about reputations of a rabbi, okay, and also about

10   anti-Semitism.  If a Jewish resident said that a rabbi

11   was a schnorrer, a rabbi's a schnorrer, would you take

12   that person to be anti-Semitic?

13              MR. NELSON:  Object to the form.

14     A.      Repeat your question.

15   BY MR. STEDRONSKY:

16     Q.      Yeah.  If a Jewish resident said, That

17   rabbi's a schnorrer," based upon that sentence alone,

18   would you take that person to be anti-Semitic?

19              MR. NELSON:  Object to the form.

20     A.      God forbid.

21   BY MR. STEDRONSKY:

22     Q.      Pardon?

23     A.      God forbid.

24     Q.      I don't know if that's a yes or no.

25     A.      If someone said the rabbi was a schnorrer,

Page 214

```
 1   STATE OF CONNECTICUT  )
                           )  SS.
 2   COUNTY OF HARTFORD    )

 3

 4           I, Ann W. Friedman, License No. 91, a notary

 5   public for the State of Connecticut, do hereby certify

 6   that the deposition of RABBI JOSEPH EISENBACH, was taken

 7   before me at the Law Offices of James Stedronsky, LLC,

 8   82 Meadow Street, Litchfield, Connecticut, commencing at

 9   11:03 a.m. on Wednesday, August 11, 2010.

10           I further certify that the witness was first

11   sworn by me to tell the truth, the whole truth, and

12   nothing but the truth, and was examined by counsel, and

13   his testimony was stenographically reported by me and

14   subsequently transcribed as hereinbefore appears; that

15   this deposition is a true record of the testimony given

16   by the witness to the best of my ability.

17           I further certify that I am not related to

18   the parties hereto or their counsel, and that I am not

19   in any way interested in the event of said cause.

20           Dated this ___ day of _____, 2010.

21   _____
     Ann W. Friedman, Notary Public
22   My commission expires:  8-31-11.

23

24

25
```