**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CHABAD LUBAVITCH OF                         CIVIL ACTION NO.:
LITCHFIELD COUNTY, INC., et al.,            3:09 CV 1419 (JCH)

     *Plaintiffs,*

vs.

BOROUGH OF LITCHFIELD et al;

     *Defendants*.                              AUGUST 2, 2017

**DEFENDANTS' PROPOSED FINDINGS OF**
**FACT AND CONCLUSIONS OF LAW**

The defendants, Borough of Litchfield and the Historic District Commission of the

Borough of Litchfield, respectfully propose the following findings of fact and conclusions of

law, as follows:

I.     Findings of Fact

     1.     Plaintiff, Chabad Lubavitch of Litchfield County, Inc. is a religious corporation

formed in 1996 under the Connecticut Religious Corporations Law and owns property within the

Borough of Litchfield .  Plaintiff's *Third Amended Complaint*. ¶ 9

2.      Defendant Borough of Litchfield, Connecticut is a municipal corporation duly formed and existing pursuant to the laws of the State of Connecticut. Plaintiff's *Third Amended Complaint*. ¶ 11

3.      Defendant Historic District Commission (hereinafter, "HDC") is the municipal legislative body authorized to adopt, interpret and apply land use regulations for the Borough of Litchfield, Connecticut. Plaintiff's *Third Amended Complaint*. ¶ 12

4.      The Town of Litchfield has a population of about 8,000.  Within the town is a five-mile section that is the Borough which is the original part of Litchfield.  The Borough is, essentially, the downtown portion of Litchfield and encompasses the Litchfield green. (7/26/17 Trans. p. 100 at 19-25; p. 101 at 1-13).

5.      The plaintiff was the owner of real property located at 85 West Street, Litchfield, Connecticut [Exhibit 26] (hereinafter, "85 West Street" or the "Subject Property" or the "Deming House").

6.      On or around September 9, 2007, the plaintiff attended a pre-hearing meeting, with the Historic District Commission, in furtherance of a forthcoming application for a certificate of appropriateness to modify 85 West Street. [Exhibit 81 at pages 1753-1754].

7.      On or around October 18, 2007, the plaintiff filed a signed application for a certificate of appropriateness to modify 85 West Street. [Exhibit 88(b)]

8.      Glenn Hillman currently lives in Litchfield Connecticut, has lived there for 23 to 24 years; owns a home within the Historic District; is the current chair of the Litchfield Historic District Commission and has served on the Commission for nearly 16 years (7/25/17 Trans. p. 86 at 22-25; P. 1-15)

9.      For formal training as a member of the Historic District Commission, Hillman attended workshops run by the Connecticut Trust for Historic Preservation and became familiar with the Commission's rules and regulations, bylaws, and handbook. (7/25/17 Trans. p. 87 at 19-25; P. 88 at 1-18).  As for informal training, Hillman studied architectural history at Vassar College and attended graduate level courses on 18th century architecture at Wesleyan University. Further, Hillman has been a member of the National Trust for Historic Preservation since approximately 1985 and has been a member of the Connecticut Trust for Historic Preservation for at least as long as he has resided in Litchfield.  (7/25/17 Trans. p. 88 at 23-25; p 89 at 1-5). Hillman read documents related to the Religious Land Use and Institutionalized Person's Act provided by the plaintiff and its attorneys but, otherwise, had no formal training on the impact of RLUIPA. (7/25/17 Trans. p. 89 at 20-25).

10.     Judith Acerbi has been on the Historic District Commission since 2002 (7/25/17 Trans. p. 154 at 16).  Most of Acerbi's training is by experience and some workshops held by the state. (7/25/17 Trans. p. 155 at 5-10).

11.     Joseph Montebello has lived in Litchfield for over twenty years.  (7/26/17 Trans. p. 100 at 1-4) Montebello serves on the Litchfield Historical Society, The Oliver Wolcott Library, the After School Arts Program, and the Historic District Commission. (7/26/17 Trans. p. 100 at 9-11)

12.     Hillman was the clerk of the HDC in 2007 at the time plaintiff submitted its application for certificate of appropriateness in (7/25/17 Trans. p. 90 at 20).  The Clerk's duties are to edit minutes, work with the recording clerk for anything he/she needs. The HDC has a separate recording clerk who records minutes and drafts an agenda. (7/25/17 Trans. p. 90 at 22-25; p. 91 at 1-4).  It was not the specific responsibility of the clerk to author written decisions of

the Commission.  However Hillman took part in writing the Commission's decision on the plaintiff's application (7/25/17 Trans. p. 91 at 5-10).  For the decision of the plaintiff's application, Hillman worked with the HDC's attorney Jim Stedronsky – Hillman drafted the architectural portion of the decision and Stedronsky drafted the legal portion of the decision (7/25/17 Trans. p. 91 at 19-22; P. 92 at 1-7).

13.     The HDC's decision on the plaintiff's application is Attachment 2 to the Historic District Commission's December 20, 2007 minutes [Exhibit 78].

14.     The HDC's decision approved all but two of the religiously oriented,  stylistic modifications that were proposed.  The HDC required that single door be used instead of a double door and that monitor-like clock tower be replaced with iron work similar to that used on a sister house in the district.  The HDC allowed the Plaintiffs to incorporate into the windows of the door any religious symbols or insignia they might choose; use Jerusalem Stone instead of brick and, as a further accommodation to the religious adaptive use of the property, the plaintiff was permitted to place a finial topped with a Star of David on the roof.  [Exhibit 78]

15.     The HDC denied the application, without prejudice, on the grounds that the addition would destroy the historic scale of the original residential structure and was inappropriate in scale to the other residential structures of the immediate neighborhood. The HDC set forth in its decision criteria that it would find acceptable if the applicant resubmitted a revised application. [Exhibit 78]

16.     The HDC adopted a conditional standard of scale based on a property (the "Cramer and Anderson" building) submitted for consideration by the applicants' Attorney. The addition was approximately the same size as the original house.  The HDC stated that it "would approve an addition equal in square footage to the Deming house." This standard would allow

the Chabad to resubmit an application with a two story main structure of approximately 5300 square feet and a lower level of approximately another 2,600 square feet, for a building with an approximate total of 7,900 usable square feet. [Exhibit 78]

17.     The third story of the Deming House contains an additional 1,1000 square feet and was utilized in the Bugryn Design [Exhibit 75].

18.     Addition of the 1,100 would result in a doubled building of 8,800 square feet. (7/26/17 Trans. p. 95 at 1-2). [Exhibit 75]

19.     The HDC's decision was not an indication that it would only approve a future proposal that complied with the Cramer and Anderson building standard (7/25/17 Trans. p. 134 at 2-4; p. 137 at p. 13-16).

20.     Before writing the decision, Hillman met with the other members of the HDC and had a regular meeting as a committee; Hillman took notes of the discussion and "[t]he decision is, at least in part, reflective of what the members of the commission thought at the time." (7/25/17 Trans. p. 94 at 7-13).  Acerbi testified that all commissioners discussed the application and came up with the decision (7/25/17 Trans. p. 157 at 8-9).

21.     The HDC's standard of scale as to the Cramer and Anderson building was among those presented to the HDC by the plaintiff's attorney – "[t]hey presented to us that that was an appropriate addition on a re-adaptive reuse of a residential structure, so we agreed with them…" (7/25/17 Trans. p. 95 at 3-9).  The HDC found the Cramer and Anderson example to be applicable to the application because the former was an adaptive reuse, was almost directly across the street, in the same neighborhood and was, similarly, an historic property. (7/25/17 Trans. p. 96 at 1-7; p. 126 at 11-18; p. 162 at 19-24) . (7/26/17 Trans. p. 64 at 2-15, p. 128 at 5-9).

22.     As to the plaintiff's application, the Rabbi and his attorneys represented to the HDC that they needed everything contained in the application in order for the Rabbi to practice his religion. As a commission member, Hillman found it difficult to weigh what the applicant wanted versus what he absolutely needed to practice his religion. (7/25/17 Trans. p. 95 at 20-25).

23.     The HDC considered the plaintiff's needs as far as they were able to understand what those needs were (7/25/17 Trans. p. 159 at 11-16).

24.     State statutes do not permit an historic district commission to consider interior uses when considering an application for a certificate of appropriateness.  However, as pointed out by the plaintiff's attorney (as well as the HDC's own counsel), RLUIPA "seem[ed] to supersede that."  Thus, the HDC believed it had to consider interior uses to consider the plaintiff's application (7/25/17 Trans. p. 96 at 8-17; p. 97 at 5-8) (7/26/17 Trans. p. 56 at 9-23, p. 116 at 12-17).

25.     In presenting its application, the plaintiff provided no other information or data regarding other Chabads. (7/25/17 Trans. p. 97 at 10-12).

26.     In presenting its application, the plaintiff did provide information and data regarding the properties, in Litchfield, owned by other religious organizations. (7/25/17 Trans. p. 98 at 24-25; p. 99 at 1-3; p. 101 at 1-3).  The other churches in Litchfield have rectories, but not all in the same building [as the sanctuary], but most churches do not have an attached rectory. (7/25/17 Trans. p. 101 at 10-19).

27.     Below grade portions of a property are typically not within the purview of the HDC.  However, the HDC had to consider the below grade portions of the subject property so as to comply with RLUIPA. (7/25/17 Trans. p. 97 at 22-25).

28.    The HDC looks to the *Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings* [Exhibit 31B] when rendering a decision on an application for a certificate of appropriateness. (7/25/17 Trans. p. 166 at 23-25).  The Secretary's Ninth Standard requires that: *"[n]ew additions, exterior alterations, or related new construction shall not destroy historic materials that characterize the property. The new work shall be differentiated from the old and shall be compatible with the massing, size, scale, and architectural features to protect the historic integrity of the property and its environment."* [Exhibit 31B at page 8].  (7/25/17 Trans. p. 167 at 1-4) The HDC's rules and regulations adopt the Secretary of Interior's Standards (7/25/17 Trans. p. 105 at 2-9).  The Standards also direct that "the addition put on an historic building should… not take away from the historic character, not be incongruous and should be smaller…than the original historical structure it is attached to." (7/25/17 Trans. p. 128 at 6-10)

29.    It is helpful to the HDC to have a pre-hearing when an application is for a large addition so that they can make sure all materials they need to make a decision are present (7/25/17 Trans. p. 108 at 12-23).  The HDC can advise an applicant at a pre- hearing (7/25/17 Trans. p. 109 at 3) (7/26/17 Trans. p. 103 at 4-7, 12-16, p. 106 at 14-20).  Applicants will oftentimes provide the interior space of a particular property to be considered by the commission. (7/25/17 Trans. p. 111 at 14-22).

30.    On September 9, 2007, at the first pre-hearing for the plaintiff's application, the HDC apprised the plaintiff: (i) that the building proposal is very large and will overwhelm the streetscape (ii) that this is a fragile issue and every time a building changes it chips away at the visual architecture of the Historic District and its qualities. (iii) that it is inconceivable to have

this large a structure in a residential/commercial thoroughfare and (iv) the HDC has a responsibility to preserve the architecture [Exhibit 81 at pages 1753-1754].

31.     Throughout the numerous hearings on the plaintiff's application, the plaintiff did make various revisions to its proposed plans to expand the subject property (7/25/17 Trans. p. 109 at 14-21).

32.     Throughout the numerous hearings on the plaintiff's application, prior to its decision, the plaintiff did not represent that the proposed plans would not be approved as presented as the Commission was attempting to absorb the wealth of information provided to them (7/25/17 Trans. p. 110 at 10-25).

33.     The HDC has approved applications to expand other properties within the Historic District, but Hillman is not aware of any applications that had been approved where the addition was larger than that of the plaintiff's proposal (7/25/17 Trans. p. 114 at 10-18).

34.     The Oliver Wolcott Library is located in the Historic District and has an addition (7/25/17 Trans. p. 114 at 24; p. 115 at 1-13).  The HDC never acted on any application to expand the Oliver Wolcott Library and, furthermore, the HDC was not even in existence at the time of the expansion. (7/25/17 Trans. p. 131 at 16-21)

35.     The Litchfield Town Hall is located in the Historic District and it was alleged that the Town had proposed an addition, however no formal application was submitted to the HDC. The HDC has authority over town-owned buildings but not state-owned buildings  (7/25/17 Trans. p. 115 at 14-25; p. 116 at 1-7).

36.     Rose Haven is located on North Street within the Historic District and was once a residence.  There was an addition put onto the back of the building, but the addition did not change its appearance from residential to "another look" (7/25/17 Trans. p. 129 at 7-22).  The

HDC never acted on any application to expand Rose Haven and, furthermore, the HDC was not even in existence at the time of the expansion. (7/25/17 Trans. p. 131 at 22-25; p. 132 at 1).

37.     All churches in the Historic District, along with any subsidiary structures, were erected before the existence of the HDC. (7/25/17 Trans. p. 132 at 2-6).  No information was provided by the plaintiff as to each church's needs, religious requirements, and congregation sizes . (7/26/17 Trans. p. 61 at 14-25; p. 62 at 1-10).

38.     Hillman is not aware that the HDC has ever acted on another application where the proposed expansion is comparable in size to that of the plaintiff's.  The vast majority of applications are for changes much smaller in scale or for small repairs or replacements (7/25/17 Trans. p. 132 at 7-15).  Oftentimes, the HDC will reach a decision on a smaller application right after the public hearing and only write written decisions on the larger applications and if there is a denial (7/25/17 Trans. p. 132 at 16-24).  Montebello, similarly, is not aware that the HDC has ever acted on another application where the proposed expansion is comparable in size to that of the plaintiff's. (7/26/17 Trans. p. 112 at 25, p. 113 at 1).

39.     The Deming House, at one point, was used for commercial purposes. (7/25/17 Trans. p. 117 at 5-14).  However, the Deming House always maintained its residential character. (7/25/17 Trans. p. 119 at 14-25; p. 120 at 1-4)

40.     The HDC had no objection to the Chabad using the property at 85 West Street as a synagogue (7/25/17 Trans. p. 141 at 15-17). The HDC had no objection to the Chabad having a residence for the Rabbi at 85 West Street; The HDC had no objection to the Chabad having a visitor or guest rooms at 85 West Street; The HDC had no objection to the Chabad having a pool at 85 West Street; (7/25/17 Trans. p. 121 at 5-11)

41.     The size and scale of the plaintiff's proposed renovation and addition did not fall within the standards of the Secretary of the Interior.  (7/25/17 Trans. p. 122 at 1-9).  The property at 85 West Street can be seen not only from the front of the structure, but also from both sides and, additionally, the back of the structure is visible from a parking lot adjacent to the rear of the property.  Further, "360 degrees of the structure is visible from the public way."  (7/25/17 Trans. p. 123 at 1-13) (7/26/17 Trans. p. 22-25)

42.     Appropriate massing for the property at 85 West Street depends on numerous factors including the surrounding architecture and the size of the addition. (7/25/17 Trans. p. 123 at 21-25; p. 124 at 1)

43.     In determining the plaintiff's application, the HDC tried to think in terms of which of the Rabbi's requests would fit into a doubled Deming House.  However, the HDC was never presented with any alternatives, as to size or layouts, from the plaintiff. (7/25/17 Trans. p. 134 at 24-25; p. 135 at 1-6).

44.     The hearings on the plaintiff's application was bifurcated into two portions - first was to examine the historical appropriateness of the proposed expansion and, second, was for the Rabbi to present his religious needs.  The HDC was looking for the plaintiffs to explain what was required for Chabad's religious observance.  They were flatly told, without explanation, that everything that was requested was specifically needed for the plaintiff's religious practice.  The plaintiff did not explain why it needed a pool and why the basement couldn't be occupied by classrooms.  The plaintiff did not explain why the Rabbi needed a 5,000 square foot residence and why it had to be contained within the Chabad facility.  The HDC had no ability to suggest a redesign of a smaller expansion but, rather, selected an option, of those that were presented to them by the plaintiff's attorneys. (7/25/17 Trans. p. 135 at 17-25; p. 136 at 1-25; p. 137 at p. 1-

12) (7/26/17 Trans. pp. 16 through 20; p. 57 at 1-20; p. 59 at 6-25; p. 60 at 1-22, p. 128 at 10-25).

There was no presentation by the plaintiff of any alternatives in terms of size and mass other than

the plans by Michael Boe (7/25/17 Trans. p. 140 at 12-15).  The HDC were never given the

opportunity to see what could have been sacrificed or edited down to fit into a smaller space than

that proposed by the plaintiff. (7/26/17 Trans. p. 129 at 8-18).

45.      In its decision, the HDC allowed many accommodations that would not be

afforded to a secular applicant, such as allowing them to place a Star of David atop the house,

have stained glass windows and Jerusalem stone (7/25/17 Trans. p. 141 at 21-25; p. 142 at 1-12).

46.      The only reason the application was not approved was the proposed expansion's

massing, and its effect on the neighborhood and streetscape (7/25/17 Trans. p. 142 at 13-17).

The Rabbi never explained why he needed that much space (7/25/17 Trans. p. 142 at 23-25; p.

143 at 1-3).  The Rabbi never indicated the number of congregants that he had that would be

serviced in the facility and never indicated why he needed a sanctuary for 100-plus people

(7/25/17 Trans. p. 145 at 24-25; p. 146 at 1-5) (7/26/17 Trans. p. 36 at 10-16, p. 114 at 19-25, p.

115 at 1-4).  When asked as to the size of his congregation, **he plainly replied that "it**

**fluctuates."** [Exhibit 90 – Video Clip played in Court of exchange between Rabbi Eisenbach

Attorney James Stedronsky].  Hillman was not concerned with the particular proposed use of the

building (7/25/17 Trans. p. 143 at 8-10).  The HDC discussed square footage in determining the

plaintiff's application because it affects massing and scale. (7/25/17 Trans. p. 146 at 6-12).

47.      An analysis as to massing takes into account what the historic significance is of

the original building, what the addition will do to affect the original building, and the immediate

surroundings. (7/26/17 Trans. p. 126 at 6-13).

48.    Any decision by the HDC, on an application for an addition, is affected by where the property is located within the Historic District – aspects that must be considered are lot size, spacing between individual houses, and views from different angles. (7/25/17 Trans. p. 146 at 24-25; p. 147 at 1-25; p. 148 at 1-2) (7/26/17 Trans. p. 146 at 50 at 9-25; p. 51 at 1-2);

49.    Landscaping is not within the HDC's purview (7/25/17 Trans. p. 149 at 15-22) (7/26/17 Trans. p. 25 at 8-10).  Landscaping, including trees, can be removed (7/26/17 Trans. p. 52 at 1-15)

50.    Peter Bugryn never reviewed plans drafted by Michael Boe or any other plans prepared for the plaintiff  (7/26/17 Trans. p. 85 at 1-13).  Bugryn is not aware as to whether a program was given to Michael Boe or developed with him (7/26/17 Trans. p. 86 at 15-20); Bugryn was asked to create a plan utilizing the existing structure (7/26/17 Trans. p. 88 at 11-15).

51.    Rabbi Joseph Eisenbach is an emissary of the plaintiff Chabad.  The Rabbi's mission is to bring awareness to fellow Jewish people through various different types of programs, and to perform social service in the entire community (7/26/17 Trans. p. 135 at 14-25, p. 135 at 1-3). The Chabad's mission is to reach out to individuals and inspire them (7/26/17 Trans. p. 141 at 16-18).

52.    Rabbi Eisenbach started the Chabad in 1996 and, at that time, rented the Wisdom House Emporium and lived at Lake Ridge, a community twenty minutes north of Litchfield.  In 1998, the Rabbi was able to purchase a rectory.  (7/26/17 Trans. p. 138 at 6-16).

53.    Chabad services hospitals in northwest Connecticut, Waterbury, Torrington, Sharon and New Milford.  Chabad services "golden age homes".  Chabad has a food program delivering to the needy. (7/26/17 Trans. p. 142 at 22-25, p. 143 at 1-25).

54.     The Chabad tries to reach out to non-religious individuals with secular activities, such as camp, so as to "break all barriers."  Soon these individuals will be attending Hebrew school and attending services  (7/26/17 Trans. p. 144 at 1-20).

55.     At Lake Ridge, the synagogue was the ground floor and the Rabbi lived on the top.  For camps, the Chabad rented outside. (7/26/17 Trans. p. 145 at 23-25, p. 126 at 1-10).

56.     The second place the Chabad used was the rectory purchased in 1998, of which the Chabad was on the ground floor for the first two years.  At that time, the Chabad rented additional space at 367 Bantam Road in Litchfield. (7/26/17 Trans. p. 147 at 21-25).  The Rabbi was able to hold weekly services, there could not have pre-school or, Hebrew school in this building and needed to rent other facilities (7/26/17 Trans. p. 152 at 18-25).

57.     The Rabbi, thereafter purchased a residence at the Litchfield Ponds Association. (7/26/17 Trans. p. 148 at 4-10).

58.     Mark Greenberg, the owner of Village Square, found rental space for the Chabad in one of his units.  Greenberg identified the property at 85 West Street as a building to acquire by the Chabad and Greenberg purchased same. (7/26/17 Trans. p. 154).  Thereafter, the plaintiff purchased the property at 85 West Street (7/27/17 Trans. p. 4 at 15-16)

59.     Rabbi Eisenbach didn't believe the building at 85 West Street was large enough to meet his religious needs but he believed there was room on the property to add to the existing building. (7/26/17 Trans. p. 156 at 1-7).  Rabbi Eisenbach used Attorney Peter Herbst and Russell and Dawson to meet with the planning and zoning commission of Litchfield. (7/26/17 Trans. p.157 at 17-22).

60.     With regard to its religious needs, the Chabad's key emphasis is on children. (7/26/17 Trans. p. 159 at 1-4).  "The needs of the Chabad are to be able to be there with your

family" (7/26/17 Trans. p. 159 at 21-22). The Chabad requested a residence for the Rabbi's family because the Rabbi must be able to hold a Shabbat dinner and be available to the congregation (7/26/17 Trans. p. 160 at 9-14). The Chabad holds a community Shabbat dinner once a month, as well as a Passover Seder and a New Year's meal. (7/26/17 Trans. p. 162 at 13-14). The Shul in the proposed synagogue seats 104 persons. (7/26/17 Trans. p. 165 at 20-25, p. 166 at 1-8).

       61.     The Chabad's application to the HDC asks for visitor quarters to house rabbinical students who volunteer at the Chabad's camp (7/26/17 Trans. p. 161 at 10-24); and a kosher kitchen (7/26/17 Trans. p. 163 at 2-7)

       62.     The dining area, in the proposed plans, is right in the Shul (7/26/17 Trans. p. 163 at 10-18). At Kiddush, the dividers in the shul are removed and tables and chairs are brought out from the closet. (7/26/17 Trans. p. 163 at 19-25, p. 164 at 1-9). The kosher kitchen is on the same floor as the Shul. Most of the attendees of the Chabad's functions come for the food served by the Chabad - Rabbi Eisenbach hopes that when attendees come for food, they will choose to participate in other Chabad functions and grow spiritually (7/26/17 Trans. p. 168 at 5-24). The kosher kitchen serves as a teaching tool and is also used in the Chabad's food delivery services. (7/26/17 Trans. p. 169 at 1-25). Every temple in the world must pray towards Jerusalem. (7/26/17 Trans. p. 164 at 11-15). A rabbi's study is part and parcel of the Chabad's mission to always be available for the congregants (7/26/17 Trans. p. 167 at 2-24). The Chabad's mission is to get a child to attend camp and swim in a pool, "but the next day he will come to Hebrew school." (7/26/17 Trans. p. 173 at 5-13). Rabbi Eisenbach met with the staff of the Planning and Zoning Commission of Litchfield and understood that, based on the zoning requirements, that the proposed Chabad's proposed programs could fit within the renovated and added building.

(7/27/17 Trans. p. 7 at 8-24).   Rabbi Eisenbach looked to other buildings in Litchfield that had
not gone in front of the HDC, such as Rose Haven, Oliver Wolcott, and Town Hall, to see if they
had been enlarged within the historic district from their original sense. (7/27/17 Trans. p. 8 at 6-
14).   Rabbi Eisenbach intended to pay for the proposed renovations "from the community."
(7/27/17 Trans. p. 18 at 7).

      63.     The Chabad has a rectory in Litchfield (7/27/17 Trans. p. 27 at 22-25) and a home
in Waterbury (7/27/17 Trans. p. 28 at 10-14).  The home in Waterbury is a Chabad house.
(7/27/17 Trans. p. 28 at 19-21).  The Waterbury Chabad has three guest rooms, four bedrooms,
and one kosher kitchen.  (7/27/17 Trans. p. 29 at 14-25).  Classes are conducted at the Waterbury
Chabad (7/27/17 Trans. p. 30 at 1-2).   The Waterbury Chabad contains a sanctuary. (7/27/17
Trans. p. 30 at 11-13); The Litchfield rectory has four floors with two bedrooms on the top floor,
a kitchen living room and dining room on the middle floor, another three bedrooms on the
bottom floor, and a storage area on the lowest floor. (7/27/17 Trans. p. 30 at 17-21).   Litchfield
rectory is located at 52 Litchfield Ponds Road (7/27/17 Trans. p. 31 at 6-7).   The Chabad holds
Shabbat dinners at the rectory. (7/27/17 Trans. p. 31 at 14).  Even if the Chabad were to get a
very large apartment in 85 West Street, the Rabbi would not give up the Waterbury Chabad
(7/27/17 Trans. p. 35 at 19-22).

      64.     Rabbi Eisenbach has no alternate plan for living near the proposed synagogue
other than to live in it. (7/27/17 Trans. p. 36 at 3-5).  Other than an unsuccessful proposed
purchase of the Baldwin House, Rabbi Eisenbach has not explored any alternative with respect to
living nearby 85 West Street so as to be able to walk to the synagogue. (7/27/17 Trans. p. 36 at
6-24).

65.     When the Rabbi defines the "community" which the Chabad serves as "[t]he Jewish people in Litchfield" (7/27/17 Trans. p. 37 at 16-23) as well as "Litchfield as a town, the greater Litchfield." (7/27/17 Trans. p. 39 at 9-14).   Rabbi Eisenbach defines "Chabad" as "everyone that attends, supports our community." (7/27/17 Trans. p. 41 at 3-4).   Nate Zimmerman, who regularly attends services, would not have the exercise of his religion burdened due to the absence of a pool, as he does not swim. (7/27/17 Trans. p. 42 at 23-25, p. 43 at 1-25, p. 44 at 1-13).   "The Pool's burden is strictly camp related" (7/27/17 Trans. p. 47 at 13-15).   Similarly, other congregants or attendees that don't have children will not have the exercise of their religion burdened due to the absence of classrooms. (7/27/17 Trans. p. 44 at 15-20). There's not a single Chabad. There are a number of different people that make up the Chabad. (7/27/17 Trans. p. 44 at 21-25, p. 45 at 1).   The seats in the Shul are not affixed but stackable (7/27/17 Trans. p. 54 at 7-23). The seats in the Shul, which are positioned in a fan-shape, would not be substantial burden if they were faced in a perpendicular fashion. (7/27/17 Trans. p. 51 at 22-15, p. 52 at 1-2).   The design [placement] of the chairs in the Shul is "garnish" which means nothing (7/27/17 Trans. p. 53 at 4-8).   The proposed Shul is also used as a meeting hall and dining hall (7/27/17 Trans. p. 55 at 16-21).

66.     The Rabbi worked with Russell and Dawson Architects to design a program to expand 85 West Street (7/27/17 Trans. p. 101 at 9-18).   Rabbi Eisenbach received a proposal from Russell and Dawson, with a design, and a program was developed (7/27/17 Trans. p. 101 at 19-25, p. 102 at 1-11). Russell and Dawson drafted a plan for the Chabad in 2006

67.     The Rabbi also worked with Merrill Associates (7/27/17 Trans. p. 102 at 17-24) [Exhibit 69].   Merrill Associates helped Chabad get its special exception for Planning and Zoning (7/27/17 Trans. p. 104 at 12-13).   The Rabbi received a special permit from the Town,

permitting the property to be used as a synagogue.  He recorded it on the land records (7/27/17 Trans. p. 104 at 20-23, p. 118 at 8-11).

68.     Rabbi Eisenbach is familiar with other Chabads in the area and the Chabad of West Hartford (7/27/17 Trans. p. 122 at 1-5).   The Rabbi at the Chabad in West Harford does not reside in the same building as the synagogue (7/27/17 Trans. p. 122 at 13-17).  The Chabad in West Hartford does not have a pool in the same facility as the synagogue (7/27/17 Trans. p. 122 at 19-20).  The Rabbi at the Chabad in Simsbury does not reside in the same building as the synagogue (7/27/17 Trans. p. 122 at 21-22).  The Chabad in Simsbury does not have a pool in the same facility as the synagogue (7/27/17 Trans. p. 122 at 23-24).

69     The Rabbi currently runs a camp (7/27/17 Trans. p. 128 at 1-8).  At some point in time, the Chabad had to rent a location and pools for its camp (7/27/17 Trans. p. 128 at 9-10).  Some camp locations have a pool, other locations don't have a pool and the campers need to be bussed (7/27/17 Trans. p. 128 at 11-18).

70.     While it is preferable, it is not a rule that the residence of a Rabbi must be in the same building that houses a Shul. (7/25/17 Trans. p. 55 at 2-6).  More often than not, a Rabbi does not live in the Chabad. (7/25/17 Trans. p. 84 at 11-13).  In places where the Chabad is serving a stable group of people in the area, it's common for the Rabbi to live in the Chabad, "but not the majority of cases" (7/25/17 Trans. p. 84 at 18-21).

71.      A Rabbi's residence in the Chabad is a convenience (7/25/17 Trans. p. 55 at 13-16) and not a necessity (7/25/17 Trans. p. 56 at 10-14)

72.     For Chabad, the home is important and everybody's home is a Chabad. (7/25/17 Trans. p. 55 at 17-21)

73.     For Chabad, being around the Rabbi's home is important, but that can be *wherever* the home is.  (7/25/17 Trans. p. 55 at 22-15 though p. 56 at 1-9).

74.     The majority of Chabad Rabbis do not live in a synagogue (7/25/17 Trans. p. 57 at 3-7).  There is a larger number of Rabbis who do not have their residence [in the synagogue] (7/25/17 Trans. p. 57 at 17-19).

75.     It is good for a Rabbi to have as many things as possible in his synagogue, but it depends on whether the Rabbi is *able* to have them (7/25/17 Trans. p. 57 at 20-23).

76.     Litchfield is a fairly small and diffuse community; people are spread out over a large area. (7/25/17 Trans. p. 60 at 15-18).

77.     The Rabbi at the Chabad in West Hartford had a separate residence from the Chabad and did not live in the synagogue. (7/25/17 Trans. p. 61 at 5-9 and p. 62 at 4-6).

78.     The Chabad in Dayton Ohio serves 3,500 people (7/25/17 Trans. p. 62 at 23-25 and p. 63 at 1).

79.     The Chabad in Dayton Ohio's facility has a synagogue, which is the main room that the Dayton Chabad uses; it has a second room on the same level where they have most of the eating events such as the Shabbat meal.  The kitchen is right behind that second room on that level.  Classrooms are located downstairs as well as two rooms that are reserved for people who need to stay [overnight].  Outside, the Dayton Chabad developed a modern playground with different equipment and things for camp and other functions. (7/25/17 Trans. p. 63 at 2-15).

80.     The land owned by the Chabad, at the site of the synagogue, is approximately one-half acre. (7/25/17 Trans. p. 63 at 25 and p. 64 at 1-8).

81.     The Dayton Chabad's sanctuary comfortable holds 120 people, although on some

of the high holidays can hold held "up to about 180, close to 200" "[i]f we really cram."

(7/25/17 Trans. p. 64 at 24-25 and p. 65 at 1-8).

82.     The Dayton Chabad's facility does not contain a mikvah (7/25/17 Trans. p. 65 at

9-13).

83.     The Dayton Chabad has had "pipe dreams" to develop a school for the

community and to expand its summer camp, but those things are more of a wish list than a

necessity and without these items the Dayton Chabad is "doing fine."

84.     When establishing a Chabad, it's appropriate to try to get as much as you possibly

can get under the circumstances at the time. (7/25/17 Trans. p. 73 at 10-15).

85.     The Dayton Chabad transports kids to a swimming pool once or twice a month for

their summer camp. (7/25/17 Trans. p. 77 at 1-7).

86.     In his travels to approximately 50 Chabads around the country, Rabbi Klatzkin

does not remember a single Chabad having a swimming pool inside its facility (7/25/17 Trans. p.

77 at 7-13; p. 80 at 1-5).  It is unusual for the Chabad to have a swimming pool inside its facility

(7/25/17 Trans. p. 80 at 18-21).

87.     Having a swimming pool, for the summer camp, is more for the development of a

community, "not just in terms of you're doing a specific religious exercise, but the general sense

of a community that's cohering with each other." (7/25/17 Trans. p. 78 at 3-13).

88.     Rabbi Klatzkin is not aware as to the details of the  Historic District

Commission's decision on the plaintiff's application for a certificate of appropriateness. (7/25/17

Trans. p. 81 at 7-24).

89.     Rabbi Klatzkin was not asked to provide an opinion as to the plans submitted to the Historic District Commission in support if the plaintiff's application for a certificate of appropriateness. (7/25/17 Trans. p. 82 at 2-16; p. 83 at 8-12).

90.     Wayne Garrick is a registered architect in the State of Connecticut (7/27/17 Trans. p. 64 at 24-25, p. 65 at 1-12).  Garrick has worked as an architect since 1976 (7/27/17 Trans. p. 66 at 2-4).  Garrick has designed numerous religious buildings including Congregation Share Torah in Bridgeport, Connecticut, Congregation B'nai Jacob in Woodbridge, Connecticut, and the new Chabad at Yale in New Haven (7/27/17 Trans. p. 66 at 13-21).

91.     An architect can't begin a project without a program, thus Garrick established a program based on other work that had previously been produced for plaintiff. (7/27/17 Trans. p. 68 at 15-20).  Garrick was cognizant of the Secretary of Interior's Standards for Rehabilitation as well as the Connecticut General Statutes, as they relate to a Certificate of Appropriateness. (7/27/17 Trans. p. 68 at 23-25).

92.     In preparing a design to expand the property at 85 West Street, Garrick viewed assessor's records, took photographs of the property from adjacent properties, conducted a zoning review, as well as a building code and fire code review, and reviewed a survey of the property. (7/27/17 Trans. p. 70 at 6-20). Additionally, Garrick reviewed the Merrill Associates plan, and Michael Boe's plan (7/27/17 Trans. p. 75 at 5-13) [Exhibit 74].   Garrick also used the program for the Chabad at Yale as a guide for the current program (7/27/17 Trans. p. 86 at 15-25).  Garrick was unable to obtain permission to view the interior of the building at 85 West Street (7/27/17 Trans. p. 92 at 16-19).  Garrick prepared plans to expand the subject property [Exhibit 102A].

93.     Page SD.1 shows the ground floor plan [Exhibit 102A at page 1].  Page SD.2 shows the first floor plan [Exhibit 102A at page 2].  Page SD.3 shows the second floor plan [Exhibit 102A at page 3].  Page SD.4 shows the north and south elevations [Exhibit 102A at page 4].  Page SD.5 shows the east elevation [Exhibit 102A at page 5]. Page SD.6 shows the west elevation [Exhibit 102A at page 6].

94.     The concept behind Garrick's plans was to maintain and respect the scale and proportion of the town. (7/27/17 Trans. p. 73 at 24-25).

95.     At the basement level, Garrick's proposed expansion includes three classrooms, a children's library, a kitchenette, two restrooms, a mikvah, a janitor's closet and a laundry room. [Exhibit 102A]

96.     At the first floor, Garrick's proposed expansion includes a lobby, a Shul with an occupancy of 110, a lounge/conference room/library, a Rabbi's office, administrative assistant space adjacent to the office, restrooms, and gift cases [Exhibit 102A].

97.     At the second floor, Garrick's proposed expansion includes a kitchen, a dining room with an occupancy of 67, restrooms, and two residential suites.

98.     The proposed expansion contains/contemplates a Shabbos elevator which runs continuously on Shabbat, stopping at each floor, so that no buttons on the elevator need be pressed to operate (7/27/17 Trans. p. 85 at 3, p. 90 at 8-23).

99.     The total above grade square footage of Garrick's proposed plan equals 7,010. The sub-area provides an additional 3,800 square feet.

100.     Garrick designed the rooflines so that the roof in the center is lower than the two rooflines in the front and back.

II.     Conclusions of Law

101.        Subsection (a) of 42 U.S.C. § 2000cc lays out RLUIPA's substantial burden rule:

(1) General rule. No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution:

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

102.        Because RLUIPA does not define the term "substantial burden," the courts have looked to the Supreme Court's free exercise jurisprudence for guidance. Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007).  As the Second Circuit has explained, "Supreme Court precedents teach that a substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion … on the other hand.'"  Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007) (*quoting* Sherbert v. Verner, 374 U.S. 398, 404, 83 S. Ct. 1790, 10 L. Ed. 2d 965, (1963)).

103.         The Second Circuit, in its decision on the instant matter, set forth the standards for this court to use in determining whether there is any question of fact as to whether the Defendants' actions substantially burdened the exercise of the Plaintiffs' religion.  They are quoted in their entirety:

Instead, *Westchester Day School* enumerates some of the factors that may be considered to determine whether a substantial burden is imposed, including whether the law is neutral and generally applicable. In conducting the substantial burden analysis, we considered several factors. *See* 504 F.3d at 352 (stating that the "arbitrary and unlawful nature" of defendant's conduct "support[ed]" a substantial burden claim, while also looking to "other factors"); *see also Fortress Bible Church*, 694 F.3d at 219 (finding that arbitrary and capricious application of land use regulation "bolstered" a substantial burden claim). In addition to the arbitrariness of a denial, our multifaceted analysis considered whether the denial was conditional; if so, whether the condition was itself a substantial burden; and whether the plaintiff had ready alternatives. *See Westchester Day Sch.*, 504 F.3d at 352; *see also Fortress Bible Church*, 694 F.3d at 219 (considering whether rejection of land use application denied plaintiff the "ability to construct an adequate facility" for its religious exercise, or was merely a "rejection of a specific building proposal"). Our sister circuits have contributed additional texture to this analysis. *See, e.g.*, *Bethel World Outreach Ministries*, 706 F.3d at 558 (weighing whether plaintiff had "reasonable expectation" of receiving approval to build church when it bought property and deeming it "significant that the [defendant] has completely prevented [the plaintiff] from building any church on its property"); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) (considering as a factor whether plaintiff "bought property reasonably expecting to obtain a permit," particularly when alternative sites were available); *Midrash Sephardi, Inc.*, 366 F.3d at 1228 (deeming it significant that the plaintiff could operate a church "only a few blocks from" its preferred location). Thus, while we conclude that the substantial burden provision applies, we leave it to the district court to determine as a question of first instance, *see Dardana Ltd. v. Yugansknefigaz*, 317 F.3d 202, 208 (2d Cir. 2003), whether the denial here in fact "impose[d] a substantial burden on the [Chabad's] religious exercise, "[9]42 U.S.C. § 2000cc(a)(1); *see Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2d Cir. 2012) (requiring that the substantial burden have a "close nexus" with religious exercise to be cognizable under RLUIPA)*; Westchester Day Sch.*, 504 F.3d at 349 (holding that substantial burden occurs when government "coerces the religious institution to change its behavior" (emphasis omitted)) . We note that, in conducting the substantial burden analysis on remand, the district court should consider, *inter alia*, whether the conditions attendant to the HDC's denial of the Chabad's application themselves imposed a substantial burden on the Chabad's religious exercise, whether feasible alternatives existed for the Chabad to exercise its faith, and whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street. The district court should also consider, of course, whether the proposed modifications shared a "close nexus" with and would be consistent with accommodating the Chabad's religious exercise. *See Fortress Bible Church*, 694 F.3d at 219.

Chabad Lubavitch of Litchfield County   v.  Litchfield Historic District Commission 768

F.3d 183, 195-196 (2d Cir. 2014).

104.    The Chabad bears the burden of persuasion with respect to establishing whether

there are quick, reliable, and financially feasible alternatives that it may utilize to meet its religious; and whether the denial was conditional (See 42 U.S.C. § 2000cc–2 (putting burden on plaintiff to prove that government's action substantially burdened plaintiff's exercise of religion).)

105.    The Litchfield Chabad, essentially, asks this court to exempt it from considerations of scale that apply to every other application before the Commission.  Granting this request would effectively immunize the Chabad from any restrictions on the size of the property. However, "no such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise." <u>Civil Liberties for Urban Believers v. City of Chicago</u> 342 F.3d 752, 761 (7th Cir., 2003).[1]  The Commission's rules and regulations apply equally to all landowners in the Historic District, and RLUIPA does not require municipalities "to favor [congregants] in the form of an outright exemption from land-use regulations." <u>Civil Liberties for Urban Believers v. City of Chicago</u>, 342 F.3d 752, 761 (7th Cir. 2003).

106.    As stated, *supra,* the <u>Westchester</u> court noted that the religious landowner must show that there are no practical alternatives to reach its goal, and that the decision of the municipality had to be final, not conditional, with the prospect of the applicant amending its plan. <u>Westchester</u> 504 F. 3d at 352.   The Chabad plainly failed its burden of persuasion on this point, because the decision was not final, invited the Plaintiffs to submit a modified application, and failed to appeal the decision under ordinary land use law.

---

[1] RLUIPA was not intended to "relieve religious institutions from applying for variances, special permits or exceptions ... where available without discrimination or unfair delay." 146 CONG. REC. S7774-01, S7776 (daily ed. July 27, 2000) (Joint Statement of Sen. Orrin Hatch and Sen. Edward Kennedy).  Thus, RLUIPA has not elevated federal courts into appellate land use boards.  See <u>Murphy v New Milford Zoning Commission</u>, 402 F.3d  342, 348-49 (2d. Cir. 2005).

107.    The language of the Second Circuit in <u>Chabad Lubavitch</u> *supra,* stated that the court, on remand, consider three things.  While one of which is whether the conditions themselves imposed a substantial burden, another is whether feasible alternatives existed; and a third is whether the plaintiff could reasonably believe it would be permitted to build what it proposed.  Plaintiffs did not sustain their burden of persuasion on either of the latter two issues.

108.    The Second Circuit has cited two cases for the proposition that the applicant's reasonable expectations are a factor in determining whether the denial of an application works a burden on the practice of their religion.  In each of these cases the expectation concerned whether a house of worship would, at all, be allowed.   In <u>Bethel World</u> <u>Outreach Ministries v.</u> <u>Montgomery Cnty. Council</u>, 706 F.3d 548, 557 (4th Cir. 2013), the County, to which the Plaintiff had applied for a permit to build a church, had permitted other churches in the pertinent zone at the time that the plaintiff had purchased its property.  Additionally, the court found it "significant" that the County prevented the Plaintiff from building any church on its property rather than "simply imposing limitations on a new building".  Id.   In this case it is important to note that the HDC had no jurisdiction over Plaintiffs' intended use of the property[2] and did exactly what the court in <u>Bethel</u>, suggests:  it stated that it would allow an addition not only compatible with other buildings in the vicinity, but a building that measured very favorably with other Chabads located in far larger Connecticut cities.  It also indicated that it would accommodate particular religious architectural enhancements, specific to Plaintiffs' religion.

---

[2] CGS Section 7-147f (b):  "In its deliberations, the historic district commission shall act only for the purpose of controlling the erection or alteration of buildings, structures or parking which are incongruous with the historic or architectural aspects of the district. **The commission shall not consider interior arrangement or use**." [Emphasis added.]

109.     In <u>Fortress Bible Church v. Feiner</u>, 694 F.3d 208, 219 (2d Cir. 2012) the Second Circuit noted that the district court had found that the town was disingenuous in purporting a willingness to consider a modified plan.  The trial court had also found that the town wanted to "derail" the Church's project because it refused to accept a payment in lieu of taxes; and the Town's actions "amounted to a complete denial of the Church's ability construct an adequate facility rather than a rejection of a specific building proposal." <u>Id</u>.   The last paragraph of the Historic District's Decision, Exhibit 78, indicating the religious emoluments it would approve, including a Star of David, makes it clear the there was no attempt to deny the Chabad with the ability to build a house of worship on its property.

110.     The Second Circuit has observed that "not every activity carried out by a religious entity or individual constitutes a 'religious exercise.' " <u>Westchester Day School v. Village of Mamaroneck</u> 386 F.3d 183, 190 n. 4 (2d Cir.2004) (<i>quoting</i> 146 CONG. REC. S7774-01, S7776 (July 27, 2000)). Instead, RLUIPA requires inquiring "whether the facilities to be constructed [are] to be devoted to a religious purpose." <u>Westchester Day School v. Village of Mamaroneck</u> 386 F.3d 183, 189 (2d Cir. 2004). Such religious purpose need not implicate "core religious practice," <u>Guru Nanak Sikh Society of Yuba City v. Cnty. of Sutter,</u> 326 F.Supp.2d 1140, 1151 (E.D.Cal.2003), or "an integral part of one's faith," <u>Living Water Church of God v. Charter Township of Meridian</u>, 384 F.Supp.2d 1123, 1129 (W.D.Mich.2005), rev'd on other grounds, 258 Fed. Appx. 729 (6th Cir.2007).

111.     While the Second Circuit has not clarified the meaning of "devoted" in its <u>Westchester</u> opinion, courts within the Circuit have interpreted it to require a "careful, fact-sensitive balancing of secular purposes and religious purposes in relation to the spaces being constructed, as opposed to a strict requirement of exclusive use for religious purposes, which

would be inconsistent with the text and legislative history of RLUIPA." Westchester Day School v. Village of Mamaroneck, 417 F.Supp.2d 477, 544 (S.D.N.Y.2006).


112.    Religious exercise under RLUIPA is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). Further, using, building, or converting real property for religious exercise purposes is considered to be religious exercise under the statute. § 2000cc–5(7)(B). To remove any remaining doubt regarding how broadly Congress aimed to define religious exercise, RLUIPA goes on to state that the Act's aim of protecting religious exercise is to be construed broadly and "to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc–3(g). Westchester Day School v Village of Mamaroneck, 504 F.3d 338,347 (2007)


113.    That is to say, to get immunity from land use regulation, religious schools need to demonstrate more than that the proposed improvement would enhance the overall experience of its students. Westchester Day School v Village of Mamaroneck, 386 F.3d 183, 189 (2004). For example, if a religious school wishes to build a gymnasium to be used exclusively for sporting activities, that kind of expansion would not constitute religious exercise. Or, had the ZBA denied the Westchester Religious Institute's 1986 request for a special permit to construct a headmaster's residence on a portion of the property, such a denial would not have implicated religious exercise. Nor would the school's religious exercise have been burdened by the denial of a permit to build more office space. Accordingly, we suggested the district court consider whether the proposed facilities were for a religious purpose rather than simply whether the school was religiously-affiliated. Id.

114.     We recognize further that where the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive. There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise. Imagine, for example, a situation where a school could easily rearrange existing classrooms to meet its religious needs in the face of a rejected application to renovate. In such case, the denial would not substantially threaten the institution's religious exercise, and there would be no substantial burden, even though the school was refused the opportunity to expand its facilities.  Westchester Day School v Village of Mamaroneck, 504 F.3d 338, 349 (2007).


115.     In examining the second factor—whether the Village's denial of the school's application was conditional or absolute—we look at several matters: (a) whether the ZBA classified the denial as complete, (b) whether any required modification would itself constitute a burden on religious exercise; (c) whether cure of the problems noted by the ZBA would impose so great an economic burden as to make amendment unworkable; and (d) whether the ZBA's stated willingness to consider a modified proposal was disingenuous. See Westchester Day School v Village of Mamaroneck, 386 F.3d 183, 188 (2004) n. 3


116.     The Second Circuit has cited, with approval, the Seventh Circuit holding in Vision Church v. Village of Long Grove, 468 F.3d 975, 998–99 (7th Cir.2006) that "… land use conditions do not constitute a substantial burden under RLUIPA where they are "neutral and traceable to municipal land planning goals and where there is no evidence that government

actions were taken "*because* [plaintiff] is a *religious* institution…." (emphasis in original). <u>Westchester Day School</u> *supra* at 350.

117.    The <u>Feiner</u> court determined that although the denial was not facially absolute, as modified proposals could have been submitted, it was *de facto* absolute because the municipality lacked good faith and would consider the next proposal disingenuously.  In reaching this conclusion, the court made extensive findings concerning the town's perceived misconduct, noting in particular deviations from normal procedures, the town's opposition to the church's tax exempt status, and its refusal to consider evidence of minimal environmental impacts.   The court found that the town had engaged in intentional delay, acting in a hostile, biased and insincere manner, and that these actions amounted to a substantial burden.  The evidence indicates no such motives here.

118.    The Second Circuit has twice stated that "[a] denial of a religious institution's building application is likely not a substantial burden if it leaves open the possibility of modification and resubmission." <u>Id</u>. citing to <u>Westchester Day School v. Village of Mamaroneck</u>, 504 F.3d 338, 349 (2d Cir.2007).

The HDC was mindful of <u>Westchester</u> and did exactly this.  The HDC stated:

> This decision allows a building and addition that would substantially enhance the Applicant['s] Current religious practices. A future plan by the Applicant, conforming to this decision, would also restore the Deming house and thereby enhance the historical character of the immediate neighborhood.  It would be a welcomed improvement to the Town of Litchfield and its Historic District.

x.    The HDC Decision was consistent with the position of the Second Circuit:

> (W)hen the denial of a religious institution's application to build is not absolute, such would not necessarily place substantial pressure on the institution to alter its behavior, since it could just as easily file a second application that remedies the problems in the

first. As a consequence, as we said when this case was earlier before us, "rejection of a submitted plan, while leaving open the possibility of approval of a resubmission with modifications designed to address the cited problems, is less likely to constitute a 'substantial burden' than definitive rejection of the same plan, ruling out the possibility of approval of a modified proposal." *Westchester Day Sch.,* 386 F.3d at 188. Of course, a conditional denial may represent a substantial burden if the condition itself is a burden on free exercise, the required modifications are economically unfeasible, or where a zoning board's stated willingness to consider a modified plan is disingenuous. *Id.* at 188 n. 3. However, in most cases, whether the denial of the application was absolute is important; if there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on it to change its behavior and thus does not constitute a substantial burden on the free exercise of religion.  Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 349 (2d Cir. 2007).

119.    The fact that the HDC identified a particular property which it believed was suitable, did not foreclose the Chabad's opportunity to present a building of greater size and mass and was an invitation to return with another application.  In fact, Plaintiff's expert had designed a Chabad to fit entirely within the existing structure, without the doubling in size.

120.    Even if the Plaintiffs had met the threshold criteria for claiming a burden to their religion, two interrelated elements must be considered in determining whether a particular government action or regulation inflicts a "substantial burden" on religion. See Westchester Day School v. Village of Mamaroneck 504 F.3d 338, 348-350 (2nd Cir. 2007).  The first issue is the impact on religious activity.  The Second Circuit has made it clear that the impact must directly impinge upon the plaintiff's ability to practice religion and must truly be substantial.

121.    "RLUIPA does not guarantee that a religious organization may build a complex as large as that organization desires." Vision Church v. Vill. of Long Grove, 397 F. Supp. 2d 917, 929 (N.D. Ill. 2005) *aff'd* 468 F.3d 975 (7th Cir.2006). The court in Vision Church held that the municipality "did not 'substantially burden' the church in the practice of its religion" where, as here, it "simply placed limitations on the size of a church that could be built on the 27.4 acre parcel." Vision Church, 397 F. Supp. 2d 917, 929. *aff'd* 468 F.3d 975 (7th Cir.2006).   Nor does

RLUIPA guarantee any particular location.  <u>Grace United Methodist Church v. City Of Cheyenne</u> 451 F.3d 643 (10th Cir.2006.).

122.    Expectations for future dramatic growth, reasonable or not, has no relevance to the Court's present determination. See <u>Living Water Church of God v. Charter Twp. of Meridian</u>, 258 Fed. App'x 729, 738 (6th Cir. 2007) ("The question before us here is whether the Township's denial substantially burdens Living Water's religious exercise now – not five, ten or twenty years from now – based on the facts in the record"); see also <u>Centro Familiar Cristiano Buenas Nuevas v. City of Yuma</u>, 615 F. Supp. 2d 980, 992 (D. Az. 2009) (stating that "the desire for a larger facility does not justify excluding options that would meet the ordinary needs of the Church's current congregation").

123.    The Sixth Circuit's decision in <u>Living Water</u> illustrates that the mere frustration of an applicant's preferences, as opposed to a religion's requirements, does not constitute a substantial burden.  In <u>Living Water</u>, the district court held that a township's denial of an application for a special use permit to construct a 34,989 square foot building substantially burdened plaintiff's religious exercise. <u>Living Water Church of God</u>, 258 Fed. App'x at 732-33. The plaintiff asserted that the size of its current facility required the church to close its daycare ministry, constrained its ability to attract students to its school, caused a reduction in church membership due to insufficient space, and limited midweek worship services and other activities. <u>Living Water Church of God</u>, 258 Fed. App'x at 738.

124.    While recognizing that these limitations imposed some burden on the church, the Sixth Circuit nevertheless reversed the trial court's decision and held that the inadequacy of the current facility "does not give the church free reign to construct on its lot a building of whatever size it chooses, regardless of the limitations imposed by the zoning ordinances." <u>Living Water</u>

Church of God, 258 Fed. App'x at 739. The Sixth Circuit concluded that while the township's actions burdened plaintiff to "some degree", the township did not impose a substantial burden where plaintiff "demonstrated only that it cannot operate its church on the scale it desires." Living Water Church of God, 258 Fed. App'x at 741.  The de minimis burden imposed by the HDC's approval of a significant addition to the Deming House is an "incidental burden," (Employment Div. v. Smith, 494 U.S.872, 892 (1990)), not a substantial burden.

125.    In Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846 (7th Cir. 2007), the Seventh Circuit held that the governmental zoning decision presented no substantial burden where an organization "decided to go ahead and purchase the property outright after it knew that the permit would be denied . . . ." Village of Northbrook, 489 F.3d at 851.   As Judge Posner explained, the organization "had no reasonable expectation of obtaining a permit" and "assumed the risk of having to sell the property and find an alternative site for its church . . . ." Id. (noting that plaintiff had failed to present sufficient evidence concerning the availability of suitable land in other areas).  "Religious organizations would be better off if they could build churches anywhere, but denying them so unusual a privilege could not reasonably be thought to impose a substantial burden on them."  Village of Northbrook, 489 F.3d at 851.

DEFENDANTS,
HISTORIC DISTRICT COMMISSION OF
THE BOROUGH OF LITCHFIELD
ANDBOROUGH OF LITCHFIELD


By _____/s/_____
          Mark S. Shipman, Esq.
          Federal Bar No.04323
          C. Scott Schwefel, Esq.
          Federal Bar No.19324
          Shipman, Shaiken & Schwefel, LLC
          433 South Main Street, Suite 319
          West Hartford, CT 06110
          Telephone No. (860) 606-1712
          Facsimile No. (866) 431-3248
          Email: mark@shipmanlawct.com
          Email: scott@shipmanlawct.com




## **CERTIFICATION**


        The undersigned hereby certifies that on this date, a copy of the foregoing was filed
electronically and served by electronic service to those receiving notices through the Court's
CM/ECF system.



          _____/s/_____
          C. Scott Schwefel