## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DISTRICT

CHABAD LUBAVITCH OF                          CIVIL ACTION NO.:
LITCHFIELD COUNTY, INC. AND                  3:09 CV 1419 (JCH)
RABBI JOSEPH EISENBACH,

      Plaintiffs,

vs.

BOROUGH OF LITCHFIELD, CONNECTICUT;
HISTORIC DISTRICT COMMISSION OF
THE BOROUGH OF LITCHFIELD; GLENN HILLMAN
AND KATHLEEN CRAWFORD

      Defendants.
_____/                     *August 2, 2017*

### Plaintiff's Proposed Findings of Fact and Conclusions of Law

1. This action is commenced by Plaintiff, Chabad Lubavitch of Litchfield County, Inc.
   against the Borough of Litchfield and the Litchfield Historic District, to redress
   violations of their civil rights as protected by the Religious Land Use and
   Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.*, allegedly, caused by
   the Defendants' conduct, which they claim, has substantially burdened the free exercise
   of their religion and has violated the nondiscrimination provisions of RLIUPA, by
   virtue of the denial of a Certificate of Appropriateness for the construction of a
   religious facility on the Plaintiffs' Property in the Borough of Litchfield, Connecticut
   (hereinafter, , "Borough").

2. This Court has subject matter jurisdiction over this case pursuant to 28 USC § 1331, as the Church brings claims under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc et. Seq ("RLIUPA").

3. The sole claim of Chabad Lubavitch of Litchfield County, Inc. against Defendants, The Borough of Litchfield, Connecticut and the Historic District of the Borough of Litchfield, Connecticut, arises under the substantial burden sections of the Religious Land Use and Institutionalized Persons Act, 42 USC 2000cc et. seq. The claims are set forth in Count Six of the Third Amended Complaint.

4. The following claims have been dismissed by the Court through Motions for Summary Judgement;[1]

   a. *Count 1,* Free Exercise Claims under the First Amendment of the United States Constitution;

   b. *Count 2,* Free Speech Claims under the First Amendment of the United States Constitution;

   c. *Count 3,* Freedom of Association claims under the First Amendment of the United States Constitution;

   d. *Count 4*, Equal Protection claims under the Fourteenth Amendment of the United States Constitution;

   e. *Count 5,* Due Process claims under the Fourteenth Amendment of the United States Constitution;

   f. *Count 8,* Equal Terms claims under the Religious Land Use and Institutionalized Persons Act, 42 USC 2000cc (2)(b)(1);

   g. *Count 9*, Civil Conspiracy, 42 USC 1985(3);

   h. *Count 10,* Failure to Prevent Civil Conspiracy, 42 USC 1986;

   i. *Count 11*, Claims under the Connecticut State Constitution, Articles I, 3, 4, 5 and 14;

---

[1] See, ***Dkt. 137: Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield, CT., et. al.*** 853 F. Supp. 2d 214 (2012):

j. *Count 12*, Claims under the Connecticut Religious Freedom Restoration Act, Conn. Stat. 52-571b.

5.   Plaintiff voluntarily dismissed the following claims;

   a.   Dismissal of claims against Defendants Crawford and Hillman.  ***Dkt. 274.***

   b.   Dismissal of Count 7.  ***Dkt. 302***

   c.   Dismissal of Rabbi Eisenbach after the Court ruled that damages were not available and he did not have a claim for injunctive relied.  ***Dkt. 302***

6.   Prior to trial, the parties stipulated to the following facts, See ***Dkt 276, Tab H***. *Joint Final Pre-Trial Order, Stipulated Facts*

   a.   Plaintiff Chabad Lubavitch of Litchfield, County Inc. (hereinafter referred to as the "Chabad") is a religious corporation formed in 1996 under Connecticut Religious Corporations Law and owns the Property within the Town upon which it is attempting to construct the Temple and a place of worship and related facilities.

   b.   The Chabad was founded for the purpose of serving the spiritual and physical needs of the community in and around the Town.

   c.   The Chabad, its parishioners and associates, seek to fulfill a religious and spiritual mission in and around the Town.

   d.   There is no Temple in the Borough of Litchfield where the Chabad is able to hold its regular services and various meetings.

   e.   The Chabad purchased the Property located at 85 West Street, Litchfield, Connecticut to be used for the exercise of its religion.

   f.   The Chabad's property was most recently used as a commercial building, which housed "The Wilderness Shop."  Over the years, the existing structure (known as the Julia Deming house) was changed from a residential use to a commercial use.

   g.   In 1975, the zoning for the building next door to the Property was also changed from residential to business.  This area of the Town's West Street was then zoned Business Historic at the time of the 1986 borough zone changes.

   h.   The Chabad decided to modify the Property for purposes of establishing a Chabad House.

i.  Prior to making its proposed modifications, the Chabad filed an application for a Certificate of Appropriateness with the Historic District Commission of the Borough of Litchfield (the "HDC") to restore and rehabilitate the existing structure (known as the Julia Deming house) on the Property.

j.  After purchasing the property, Plaintiffs retained professionals in the fields of engineering, architecture and historic preservation to develop a plan for a proposed Chabad House.

k.  Approval of a Certificate of Appropriateness by the HDC requires it to apply state statutes and its own regulations, which in turn require an exercise of reasonable discretion.

l.  When the plans were first presented, the Defendants asked the Plaintiffs to make architectural and site plan modifications, relating to the proposed building. Plaintiffs complied with some of the requested modifications.

m.  Plaintiffs' plan to use a portion of the Property as a sanctuary and place of worship.

n.  The various uses contemplated by the addition included, inter alia: a sanctuary; a rabbi's study, a ritual bath; two kosher kitchens; a religious school; a residence for Rabbi Eisenbach and his family; staff / visitor housing; a library; a coffee bar; and, a swimming pool.

o.  The defendants agree that construction of a sanctuary, rabbi's study, classrooms, ritual bath, kosher kitchen and library can be considered as part of the Chabad's religious exercise.

p.  However, the Defendants have questioned whether a swimming pool, visitor housing, staff housing, and Rabbi's residence, contained within the structure, are necessary for the Plaintiffs' religious exercise.

q.  The Chabad, submitted an application for a Certificate of Appropriateness (including all required supporting materials) to the Defendants at a pre-hearing meeting held on or about September 6, 2007.

r.  An application for a Certificate of Appropriateness (including all required supporting materials) was formally filed at the second pre-hearing meeting on or about October 18, 2007.

s.  The public hearing on the Certificate of Appropriateness was opened on November 15, 2007, and continuations of the public hearing were held on or about December 6, 2007, and again on or about December 17, 2007.

t.   On or about December 20, 2007, the Defendants issued a written decision denying Plaintiffs' Certificate of Appropriateness, suggesting a building that was of smaller mass and size, and inviting the Chabad to return with a revised Application.

u.   The Defendant Borough of Litchfield, Connecticut is a municipal corporation duly formed and existing pursuant to the laws of the State of Connecticut. Defendant Borough of Litchfield, Connecticut Defendant is empowered to act through its governing body, officials, and employees.

v.   Defendant Borough of Litchfield, Connecticut, enacted laws, including land use laws for the Borough of Litchfield, Connecticut, and has appointed the Litchfield Historic District to make decisions in accordance with its own regulations and with Connecticut General Statutes.

w.   Defendant Litchfield Historic District, adopted, interpreted, and applied laws, including Policies meeting the definition of a land use regulation under 42 U.S.C. § 2000cc-5(5).

x.   In 1959, the State Legislature passed a special act that established the present Historic District and provided that any new construction or modification would be allowed only upon the granting of Certificates of Appropriateness the Board of Warden and Burgesses.

y.   In 1989, pursuant to the authority granted in Connecticut General Statutes (CGS), 7-147a et seq. the Borough established the Litchfield Historic District to govern aspects of the construction and modification of buildings within the Litchfield Historic District.

z.   Under the special act, size was not a criterion the Board of Warden and Burgesses could consider; and they were expressly directed not to consider the relative size of buildings.

7.   For purposes of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C.

§2000cc et. seq., the following apply:

a.   The Chabad is a "religious assembly or institution." 42 U.S.C. § 2000cc(2)(b).

b.   The Litchfield Historic District ("HDC") is a municipal legislative body authorized to adopt, interpret and apply land use regulations for the Borough of Litchfield, Connecticut.

c.   The HDC is a branch, department, agency or instrumentality of a government within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

d. The Defendants adopted, interpreted, and applied laws, including the Policies and other land use laws, for the Borough meeting the definition of a land use regulation under 42 U.S.C. § 2000cc-5(5)

e. For purposes of RLUIPA, the Defendants constitute a "government" under 42 U.S.C. § 2000cc-5(4)(A).

f. Plaintiffs' plan to use the Property as a place of worship and Temple is "religious exercise" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(7)(a) & (b).

g. For purposes of RLUIPA, Plaintiff Chabad Lubavitch of Litchfield County, Inc. is a "religious assembly or institution." 42 U.S.C. § 2000cc(2)(b).

8. The HDC is empowered by the Defendant Borough of Litchfield and the State of Connecticut to regulate and restrict the use of land within the Town including areas designated as a "Historic District," also known as the "Old and Historic Litchfield District."

9. There is no Temple in the Town where the Chabad is able to hold its regular services and various meetings.

a. The Chabad, its parishioners and associates, are fulfilling a religious and spiritual mission in and around the Town.

b. The Chabad is formed to communicate a message and mission to instruct in righteous living, foster fellowship of its parishioners, serve the community, and to empower its parishioners to fully participate in the community as productive citizens and caring neighbors.

c. The Plaintiffs' currently have no physical location to worship requiring them to temporarily rent facilities in the Litchfield area that cannot fulfill Plaintiffs' religious and spiritual mission in and around the Town.

d. Plaintiff has lost parishioners because of the lack of a facility. To accommodate its existing parishioners, and those parishioners who would like to join the worship and religious instruction, Plaintiff needs to acquire a facility to serve as its permanent location as a dedicated synagogue.

10. The Chabad purchased the Property located at 85 West Street, Litchfield, Connecticut, in 2005 in order to communicate and accomplish the mission central to the belief and practice of their religion.

   a. The Historic Survey of the Property shows that the Property had undergone a major remodeling and that most of the architectural details of the Property had been lost.

   b. Since 1981, the Property has been used as a commercial enterprise. The most visible portions of the building, including many of the elements that defined its architectural style, were drastically altered or destroyed in order to make the building suitable for commercial uses.

   c. The Property was most recently used as a commercial building which housed "The Wilderness Shop." Over the years, the building was changed from a residential use to a commercial use.

   d. In 1971, the Property was officially rezoned from residential to commercial. The building subsequently housed an antique shop with multiple vendors, a fabric store, and the Wilderness Shop (a retail outfitters store).

   e. The building's original architectural style has been lost, changed, or gutted during the time the HDC has existed. The decades of commercial alterations have caused the Deming House to lose any type of historical significance as a contributing structure to the historic district.

   f. Many of the properties located within the Historic District in Litchfield, Connecticut, were once residences and have been used, historically and currently, for a variety of uses including institutional, business and commercial.

11. The Chabad requires modifications to the Property in order to accommodate the needs of its parishioners and associates so that it may communicate the message and accomplish the mission central to the belief and practice of their religion.

   a. Completing a Temple as a place of worship is central to the Chabad Jewish belief. Many elements of the faith and practice may only be performed in a consecrated place of worship commonly referred to as a *shul* or synagogue. Without a *shul*, Chabad Jewish people are limited in their ability to practice their faith and religious tenets.

b. The Chabad Jewish leadership is Orthodox and Hasidic and is distinguished by a particular method of dress, certain religious customs and practices and their use of the Yiddish language.

c. In order to adequately carry out the faith and practice required by Plaintiff's religion, Plaintiff purchased Plaintiff' Property.

d. Plaintiff's advisory committee met numerous times, and the size of renovation was determined to be the minimum required for Plaintiff's mission and purpose to serve our area.

e. Every aspect of Plaintiff's application, throughout the design, reflects the spiritual and physical needs to further Plaintiff's mission.

f. Plaintiff designed a synagogue for the current number of attendees, reflecting conservatively on the size of the greater Litchfield community

g. The floors under and above are based upon the necessary spaces to accommodate Plaintiff's religious practice and current programs serving all of Litchfield County and the Northwest area.

   i. Most of the Temples around the world fill their sanctuary twice a year during high holy days and lifecycle events.

   ii. One of New York City's largest temples known as the "Central Synagogue" averages twenty-five to fifty (25-50) at a Sabbath service (non Bar/Bat Mitzvah week)

   iii. Like other religious faiths, Plaintiff has weekly attendance that varies each week and season.

h. Like other religious faiths, Plaintiff requires space to accommodate for the times when the Temple will be filled.

i. It is the custom and practice of Plaintiff's faith to dedicate the living areas of the Rectory/Parsonage/Residence to serve the religious needs of Plaintiff's participants and the Rabbi's family.

   i. Every aspect of the Rabbi's families' life – including the Rectory/ Parsonage/ Residence – is dedicated to serve a religious purpose.

      2. The Lubavitcher Rebbe instructed all Plaintiff's followers to designate their private dwellings as Chabad Houses in the symbolic sense of: (a) identifying with values and goals of the Chabad Movement in terms of personal religious lifestyle alongside devotion to other people (inspiring all who dwell or visit

there); and (b) as an educational tool for the resident children to realize their responsibilities toward everyone else.

ii. Plaintiff's application included the Rectory/Parsonage/Residence to serve the religious needs of Plaintiff's participants and the Rabbi's family as a Chabad House.

iii. In countless public addresses, the Lubavitcher Rebbe called on his followers to make their homes *Batei Chabad* -- Chabad Houses.

iv. The mandates of Plaintiff's faith are found in a long library of texts discussing the use of our Chabad House for religious purposes.

v. In a Chabad House, even the non-consecrated activities such as eating, sleeping, playing, etc. must also be infused with holiness, even beyond the normative religious rituals that are mandated (such as grace before and after consumption of food and beverages, Torah-study in both day and night-time, the observance of the Sabbath and Holy Days with their specific rituals, family-celebrations that relate to religion, acts of charity and kindness, affixing of mezuzot - scrolls of Biblical passages affixed to all doors as reminders of Divine presence, requirement of some library of religious texts even if it be minimal etc.), to become in effect miniature sanctuaries - though not of permanent status nor of the same kind as a synagogue

vi. Practical examples included in Plaintiff's application showed the design and construction of a kitchen that satisfies Plaintiff's religious mandates for food preparation. The kitchen serves to provide a place to instruct others in the preparation of food according to Plaintiff's religious beliefs. The kitchen serves to fulfill not only the physical needs of feeding Plaintiff's participants and the Rabbi's family, but also fulfills the religious purpose of passing on the tenants of Plaintiff's faith and culture to both Plaintiff's participants and the Rabbi's family members. Plaintiff's religious faith and practice requires separate kitchens for various uses. Because each of the kitchens must be kept according to religious mandates, more space is needed to accommodate each kitchen type.

vii. Another example included in Plaintiff's plans showed the design and construction of a Library that satisfies Plaintiff's religious mandates for the inclusion of at least the minimal religious texts which would serve to educate and instruct Plaintiff's participants and the Rabbi's family. Defendants' claim that the plans include a "coffee bar" is untrue. The Library includes an area for self-service coffee for those visiting the Library.

j.  The pool area and lower educational areas are dedicated to various religious uses for Plaintiff's participants including Plaintiff's Gan Israel program for children. Plaintiff is forced to rent extra space for events at other locations due to the size limitations of the current location.

k.  Plaintiff has repeatedly had to rent space at the Litchfield Inn in Litchfield; the Heritage Resort & Conference Center in Southbury; the Holiday Inn in Waterbury; the Isabelle Freedman Retreat Center in Falls Village; the Wamgoo School in Litchfield and the Shepaug School in Washington.

l.  Plaintiff currently spends thousands of extra dollars to accommodate Plaintiff's religious needs at other locations due to the lack of space needed for the programs such as Gan Israel and other children and adult programs throughout the year.

m.  Plaintiff expends thousands of dollars to rent space for Gan Israel and other programs including renting a pool and shuttling participants around the area for program services.

   i.  Plaintiff's pool was designed below grade under the building so that it is not visible

n.  Every synagogue has unique programs to serve the needs of individual communities.

   i.  Plaintiff's programs are more intensive, far reaching, and distinct from others.

   ii.  Plaintiff's programs will provide the only Temple in the area and programs for a Hebrew school and myriad other children and adult programs not offered to the community due to lack of facilities.

   iii.  Plaintiff's programs include the only Jewish Summer camp in Litchfield County to serve the community's children and Plaintiff's Application includes plans for the only Jewish preschool in Litchfield County.

   iv.  Plaintiff's programs also include the JewishFest and other adult programs not offered elsewhere.

12.  Plaintiff seeks to build a synagogue alongside other religious institutions near the center of the Borough of Litchfield consistent with this tradition.

13. Plaintiff's plans center upon the Temple/Worship area and all other uses in the design were accommodated by "stacking" equal to the size and orientation necessary to create the Temple/Worship area

14. The size and design of the proposed Chabad meet local standards for planning and zoning and is 5% less than what is permitted on the Property.

15. The size and design of the Temple/Worship area is based upon Plaintiff's needs during weekly services and high holy days in the same manner Christian facilities are made large enough to accommodate Christian holidays at Easter and Christmas

16. The size and scale are the smallest possible in order to meet Plaintiff's religious mandates and the necessary orientation while complying with federal, state, and local laws.

17. The proposed building is equal in size to one other church building – [the United Methodist Church] – and remarkably smaller than those of the other [three] religious institutions in the Borough.

   a. The Oliver Wolcott Library is an addition to a residential structure which is one of the most historically significant residential structures within the Historic District. It consists of a historically significant home to which is attached a substantially sized addition. The square footage of the rear addition to Wolcott's historic home is larger than the house itself, the addition extends way beyond the existing building at the south side of the structure. It is not half the size of the historic home – it is larger than the Wolcott's historic home.

   b. The Rose Haven home is located on North Street within the Historic District. Like Plaintiffs' Property, the Rose Haven home is an historic Deming house which also has an extensive rear addition that is much larger than the residential home structure.

   c. Another originally historic home within the Historic District houses the Cramer & Anderson law firm. The Defendants approved an addition nearly doubling the size of the original historic home's structure.

18. Prior to making the necessary modifications, the Chabad filed a Certificate of Appropriateness to restore and rehabilitate the existing structure (known as the Julia Deming house) on the Property as well as make additions to the Property to accommodate the needs of its parishioners and associates so that it may communicate the message and accomplish the mission central to the belief and practice of their religion.

19. After purchasing the property, Plaintiffs retained professionals in the fields of including engineering, architecture and historic preservation to develop a site plan with architectural drawings and to perform thorough studies to address all relevant health, welfare and safety issues.

20. Plaintiffs commissioned an extensive examination of the surrounding architectural uses, and examined the surrounding areas to ensure that no compelling governmental interest existed to deny Plaintiffs' architectural plans.

21. The Defendants demanded numerous architectural and site plan modifications. Plaintiffs repeatedly complied and performed the modifications demanded by the Defendants thereby increasing the costs and fees charged to Plaintiffs by the engineers and architects.

22. The Chabad submitted an application known as a Certificate of Appropriateness and elevation plans, along with a site plan and plot plan (including all required supporting materials) to the Defendants at a pre-hearing meeting held on or about September 6, 2007

    a. The Chabad made changes to the design of the building based on the comments of the HDC members at the September 6, 2007 meeting

23. The Certificate of Appropriateness (including all required supporting materials) was formally filed at the second pre-hearing meeting on or about October 18, 2007.

    a. The Chabad made changes to the design plan based on the comments of the HDC members at the October 18, 2007 meeting.

24. The public hearing on the Certificate of Appropriateness was opened on November 15, 2007, and continuations of the public hearing were held on or about December 6, 2007, and again on or about December 17, 2007.

    a. The Chabad made design changes after the November 15 and December 6 meeting based on the comments of the members of the HDC.

    b. At the December 17 meeting, the Chabad asked the HDC if there were any other changes it wanted. No member of the HDC responded.

    c. The HDC never asked the Chabad to reduce the mass of the building.

25. On or about December 20, 2007, the Defendants issued a written decision denying Plaintiffs' Certificate of Appropriateness.

    a. The HDC determined that subjectively, the mass of the building was too large and incongruous with the adjacent buildings in the historic district.

        i. No person could go through the historic district and look at the historic district and see what it looks like historically, architecturally, and then implement those same designs in their building plan and then have an assurance that the application would be approved by the HDC.

        ii. There are numerous residential houses within the Historic District that are similar in size, if not larger than, Plaintiff's Property would be with the proposed addition requested in Plaintiff's application. Many of these houses were expanded over the years through sizable additions.

    b. The HDC's decision states it would only "approve an addition equal in square footage to the Deming House." The current square footage of the Deming House is 2,679 square feet. *Id.* The HDC's decision further dictates any addition must be "subordinate to the roof and width of the Deming House. *Id.*

c.  The HDC cannot look at the interior uses of the Property.  The testimony at trial confirmed that they did look at the interior uses of the property.

d.  The HDC decision is arbitrary and concluded, "Depending upon the foot print of the addition and the design of the *below grade* spaces, the applicant should be able to design an addition that renders a completed building with over 6,000 square feet of usable space."  *Id.* (emphasis supplied).  Notably, the HDC's decision limits Plaintiff to "an addition equal in square footage" to the current building – 2,769 – and demands that the addition include a "design of the *below grade* spaces" so that the total addition approximates "6,000 square feet of usable space." *Id.*

## Conclusions of Law

By denying the Chabad's application, Defendants imposed unreasonable and arbitrary restrictions upon Plaintiff's ability to exercise religious faith and practice in violation of RLUIPA's Substantial Burden Clause.

### a.  RLUIPA's Substantial Burden Clause

RLUIPA's Substantial Burden Clause provides that:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

The Substantial Burden provision applies in three situations, where:

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or,

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2). The Second Circuit has already held that the third prong is applicable in this case. *Chabad Lubavitch of Litchfield County et al. v. Litchfield Historic District Commission, et al.,* 768 F.3d 183, 192 (2d Cir. 2014) ("RLUIPA's substantial burden provision applies in this case under the statute's 'individualized assessment' predicate.").

There are two prongs to a Substantial Burden analysis: first, whether or not the behavior being curtailed constitutes "religious exercise," and second, whether the government's action substantially burdened the religious exercise. *See, e.g, Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007) ("*Westchester Day III*").

### b. The Chabad is engaged in "religious exercise"

The Substantial Burden Clause prevents the government from imposing a substantial burden on "religious exercise." 42 U.S.C. § 2000cc(a)(1). RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Also, the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7)(B). The Second Circuit has also stated that, to determine if a use qualifies as "religious exercise," district

courts should ask "whether the proposed facilities were for a religious purpose rather than simply whether the [facilities] w[ere] religiously-affiliated." *Westchester Day III*, 504 F.3d at 348.

The Chabad's plan for 85 West Street contemplates the minimum about of space needed for the religious needs of that community and therefore, the renovation and addition to 85 West Street constitutes "religious exercise" under RLUIPA. The testimony at trial confirmed that there is no question that the shul/sanctuary, a rabbi's study, a ritual bath, two kosher kitchens, a religious school, a residence for Rabbi Eisenbach and his family, staff/visitor housing, a library, a coffee bar, and a pool. See also, *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 2016 U.S. Dist. LEXIS 10491, *17 (D. Conn. Jan. 27, 2016); **Doc. No. 226** at 4-5. Defendants have conceded that construction of the sanctuary, rabbi's study, classrooms, ritual bath, library and coffee bar constitutes religious exercise. *Id.* at *23; **Doc. No. 226** at 16. Defendants have also conceded that construction of the kosher kitchens constitutes religious exercise, though they argued the second kitchen as only necessary because the proposal included Rabbi Eisenbach's residence, which Defendants argue is not religious exercise. *Id.* at *24; **Doc. No. 226** at 16. However, at trial the only areas of the building opposed by the Defendants were the residence, the staff housing and the pool.

Construction of an intuitively secular facility can constitute religious exercise if the facility will be used, at least in part, for religious exercise. *See, e.g., Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 500 (S.D.N.Y. 2010); *Westchester Day III*, 504 F.3d at 348. Rabbi Eisenbach has testified the "pool area and lower educational areas are dedicated to various religious uses for [the Chabad's] participants including [the Chabad's] Gan Israel program for children.". Thus, since the proposed pool will at least in part be used for religious purposes, its

construction constitutes "religious exercise." *See, e.g., Fortress Bible Church*, 734 F. Supp. 2d at 500; *Westchester Day III*, 504 F.3d at 348.

Similarly, the undisputed testimony at trial demonstrated that Rabbi Eisenbach's residence will also be used at least in part for religious purposes. As the residence of the Chabad community's leader, Rabbi Eisenbach's proposed residence serves the religious purpose of providing the community with an example of how to raise a family in a household that incorporates the Chabad's tenets, and of how "every home" can become a "Chabad House." *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at *28-29; **Doc. No. 226** at 19. Further, Defendants have not disputed Rabbi Eisenbach's assertion that all aspects of his domestic life are infused with religious exercise, nor have they disputed that his home serves as a religiously-mandated exemplar to the Chabad community. *Id.* at *29; **Doc. No. 226** at 19. As such, the construction of the Rabbi's proposed residence also constitutes "religious exercise." *See Fortress Bible Church*, 734 F. Supp. 2d at 500; *Westchester Day III*, 504 F.3d at 348.

Finally, with respect to the staff/visitor housing, the Chabad presented evidence that it will be used to house visiting rabbis and counselors, and Defendants have offered no evidence or argument that such use does not qualify as religious exercise. *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at *30-31; **Doc. No. 226** at 20. As such, the construction of the staff/visitor housing also constitutes "religious exercise." *See Fortress Bible Church*, 734 F. Supp. 2d at 500; *Westchester Day III*, 504 F.3d at 348.

In sum, the construction of each and every aspect of the Chabad's proposed addition constitute "religious exercise" for purposes of a RLUIPA Substantial Burden analysis.

### c. Defendants have imposed a substantial burden on the Rabbi and Chabad's religious exercise

Since the interior uses of the constitutes "religious exercise," the next inquiry is whether the government's denial of the Chabad's proposal has imposed a substantial burden on the Chabad's religious exercise.

RLUIPA does not define the term "substantial burden." The Second Circuit has explained that a substantial burden, in the context of the government's denial of a religious institution's building application, "is one that 'directly coerces the religious institution to change its behavior.'" *Fortress Bible Church II*, 694 F.3d 208, 218-19 (2d Cir. 2012) (quoting *Westchester Day III*, 504 F.3d at 349). In this case, the Second Circuit announced the following factors to consider in order to determine whether the HDC's denial of the Chabad's Certificate of Appropriateness application substantially burdened the Chabad's religious exercise:

(1) "the arbitrariness of the denial";

(2) "whether the denial was conditional";

(3) whether, if the denial was conditional, "the conditions attendant to the HDC's denial of the Chabad's application themselves imposed a substantial burden on the Chabad's religious exercise";

(4) "whether feasible alternatives existed for the Chabad to exercise its faith";

(5) "whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street"; and,

(6) "whether the proposed modifications shared a close nexus with and would be consistent with accommodating the Chabad's religious exercise."

*Chabad Lubavitch*, 768 F.3d at 195-96. Below is an analysis of each factor as it relates to the HDC's denial.

i. <u>Arbitrariness of the denial</u>

The factual record clearly indicates the HDC's denial was arbitrary and based on numerous illegal considerations. The testimony at trial confirmed that the HDC's decision was based on illegal considerations such as "interior use or square footage" and "below grade or other unseen areas." Further, the HDC Decision arbitrarily attempts to sustain the residential character of the Deming House, despite the fact that "the historic residential character of the property was already eviscerated when the HDC approved the conversion of the Property from a residential to a commercial building."

Clearly, the testimony at trial was that the HDC members considered the subjective element of "mass" when denying the use. They arbitrarily picked a condition of "doubling the size" based on their own perception of what they thought was appropriate. As HDC member Montebello testified, they guessed at the size of the space at the Dunkin Donuts where the Chabad worshiped at in 2007 and concluded that doubling that size was "big enough." Clearly, this was an arbitrary decision.

Further, the defendants assert that the Chabad has not alleged any "specific arbitrary, capricious or illegal application of the laws and regulations applied by the Commission in rendering its decision." Rather, they argue that, "the HDC extensively explained the basis and rationale for its decision, as related to the Secretary [of Interior's] Standards [for Rehabilitating Historic Buildings] and C.G.S. § 147f . . . " The record makes clear the HDC's decision was based on illegal considerations, including "interior use or square footage" and "below grade or other unseen areas." *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at *35; **Doc. No. 226** at 23-24. The HDC is barred from considering "interior arrangement or use" under Section 7-147f of the Connecticut General Statutes. *Id.*; **Doc. No. 226** at 24 (citing C.G.S.A. § 7-147f(b)). In its

decision denying the Chabad's application, the HDC stated that it "would approve an addition equal in square footage to the Deming House." *Id.* at *37; **Doc. No. 226** at 24 (referencing **Doc. No. 187-16**). The decision also states that, "[d]epending on the foot print of the addition and the design of the below grade spaces, the applicant should be able to design an addition that renders a completed building with over 6,000 square feet of usable space." *Id.* HDC member Robert D'Andrea testified the HDC "considered the square footage that was explained to us by the applicant and the applicant's architect." *Id.*; **Doc. No. 226** at 25 (referencing **Doc. No. 205-8**).

The HDC's decision also took into consideration "below grade or other unseen areas," though the HDC has admitted it has no jurisdiction over sub-surface space. *Id.* at *39; **Doc. No. 226** at 26. Specifically, the HDC's decision noted that "[d]epending on the foot print of the addition and the design of the below grade spaces, the applicant should be able to design an addition that renders a completed building with over 6,000 square feet of usable space." *Id.*; **Doc. No. 226** at 26. By considering the below grade space of the Chabad's proposal, the HDC's denial illegally relies upon factors wholly outside its authority. Thus by considering "interior use or square footage" and "below grade or other unseen areas" in making its decision, the HDC based its decision on improper and illegal considerations and thus its decision to deny the Chabad's application was arbitrary.

Additionally, the record shows the HDC's decision arbitrarily attempts to sustain the residential character of the Deming House and the neighborhood in general, as the residential nature of the Deming House and the neighborhood had already been lost due to the HDC previously approving the conversion of the Deming House from a residential to commercial structure. *Id.* at *35; **Doc. No. 226** at 27. As the Court has already indicated, the HDC's inconsistent pursuit of its goal to preserve the residential character of originally residential

buildings constitutes arbitrary behavior. *Id.* at *41; **Doc. No. 226** at 27 (citing *Guru Nanak Sikh Soc'y v. Cnty. of Sutter*, 456 F.3d 978, 990 (9th Cir. 2006)). The Court has further acknowledged that the record shows many original exterior features of the Deming House have been lost over time and that a "substantial" addition had been approved for the originally residential Oliver Wolcott Library building. *Id.*; **Doc. No. 226** at 27. Based on this evidence, the Chabad contends that the HDC's reliance on the residential nature of the Deming House to justify denying the Chabad's proposed addition was pretextual in nature and thus arbitrary.

In sum, the record shows the HDC's denial of the Rabbi and Chabad's proposal was arbitrary.

ii.   Whether the denial was conditional

This Court has already determined the HDC's denial was conditional on its face. *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at *30-31; **Doc. No. 226** at 27. The HDC decision stated "the Commission would approve an addition equal in square footage to the Deming House" and included a further condition that the "addition's roof and width should also be subordinate to the roof and width of the Deming House." *Id.* at *31; **Doc. No. 226** at 28. However, a seemingly conditional denial can be reclassified as an absolute denial, and thus rise to the level of a substantial burden, if the government's "stated willingness to consider a modified proposal was disingenuous." *See Westchester Day III*, 504 F.3d at 352; *Fortress Bible Church II*, 694 F.3d at 219.

Here, the Chabad contends the HDC's disingenuous behavior indicates the ostensibly conditional denial was, in reality, a final denial. *See, e.g., Fortress Bible Church I*, 734 F. Supp. 2d at 502. The testimony at trial is that because the term "mass" was undefined, the HDC could use it to conclude that the Chabad's proposal could be denied. The testimony at trial confirmed

that the minimum amount of uses were in the design plan for the Chabad and the HDC arbitrarily selected the twice the size idea knowing that the Chabad could never squeeze everything it needed into a 5200 square foot building. This is confirmed by the expert of the Defendants who designed the Chabad to be 7300 square feet without the residence and the pool. The Defendants own expert confirmed that the guess of the HDC could not be accomplished for the Chabad. The Chabad introduced evidence that it cannot comply with the HDC's two conditions without substantially burdening its religious exercise. *See id.* at \*49-51; **Doc. No. 226** at 32-33. Thus, the Chabad contends the HDC's denial, while seemingly conditional, in effect amounts to an absolute denial since complying with the conditions would substantially burden the Chabad's religious exercise.

b. Whether the conditions create a substantial burden

The factual record also makes clear that the Chabad's religious exercise would be substantially burdened if it were limited to an addition of 2,656 square feet of above-ground space, which is narrower than the original building and has a lower roofline. *See Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at \*45; **Doc. No. 226** at 29.

Rabbi Eisenbach was asked on 15 separate occasions by counsel for the Defendant if the denial of the religious uses set forth in his proposal was a substantial burden and the Rabbi affirmed it was. Not only that, the Chabad introduced a significant amount of evidence at trial that the denial of the Certificate of Appropriateness resulted in the denial of the Chabad's religious exercise.

"While RLUIPA does not afford religious organizations blanket approval to build however large a facility it desires, it does afford such organizations the right to build a facility that will allow it to engage in its religious exercise without being substantially burdened." *Id.*;

**Doc. No. 226** at 30. Accordingly, "while the Chabad is not necessarily entitled to build however large an above-ground addition it would like, it must still be able to engage adequately in its religious exercise in a building the size of which the HDC would allow — specifically, a building with 5,312 above-ground square feet (2,656 square feet in the original Deming House times two)." *Id.* at *46; **Doc. No. 226** at 31 (referencing *Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. Appx. 729 (6th Cir. 2007)).

The facts in this matter indicate the Chabad cannot adequately engage in its religious exercise in an addition of the size mandated by the HDC. To reiterate, there is no question that construction of the proposed sanctuary, rabbi's study, ritual bath, kosher kitchens, library, and classrooms constitutes religious exercise. *Id.* at *48; **Doc. No. 226** at 31. Plaintiffs also strongly contend, for the reasons above, that there is no question that construction of the rabbi's residence, the pool, and the staff/visitor housing also constitutes religious exercise. *Id.*; **Doc. No. 226** at 31. The ritual bath and pool are located completely underground, the classrooms and library are located on a floor that is partially underground and partially above-ground, and the sanctuary, rabbi's study, both kosher kitchens, and Rabbi Eisenbach's residence are all located entirely above-ground. *Id.*; **Doc. No. 226** at 31. The "classroom level" that contains the classrooms and the library is 4,941 square feet. *Id.*; **Doc. No. 226** at 31. The "sanctuary level," which contains one kitchen, the sanctuary, the rabbi's study, the coffee bar, and other rooms such as bathrooms and a coatroom, is also 4,941 square feet. *Id.*; **Doc. No. 226** at 31-32. The "residential level" is 4,766 square feet, and the "staff residential level" is 532 square feet. *Id.*; **Doc. No. 226** at 32.

As the Court has recognized, the Rabbi and Chabad cannot accommodate all of these rooms in 5,312 square feet of above-ground space. *Id.* at *49; **Doc. No. 226** at 32. Thus, the Chabad must modify its plans in order to fit all its proposed uses into a smaller space, which

"would clearly burden the Chabad[.]" *Id.*; **Doc. No. 226** at 32. The Chabad further contends this burden has "more than a minimal impact on religious exercise," which is necessary in order to constitute a <u>substantial</u> burden under RLUIPA. *See Fortress Bible Church II*, 694 F.3d at 219. The Chabad, through Rabbi Eisenbach, has presented testimony that it cannot reduce the size of its plans: specifically, "[t]he length of the building is determined by the sanctuary and the need for the kosher kitchen to be located on the same floor" and the "length and width of the building are also influenced by the orientation of the seating arrangement to face Jerusalem." *Id.* at \*50; **Doc. No. 226** at 32. The Rabbi and Chabad has also noted that "[t]he State Building Code, State Fire Code and the Americans with Disabilities Act also affect the length and the width as there must be adequate space for internal circulation and multiple exits." *Id.*; **Doc. No. 226** at 33.

The Chabad has further offered testimony, through Rabbi Eisenbach, that it cannot rearrange its plans to fit a 104-person sanctuary that must face Jerusalem into a building with above ground square footage that is double the Deming House. *Id.* at \*51; **Doc. No. 226** at 33. As the Court has noted, Defendants have failed to introduce any evidence whatsoever to counter this testimony. *Id.* at \*51; **Doc. No. 226** at 33.

Since the Rabbi and Chabad cannot adequately engage in its religious exercise in an addition of the size the HDC has mandated, the conditions attached to the HDC's denial substantially burden the Chabad's religious exercise.

### iii.  Existence of feasible alternatives

The Chabad contends that no feasible alternatives existed that would have allowed it to exercise its faith. *Chabad*, 768 F.3d at 196. The Court has interpreted this factor to ask whether alternative properties were available that could have accommodated the Chabad's religious exercise. *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at \*52; **Doc. No. 226** at 34. In cases

where courts have found no feasible alternative existed, the findings have been supported by factual evidence. *See Westchester Day III*, 504 F.3d at 352; *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011).

Here, the Chabad offered evidence that Rabbi Eisenbach and a real estate agent visited three other properties before purchasing the 85 West Street property: (1) 367 Bantam Road, which the Chabad had previously occupied as a tenant for a period of time; (2) the Gill property on South Street; and, (3) a property that housed a restaurant called the West Street Grill. *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at *53-54; **Doc. No. 226** at 35. The one property that may have satisfied the Chabad's needs was no longer available by the time Rabbi Eisenbach made an offer. *Id.* at *54; **Doc. No. 226** at 35-36.

In sum, the Chabad has offered sufficient evidence to show it searched for other properties and was unable to find a feasible alternative.

### iv.    Reasonable belief

The testimony at trial confirmed that the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street. *See Chabad*, 768 F.3d at 196.

As a general proposition, "[w]hen a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden." *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 557 (4th Cir. 2013). Further, if the religious organization did, in fact, operate under this reasonable expectation, it may be substantially burdened "even though other suitable properties might be available, because the 'delay, uncertainty, and expense' of selling the current property and finding a new one are themselves burdensome." *Id.*

In *Bethel*, the county argued that the religious organization could not have reasonably expected that it would be permitted to build a church on the purchased property for two reasons: (1) "because at that time the County had long been considering changes to its private institutional facilities policy to limit such institutional uses," and, (2) because "there were no guarantees that Bethel would get all the necessary approvals to build what it wanted." *Id.* at 558 (internal quotation marks omitted). The court rejected both arguments because the county "permitted churches in the rural density transfer zone at the time Bethel bought the property, and [because] modern zoning practices are such that landowners are rarely <u>guaranteed</u> approvals." *Id.* (emphasis in the original). On the other hand, in *Petra Presbyterian Church v. Vill. of Northbrook*, the court concluded the religious group did not have a reasonable expectation that it would be permitted to build a church on the purchased property because it "decided to go ahead and purchase the property outright <u>after</u> it knew that the permit would be denied." 489 F.3d 846, 851 (7th Cir. 2007) (emphasis added).

The Rabbi testified that the other Churches in Litchfield that are located in the Historic District "are essentially equally as massive as the Chabad's proposed structure." See also, *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at \*60; **Doc. No. 226** at 39. As such, it was reasonable for the Chabad to have seen these two large churches in the Historic District and formulate a belief that it too would be able to build a house of worship of a similar size. *Id.*; **Doc. No. 226** at 39.

The Chabad's reasonableness argument is further strengthened by the fact there is another structure in the Historic District—the Rose Haven Home, the Cramer & Anderson Building and the Oliver Wolcott Library—that was originally a residential house that now includes an addition that is quite large relative to the house's original size. *Id.* at \*60-61; **Doc. No. 226** at 39.

Defendants claim the Deming House was not sufficiently similar to the Wolcott Library because the addition to the Wolcott Library made use of a sloping rear yard, was hidden below and behind the house, is narrow and lower than the original house, and is only visible from one public street. *Id.* at *61; **Doc. No. 226** at 39. However, it is highly unlikely that the Chabad would know its property did not share these traits so as to be sufficiently similar to the Wolcott Library's property, and thus that the HDC would deny its proposal. *Id.*; **Doc. No. 226** at 40. Moreover, the factual record indicates the size of the Chabad's addition would have been permitted under the zoning regulations' size allowances. *Id.* at *61-62; **Doc. No. 226** at 40.

Therefore, the factual record indicates that Plaintiffs reasonably believed the Chabad would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street.

v. Close nexus

Lastly, the Rabbi and Chabad's proposed modifications share a "close nexus" with and are consistent with accommodating the Rabbi and Chabad's religious exercise. *See Chabad*, 768 F.3d at 196.

For a denial to constitute a substantial burden, "[t]here must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise." *Westchester Day III*, 504 F.3d at 349. Stated another way, "the question asked by the 'close nexus' factor is whether the religious organization is still capable of engaging in its religious exercise despite the government's denial of its proposal." *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at *64; **Doc. No. 226** at 41.

In *Fortress Bible Church I*, the Second Circuit concluded that a "close nexus" existed between the town denying the Church's application to build a new facility and the Church's

religious exercise. 734 F. Supp. 2d at 503. According to the court, the Reverend's testimony about how the Church's current facility has impeded the congregants' religious practice was particularly helpful.

> Reverend Karaman testified that the inadequacies of the current facility have prevented the Church from performing tasks that it believes are mandated by God, including expanding the Church's membership and discipling [sic] to more members. Reverend Karaman also testified that the size limitations of the current facility have impeded the Church's ability to perform certain religious practices, to host visiting missionaries, and to teach certain subjects and accommodate handicapped students in its school. Thus, the Church's lack of adequate space is significantly curtailing its religious activities and preventing Plaintiffs from fulfilling their religious mandate. By precluding the construction of a much needed facility, Defendants significantly interfered with the Church's ability to exercise its religion. *Id.*

As this Court has already concluded, "[t]he evidence in the case at bar mirrors that in *Fortress Bible Church I.*" *Chabad Lubavitch*, 2016 U.S. Dist. LEXIS 10491 at \*64; **Doc. No. 226** at 42. Rabbi Eisenbach has presented testimony that the Chabad has "lost parishioners because of the space limitations of the current facility" and has frequently had to rent space at other locations to have sufficient space to engage in various religious events, such as Passover Seders, holiday services, and the dedication of a new Torah. *Id.* at \*65; **Doc. No. 226** at 42.

This Court also indicated how the Rabbi and Chabad's situation is different than the hypothetical situation posed in *Westchester Day III*. Unlike the hypothetical plaintiff "who could simply rearrange the classrooms in its current facility — in this case, Rabbi Eisenbach has averred that the Chabad cannot engage fully in its religious exercise in its current facility. In short, on the record before this court, without approval for the proposed addition, a reasonable jury could find that Rabbi Eisenbach cannot fulfill the 'religious and spiritual mission' that he has been 'called to fulfill.'" *Id.* at \*65-66; **Doc. No. 226** at 42. In sum, based upon Rabbi Eisenbach's uncontested testimony, there is clearly a "close nexus" between the HDC's denial of

the Chabad's proposal and the Rabbi and Chabad's religious exercise.

Thus, Plaintiffs contend they have satisfied all six prongs announced by the Second Circuit in *Chabad*, 768 F.3d at 195-96. As a result, Plaintiffs respectfully assert they have demonstrated a prima facie Substantial Burden claim under RLUIPA

## CONCLUSION

For nearly a decade, the Chabad has been unable to fulfill their religious mission due to the arbitrary, unreasonable decision of the HDC to deny the Chabad's Certificate of Appropriateness application. The Defendants' actions are even more egregious in light of the fact that several Christian houses of worship that are the same size as the Chabad's proposed addition have been allowed to operate in the Historic District, while the Defendants continue to refuse to allow the Chabad to do the same.

Through this lawsuit, the Plaintiffs simply seek the ability to construct its proposed addition in order to fully realize and fulfill the Chabad's religious mission. Thus, the Plaintiffs respectfully submit they are entitled to injunctive relief to allow them to construct the addition, as well as monetary damages

Respectfully submitted this 2nd day of August, 2017.

*/s/ Daniel P. Dalton*
Daniel P. Dalton (Mich Bar. No. P44056)
*Admitted Pro Hac Vice*
Lead Trial Counsel
Dalton & Tomich PLC
The Chrysler House
719 Griswold St., Suite 270
Detroit, MI 48226
Tel: 313.859.6000
ddalton@daltontomich.com

*/s/ Kenneth R. Slater, Jr.*
Kenneth R. Slater, Jr.
Fed. Bar #ct09451

(Local Counsel)
HALLORAN & SAGE LLP
One Goodwin Square
Hartford, CT 06103-4303
Telephone: (860) 297-4662
Facsimile: (860) 548-0006
Email: slater@halloran-sage.com

## **CERTIFICATION**

I hereby certify that on 2nd day of August, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties of operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Daniel P. Dalton*
Daniel P. Dalton (Mich Bar. No. P44056)
*Admitted Pro Hac Vice*
Lead Trial Counsel
Dalton & Tomich PLC
The Chrysler House
719 Griswold St., Suite 270
Detroit, MI 48226
Tel: 313.859.6000
ddalton@daltontomich.com