**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHABAD LUBAVITCH OF | : | CIVIL ACTION NO. |
| LITCHFIELD COUNTY, INC., et al., | : | 3:09-CV-1419 (JCH) |
|    Plaintiffs, | : | |
| | : | |
|      v. | : | |
| | : | |
| BOROUGH OF LITCHFIELD, | : | NOVEMBER 1, 2017 |
| CONNECTICUT, et al., | : | |
|    Defendants. | : | |

**BENCH TRIAL RULING**

**I.     INTRODUCTION**

This is an action brought by the plaintiff, Chabad Lubavitch of Litchfield County,

Inc. ("the Chabad"), pursuant to the Religious Land Use and Institutionalized Persons

Act of 2000 ("RLUIPA"), title 42, sections 2000cc et seq of the United States Code.  This

action arises out of a denial of an application for a Certificate of Appropriateness made

by the Chabad to the Historic District Commission of the Borough of Litchfield (the

"Commission").  The Chabad alleges that this denial substantially burdened its religious

exercise, in violation of RLUIPA's "Substantial Burden" provision.  The defendants, the

Commission and the Borough of Litchfield, deny this allegation.

The court is painfully aware of the delicate role it must play in adjudicating a case

where the plaintiff is a religious organization expressing the view that all of its proposed

uses are religious exercise and that any facility smaller than the one proposed would

substantially burden that religious exercise, and the defendants are governmental

bodies seeking to preserve the historic character of their town.  In some respects, this

case presents the court with a circumstance akin to that faced by Odysseus when he

traversed the narrow waters between Scylla and Charybdis, here freedom of religion on one side and non-establishment of religion on the other.

## II.   BACKGROUND

### A.   Procedural History

The Chabad commenced this action to challenge the denial of its application for a certificate of appropriateness by the defendants, which was issued on December 20, 2007.  In its initial Complaint, the Chabad asserted Free Exercise, Free Speech, and Freedom of Association claims under the First and Fourteenth Amendments; Due Process and Equal Protections claims under the Fourteenth Amendment; and Substantial Burden, Nondiscrimination, and Equal Terms claims under RLUIPA.  The Chabad also alleged Civil Conspiracy under title 42, section 1985(3) of the United States Code; Failure to Prevent Violations and Civil Conspiracy under title 42, section 1986 of the United States Code; claims under the Connecticut State Constitution; and a Free Exercise claim under the Connecticut Religious Freedom Act, title 52, section 571b of the Connecticut General Statutes.

The original suit was brought by the Chabad and Rabbi Joseph Eisenbach, founder and current leader of the Chabad Lubavitch of Litchfield County, against the Commission, the Town of Litchfield, several members of the Commission in their individual and official capacities, and several Doe defendants.  By the Third Amended Complaint, however, the plaintiffs had dropped their claims against the Town of Litchfield and the Doe defendants.

This court granted summary judgment in favor of the defendants on all claims. See Chabad Lubavitch v. Borough of Litchfield, 796 F. Supp. 2d 333 (D.Conn. 2011). The Chabad appealed that judgment and the Second Circuit remanded the case,

vacating the judgment with respect to two of the claims: the Substantial Burden claim and the Nondiscrimination claim.  See Chabad Lubavitch v. Litchfield Historic Dist., 768 F.3d 183 (2d Cir. 2014) (hereinafter Chabad App'l).

The Second Circuit dismissed all claims against one of the Commission members, Wendy Kuhne.  See id. at note 1.  The plaintiffs subsequently voluntarily withdrew all claims against the other two Commission members, Glenn Hillman and Kathleen Crawford.  On the eve of trial, Rabbi Eisenbach voluntarily withdrew from the case as a plaintiff, following the court's Ruling on a Motion in Limine that evidence of damages was inadmissible.  Because that Ruling eliminated all legal claims, the remaining plaintiff, the Chabad, had no right to a trial by jury.  Therefore, by the time trial commenced, the case had evolved from a two-plaintiff, twelve-defendant, twelve-count action to an action by a single plaintiff against two defendants on one claim for injunctive relief: Substantial Burden under RLUIPA.

B.    The Trial

This action was tried to the court over a three day period.  The Chabad presented six witnesses:

1. Rabbi Schmuel Klatzkin, a rabbi with Chabad of Greater Dayton, who testified as an expert witness about the history of Chabad Lubavitch and its current practices.

2. Glenn Hillman, then-Clerk and now-Chair of the Commission, and co-author of the written opinion denying the Chabad's application for a certificate of appropriateness.

3. Judith Acerbi, one of the members of the Commission who denied the Chabad's application.

4. Peter Bugryn, an architect who worked with the Chabad, after the Commission's denial, to develop plans for the purposes of a special use permit to use the 85 West Street property as a place of worship.

5. Joseph Montebello, one of the members of the Commission who denied the Chabad's application.

6. Rabbi Joseph Eisenbach, the founder and leader of the Chabad, who testified as an expert about the Chabad Lubavitch movement and testified as a fact witness about his experience as the Chabad emissary in the Litchfield area, the needs of his Chabad community, and the application for a certificate of appropriateness.

After the Chabad rested, the defendants presented one witness, architect Wayne Garrick.  Mr. Garrick presented an alternate plan for the Chabad's addition, which plan he was commissioned to develop by the Commission.

Over the course of the trial, the court admitted into evidence 31 exhibits, including photographs of the property, assessor cards of the 85 West Street property and nearby properties, the plans that were presented to the Commission and several alternate sets of plans, and video clips of the public hearings held on the Chabad's proposal.

At trial, the Chabad argued that all the uses of the proposed construction were religious exercise, at least in part, and that its proposal represented the minimum size necessary to accommodate its religious exercise.  Furthermore, the Chabad argued that the Commission was disingenuous in articulating conditions under which a revised proposal would be accepted, and that the denial should therefore be interpreted as an absolute denial of any construction or modification of property at 85 West Street.

The defendants argued that the denial was not disingenuous, that several proposed uses—the rabbi's residence, the staff residence, and the indoor swimming pool—were not intended for religious exercise, and that, in any event, it would not be a substantial burden on the Chabad's religious exercise to locate the rabbi's residence and the staff residence in a nearby location.  In short, the defendants argued that the denial was, at most, an inconvenience, not a substantial burden.

III.    **FINDINGS OF FACT[1]**

    A.    History of Chabad Lubavitch

Chabad Lubavitch is an Orthodox Jewish movement that dates back to the 18th century.  Founded in Russia, Chabad's mission, then and now, is to revitalize the Orthodox Jewish community.  Although followers of Chabad came to the United States as early as the 18th Century, Chabad as a movement came to the United States at the beginning of World War II when the then-leader of Chabad Lubavitch, Rabbi Yosef Yitzchak Schneersohn, emigrated to the United States and settled in the Crown Heights neighborhood of Brooklyn.

Rabbi Schneersohn was succeeded in leadership of the Chabad movement by his son-in-law, Rabbi Menachem Mendel Schneerson ("Rabbi Schneerson").  Rabbi Schneerson is considered the last great leader of the Chabad movement.  Many of the practices and principles of the Chabad movement today are rooted in the teachings and writings of Rabbi Schneerson.

---

[1] The court has sought to separate out its findings of fact from its conclusions of law.  Fed. R. Civ. P. 52(a)(1).  However, there may be occasions when findings of fact are intertwined with the legal discussion / conclusions in the Conclusions of Law section.

Among his contributions to Chabad, Rabbi Schneerson spearheaded a practice of sending Chabad couples, known as emissaries, into areas where Orthodox Judaism was not already widely practiced.  Chabad emissaries are located across the U.S. and around the world, from India to Cuba.

Rabbi Schneerson also taught that members of the Chabad community should infuse all elements of their lives with religiosity, in part as a way to attract more people to the faith.  He encouraged followers to make "every house a Chabad House," meaning that the practices of daily living and the home environment should reflect and facilitate the teachings of Judaism.  It is one of Rabbi Schneerson's core teachings that what God desires most is "a home which is distinguished by observance": "That [Judaism] is not just a hat you put on one day a week or an hour a day, but it's the nature of your whole life, especially where you live, that it is infused with Jewish values and ideas and practice."  Tr. 1 at 40 (testimony of Rabbi Klatzkin).

In addition to the general idea that followers of Chabad Lubavitch should be observant within their homes, rabbi's homes are important places for sharing meals in the home.  Being invited to a rabbi's home for Shabbat or a holiday meal has special significance within the Chabad faith.

Rabbi Schneerson also emphasized the importance of connecting children to the faith.  To that end, Rabbi Schneerson spearheaded the development of "Gan Israel" summer camps, which are in large part recruiting tools for attracting young people who are unaffiliated with Orthodox Judaism.  Secular activities at the camp draw in children and families who would not be interested in a purely religious camp, and thus facilitate recruitment.

Because one of the primary goals of the Chabad Lubavitch movement is to grow the faith, Rabbi Schneerson taught that Chabad followers should always do as much as they can for the faith, and should always be expanding their efforts.  In other words, the view is: if you are able to build a Chabad House with ten rooms that is better than one with eight, but twelve rooms would be better.  Chabad emissaries will never complete their work, but are instead tasked with growing their communities in perpetuity.

Although the above principles apply broadly to all Chabads, another tenet of the Chabad movement is that each individual community has unique needs.  It is the role of the emissaries, the Rabbi and his wife, to spend time assessing the needs of the community they serve, and ultimately to develop a Chabad House that meets the needs of their individual Chabad community.  The Chabad's view of "religious necessity" is therefore in large part driven by the needs of the community and the determinations of the Rabbi and his wife as opposed to the Chabad Lubavitch movement writ large.

> B.    Chabad Lubavitch of Litchfield County

The Chabad Lubavitch of Litchfield County, Inc. ("the Chabad") was incorporated as a religious, non-profit corporation in 1996.  It was founded and continues to be led by Rabbi Joseph Eisenbach, a Chabad emissary who, with his wife, was called to bring the Chabad movement to the Litchfield, Connecticut, area.

The Chabad was first located in Lake Ridge, Connecticut but, in 1998, the Chabad purchased a rectory in Litchfield, in a condo community known as the Litchfield Ponds.  Although the Chabad initially had its shul on the ground floor of the Litchfield Ponds property and the Eisenbach family lived above it, that space soon became insufficient for the needs of both Rabbi Eisenbach's family and the Litchfield Chabad community.

7

The Chabad subsequently rented various spaces around Litchfield for weekly worship services and religious classes, including two different spaces in the same strip mall alongside a Dunkin Donuts store.  The Chabad also rented event spaces and other facilities for High Holidays, such as Yom Kippur, and for running Gan Israel camps each summer.

At the same time that the Chabad purchased the Litchfield Ponds property, the Chabad was searching for a permanent location in the Litchfield area that would accommodate all the needs of the Chabad community and Rabbi Eisenbach's family. Rabbi Eisenbach looked at several properties other than the 85 West Street property. However, of the other properties he looked at, only one other property was suitable for the Chabad's needs.  These needs included both sufficient space as well as a prominent, central location in town.  In essence, the presence of the Chabad House / shul in a central location is part of the Chabad's outreach.

Generally speaking, there are limited properties in the central downtown district of Litchfield.  Among such downtown locations, the only other property that was on the market when the Chabad was looking for a permanent location that was large enough to accommodate the Chabad's needs was the West Street Grille, which is near the Julia Deming House on the north side of West Street.  The Chabad made an offer on that property, but was informed, upon making the offer, that it was no longer available.

Then, in 2005, a Chabad parishioner, Adam Greenberg, purchased the property at 85 West Street in Litchfield, with the intention of selling it to the Chabad, which he ultimately did.

8

The 85 West Street property is located within an historic district known as the Borough of Litchfield ("the Borough").  The Borough is an independent municipal corporation whose boundaries are entirely within the Town of Litchfield.  The Borough is governed by a municipal charter adopted in 1989, pursuant to the Connecticut General Statutes.  In 1989, pursuant to the provisions of Chapter 97a of title 7 of the Connecticut General Statutes, the Borough established the Historic District Commission (the "Commission") to govern aspects of the construction and modification of buildings located within the Borough.  Specifically, Connecticut General Statutes section 7-147(d) states: "No building or structure shall be erected or altered within an historic district until after an application for a certificate of appropriateness as to exterior architectural features has been submitted to the historic district commission and approved by said commission."  Section 7-147c(e) of title 7 of the Connecticut General Statutes permits the Commission to adopt regulations setting forth the criteria by which to judge applications.  In deciding whether to grant a certificate of appropriateness, the Commission may not consider a building's "interior arrangement or use."  C.G.S.A. § 7-147f(b).

       C.     <u>The Chabad's Proposed Modifications to the 85 West Street Property</u>

In acquiring the 85 West Street property, it was never the Chabad's intention to operate out of the existing structure, but instead to build an addition on the existing structure.  To that end, in 2006 the Chabad began working with several architectural firms in the area to develop plans for an addition.  The Chabad also consulted with personnel at the Planning and Zoning Commission of Litchfield to determine how large it could build an addition without violating local zoning regulations.  Further, Rabbi Eisenbach also observed the size and types of structures in the vicinity of the Deming

House.  As a result of these consultations and observations, the Chabad commissioned a set of plans by architect Michael Boe (the "Boe plans"), which were designed to cover almost all (ninety-five percent) of the allowable lot coverage for construction.

The exterior of the Boe plans contain several modifications to the existing structure.  Most notably, the Boe plans propose adding Jerusalem stone to the foundation of the building and around the exterior of the Shul, adding a clock tower on top of the building, and mounting a finial with a Star of David on top of the clock tower.

In terms of interior design, the Boe plans propose an addition that, when added to the original structure, would result in a building with a footprint of 4,941 square feet and approximately 20,200 square feet of interior space.  The proposed structure would contain four stories and a sloped roof attic, with one story located entirely below grade, another story partially above and partially below-grade (due in part to the downward slope of the property as one moves from the front of the property to the back), and two stories and a partial attic entirely above-grade.

### 1.    The Sub-Basement

The lowest level of the Boe plans, which will be referred to here as the sub-basement, contains a swimming pool and a ritual bath, known as a mikvah; restrooms associated with the mikvah; locker rooms associated with the swimming pool; and a mechanical room.[2]

The swimming pool would be used primarily for the Gan Israel summer camp that the Chabad has run in the past and intends to run in the future.  Given that there is no

---

[2] In addition to the facilities described here by floor, each story also contains an elevator, and two staircases connecting the floors.

public pool in Litchfield, the Chabad spends thousands of dollars every summer busing

campers to public pools or renting private pools.

At trial, Rabbi Katzkin testified that a pool would be an asset for his own Chabad,

in Dayton, Ohio, specifically for its Gan Israel camp.  However, he also testified that, of

the roughly fifty Chabads he had visited, he did not recall any that had an indoor pool.

When asked whether the pool itself would actually be religious exercise, Rabbi Klatzkin

gave the following response:

> Aside from the idea of — that we're looking to establish a
> sense of a community that is doing all the things together.  The
> summer camps, which was — one of [Rabbi Schneerson]'s
> big initiative [sic] was the Gan Israel Summer Camp chain, we
> find to be extraordinarily effective because the kids are with
> each other for a long period in the day.  And there's a sense
> of developing a community not just in terms of you're doing a
> specific religious exercise, but the general sense of a
> community that's cohering with each other.

Tr. 1 at 78.

Rabbi Eisenbach described the purpose of the swimming pool for his campers

similarly.  In essence, he described a swimming pool as a recruitment tool for the Gan

Israel camp and for Chabad Lubavitch in general.  "[S]o many who will not go to a

Hebrew school or a shul have no issue coming to a place where there's swimming,

karate and tennis."  Trial Transcript of July 27, 2017 ("Tr. 3") (Doc. No. 318) at 95.  The

Chabad's use of the pool would be for convenience and recreational swimming.

### 2.    The Basement

The level above the sub-basement, referred to here as the basement, contains

seven classrooms, a library, and a preschool area.  As described above, the basement

is located partially below- and partially above-ground, partly due to the fact that the 85

West Street property slopes downward slightly as one moves from the street to the rear of the property.

The Chabad uses classrooms solely for religious education, and frequently uses multiple classrooms simultaneously.  As Rabbi Eisenbach testified:

> [C]lassrooms are essential because at the same time you could be having Hebrew school, you can have someone else teaching someone for a Bar Mitzvah or you can have someone being counseled by another member of the community.  So Chabads traditionally have multiple classrooms in order to be able to have continuous programs running simultaneously.

Tr. 2 at 177.

It is important for the Chabad to have its classrooms located within the Chabad House.  Chabad Houses typically serve a centralizing purpose, bringing together a wide range of religious programming including religious services, education, and fellowship, and thus usually contain classrooms.  The Chabad has lost parishioners since 2007 because it has been unable to centralize their programs in a single, permanent location, and it has not been able to carry out its religious mission.  Specifically, the Chabad has never had enough space to provide a preschool to its community, and it has had only limited space for its Hebrew School, such that the Chabad has not been able to teach several of the religious classes it intends to teach in the modified 85 West Street property.  More significantly, the space that the Chabad was renting in 2007 for worship and religious education became unavailable in 2015.  Since that time, the Chabad has not had any classroom space.  In order to have a Hebrew School, and the other educational programming the Chabad has had and plans to have in this facility, multiple classrooms are needed.  Further, it is traditional for a Chabad House to have multiple classrooms.

3.     The First Floor

Above the basement, on the first floor, the Boe plans contain a shul, or sanctuary, with seating for one-hundred and four congregants.  The sanctuary can be converted to a meeting hall.  In addition, on the first floor the Boe plans call for a large kosher kitchen; a reception area; a rabbi's study; a coffee bar; restrooms; and closet space.

The size and layout of the Boe plans as a whole are, in large part, driven by the size and layout of the first floor.  The size and layout of the first floor of the Boe plans, in turn, are largely driven by the shul and kosher kitchen.

The Chabad proposed a shul that could seat one-hundred and four congregants because, for the three years leading up to the submission of its application to the Commission, the Chabad was attracting approximately one hundred attendees to its High Holiday services.  In addition, between ten and fifty congregants attend its regular weekend services.  The shul was therefore designed to seat one-hundred and four congregants in order to accommodate High Holiday attendance, and also to allow for some congregation growth.  In addition to the seating for religious services, the shul was designed to contain shelves for prayer shawls and torahs, a partition to separate men and women during services, and memorial walls, as well as the cantor's pulpit and the rabbi's pulpit.  The Chabad also intends to use the shul area as a meeting hall for religious meals, after services and on High Holidays.

The layout of the proposed addition is influenced by the fact that, in Orthodox Jewish temples, the shul must face east, toward Jerusalem.

After the shul, the next largest facility on the first floor is the kosher kitchen.  Food is important to the Jewish religion.  As Rabbi Eisenbach testified, "every Jewish

13

holiday is, they try to kill us, we survive, let's eat.  So eating is a very big part of our Chabad services."  Tr. 2 at 162.

The religious practices of the Chabad demand a relatively large kitchen.  This is primarily due to the fact that kosher food preparation, which is dictated by Jewish law, requires a special kitchen arrangement, including separate facilities for dairy products and meat products.

The Chabad intends to use the kitchen as a model to educate congregants who are interested in keeping kosher at home, but lack the knowledge and skills to do so.  In addition to providing a visible model of kosher food preparation, the Chabad intends to hold classes to teach congregants how to prepare traditional Jewish food.  For example, the Chabad intends to use the kosher kitchen to conduct challah baking classes.

The Chabad located its kosher kitchen on the first floor of the proposed structure so that it could easily be accessed for meals served in the shul, which would double as a meeting hall.  This is particularly important for the Chabad because, as followers of Orthodox Jewish law, many members of the Chabad community do not use elevators on the Sabbath.  For that reason, if the kitchen were located on the second story or in the basement, members of the Chabad community would be forced to carry food and drink up- and downstairs.

In addition to the shul and the large kosher kitchen, the first floor also contains a rabbi's study, a reception area, a small coffee bar,[3] a lobby, restrooms, and a coat closet.  The reception area must be on the first floor both for security reasons and to

_____

[3] As Rabbi Eisenbach clarified on the record, the area demarked as a "coffee bar" on the Boe Plans would be a gift shop with coffee available.  As Rabbi Eisenbach's testified, it is common practice for synagogues to contain gift shops to sell religious items.  See Tr. 2 at 164.

serve its purpose.  Furthermore, in order for the rabbi to be available to his congregation, it is important to have the rabbi's study on the first floor.  The lobby, restrooms, and coat closet are all auxiliary to the shul.  While the court makes no finding as to the importance of having the coffee bar and gift shop on the first floor, the small size of the coffee bar renders its impact on the floor plans negligible, as the defendants recognized at trial and at oral argument.  Generally, the size of the first floor is driven by the sanctuary and its orientation, and the kosher kitchen.

4.    The Second Floor

The second floor of the Boe plans is occupied entirely by a residence for Rabbi Eisenbach and his family, including seven bedrooms, a kosher kitchen, and a living area.

Rabbi Eisenbach intends to live in the proposed Chabad House with his wife and twelve children, the oldest of whom is currently twenty-one.  Chabad Lubavitch does not require rabbis to have their homes inside their Chabad Houses, and in fact most Chabad Houses do not have a rabbi's residence inside.

When asked about whether the rabbi's residence needed to be inside the Chabad House, Rabbi Klatzkin testified that, "based on the principle that the rabbi should respond to the best of his ability to the needs of the community," he could not say that being located within the Chabad House was a mere convenience.  Tr. 1 at 55. In addition, Rabbi Klatzkin testified to his personal experience with a Chabad House at Boston University where the rabbi's residence was inside the Chabad House, which was "crucial" in that university context.  When pressed on whether being located within the Chabad House was a necessity, as opposed to a convenience, Rabbi Klatzkin gave the following answer:

> It is — if you mean by that, is it the majority of Chabad rabbis
> live in the synagogue, then that would not be the case. But if
> it's — in certain cases have rabbis found that to be crucial in
> their own mind, to their mission, to their job, I would say those
> rabbis who do have it there would speak, I'm supposing, but
> you are asking my opinion on it, they would speak the way
> that I am and emphasizing how valuable that was to them.

Tr. 1 at 57. In keeping with this description of the varying needs of Chabad

communities, Rabbi Klatzkin testified that, in most of the Chabad Houses that he was

familiar with that were located in tourist or college communities, the rabbi's residence

was inside the Chabad House.

Rabbi Eisenbach testified that having his family located inside the Chabad House

was necessary for the religious exercise of the Chabad because it made him accessible

to his parishioners "24/7," which he described as especially important in a tourist

community like Litchfield:[4]

> As myself being the emissary of the Rebbe to Litchfield, I
> understand so much the importance of being right by the
> Chabad to enable us to have a community . . . . [I]t is so
> challenging to see — to be able to connect the community in
> such an unaffiliated and secular community without us being
> right in the midst.

Tr. 3 at 37.

Rabbi Eisenbach also testified that it was important for his home to be within the

Chabad House in order to serve as a visible model for the community. As described

more fully in Section III(A), according to Chabad Lubavitch tradition, "every house is a

Chabad House," meaning that every home should be a site of religious practice. Rabbi

---

[4] Although the court has no doubt that Litchfield is a beautiful town and people do visit it, the court notes that the record does not contain evidence to support Rabbi Eisenbach's opinion that Litchfield is "a high, densely tourist community." Tr. 2 at 160.

Eisenbach also testified that it would make it easier to share Shabbat dinner with members of the Chabad community, and that it would make it much easier for him and his family to be present on the Sabbath, when Orthodox Jewish law prohibits driving cars.  "[T]his is what Chabad is," Rabbi Eisenbach testified, "to be able to be right there for the people all the time and be able to say, come join us as a family."  Tr. 2 at 161.

However, Rabbi Eisenbach and his family have been spending the night four nights a week during the school year in Waterbury, Connecticut, because Rabbi Eisenbach's younger children attend Hebrew school in Waterbury.  The Eisenbachs intend to continue to stay in Waterbury half the week, even if the Chabad's proposal for 85 West Street is approved.  Tr. 3 at 33.  Therefore, regardless of the outcome of this proceeding, Rabbi Eisenbach does not intend to live full-time at the 85 West Street property.

### 5. The Attic

Finally, the partial attic contains a staff residence, with a kitchenette, living room, and two bedroooms.  The staff housing is primarily intended for use by students working for the Gan Israel summer camp.  This staff always stays in the home of a Chabad Rabbi and their family.  Thus, the location of the staff housing is tied to the location of the rabbi's residence, at least to the extent that it is used by young camp counselors from Israel.

### D.     The Chabad's Application for a Certificate of Appropriateness

Because 85 West Street is located in the Litchfield Historic District, the Chabad was required to apply to the Commission for a certificate of appropriateness in order to build an addition to its property and otherwise modify the property's exterior.  In

accordance with this statutory scheme, the Chabad submitted a proposal, based on the Boe plans, to the Commission.

The Commission first considered the Chabad's application at a pre-hearing meeting on September 6, 2007.  Commission members voiced concern about the size of the addition and expressed an interest in alerting the public to the proposal.

The second pre-hearing meeting was held a month later on October 18, 2007. During that meeting, the Chabad announced changes it had made in response to requested modifications.  Those changes included altering the shape of the windows and lowering the roofline of the addition.  Following the second pre-hearing meeting, the Commission bifurcated the hearing process concerning the Chabad's application, with the first hearing dedicated to the Chabad's proposed modifications and the second dedicated to determining whether denial of the Chabad's application would place a "substantial burden" on the Chabad's religious exercise.

Following the first public hearing, held on November 15, 2007, the Chabad altered its proposal to, among other things, lower the foundation of its addition, use alternative exterior building material, reduce the height of the Star of David finial atop the clock tower, and reconstruct a front porch that had been removed during an earlier renovation.  The second hearing was held on December 17, 2007.  At that hearing, the Chabad argued that its proposal represented the minimum addition size necessary for its religious exercise, and that it would therefore be substantially burdened by a denial of its application.  During that hearing, the attorney for the Commission, Attorney James Stedronsky, pressed Rabbi Eisenbach for specific facts about the size of his congregation.  Although he initially responded only that attendance at weekly services

"fluctuated," Rabbi Eisenbach eventually stated that anywhere from about ten to the Chabad's capacity at the time (about fifty people) attended weekly services, and that Chabad's High Holiday services had drawn as many as one hundred congregants.

At that same hearing on December 17, 2007, one of the Chabad's attorneys, Peter Herbst, read a statement to the Commission.  Attorney Herbst argued, among other things, that many large additions had been added to historic buildings in the Borough of Litchfield, including the historic Oliver Wolcott House, which is now the Oliver Wolcott Library; a historic house which is now the Rosen Haven Home (a retirement home); and a historic house which is now the offices of the Cramer and Anderson law firm (the "Cramer and Anderson building").  Given that these large additions had not destroyed the character of the historic houses on which they were built, Attorney Herbst argued, the Chabad's proposed addition would not destroy the character of the Julia Deming House.  Attorney Herbst did not request an addition modeled after the Cramer and Anderson building for the Chabad.

Throughout the application review process, concerns were expressed about the mass of the proposed addition throughout the application process.  However, the Commission never requested that the Chabad reduce the size of the addition, nor did the Commission inform the Chabad that the mass of the proposed addition would prevent or likely prevent the approval of its application.

        E.    The Commission's Decision

On December 20, 2007, the Commission issued a written decision denying the Chabad's application without prejudice.  Although the Commission issues written decisions on some applications—particularly when applications are denied—the written

decision on the Chabad's application is the most lengthy, detailed written decision issued in the memory of the three commissioners who testified at trial.

A draft of the decision was read aloud at the regular meeting of the Commission held on December 20.  After the draft was read, two sentences were deleted from the draft, including a sentence about how the Commission may have been formed in response to the large addition made to the Oliver Wolcott House, and a sentence about how, in approving the Star of David, the Commission was making an accommodation for the Chabad that it would likely not have made for a secular applicant.

The initial draft of the decision was attached to the minutes of the December 20 meeting as "Attachment 1," while the final version (the "Decision") was attached as "Attachment 2."  See Exh. 78.

The Decision was drafted by Mr. Hillman and Attorney Stedronsky, with Mr. Hillman taking the lead on portions of the Decision that addressed the historic character of the building and Attorney Stedronsky taking the lead on the legal analysis.

The Decision stated that the 85 West Street property, known as the Julia Deming House, was built in 1872 by Julius Deming.  Julius Deming was the third son of William and Charlotte Deming and the grandson of the prominent late 18th century resident Julius Deming.  Julia, born in 1871, was the only child of Julius Deming and inherited the house from her father.

The Decision described the original structure as a "2,656 foot, square, two-story residential folk Victorian" in the "stick style,"[5] and noted that the house's exterior has been altered over time. Exh. 78 at 1856. For example, it has "lost its central verandah," its front door has been moved from the center to one side of the building, the former front door has been replaced with a picture window, and a small addition for a staircase was added to the rear of the structure in 1981. Id.

The Decision also described the history and current state of the area immediately surrounding 85 West Street. "This structure and its well preserved neighbor the historic Baldwin house (1887), act as anchors preserving the original residential nature of this immediate section of the streetscape." Id. Noting that the Julia Deming House was once one of five residences located between the Methodist Church and the Litchfield Center School, three of which have been lost, the Decision stated that the "[l]oss of either [the Baldwin house or the Julia Deming house] would completely destroy the residential character which remains on this block." Id.

In addition to emphasizing the impact that the physical presence of the Julia Deming house has on the immediate area, the Decision also stressed the importance of the negative space surrounding the house:

> [T]he scale and spacing of [the] buildings along the south side of the street reflect and balance the spacing and scale of the buildings on the north side of West Street. . . . As a whole, the Deming house is an important contributor to the historic spacing and character of the houses which ascend West Street and forms the backbone of the nineteenth century Victorian streetscape.

---

[5] "Stick style" architecture, which was popular in America in the second half of the nineteenth century, is characterized by "angularity, verticality and asymmetry." John C. Poppeliers & S. Allen Chambers, Jr., What Style Is It: A Guide to American Architecture 70 (2d ed. 2003). Roofs on stick style homes are typically composed of "steep intersecting gables," and verandas and porches are common. Id.

Id. at 1857.  The Commission also specifically described "the scale and spacing of the AT&T building, and the Deming and Baldwin houses" as "maintain[ing] the residential character of this section of the streetscape."[6]  Id. at 1856.

After describing the importance of the Deming house to the surrounding area, the Decision then addressed the specific modifications proposed by the Chabad.  It cited with approval the Chabad's proposal to "restore the central portico with its mid-nineteenth century detailing" and to "return the doorway to the central projecting mass and restore the first floor eastern window."  Id.  The Decision also stated that it would approve certain other elements of the Chabad's proposal, despite those elements being out of keeping with the historical style, in order to accommodate the Chabad's religious needs.  These accommodations include permitting the Chabad to put stained glass in the front door rather than plain glass and to affix a Star of David on the roof.  Id. at 1859.  However, the Decision stated it would not approve the double door that the Chabad's application proposed for the front door, or the clock tower that the Chabad had proposed and on which it intended to affix the Star of David.[7]

---

[6] The Decision does not, however, discuss the lot space to the south of the Deming House, on which the addition would be built.  The court notes that behind the Deming House there is a parking lot and a large school.  Therefore, while the Deming House is visible from all sides, and the addition would have some impact on the "streetscape" from West Street, it is not clear that the "streetscape" that would be altered by the addition is primarily the view from West Street as opposed to the view from behind the Deming House and the neighboring properties.  From that angle, the record is devoid of evidence that the "streetscape" from the rear was either historic or residential in character, or that said streetscape would have been adversely affected by the proposed addition.  In particular, there is no evidence to suggest that, from the rear, the addition would have altered the "balance" of the surrounding streetscape.

The court reads and understands the Decision as discussing the streetscape as it is viewed from West Street.

[7] The Chabad did not challenge these aspects of the Commission's Decision in the action before this court.

Finally, and most significantly for this case, the Commission stated that it would not approve an addition anywhere near the size of the structure proposed by the Chabad.  The Decision described the addition in the final Boe plans as an addition "over five times as large" that "dominates the original house in every aspect," "destroys the architectural and historical significance of the Deming house," and "destroy[s] any sense of the historical residential character of the building and immediate neighborhood."  Id. at 1860.

The Decision then turns to what kind of addition it would approve.  Noting that "the Applicant's attorney directed the Commission's attention to a colonial house across the street from the Applicant's house now used as law offices for the firm Cramer and Anderson," which an earlier Commission had previously approved for an addition of a size equal to the original structure, the Commission noted that this addition "does not change the residential character of the original house, nor does it adversely impact the neighborhood."  Id.  The Commission concluded:

> Therefore, the Commission would approve an addition equal in square footage to the Deming house.  The square footage of the Deming house, according to the Applicant's drawings, is 2679 square feet above ground.  The addition's roof and width should also be subordinate to the roof and width of the Deming house.  Depending on the foot print of the addition and the design of the below grade spaces, the applicant should be able to design an addition that renders a completed building with over 6,000 square feet of usable space.

Id.  Thus, the Decision denied the Chabad's application and invited the Chabad to submit a new proposal, placing strict limitations on the addition that the Chabad could propose.

At trial, all three of the commissioners who testified—Mr. Hillman, Ms. Acerbi, and Mr. Montebello—attributed the choice to limit the Chabad to an addition "equal in square footage to the Deming house" to Attorney Herbst's reference to the Cramer and

23

Anderson building.  For example, when asked why he included the condition that the Chabad could build an addition equal in size to the existing structure, Mr. Hillman testified as follows:

> That is, to the best of my recollection, based on the Cramer and Anderson Law Firm that's across the street that was presented to us by the applicant's attorney.  They presented to us that that was an appropriate addition on a re-adaptive reuse of a residential structure, so we agreed with them and ran with that.  That's the basis of that statement.

Tr. 1 at 95.  Ms. Acerbi also testified that the Commission got the idea for an addition equal in size to the original structure from Attorney Herbst.  When asked at trial whether "the Chabad's representative indicated at the hearing that it would be acceptable to them to just double the size of the Deming house," she answered affirmatively.

This testimony is contrary to the Commission hearing record.  Video footage of Attorney Herbst's testimony played during the trial clearly showed that Attorney Herbst's reference to the Cramer and Anderson building was simply as one of many examples he gave of large additions on nonreligious buildings.  He never suggested that the size of the Cramer and Anderson addition (equal to the original building) was appropriate or acceptable to the Chabad.

In addition to attributing the choice of the Cramer and Anderson building proportions to the comments of Attorney Herbst, the commissioners also testified that they settled on the Cramer and Anderson proportions as providing for a relatively large, but not overwhelming, addition.  Ms. Acerbi, for example, testified that the Cramer and Anderson addition "didn't overpower" the original structure, while still amounting to a sizeable addition.  Tr. 1 at 162.  Mr. Hillman testified that the Commission generally follows the standards of the Secretary of the Interior (although the Commission is not

24

bound by them), and those standards state that additions should "not take away from the historic character, not be incongruous and should be smaller, in general, than the original historical structure it is attached to."  Id. at 128.  Similarly, Mr. Montebello testified that the choice of the Cramer and Anderson proportions was the Commission's attempt to permit a large addition while also trying to "maintain the historic substance of that house and not lose its character."  Tr. 2 at 115.

The Decision did not address in any detail the proposed uses for the structure, or the religious needs of the Chabad.  However, the commissioners reviewed the plans for the interior of the space, arguably in contravention of the Connecticut Historic District statute.  The commissioners considered the Chabad's interior use of the proposed addition in an attempt to address what RLUIPA required of them.

In the conclusion of its Decision, the Commission noted that "the Applicant is practicing its religion in a rented, commercial space of approximately 3,000 square feet,"[8] in a location that is both "inconvenient [and] compromises the dignity of the regular religious services," and stated that a structure of the size described in the denial "would substantially enhance the Applicant [sic] current religious practices" as well as "enhance the historical character of the immediate neighborhood."  Id. at 1861.

    F.    The Surrounding Area

The subject property is located in an area zoned Business Historic.  It is located on the South side of West Street on a block with three other structures.  From east to west these structures include the United Methodist Church of Litchfield; the Frontier

---

[8] This statement overlooks the fact that the Chabad had been renting larger spaces for such activities as High Holiday services, the Gan Israel Camp, and religious education.

Communications building; 85 West Street, otherwise known as the Julia Deming House; and the historic Baldwin House, which contains the town attorney's office.  The Baldwin House sits on the corner of West Street and Woodruff Street.[9]  Behind the Baldwin House, on Woodruff Street, is a non-historic school building.  The parking lot associated with that school sits behind the 85 West Street property.  Across Woodruff Street from the Baldwin House is the Center School, a non-historic elementary school.

The United Methodist Church, a traditional Protestant church structure, has a footprint of 2,982 square feet on a 0.38 acre lot.  The Frontier Communications building, a non-historic, commercial structure with a residential appearance built in the 1950's, has a footprint of 2,995 square feet on a 1.15 acre lot.  The Deming House has a footprint of 1,328 square feet on a 0.39 acre lot.  Finally, the Baldwin House has a footprint of 1,317 square feet on a 0.60 acre lot.

For point of comparison, the footprint of the structure proposed in the Boe plans is 4,941 square feet.  Thus, if constructed, the Chabad House would be the largest building on the South side of West Street on the block by approximately 1,500 square feet.  On the other hand, there are larger structures within a block of the Chabad House, including the Center School, which has a footprint of 24,097 square feet and interior square footage of 54,593.  Approximately half a mile away, the Oliver Wolcott Library contains an addition of 7,990 square feet, added to a historic, residential-style building that was originally 2,218 square feet in size.  While the largest building on the block, the Frontier Communications Building, has a significantly larger lot size than 85 West

---

[9] Woodruff Streets runs north to south, ending on the south side of West Street.

Street, the United Methodist Church is a structure substantially larger than the Deming House and sits on a parcel of land almost identical in size to that of 85 West Street.

## IV.    CONCLUSIONS OF LAW

RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution."  42 U.S.C. § 2000cc(a)(1); see also Chabad App'l, 768 F.3d at 192.  Under the statute, the Chabad carries the burden of proving that the defendants' conduct imposes a "substantial burden" on the plaintiff's "religious exercise."  See 42 U.S.C. § 2000cc–1(b).  RLUIPA also contains a jurisdictional prerequisite, which can be satisfied by showing, among other things, that "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved."  42 U.S.C. § 2000cc(a)(2)(C).

In the Second Circuit opinion in this case, the Court of Appeals held, as a matter of law, that the Connecticut Historic District statute is a land use regulation and that the approval process for certificates of approval is an "individualized assessment" for the purposes of RLUIPA, therefore satisfying RLUIPA's jurisdictional prerequisite.  Chabad App'l, 768 F.3d at 192–93.  Therefore, the court does not address those requirements here except to note that they are satisfied.

If the Chabad proves by a preponderance of the evidence that its religious exercise was substantially burdened by the Commission's denial, then RLUIPA provides that the government may justify its decision on the basis that it acted "in furtherance of a compelling government interest" and that its action "is the least restrictive means of

furthering that interest."  42 U.S.C. § 2000cc–2(a)(1).  In this case, however, the defendants did not pursue this defense.[10]  The case, therefore, hinges on whether the Chabad has proven, by a preponderance of the evidence, that the Commission's decision substantially burdened the Chabad's religious exercise.

The Second Circuit defines "substantial burden" for the purposes of RLUIPA's land use provisions as one which "directly coerces the religious institution to change its behavior."  See Fortress Bible Church v. Feiner, 694 F.3d 208, 218–19 (2d Cir. 2012) (quoting Westchester Day III, 504 F.3d at 349).  The Second Circuit has further held that, to be substantial, "[t]he burden must have more than a minimal impact on religious exercise, and there must be a close nexus between the two."  Id. at 219.

The Second Circuit opinion in this case directed the fact-finder to consider a number of factors in analyzing whether the denial substantially burdened the Chabad's religious exercise, including: (1) "whether the denial was conditional;" if so (2) "whether the conditions attendant to the Commission's denial of the Chabad's application themselves imposed a substantial burden on the Chabad's religious exercise[;] [(3)] whether feasible alternatives existed for the Chabad to exercise its faith[;] and [(4)] whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street;" as well as (5) "whether the proposed modifications shared a 'close nexus' with and would be

---

[10] The defendants stated at the oral argument following trial that they did not raise a compelling-government-interest defense because the Court of Appeals concluded, in its proceedings in this case in 2014, that the Commission acted pursuant to an important, but not compelling, government interest.  This court can discern no such conclusion.  See generally Chabad App'l, 768 F.3d 183.

28

consistent with accommodating the Chabad's religious exercise;" and (6) "the arbitrariness of the denial." Chabad App'l, 768 F.3d at 195–96.

The first two factors define the burden itself—in this case, whether the Chabad was precluded from modifying its property altogether, was limited in its ability to modify the property, or was simply burdened with the need to renew its application.  "[I]f there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on it to change its behavior and thus does not constitute a substantial burden on the free exercise of religion." Westchester Day III, 504 F.3d at 349.  If the court finds that the decision was conditional, the second factor directs the court to analyze the conditions themselves to determine whether they are substantially burdensome.

The next two factors relate to causation—for instance, even if the Chabad is substantially burdened by its inability to build the proposed addition, the burden is self-imposed if it knew all along that its application would be denied, or chose to shoulder a burden in the face of ready alternatives.  In Petra Presbyterian Church v. Village of Northbrook, for example, the Seventh Circuit found that the plaintiff's religious exercise was not burdened by the denial of a permit where the plaintiff purchased the property in question after being informed by the Zoning Commission that its application for rezoning would be denied.  489 F.3d 846, 851 (7th Cir. 2007) ("Having decided to go ahead and purchase the property outright after it knew that the permit would be denied, Petra assumed the risk of having to sell the property and find an alternative site for its church . . . .").

The fifth consideration——whether there is a "close nexus" between the modifications and the religious exercise——essentially directs courts to consider whether the modification itself is necessary to accommodate the plaintiff's religious exercise.  In other words, if the court finds that the religious organization is currently substantially burdened, could the religious organization reasonably alleviate that burden in some way other than the proposed modification?

The final consideration——whether the denial was arbitrary——is relevant both to determining whether the burden was substantial and to crafting appropriate relief if it was.  First, with respect to the substantial nature of the burden, land use decisions that constitute "generally applicable burdens, neutrally imposed, are not 'substantial.'" Westchester Day III, 504 F.3d at 350; see also Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, (7th Cir. 2003) (scarcity of affordable land and costs, requirements, and political aspects of zoning approval did not impose a substantial burden; to hold otherwise "would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations").  RLUIPA's purview is, instead, land use decisions that unfairly burden religious exercise and land use regimes whose "essentially standardless" processes are vulnerable to abuse.  See Chabad App'l, 768 F.3d at 193 ("RLUIPA's substantial burden provision combats 'subtle forms of discrimination' by land use authorities that may occur when 'a state delegates essentially standardless discretion to nonprofessionals operating without procedural

safeguards.'" (quoting <u>Sts. Constantine & Helen</u>, 396 F.2d at 900)).[11]  Therefore, it is germane to the substantial burden inquiry whether a land use regulation was imposed arbitrarily, capriciously, or unlawfully against a religious organization.  <u>See</u> <u>Westchester Day III</u>, 504 F.3d at 351 ("Where the arbitrary, capricious, or unlawful nature of a defendant's challenged action suggests that a religious institution received less than even-handed treatment, the application of RLUIPA's substantial burden provision usefully 'backstops the explicit prohibition of religious discrimination in the later section of the Act'") (quoting <u>Sts. Constantine & Helen</u>, 396 F.3d at 900)).

Second, with respect to remedy, courts granting injunctive relief for plaintiffs routinely consider whether the decisionmaking entity treated the plaintiff fairly in the first instance in determining whether a remand would be appropriate and, if so, to what extent the court should direct the nature of further proceedings.  <u>See</u> <u>Westchester Day II</u>, 417 F. Supp. 2d at 572 (issuing mandatory injunction ordering zoning board to accept plaintiff's original application where denial was "so contrary to the evidence and to the equities as to be arbitrary and capricious"); <u>Fortress Bible Church v. Feiner</u>, 734 F. Supp. 2d 409, 520 (S.D.N.Y. 2010) (setting aside zoning decisions and ordering acceptance of plaintiff's proposal where there was "overwhelming evidence of Defendants' intentional delay, hostility, and bias toward the Church's application").

These factors are not exhaustive, but they demonstrate that the substantial burden analysis demands a complex assessment of the totality of the circumstances

---

[11] In this case, the Second Circuit has determined as a matter of law that the decisionmaking process employed by the Commission was one of these "essentially standardless" processes which RLUIPA governs.  <u>Id.</u> at 193 ("Connecticut's statutory scheme undeniably demands an individual assessment of applications to alter historic properties.").

surrounding a land use decision and its impact on the plaintiff.  In the analysis that

follows, the court addresses these factors as they are raised by the evidence presented

at trial.  First, the court addresses the conditionality of the Commission's denial of the

Chabad's application for a certificate of appropriateness, for the court cannot determine

whether the Chabad was substantially burdened by the denial until the court determines

what the impact of the denial was.

A.    <u>Conditionality of the Denial</u>

As to the first factor—whether the denial was conditional—there is no dispute

that the Commission's denial of the Chabad's application was facially conditional.

Although it was a final decision, it was explicitly a denial without prejudice and described

conditions under which a renewed application would be approved.  <u>See</u> <u>supra</u> Section

III(E).  However, that does not end the conditionality analysis.  An ostensibly conditional

denial is properly reclassified as an absolute denial if the government's "stated

willingness to consider a modified proposal was disingenuous."  <u>Westchester Day III</u>,

504 F.3d at 352.

For example, in <u>Saints Constantine and Helen Greek Orthodox Church, Inc. v.</u>

<u>City of New Berlin</u>, the Seventh Circuit Court of Appeals construed a conditional denial

as disingenuous where one condition was not feasible and one would have had the

same effect as a step already taken by the plaintiff church, indicating that "the mayor,

unless deeply confused about the law, was playing a delaying game."  396 F.3d 895,

899 (7th Cir. 2005).  And in <u>Guru Nanak Sikh Society of Yuba City v. County of Sutter</u>,

the Ninth Circuit Court of Appeals treated the zoning board's decision as absolute

where the plaintiff "readily agreed to every mitigation measure suggested by the

32

Planning Division, but the County, without explanation, found such cooperation insufficient."  456 F.3d 978, 989 (9th Cir. 2006).

The Chabad argues that the denial was not genuinely conditional because the size of the addition permitted was so inadequate as to render the conditions disingenuous.  In other words, since the Commission could not possibly have considered the conditions sufficient for the Chabad's needs, such conditions were disingenuously offered.  On the other hand, the defendants argue that the Commission would have approved a renewed application that complied with the conditions stated in the Decision.  The defendants further suggest that the Commission also would have considered any renewed application with an addition that was smaller than the original proposal, even if it was not as small as its stated conditions allowed.  To the extent that the stated conditions are insufficient for the Chabad's needs, the defendants attribute this to their ignorance of the Chabad's needs.[12]

The court concludes that the denial was conditional to the extent that the Commission would have approved a renewed application that complied with its conditions.  That conclusion is based on the text of the denial itself, as well as the testimony of the commissioners.

---

[12] The defendants attribute their ignorance to the unwillingness of the Chabad, through Rabbi Eisenbach, to provide them with a basis for his statements that, in essence, losing an inch of the proposed addition would substantially burden the religious exercise of the Chabad.  Although the commissioners who testified emphasized that they did not know why Rabbi Eisenbach needed an addition of the size requested, it is not clear from the record to what degree the Commission tried to get information on that subject.  Admittedly, a portion of the video recording of one of the Commission's hearings on the Chabad's application shows Attorney Stedronsky questioning Rabbi Eisenbach about the size of his congregation, to which Rabbi Eisenbach gave somewhat vague responses.  Exh. 92.  However, when Mr. Hillman was asked whether the Commission " asked any of the reason [sic] why [the Chabad] needed the size of the sanctuary, the number of seats," Mr. Hillman replied, "I don't even know that it is within our purview to ask that, quite honestly."  Tr. 1 (Doc. No. 316) at 152.

The three commissioners who testified—Mr. Hillman, Ms. Acerbi, and Mr. Montebello—all stated that they were concerned with the size of the proposed addition and its relationship with the existing structure and streetscape.  All three witnesses testified that they had never received an application for so large an addition.  All three further testified that the Commission considers factors like the impact that the proposed modification will have on the historic character of the existing structure and the streetscape.  Concerns were expressed throughout the hearing process about the size of the proposed addition, although the Chabad was never asked to reduce the size of the addition or informed that its application would be denied on that basis.  The fact that the commissioners were concerned about the size of the addition suggests that the Commission was sincere in its willingness to approve a smaller addition, as stated in its denial.  This is further buttressed by the fact that the conditions themselves—that the addition be lower and narrower than the original structure and have a footprint equal in size to the Julia Deming House—reflect the Commission's concerns about the impact the addition would have on the historic character of the original structure, and the negative space between structures in the streetscape.

Finally, all three commissioners testified that the conditions stated in the denial were based on the Cramer and Anderson building, a law firm with an addition as large as the original structure.  The commissioners viewed this building as an example of a house in the historic district which had been modified with a large addition and had nevertheless retained its historic character.

Although the court was not persuaded by the entirety of the commissioners' testimony, as described more fully in Section IV(J), the facts here to do not rise to the

34

situation in, for example, Sts. Constantine and Helen or Guru Nanak, which raised strong inferences of bad faith on the part of the zoning boards in question. The court therefore concludes that the Commission was genuine in stating that it would approve a renewed application that complied with the stated conditions.

However, the court does not agree with the defendants' argument that the conditional denial simply invited a renewed application with a proposed addition smaller than the original proposal.  The plain language of the denial clearly indicates that the Chabad would be approved within the stated conditions; any larger proposal would be noncompliant and not approved.  See supra Section III(E).  The court recognizes that the denial did not expressly state that the Chabad would be approved "only" if a renewed application complied with their conditions, but it also did not invite alternative proposals, nor did it describe the conditions as an example or option for the Chabad to consider.  Therefore, the best reading of the Decision is that it was conditional in the sense that the Chabad would be approved for an addition of the same size as the original structure, and no more.

B. Religious Exercise

Having concluded that the denial was conditional, and that the conditions limited the Chabad to an addition with the same footprint as the original structure, a lower roofline, and a narrower profile, the next question is whether those conditions substantially burdened the religious exercise of the Chabad.  In order to make this determination, the court must first determine which of the Chabad's proposed uses is "religious exercise."

RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. 2000cc–5(7)(A).

35

This broad definition explicitly rejects the idea that courts should evaluate religious exercise based on its importance to a religion.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 663 (10th Cir. 2006) (holding that district court's instruction that religious exercise was "activities that are fundamental to the institution's religion" was error).  RLUIPA further states that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  42 U.S.C. § 2000cc–5(7)(B).

The Second Circuit has provided guidance with respect to this provision.  In Westchester Day School v. Village of Mamaroneck, 386 F.3d 183, 189–90 (2d Cir. 2004) (hereinafter Westchester Day I), the Second Circuit cautioned district courts that broadly applying RLUIPA's protections to land use proposed by a religious organization, without engaging in a fact-intensive analysis of whether the proposed purposes of that construction were religious, may run afoul of the Constitution.  Id.  The facts in the Westchester Day cases are analogous to this case.  There, the plaintiff, an Orthodox Jewish day school, applied to the local zoning board to expand its facilities, including classrooms.  At the summary judgment stage, the district court concluded that, "[b]ecause the School delivers a secular and religious education in a religious environment, . . . any program of the School to improve its facilities in a manner that would improve the students' overall educational experience would be protected by RLUIPA."  Id. at 189.  The Court of Appeals expressed concern that such logic would mean that, "if two identically situated schools submitted functionally identical applications to a zoning board to rebuild and enlarge their gymnasium facilities, one

being a religious school, the other a secular school . . . the zoning board would be free

to reject the application of the secular school but not that of the religious school,

assuming the gymnasium would improve the experience of the students in the religious

school." Westchester Day I, 386 F.3d at 189.  Such a result might violate the

Establishment Clause's prohibition on "government becoming entwined with religion in a

manner that would express preference for one religion over another, or religion over

irreligion." Id.

On remand, pursuant to the directive of the Court of Appeals, the district court

made extensive factual findings that "each room the school planned to build would be

used at least in part for religious education and practice." Westchester Day III, 504 F.3d

at 348.  Because the district court reached the conclusion that every room in the

proposal would be used for religious exercise, it was not necessary in that case to

"demarcate the exact line at which a school expansion project comes to implicate

RLUIPA." Id.  The Court of Appeals, however, foreshadowed that there would someday

come a case "between this case, where every classroom being constructed will be used

at some time for religious education, and a case like the building of a headmaster's

residence, where religious education will not occur in the proposed expansion." Id.

The Second Circuit is not alone in demanding that courts distinguish religious

uses from secular uses of religiously affiliated property.  For example, the Tenth Circuit

Court of Appeals upheld a jury verdict finding no substantial burden on the grounds that

operation of a daycare was not a sincere religious exercise of the plaintiff. Grace United

Methodist Church v. City of Cheyenne, 451 F.3d 643, 662–64 (10th Cir. 2006).

Similarly, the Sixth Circuit, in an opinion foreshadowed by the Westchester Day I

opinion, overturned a district court's finding of substantial burden on the ground that the land use decision in question was limiting only insofar as the plaintiff could not build a gymnasium.  Living Water Church of God v. Charter Township of Meridian, 258 Fed. App'x 729, 738–39 (6th Cir. 2007).  Recognizing that an on-site gymnasium would be "more convenient" for the church plaintiff, the Sixth Circuit nevertheless was "hard-pressed to conclude that Living Water will be unable to carry out its church missions and ministries without it."  Id. at 739.

Given the fact-intensive analysis demanded by the appeals court in the Westchester Day cases, and guided by the Circuit's opinion in this case, Chabad App'l, 768 F.3d 183, this court has previously concluded that the proper approach to analyzing the addition that the Chabad has proposed is a "segmented" approach.  See Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield, 3:09-CV-1419, 2016 WL 370696, at **6–7 (D. Conn. Jan. 27, 2016) [hereinafter Chabad Dist.].  In so doing, this court recognized that it could take a "balancing" approach that would "look at each room / facility and determine how it is used—exclusively secular, exclusively religious, or a hybrid use—and then, weighing all of the rooms / facilities, make a final determination as to whether construction of the entire building is, on balance, a form of religious exercise or not."  Id. at 6.

However, the history and purpose of RLUIPA—as well as the Second Circuit case law—demanded a more granular approach.  As the Second Circuit described in Westchester Day I,

> RLUIPA occupies a treacherous narrow zone between the Free Exercise Clause, which seeks to assure that government does not interfere with the exercise of religion, and the Establishment Clause, which prohibits the government from

> becoming entwined with religion in a manner that would
> express preference for one religion over another or religion
> over irreligion.

386 F.3d at 189.  In keeping with this "treacherous narrow zone," this court adopted a

"segmented" approach to the RLUIPA analysis, which entails "look[ing] at each distinct

room / facility within the multi-use building and determin[ing] if it is used exclusively for

secular purposes, or if it is used either exclusively for religious purposes or for both

religious and secular purposes."  Chabad Dist., 2016 WL 370696, at *6.  The impact of

that analysis is that rooms used at least in part for religious purposes are considered

when determining whether the denial imposed a substantial burden on the Chabad's

religious exercise.  Rooms or facilities proposed exclusively for secular use, on the

other hand, are not properly considered in determining whether the denial was

substantially burdensome.

The facts of this case further demonstrate why a segmented approach is superior

to a balancing approach.  Many RLUIPA cases involve an outright denial of any

construction or use on a property owned by a religious organization.  See, e.g., Fortress

Bible Church v. Feiner, 694 F.3d 208 (2d Cir. 2012); Bethel World Outreach Ministries v.

Montgomery County Council, 706 F.3d 548 (4th Cir. 2013); Guru Nanak Sikh Society of

Yuba City v. County of Sutter, 456 F.3d 978 (9th Cir. 2006).  When a zoning board or

historic district commission denies a religious group the right to build a place of worship

altogether, such a room-by-room analysis is unlikely to be helpful to the court's

decisionmaking.  See, e.g., Reaching Hearts Int'l, Inc. v. Prince George's Cnty., 584 F.

Supp. 2d 766 (D. Md. 2008) (finding a substantial burden where the plaintiff was limited

to building on only 0.7 of its 17-acre parcel, which was "insufficient to build the church

alone—much less any of the other structures that [the plaintiff]'s current congregation

requires" and distinguishing cases where "the plaintiff religious organizations . . . had existing facilities and sought to expand"), aff'd by 386 Fed. App'x 370 (4th Cir. 2010). Unlike those cases involving an outright ban on any construction or use of property, in this case both the Commission's decision and the Chabad's lawsuit challenging it hinge on how much the Chabad could build.  Under these circumstances, the substantial burden analysis necessarily hinges on the precise contours of the religious exercise at issue.

Although adjudicating RLUIPA claims requires the court to determine what is and what is not religious exercise, that inquiry extends only to the sincerity of religious beliefs, not to their validity.  See United States v. Ballard, 322 U.S. 78, 86–87 (1944); Int'l Church of Foursquare Gospel v. City of San Leandro, 673 F.3d 1059, 1069 (9th Cir. 2011) ("The district court's flat rejection of the Church's characterization of its core beliefs runs counter to the Supreme Court's admonition that while a court can arbiter the sincerity of an individual's religious beliefs, courts should not inquire into the truth or falsity of stated religious beliefs."); Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona, 138 F. Supp. 3d 352, 434 (S.D.N.Y. 2015) ("[I]t is the religious entity, and not the Village, that has the right to determine its religious exercise, and RLUIPA protection is 'not limited to beliefs which are shared by all of the members of a religious sect.'") (quoting Holt v. Hobbs, 135 S. Ct. 853, 863 (2015)).

In this case, the defendants stipulated to the religious purpose of most of the rooms or facilities in the Boe plans, such as the shul and the kosher kitchen.  With respect to the undisputedly religious facilities, however, the defendants argue that most if not all of those facilities could be smaller without substantially burdening the Chabad.

40

In addition, the defendants do dispute the religious use of three facilities: the swimming pool, the rabbi's residence, and the staff housing.  Finally, the defendants argue that, even if one or more of those facilities is intended for religious use, the Chabad has not shown that it is substantially burdened by the denial.

   C.   First Floor

As aforementioned, the first floor of the Boe plans contains a shul, or sanctuary, with seating for one-hundred and four congregants that can be converted to a meeting hall; a large kosher kitchen; a reception area; a rabbi's study; a coffee bar; restrooms; and closet space.

           1.        Shul

The defendants do not dispute that the shul is intended for religious use, and there can be little question that a sanctuary is religious.  See, e.g., Guru Nanak Sikh Society of Yuba City v. Cnty. of Sutter, 326 F. Supp. 2d at 1152–53 ("Preventing a church from building a worship site fundamentally inhibits its ability to practice its religion. . . . If [plaintiff] could not build a church, it could not exist." (quoting Cottonwood Christian Ctr. v. Cypress Redevelopment Agency, 218 F. Supp. 2d 1203, 1226 (C.D. Cal. 2002))).  Given that the shul is intended for religious services—clearly a religious use—the remaining question for the court is whether it would substantially burden the Chabad to have a smaller shul.  The court concludes that it would substantially burden the Chabad to have a smaller shul, for several reasons.

First, as described in the Findings of Fact, supra Section III(C)(3), for the three years preceding the 2007 application for a certificate of appropriateness, the Chabad had attendance of roughly one hundred people for its High Holiday services.  It is important for the Chabad's religious exercise to be able to accommodate the current

41

attendees for High Holidays to its permanent location in order to cultivate a community and grow its congregation.

Second, the Chabad intends to use the shul area as a meeting hall for meals, after services and on holidays.  These meals are both religious in their own right, and are also auxiliary to the Chabad's religious services.  In light of the court's finding that these meals are part of the Chabad's religious exercise, the court concludes that the Chabad would be substantially burdened if the shul space was not large enough to accommodate seating for meals.

Third, the Chabad attracts between ten and fifty congregants to its regular weekend services.  Although that many attendees do not require one hundred and four seats, the court accepts—to some degree—that, as Rabbi Eisenbach testified, like "the old movie, build and they will come."  Tr. 2 at 166.  This is not to say that, because the Chabad anticipates that a larger space would grow its congregation, therefore it is entitled to whatever shul space it requests.  See Vision Church v. Village of Long Grove, 368 F.3d 975, 999–1000 (7th Cir. 2006) (concluding that it was not a substantial burden to limit church with 120-person congregation to facility large enough for 800 people, despite church's anticipation of greater future growth).  However, even a modest view of the Chabad's prospects for growth suggests that a shul of the size proposed may well be needed in the relatively near future.  And it is undisputed that a shul the size of the Chabad's proposal is needed now for High Holidays.

In sum, in light of the Chabad's High Holiday attendance, multiple uses for the shul space, and demand for space to grow its congregation, the court concludes that

42

the Chabad would be substantially burdened by a smaller shul unable to accommodate one hundred congregants.

### 2.   Kosher Kitchen

Having concluded that the Chabad would be substantially burdened by a smaller shul, the court turns to the kosher kitchen.  As with the shul, the defendants do not argue that the kosher kitchen is not intended for religious use.  Food is important to the Jewish religion.  "[E]ating is a very big part of [the] Chabad services."  Tr. 2 at 162.  As described in more depth in the Findings of Fact, supra Section III(C)(3), the Chabad intends to use the proposed kosher kitchen for preparation of kosher meals and to teach classes on meal preparation consistent with Jewish law, as well as to facilitate its charitable (mitzvah) mission.  In light of these religious uses, the court concludes that the Chabad's religious exercise would be substantially burdened in the absence of a sizable kosher kitchen.

The defendants do not dispute the importance of a kosher kitchen inside the Chabad House.  To the extent that they challenge the size of the kitchen, the court concludes that the Chabad has proved by a preponderance of the evidence that a smaller kitchen would substantially burden its members' religious exercise.

However, it is worth addressing another contention that the defendants make: that the kosher kitchen could be located on the second floor of the building without substantially burdening the Chabad's religious exercise.  In essence, the defendants argue that the Chabad could eliminate the rabbi's residence, put the kosher kitchen upstairs, and fit everything into the conditionally-approved 6,000 square feet with no substantial burden.

Such an argument is cognizable in the substantial burden setting.  As the Second Circuit reasoned in Westchester Day III, if "a school could easily rearrange existing classrooms to meet its religious needs in the face of a rejected application to renovate," then "the denial would not substantially threaten the institution's religious exercise, and there would be no substantial burden, even though the school was refused the opportunity to expand its facilities."  504 F.3d 338, 349 (2d Cir. 2007).

Without addressing at this point the importance of locating the rabbi's residence and the staff housing inside the Chabad House, however, the court concludes that it would be a substantial burden on the religious exercise of the Chabad if the kosher kitchen were located upstairs.  Many followers of Chabad Lubavitch do not use elevators on the Sabbath, which extends from sundown on Friday to sundown on Saturday, and is the day when the Chabad hosts services and many of its meals.  See supra Section III(C)(3).  Although individual members of the Chabad community are no doubt capable of using stairs to access the kosher kitchen, the Litchfield area is home to the biggest senior community in the state of Connecticut, Heritage Village, and many of the Chabad congregants are seniors who are unable to use stairs.  Locating the kosher kitchen on the second floor would therefore preclude certain members of the current congregation from accessing the kitchen.

In addition to accessibility concerns, the Chabad attracts as many as one hundred congregants to High Holiday services, at which food and drink may be provided.  To require that the Chabad transport food and drink for a hundred or more congregants up- and down-stairs would substantially burden the Chabad's ability to carry out this important religious exercise, particularly when High Holidays overlap with

the Sabbath and members of the Chabad community are therefore forbidden from using elevators.

The court therefore concludes that it is not a feasible alternative for the Chabad to put a kosher kitchen on the second floor or, for that matter, on any floor aside from the first floor where the shul, which doubles as the meeting hall, is located.

### 3. Other First Floor Uses

As described above, the first floor also contains a rabbi's study, a reception area, a small coffee bar and gift shop, a lobby, restrooms, and a coat closet.

With respect to the rabbi's study, location on the first floor makes his study easily accessible to congregants for counseling and study. Having the study on the first floor makes the rabbi visible and accessible, particularly when congregants are in and out of the Chabad House for religious services, religious education, and other activities.

Several other facilities would make little sense located elsewhere in the building. The reception area, for example, must be located on the first floor for security reasons, as well as to serve the purpose of a reception area. The lobby, restrooms, and coat closet are auxiliary to the shul.

Finally, the coffee bar and gift shop is a small facility tucked in a corner between the kosher kitchen and the shul. It is so small, in fact, that the defendants did not dispute its religious purpose at trial.

The court therefore concludes that each of the facilities located on the first floor of the Boe plans either must be located on the first floor or, in the case of the coffee bar / gift shop, are so small in size as to have a negligible impact on the substantial burden analysis.

4.    Effect of the Conditional Denial on the First Floor Religious
Uses

The first floor proposed by the Boe plans is 4,941 square feet, while the

conditional denial would allow for a first floor of approximately 2,656 square feet.  The

court concluded above that the Chabad needs a shul that can seat at least one hundred

people, and accommodate meals for the Chabad community when used as a meeting

hall.  The court has further concluded that the Chabad needs an adjacent kosher

kitchen of substantially the size requested for its religious exercise.  The size and layout

of the first floor is largely driven by the shul, which must face east toward Jerusalem and

accommodate approximately one hundred people, and the kosher kitchen, which

facilitates a wide variety of the Chabad's religious practices.  Finally, among the other

uses depicted in the Boe plans—the reception area, the rabbi's study, the coffee bar,

coat closets, and restrooms—the court concludes that all the uses proposed are either

necessary for the Chabad's religious exercise or so minimal in size as to have little

impact on the overall size of the structure.  In light of these findings, the court concludes

that it would be substantially burdensome for the Chabad to be limited to a first floor of

the size permitted by the conditional denial.

The next question is whether the Chabad is entitled to the floor plan it proposed

in its 2007 application.  The only set of plans presented to the court which represent a

middle ground option, between the limits of the conditional denial and the Boe plans

presented by the Chabad, was a set of plans drafted by architect Wayne Garrick at the

request of the Commission.  Mr. Garrick testified that each floor in his plans occupied

about 3,800 square feet, which is essentially at the mid-point between the conditionally

approved addition and the Chabad's proposed addition.  The Garrick design is narrower

than the Boe plans, and complies with the Commission's condition that "the addition's roof and width should . . . be subordinate to the roof and width of the Deming house." However, in the Garrick plans, the kosher kitchen is located on the second floor.  As described at some length above, see supra Section IV(C)(4), the court is persuaded that such a design would substantially burden the religious exercise of the Chabad.  Thus, the Garrick plans are not a feasible alternative design, and the court need not reach the question of whether "appropriate relief" under RLUIPA could countenance choosing this compromise option.

Had the defendants raised the argument that, in denying the Chabad's application they acted pursuant to a compelling government interest, the court would turn to that argument at this point.  However, as noted above, the defendants did not pursue that line of argument.

Therefore, in the absence of an argument from the defendants that such substantial burden is imposed in furtherance of a compelling governmental interest, and narrowly tailored to achieve that interest, the court concludes that the Chabad is entitled to the first floor plan as proposed in the final Boe plan presented to the Commission for the December 17, 2007, meeting.

     D.    <u>Basement</u>

The basement level of the Boe plans is occupied with seven classrooms, a library, and a preschool area.  <u>See</u> <u>supra</u> Section III(C)(2).  The defendants have stipulated that the facilities in the basement are intended for religious use.  However, they argue that the number and size of classrooms is unnecessary, and the classrooms could fit in a smaller space.

Nothing in the record demonstrates why the Chabad proposed a structure with seven classrooms, as opposed to, say, four or eleven.  However, because the court has already concluded that the Chabad would be substantially burdened by a first floor smaller than the one delineated in the Boe plans, the court need not determine precisely how many classrooms are needed to prevent a substantial burden from being imposed on the Chabad's religious exercise.  Furthermore, as described in more depth in Section III(C)(2), the Chabad has identified a variety of religious uses for the classrooms.  No secular use is planned.  Because the basement is devoted entirely to religious education, it is religious exercise.  The court therefore concludes that the Chabad is entitled to the basement level as delineated in the Boe plans.

     E.    <u>Sub-basement</u>

Beneath the basement level, the sub-basement contains a swimming pool, a mikvah (a ritual bath), restrooms associated with the mikvah, locker rooms associated with the swimming pool, and a mechanical room.

The defendants have stipulated that the mikvah is intended for religious exercise, and they do not dispute its size.  They do, however, vigorously argue that the swimming pool is not religious exercise.  The Chabad, on the other hand, argues that the pool serves at least two purposes:[13] (1) it would be beneficial to the Chabad's summer Gan Israel Camp, which brings families into the Chabad community; and (2) it would be an asset to the community of Litchfield in general, Jewish and otherwise, because Litchfield has no public pool, and this would help the Chabad build a positive relationship with the

_____

[13] Twice in the course of his testimony at trial Rabbi Eisenbach described the purpose of the swimming pool as "three-prong," but on both occasions described only two purposes.  <u>See</u> Tr. 2 at 174; Tr. 3 at 45–46.

local community.  The Chabad also argues that, because there is no public pool in

Litchfield, it spends thousands of dollars every summer busing campers to public pools

or renting private pools.

As noted in the Findings of Fact, Rabbi Katzkin testified that a pool would be an

asset for his own Chabad, in Dayton, Ohio, specifically for its Gan Israel Camp.

However, he also testified that, of the roughly fifty Chabads he had visited, he did not

recall any that had a pool inside.

The court concludes that the swimming pool is not a form of religious exercise for

the Chabad.  Although Rabbi Eisenbach stated that the swimming pool was religious

exercise, his own testimony explaining that position contradicts that characterization.  In

testifying that "so many who will not go to a Hebrew School or shul have no issue

coming to a place where there's swimming, karate and tennis," Rabbi Eisenbach

illustrated the point that the pool serves as a secular attraction to draw children to

religious exercise, not as religious exercise in and of itself.  Tr. 3 at 95.  Neither Rabbi

Eisenbach nor any other witness attributed any symbolic or religious significance to a

swimming pool, as opposed to any other type of facility.[14]  Both Rabbi Eisenbach's and

Rabbi Klatzkin's testimony reflects that the importance of the swimming pool is actually

its nonreligious nature, because it appeals to families who are not attracted to the

religious elements of Chabad Lubavitch, such as services in the shul or High Holiday

celebrations.  While the pool may therefore help the Chabad attract people to its

building, it is not itself religious exercise.

---

[14] For clarity, the court emphasizes that this finding refers to the proposed swimming pool, as
distinct from the mikvah, a ritual bath that is clearly for religious use, which religious use is not challenged
by the defendants.

Having a swimming pool that assists the Chabad in community building and recruitment efforts is, to some extent, analogous to cases that have addressed commercial endeavors by religious organizations, and similarly found those endeavors to be non-religious.  For example, in California-Nevada Conference of the Methodist Church v. City and County of San Francisco, the district court held that efforts by the church to sell a property at market value were not religious exercise under RLUIPA.  74 F. Supp. 3d 1144, 1156 (C.D. Cal. 2014).  In so doing, the court recognized that the funds procured would be used "to further its religious activities," but "the nature of any subsequent use of those funds does not alter the fundamentally commercial and secular nature of the sale in the first instance."  Id.  Concluding otherwise would "cross the line between the government's protection of religious exercise into a preference for religion generally."  Id. at 1158; see also Greater Bible Way Temple of Jackson v. City of Jackson, 478 Mich. 373, 394 (2007) ("The fact that the apartment complex would be owned by a religious institution does not transform the building of an apartment complex into a 'religious exercise,' unless the term is to be deprived of all practical meaning. Something does not become a 'religious exercise' just because it is performed by a religious institution.").  Like the money procured in a commercial sale or financial investment, the proposed swimming pool may be a secular means to a religious end, but the ends do not render the means religious.

This is not to say that the Chabad would not benefit from a swimming pool. However, because its use is not religious practice or teaching, and has no other discernable religious significance, the benefit that the Chabad would enjoy is indistinguishable from that which a secular institution would enjoy.  See Westchester I,

50

386 F.3d at 189 (criticizing the logic of the district court which would give special protection to "secular education and accessory facilities" of religious organizations). The Chabad has therefore failed to carry its burden of showing that the swimming pool is religious exercise.

That being said, however, from a practical standpoint the court knows of no reason why the Chabad could not build their swimming pool.  The Boe plans place the pool entirely below grade.  This is not only beyond the purview of the Commission, see Tr. 1 at 97, but the record is devoid of evidence that this below-grade space is a suitable location for the proposed above-ground facilities.  The court is therefore of the view that, as far as the Commission regulations go, the Chabad may freely exercise in a below-grade pool, even if the exercise in question is not religious.

     F.   Rabbi's Residence

The parties also dispute the religious use of the rabbi's residence.  The defendants argue that the rabbi's residence is not proposed for religious use, but simply for the secular purpose of having a home and the convenience of being located within the Chabad House.  The Chabad argues that, in the Chabad Lubavitch tradition, the home is used for religious exercise.

Whether the rabbi's residence requested by the Chabad would be used for "religious exercise" is a close question.  On the one hand, the protective scope of RLUIPA would seem to be vastly expanded if personal residences were covered, particularly in a faith community like the Chabad where "every house is a Chabad House."  On the other hand, RLUIPA codified an extremely broad definition of religious exercise.  42 U.S.C. § 2000cc-5 ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.").

Congress even included a "Broad Construction" provision in RLUIPA, which states, "This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3. The court is also mindful of its limited role in adjudicating whether a practice is or is not "religious exercise." "[A] district court's flat rejection of the Church's characterization of its core beliefs runs counter to the Supreme Court's admonition that, while a court can arbiter the sincerity of an individual's religious beliefs, courts should not inquire into the truth or falsity of stated religious beliefs." Int'l Church of Foursquare Gospel, 673 F.3d at 1069; see also Congregation Rabbinical College of Tartikov, Inc., 138 F. Supp. 3d at 434 ("[I]t is the religious entity, and not the Village, that has the right to determine its religious exercise . . . .").

With this backdrop, the court cannot say that the rabbi's home will not be used, at least in part, for religious exercise. The court certainly does not dispute that practices like Shabbat dinner, daily prayer, and studying of the Torah are religious practices that Rabbi Eisenbach and his family engage in at home. While a very close question, the court concludes that the proposed rabbi's residence would be used, in part, for religious exercise.

However, the court is nevertheless unpersuaded that the residence must be located within the Chabad House. Although it would no doubt be a convenience for the rabbi's residence to be located at 85 West Street with the sanctuary, the Chabad has not proven that there is a close nexus between the proposed apartment and the Chabad's religious exercise such that having the rabbi's residence near the Chabad

House, as opposed to inside it, would substantially burden the Chabad's religious exercise.

Chabad Lubavitch does not require rabbis to have their homes inside their Chabad Houses, and it is in fact common for Chabad Houses not to include rabbi's residences.  See supra Section III(A).  Although Rabbi Eisenbach testified that having his family located inside the Chabad House was necessary for the religious exercise of the Chabad because it made him accessible to his parishioners "24/7," he also testified that he would continue to stay in Waterbury half the week even if his proposal for 85 West Street were approved.  Therefore, to the extent that it is burdensome not to be available "24/7" in the Litchfield Chabad House, that burden cannot fairly be attributed to the Commission's denial.

Arguably, the lack of a residence inside the Chabad House is most burdensome on the Sabbath, when the use of cars and telephones is not permitted, making physical presence at the Chabad House more important.  However, the court concludes that physically being present inside the Chabad House does not share a close nexus with the Chabad's religious exercise such that having the rabbi's residence a few blocks away would be substantially burdensome.  Significantly, Rabbi Eisenbach's response to the defendants' question about whether he could live two blocks away was focused entirely on the importance of the constant presence of the rabbi and his family for the Litchfield Chabad community.  As just described, that argument is severely undercut by the fact that Rabbi Eisenbach intends to continue living in Waterbury for half the week during the school year.

In addition to the argument that the rabbi must be physically present at all times for his congregation, the Chabad also argues that the rabbi's home must be inside the Chabad House to provide a model for congregants, to enable the rabbi and his family to share their meals with congregants, and to prevent the rabbi and his family from needing to walk back and forth to the Chabad House on the Sabbath.

With respect to the presence of the rabbi's family as a model for congregants, if the rabbi's residence were located within walking distance of the Chabad House, it would still be feasible for congregants to visit the residence and observe the rabbi's family in their home in connection with, for example, attending Sabbath services at the Chabad House.

With respect to sharing meals with members of the Chabad community, the Chabad has proposed a large kosher kitchen and a shul with the capacity to be used as a meeting hall for sharing meals on the Sabbath and on High Holidays, described at some length above.  See supra Sections III(C)(3), IV(C)(1)–(2).  The residence is not, therefore, the only place where Rabbi Eisenbach and his family could share a meal with congregants.  Furthermore, so long as the rabbi's residence is located within walking distance of 85 West Street, it will be no more than an inconvenience for congregants who are invited to a family meal at the rabbi's home to attend.

Finally, it is not a substantial burden for the rabbi and his family to walk a few blocks to the Chabad House on the Sabbath.  A similar argument was considered and rejected by the Eleventh Circuit in a RLUIPA case brought by Orthodox Jewish congregations in Florida:

> While walking may be burdensome and 'walking farther' may
> be even more so, we cannot say that walking a few extra

> blocks is 'substantial,' as the term is used in RLUIPA, and as suggested by the Supreme Court. . . .   In any given congregation, some members will necessarily walk father than others, and, inevitably, some congregants will have greater difficulty walking than others.   While we certainly sympathize with those congregants who endure Floridian heat and humidity to walk to services, the burden of walking a few extra blocks, made greater by Mother Nature's occasional incorrigibility, is not 'substantial' within the meaning of RLUIPA.

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004); see also Chabad App'l, 768 F.3d at 195–96 (citing Midrash Sephardi approvingly for this holding).  The court recognizes that it is theoretically possible that there are no properties available within walking distance of 85 West Street, or that the prices are prohibitive, or even that anti-Semitism could create barriers for an Orthodox Jewish rabbi and his family in the real estate market.[15]  However, even assuming that these conditions would amount to a substantial burden, there is no evidence on the record to support finding that these conditions exist.

Apart from the advantages of access to the congregation and convenience to the Rabbi and his family as described above, the Chabad has not put forward other reasons why the rabbi's residence must be located within the Chabad House.  Therefore, the court finds that the Chabad has not proven that it would be a substantial burden for the Rabbi and his family to live near, but not inside, the Chabad House.  Thus, the Chabad

---

[15] As analyzed with respect to the feasible alternatives factor, the record does contain evidence that few properties suitable for the Chabad House exist in the downtown Litchfield area, and that being located in the downtown area is important for the Chabad's religious exercise.  See infra Part III.G.  However, the record does not support a conclusion that the rabbi's residence similarly must be located in the small downtown area, or even that properties that would be appropriate for the rabbi's residence are not available.  In short, while the court concludes that it would be substantially burdensome for the Chabad House itself to be relegated to the outskirts of town, and that alternative properties were not readily available to the Chabad in the small downtown area, the same argument does not apply to a property that can serve as a rabbi's residence.

would not be substantially burdened by an addition that did not include a rabbi's residence.

      G.               <u>Staff Housing</u>

The attic level of the Boe plans contains a two-bedroom apartment labelled "staff residential level."  The record is sparse with respect to the intended religious use of the staff housing.  However, the court need not decide whether the staff housing is proposed for religious use because, in any event, the Chabad has not proved that the staff housing shares a close nexus with the proposed modification such that it must be located inside the 85 West Street property.  To the contrary, Rabbi Eisenbach's testimony suggests that it would be inappropriate to locate the staff housing in the Chabad House if his family were not living at 85 West Street.  <u>See</u> <u>supra</u> Section III(C)(5).  The court finds that the staff housing could be located at the rabbi's residence, and therefore the Chabad would not be substantially burdened by a Chabad House that did not include housing for staff.

That being said, like the swimming pool located in the sub-basement, the court is aware of no reason why the staff residence proposed in the Boe plans could not be included in revised plans.  In light of the court's conclusion that the Chabad would be substantially burdened absent an addition like that in the Boe plans except that it would not substantially burden the Chabad to remove the rabbi's residence on the second floor, the court is of the view that a residential level—as proposed in the Boe plans or modified to incorporate the second story of the original Deming House—would be consistent with the Commission's stated intent to reduce the overall mass of the addition, lower the roofline, and reduce the addition's impact on the streetscape.  In sum, while the court concludes that the staff residential level need not be included in the

Chabad House, the court is aware of no reason why the Chabad's proposed roofline could not "sit" on the first floor of the addition and thus why the Chabad should not build the attic level, either as proposed or modified to incorporate the second story of the Deming House.

H.    Reasonable Expectations

Having concluded that the Chabad was substantially burdened by the denial based primarily on the recognition that the first floor must be larger than the 2,641 square feet permitted by the denial, the question still remains whether the Commission is responsible for that burden.  If the Chabad reasonably should have known that their proposal would be denied and feasible alternatives were available, then the responsibility for the substantial burden lies with the Chabad.

With respect to the Chabad's reasonable expectations, the court has considered the totality of the circumstances surrounding the Chabad's purchase of 85 West Street and development of architectural plans for the property.  The most probative considerations are the size of buildings in the immediate area, including relative to lot size, and the Chabad's interactions with the Litchfield Planning and Zoning Commission.

The Julia Deming House at 85 West Street is located in the Business Historic district, on the South side of West Street on a block with the United Methodist Church of Litchfield, the Frontier Communications building, and the historic Baldwin House.  See supra Section III(F).  85 West Street is surrounded from behind by a school building and a parking lot.  Id.

The footprint of the structure proposed in the Boe plans is 4,941 square feet, which would make it the largest building on the south side of West Street on its block by

about 1,500 square feet.  That said, there are larger structures nearby, including the Center School with a footprint of 24,097 square feet and an interior of 54,593 square feet.  The Oliver Wolcott Library, located approximately half a mile east and south of the Chabad House, contains a large addition added to a historic, residential-style building. While the largest building on the Deming House's block (the Frontier Building) has a significantly larger lot size than 85 West Street, the United Methodist Church is a structure substantially larger than the Julia Deming House and sits on a parcel of land almost identical in size to that of 85 West Street.

Taking all these considerations into account, the court concludes that the area surrounding 85 West Street militates in favor of the Chabad having a reasonable belief that their addition would be approved.  Although many of the nearby buildings are smaller than the proposal, they are almost all larger than the existing Julia Deming House, and many of the larger structures sit on comparable lots.  Furthermore, the nearby Oliver Wolcott Library demonstrates that large additions have been added to buildings similar in size and historic character to the Julia Deming House.[16]  In short, the court finds that it would be reasonable for a landowner to draw conclusions about the likelihood of approval from the neighborhood.

In addition, before the Chabad approached the Commission, the staff of the Planning and Zoning Commission indicated to the Chabad that, under the Planning and Zoning regulations, the Chabad could build a structure up to five percent larger than the

---

[16] The court notes that the defendants repeatedly pointed out that the Commission did not exist at the time when the addition was added to the Oliver Wolcott Library.  However, the addition is relevant, no matter how it came to be, as a prominent example of a large addition on a historic structure. Furthermore, there is no evidence on the record or reason to believe that, at least when the Chabad purchased 85 West Street and began developing plans, the Chabad was aware that the Oliver Wolcott Library was not a perfect point of comparison because the Commission did not approve that addition.

structure proposed in the Boe plans.  See supra Section III(C).  Because the zoning process would address the size of the proposed addition, the Chabad reasonably believed that the Commission would not be focused on size, but would be concerned solely with aesthetic concerns, such as window shape and construction materials, that the Commission did discuss with the Chabad and which influenced modifications to the Chabad's proposal between each hearing.

The court therefore finds that the Chabad has proved by a preponderance of the evidence that it was reasonable to believe that it would be permitted to build the proposed addition.

I.    Feasible Alternatives

The court's conclusion that the Chabad acted on a reasonable belief of approval is directly relevant to the existence of feasible alternatives because, once a religious organization acts on a reasonable belief, alternatives that may have existed before time and money are invested in a given property become less "feasible."

In addition, the court concludes that viable alternative properties were not available.  The Chabad's options were limited by their size demands and the need to be located in the center of downtown Litchfield.  See supra Section III(B).  Rabbi Eisenbach and other members of the Chabad community looked for properties, but found only one other property that met the Chabad's needs.  When Rabbi Eisenbach made an offer on that property, it suddenly became unavailable.  The court therefore concludes that feasible alternative locations were not available for the Chabad House.

J.    Arbitrariness, Capriciousness, and Unlawfulness of Denial

At trial, the parties hotly contested whether the Decision was arbitrary, capricious, or unlawful.  The Chabad argues that the Commission's stated interest in

59

preserving the residential character of the immediate area surrounding 85 West Street was disingenuous because the area is zoned as "business historic," and is neither residential in fact nor residential in appearance. The Chabad also asserts that the Commission unlawfully considered interior uses of the proposed structure, which is explicitly barred as a consideration under Connecticut General Statutes § 7-147f(b). The Chabad further contends that the Decision imposed such restrictive conditions, specifically in limiting the Chabad to a footprint only twice the size of the original structure, that the size was arbitrary because the Commission must have known the Chabad could not fit their needs into a space that size.

The defendants counter that the Commission only considered the interior use of the space in an effort to comply with RLUIPA, and that the doubled floor plan was an effort to permit a sizeable addition without overwhelming the existing structure and altering the streetscape. In addition, the defendants contend that, by using the Cramer and Anderson building as an example, the Chabad itself suggested that the Commission settle on an addition equal in size to the original Deming house.

First, the court notes that the area immediately surrounding the Chabad is indeed zoned business historic and, although some of the buildings on the block appear residential, others do not and are not historic. The Chabad is surrounded by a Methodist church, the Frontier Communications building (built in the 1950's to look like a house), and a law firm in a historic house. See supra Section III(F). Nearby, there are two schools, a library comprised of an historic house with a large addition, and a town hall. Id. The Chabad is therefore correct in its argument that the area around 85 West Street is not purely, or even largely, residential in fact or in appearance.

However, the fact that the Deming House is one of the few buildings of its size, historic character, and residential appearance in the immediate area does not necessarily mean that the Commission was disingenuous in trying to preserve it.  The Commission acknowledged the changing character of the neighborhood in its Decision, describing the Deming House as one of two houses that serve as the "last vestiges of a residential neighborhood," the loss of either of which "would completely destroy the residential character which remains on this block."  Exh. 78 at 1856.  Furthermore, there is no evidence that the Commission's stated interest in preserving the residential character of the area has been inconsistently applied: it has not had an opportunity to do so because, to the extent that other buildings or modifications in the area have undermined the neighborhood's residential character, those modifications were made before the Commission came into existence.  This court does not think it is its role to tell a historic district that it is too late to preserve what little residential character is left of a city block.  Without more evidence to suggest that the Commission's stated interest in preserving the historic character of the area was pretextual, the court does not conclude that the Commission acted arbitrarily or capriciously in attempting to preserve what residential character remained in the area.

With respect to the argument that the Commission acted unlawfully in considering the interior arrangement of the structure, there can be little doubt that the Commission did consider interior use.  The Chabad submitted interior plans to the commissioners, which the commissioners reviewed in deciding the Chabad's application.  The Commission also made some attempt to understand how large an addition the Chabad needed for its religious exercise, specifically by asking Rabbi

Eisenbach how many congregants attended weekly and holiday services.  Although the state law prohibits consideration of interior space by the Commission, it is the view of this court that the Commission's consideration of interior use was not unlawful under the circumstances.  To the contrary, the court concludes that superseding federal law, namely RLUIPA, required the commissioners to consider interior use in order to determine whether the Chabad would be substantially burdened if its application were denied.  At trial, Mr. Hillman testified:

> As you know, the state statutes don't allow us to [consider interior use].  But however, as pointed out by our attorney and their attorneys, the RLUIPA law, the federal law, seems to supersede that.  So to a certain extent, yes, we had to.  I mean, obviously the Rabbi needs a sanctuary and, you know, multiple kitchens and office space and that type of thing.  So typically we're not allowed to.  But in this case we had to consider that, yes.

Tr. 1 at 96.  To the extent that the Commission considered interior use of the Chabad's application, it was in an effort to comply with federal law, as opposed to an arbitrary, capricious, or unlawful application of state law.[17]

The court recognizes that there were unique circumstances attendant to the Chabad's application.  The Commission encouraged public input and moved its public meetings to a larger location to accommodate an unusually high turn-out by the public.

---

[17] Indeed, to the extent that the Commission erred in its consideration of interior use, the court is of the view that that error was in failing to give enough consideration to interior use.  Although the Commission clearly considered interior use throughout the decision-making process, the HCD's ultimate conclusion seems to have been that, because the Connecticut Historic District statute is neutral with respect to religious affiliation, the Commission was not obligated to give special consideration to the Chabad.  See Exh. 78 at 1858 (concluding that "the Commission must treat the present application as it would treat any other religious applicant and, further, it must treat this Applicant as it would treat any secular applicant" and further that "there is no substantial burden if the Commission applies neutral laws and does so in a manner that is not arbitrary, capricious, or unlawful").  However, RLUIPA does create special considerations for decision-makers faced with religious land use questions that substantially burden religious exercise.  More consideration of the interior use and requirements of the Chabad may have allowed the Commission to avoid substantially burdening the Chabad's religious exercise.

It also issued its longest written decision to date when it denied the Chabad's application. It further worked more closely with its attorney, Attorney Stedronsky, than it had for any application before or since.[18]

These circumstances, however, are not necessarily indicative of arbitrary, capricious, or unlawful behavior on the part of the Commission. The Chabad's application was unusual for reasons separate from the religious nature of its proposed use: it proposed the largest addition the Commission had ever contemplated and raised issues of federal and constitutional law that the Commission had never before, or since, encountered. The Seventh Circuit Court of Appeals addressed an analogous situation in Vision Church v. Village of Long Grove. 468 F.3d 975 (7th Cir. 2006). The plaintiff in Vision Church argued that it was substantially burdened by a land use regulation that was passed in temporal proximity to its application for a special use permit and limited the size of places of assembly to 55,000 square feet. The Seventh Circuit concluded:

> Even if Vision was targeted by the Assembly Ordinance, this does not mean that it was targeted because of religion: The Plan Commission was concerned about the size of the church complex and its effect on the character of the Village, concerns separate and independent from the religious affiliation (or lack thereof) of the institution seeking to build on the land.

Id. at 999. Similarly, the Commission faced a proposal larger than any it had received and four times the size of the original structure, as well as roughly thirty percent larger than the next largest building on its block. Under those circumstances, the court

---

[18] In addition, then-chair of the Commission, Wendy Kuhne, recused herself from the proceedings at some point before the Commission voted to deny the Chabad's application. However, there is no evidence on the record as to why Kuhne recused herself, or whether that recusal had other effects on the proceedings. The court therefore cannot infer from that recusal that Kuhne exhibited discriminatory animus against the Chabad. In the absence of more evidence on the subject, the court therefore has not weighed Kuhne's recusal in reaching its findings.

declines to infer that the unusual characteristics of the review reflect arbitrariness or caprice.

With respect to the conditions in the denial, however, the court concludes that the size upon which the Commission settled—an addition equal in footprint to the existing structure—was arbitrary.  The Commission had no reasoned basis to settle on that condition as opposed to an addition half the size of the Deming house, or two times as big or, for that matter, as big as the Oliver Wolcott Library, which Attorney Herbst also referenced in his comments.  See supra Section III(F).  The commissioners justified the choice of the Cramer and Anderson building's proportions by suggesting or, in the case of one commissioner, outright testifying that Attorney Herbst had requested an addition equal in size to the original structure.  See supra Section III(E).  However, the record of Herbst's testimony shows clearly that Attorney Herbst's reference to the Cramer and Anderson building was simply one of several examples of large additions on nonreligious buildings.  The suggestion by the commissioners that Attorney Herbst asked for an addition of the Cramer and Anderson proportions blatantly misstates Attorney Herbst's argument to the Commission.

Admittedly, there are a few other reasons the testifying commissioners cited for the choice of the Cramer and Anderson proportions.  As Ms. Acerbi testified, the Cramer and Anderson addition "didn't overpower" the original structure, while still amounting to a sizeable addition.  Tr. 1 at 162; see also Tr. 2 at 115 (testimony of Mr. Montebello that the stated conditions were the Commission's attempt to permit a large addition while also trying to "maintain the historic substance of that house and not lose its character").  Mr. Hillman testified that the Commission generally follows the

64

standards of the Secretary of the Interior (although the Commission is not bound by them), and those standards state that additions should "not take away from the historic character, not be incongruous and should be smaller, in general, than the original historical structure it is attached to."  Id. at 128.[19]

Taking the record as a whole, however, the court concludes the conditions were arbitrary.  The process by which the commissioners came to their conclusion further supports this conclusion.  The commissioners did not credit Rabbi Eisenbach's assertions that the proposed addition represented the minimum structure necessary and did not otherwise educate themselves about the needs of the Chabad to reject that assertion.  Nothing in the record suggests that the Commission did more to understand the Chabad's religious needs than to ask a few questions at a hearing.  For example, there is no evidence that the Commission made written requests for information about the Chabad's religious needs, solicited information from followers of Chabad Lubavitch more generally, or even informed the Chabad that, if it could not provide more support for the space required, its application would be denied.[20]

The Commission's lack of standards and arbitrary choice of the Cramer and Anderson proportions could mask an improperly motivated decision to deny the Chabad's application on the basis of religion.  It is possible, for example, that the

---

[19] That the Commission "[g]enerally follows" the Secretary of the Interior standards is, of course, an excellent example of the "essentially standardless discretion" exercised by the Commission.  Chabad App'l, 768 F.3d at 193 (quoting Sts. Constantine & Helen, 396 F.3d at 1225).

[20] The court recognizes that there may be situations in which it is appropriate to ignore the needs of a religious organization because the countervailing governmental interest is so important.  RLUIPA accounts for those situations by making available the affirmative defense that a government entity acted "in furtherance of a compelling governmental interest" and chose "the least restrictive means of furthering that compelling governmental interest."  See 42 U.S.C. § 2000cc(a)(1).  In this case, however, the Commission did not assert that defense at trial.

commissioners' ignorance of Chabad Lubavitch, and their disregard for the averments of Rabbi Eisenbach, "reflect[s] bias or discrimination against religion," Westchester Day School III, 504 F.3d at 350, or that the Commission's stated interest in preserving the residential character of the neighborhood was a pretext for discrimination.  Although the record does not support finding discriminatory intent by a preponderance of the evidence, that is not the standard: the very purpose of the substantial burden provision is to "combat[ ] subtle forms of discrimination by land use authorities" applying a "case-by-case evaluation" which "may permit (and conceal) potentially discriminatory denials." Chabad App'l, 768 F.3d at 193 (internal quotations omitted) (emphasis added).  The court concludes that the Commission acted arbitrarily in exercising standardless discretion to choose conditions that fell far short of accommodating the Chabad's religious exercise.

Even if this court is mistaken in its view that the conditions were arbitrary, the Second Circuit has been clear that this factor is not dispositive.  While the arbitrary, capricious, or unlawful nature of the denial is relevant to the substantial burden analysis, the Court of Appeals has held that requiring the Chabad to prove that the decision was arbitrary, capricious, or unlawful would "be in tension with the plain language of RLUIPA's substantial burden provision, which in certain instances regulates 'burden[s] that] result[ ] from a rule of general applicability.'" Chabad App'l, 768 F.3d at 195.  To conclude otherwise would "render the substantial burden provision largely superfluous given RLUIPA's nondiscrimination and equal terms provisions, which regulate overtly discriminatory acts that are often characterized by arbitrary or unequal treatment of religious institutions."  Id.; accord Livingston Christian Schs. v. Genoa Charter

Township, 858 F.3d 996 (6th Cir. 2017) ("Finding a substantial burden due to evidence of discrimination would obviate the need for [the nondiscrimination provision]."); Bethel World Outreach Ministries v. Montgomery Cnty. Council, 706 F.3d 548, 557 (4th Cir. 2013) ("Requiring a religious institution to show that it has been targeted on the basis of religion in order to succeed on a substantial burden claim would render the nondiscrimination provision superfluous."); Guru Nanak, 326 F. Supp. 2d at 1153 ("RLUIPA's 'substantial burden' test does not require that plaintiff actually establish discrimination . . . .  It is sufficient that the [government]'s actions have had an actually inhibiting effect on plaintiff's ability to practice its religion . . . .").

The court notes that previous Second Circuit opinions have suggested that the application of RLUIPA in the face of substantial burden without arbitrariness, let alone discrimination, may run afoul of the Constitution if it invalidates a neutral application of a generally applicable law.  See Westchester Day III, 504 F.3d at 349–50 (noting that "the Supreme Court's free exercise jurisprudence signals caution in using effect alone to determine substantial burden" because "an effect focused analysis may run up against the reality that '[t]he freedom asserted by [some may] bring them into collision with [the] rights asserted by' others") (quoting Braunfeld v. Brown, 366 U.S. 599, 604 (1961)); id. at 351 ("The same reasoning that precludes a religious organization from demonstrating substantial burden in the neutral application of legitimate land use restrictions may, in fact, support a substantial burden claim where land use restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully.") (emphasis added); Fortress Bible Church, 694 F.3d at 219 ("Our conclusion that the Church was substantially

burdened is bolstered by the arbitrary, capricious, and discriminatory nature of the Town's actions, taken in bad faith.").

This concern reflects the fact that the Supreme Court's First Amendment precedent states that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); see also City of Boerne v. Flores, 521 U.S. 507, 537 (1997) (Stevens, J., concurring) (opining that RFRA violates the First Amendment because, "[i]f the historic landmark on the hill in Boerne happened to be a museum or an art gallery owned by an atheist, it would not be eligible for an exemption from the city ordinances that forbid an enlargement of the structure" and RFRA therefore "provided the Church with a legal weapon that no atheist or agnostic can obtain"). Congress' power to regulate individualized land use decisions is drawn from Section 5 of the Fourteenth Amendment. Under Section 5, Congress may only "enforce" the provisions of the Fourteenth Amendment; it may not "make a substantive change in the governing law." City of Boerne, 521 U.S. at 519 (majority opinion).

Therefore, to the extent that Supreme Court precedent insulates neutral applications of generally applicable law from enforcement of the Free Exercise Clause, RLUIPA's substantial burden provision would seem to be incongruent with that precedent, at least where there is no evidence of discriminatory intent on the part of the Commission. On the other hand, in enacting RLUIPA, Congress "compiled massive evidence" that "land-use laws are commonly enacted and enforced out of hostility to religion." Murphy v. Zoning Com'n of Town of New Milford, 289 F. Supp. 2d 87, 118

68

(D. Conn. 2003), vacated on other grounds, 402 F.3d 342 (2d Cir. 2005).  Furthermore, in Free Exercise jurisprudence, the Court has distinguished between "individualized government assessment" and "an across-the-board criminal prohibition" in such a way that suggests that individualized assessments are distinct from "generally applicable laws," despite the fact that such individualized assessments may be made of all applicants.  Emp't Div. v. Smith, 494 U.S. 872, 884 (1990).  Here, of course, the Commission's denial was issued pursuant to an individualized assessment, not an "across-the-board criminal prohibition."  See supra Section IV; see also Chabad App'l, 768 F.3d at 192–93, and that assessment was loosely based on a national standard that the Commission sometimes follows.  In sum, although the court recognizes that finding a RLUIPA violation on the basis of "effect alone" raises the specter of unconstitutionally privileging religion over nonreligion, given "the vulnerability of religious institutions . . . to subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards," Congress has authority to protect religious institutions pursuant to Section 5.  Sts. Constantine & Helen, 396 F.3d at 900.  And, of course, this court is bound by the Second Circuit's explicit holding that "generally applicable land use regulations" may impose a substantial burden even if not "arbitrarily and capriciously imposed."  Chabad App'l, 768 F.3d at 195.

The court's conclusion here is that the Commission did act arbitrarily in denying the Chabad's application pursuant to a land use regime giving the Commission "essentially standardless discretion."  Chabad App'l, 768 F.3d at 193 (quoting Sts. Constantine & Helen, 396 F.3d at 900).  Although this conclusion is not necessary to

find a substantial burden, the arbitrariness of the decision reinforces the court's conclusion that the Chabad was burdened by the denial because the approved footprint placed a substantial burden on the Chabad's religious exercise with respect to the first floor facilities.  See supra Section IV(C).

## V.   CONCLUSION

For the foregoing reasons, the Chabad's prayer for relief is hereby **granted in part**.

RLUIPA provides that, upon finding a violation of RLUIPA, a court may issue "appropriate relief" against a government.  42 U.S.C. § 2000cc-2(a).  It is well settled that injunctive relief is "appropriate relief" pursuant to this provision.  See Sossamon v. Texas, 563 U.S. 277, 287 (2011) (holding injunctive relief "appropriate" under RLUIPA); see also Westchester Day III, 504 F.3d at 357 (upholding district court's injunctive remedy as appropriate under RLUIPA).

Therefore, the court issues a mandatory injunction ORDERING the Historic District Commission of the Borough of Litchfield (the "Commission") to approve forthwith an application of the Chabad Lubavitch of Litchfield County (the "Chabad") for a certificate of appropriateness based on the court's conclusion that the denial substantially burdened the Chabad's religious exercise without a compelling governmental interest exercised in the least restrictive means, in violation of the

Religious Land Use and Institutionalized Persons Act, title 42, section 2000cc et seq, of the United States Code, within the following parameters:[21]

First, the conditions in the Commission's Decision that do not relate to the size of the addition are still in effect, because those conditions were not challenged by the Chabad.  See supra p. 22 & note 7.

Second, given the needs of the Chabad with respect to the proposed religious uses of the first and basement floors of the proposed structure, the Chabad is entitled to a first floor and basement level as proposed in the Boe plans.

Third, because the Chabad's religious exercise will not be substantially burdened if the rabbi's residence is not inside the Chabad House, the application should be modified to remove what is currently the second story of the Boe plans.

The Chabad is hereby ordered to submit an amended application consistent with these conditions, or a modified application if agreed to by the parties without the approval of the court, within thirty days of the date of this Ruling.  Upon receipt of said application, the Commission is ordered to approve said application within thirty days.

This mandatory injunction is subject to the continued jurisdiction of this court.

---

[21] The court notes that, because the sub-basement is located entirely below-grade and is therefore beyond the purview of the Commission, the court knows of no reason why the Commission would have the authority, much less the reason, to deny the Chabad the ability to construct the sub-basement level as proposed.  In addition, given that removal of the rabbi's residence level from the application will significantly decrease the mass and roofline of the addition, the court is of the view that the staff residential level, either as proposed or with modifications to incorporate / connect it to the second story of the original Deming House, will not conflict with the Commission's stated goals of protecting the residential character of the area and not overwhelming the original structure

**SO ORDERED.**

Dated at New Haven, Connecticut this 1st day of November, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge